# EXHIBIT A
## Part 1

KCSC #21-2-02856-6, Sub #1-6

**FILED**
2021 MAR 02 04:27 PM
KING COUNTY
SUPERIOR COURT CLERK
E-FILED
CASE #: 21-2-02856-6 SEA

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR THE COUNTY OF KING

| | |
|---|---|
| PARLER LLC,<br><br>                              Plaintiff,<br><br>vs.<br><br>AMAZON WEB SERVICES, INC., and<br>AMAZON.COM, INC.,<br><br>                              Defendants. | Case No. _____<br><br>COMPLAINT<br><br>(JURY TRIAL REQUESTED) |

## NATURE OF ACTION

1.     Defendants Amazon.com, Inc. (Amazon) and its subsidiary Amazon Web Services, Inc. (AWS) are commercial Goliaths. Amazon is the fourth most valuable company in the world with a worth of nearly $1.7 trillion, about the annual GDP of Russia. Amazon is also the largest of the Big Five "Big Tech" companies in the United States and has the fourth largest share of the global internet advertising market. And Amazon Web Services, Inc. (AWS) is the world's leading cloud service provider, capturing nearly a third of the global market. *See* Felix Richter, *Amazon Leads $130-Billion Cloud Market*, STATISTA (Feb. 4, 2021), https://www.statista.com/chart/18819/worldwide-market-share-of-leading-cloud-infrastructure-service-providers/. AWS generates tens of billions of dollars in revenue annually for Amazon. *Id.*

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

And, when companies are this big, it's easy to be a bully. Many start-up companies that have appeared to be a threat to Amazon and AWS have felt their wrath. Plaintiff Parler LLC is merely the latest casualty—a victim of Amazon's efforts to destroy an up-and-coming technology company through deceptive, defamatory, anticompetitive, and bad faith conduct.

2.      Before the actions complained of here, Plaintiff Parler LLC had one of the hottest rising apps on the internet. A young start-up company that sought to disrupt the digital advertising and microblogging markets with a unique approach, Parler positioned itself as an alternative to the likes of Twitter or Facebook. To do so, Parler did *not* employ what some have called "surveillance capitalism": Unlike its social-media competitors, Parler refused to track and sell its users' private data and target advertising based on that data. This made Parler a beacon to those who sought a free and safe place to espouse political and other views that other microblogging and social media platforms sought to censor. And it allowed Parler to offer lower rates to digital advertisers.

3.      But this rising popularity and alternative business model also made Parler a competitive threat to the likes of Amazon, Twitter, Facebook, and Google—four giants of the internet who derive enormous revenue from digital advertising. And that threat grew very real in late 2020 and early 2021 when Parler was poised to explode in growth. So together, Amazon, AWS, and others attempted to kill Parler. *See* Glenn Greenwald, *How Silicon Valley, in a Show of Monopolistic Force, Destroyed Parler*, SUBSTACK (Jan. 12, 2021), https://greenwald.substack.com/p/how-silicon-valley-in-a-show-of-monopolistic.

4.      On January 9, 2021, AWS repudiated and breached its contract to host Parler's website and app on AWS's cloud services, in bad faith. AWS tried to justify the repudiation based on allegations against Parler that AWS knew were false. AWS then leaked the same false allegations to the media, in a successful effort to tarnish and defame Parler's business.

5.      These strongarm tactics were unlawful and tortious. They were also surprising to Parler: It had a good relationship with AWS with no signs of trouble until about a day before AWS

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

terminated Parler's services. The reason AWS gave for terminating Parler's services—that Parler ostensibly was not pursuing appropriate methods to control the content espousing violence on its platform—was untrue.  Indeed, Parler stood in sharp contrast to the likes of Twitter, Facebook, and even Amazon itself, all of whom host substantial amounts of violence-inciting content.

6.     Further, there was nothing new about the operation and content of Parler's platform the day AWS announced it would be terminating Parler's services (in roughly 24 hours) compared to anytime in the two years AWS had been hosting Parler. Then, as before, Parler quickly removed any arguably inappropriate content brought to its attention. And never during those two years before that fateful day had AWS expressed any major concerns with Parler regarding the matter. In fact, just two days before the termination announcement, AWS had assured Paler that it was "okay" as to problematic content. Parler relied on this representation and similar representations from AWS, to the detriment of its own business.

7.     Finally, from the beginning of their contractual relationship, AWS had known that Parler used a reactive system to deal with problematic content—and not once had AWS said that such a system was insufficient or in violation of the parties' contract. What is more, AWS knew that Parler was testing out a new *proactive* system that would catch problematic content before it was even posted.

8.     But two things had changed for AWS. First, a few weeks before terminating Parler's services, AWS had signed a major new contract with Parler's principal competitor, Twitter. Second, when Facebook and Twitter moved to ban former President Trump from their platforms in early January, it was expected that Trump would move to Parler, bringing many of his 90 million followers with him. And AWS knew that Trump and Parler had been in negotiations over such a move. If this were to materialize, Parler would suddenly be a huge threat to Twitter in the microblogging market, and to Amazon itself in the digital advertising market.

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

9.      Thus, AWS pulled Parler's plug. And to further kick Parler while it was down, *after* it had terminated the contract, AWS directed hackers to Parler's back-up databases and has been secretly selling Parler user data to anyone with a certain type of Amazon account.

10.     Because of these actions, Parler was unable to be online for over a month. And even as of the date of this complaint, Parler has been unable to regain the reputation and success it enjoyed before AWS terminated its services.  Not surprisingly, when an internet-based company cannot get on the internet, the damage is extraordinary. And when confidential user data is hacked or sold to others, the company suffers enormous reputational damage.

11.     Just before all this occurred, Parler was about to seek funding and was valued at one billion dollars—something AWS also knew. As a result of the unlawful actions of Amazon and AWS, Parler has permanently lost tens of millions of current and prospective future users— many of whom have migrated to other platforms—and hundreds of millions of dollars in annual advertising revenue.  Parler therefore brings this suit for multiple violations of Washington's contract, tort, unfair-competition, and consumer protection laws.

## II.      PARTIES, JURISDICTION, AND VENUE

### A.  Parties

12.     Parler is "the solution to problems that have surfaced in recent years due to changes in Big Tech policy influenced by various special-interest groups." *Our Company*, PARLER.COM (Feb. 15, 2021, 5:45 AM), https://company.parler.com. Thus, "Parler is built upon a foundation of respect for privacy and personal data, free speech, free markets, and ethical, transparent corporate policy." *Id*.

13.     On information and belief, Amazon.com, Inc., is a corporation incorporated in Delaware and has a principal place of business in Seattle, Washington. On information and belief, Amazon.com, Inc., is the ultimate parent company of the other companies that make up "Amazon," including AWS. Amazon is considered to be the world's most valuable brand. *See Accelerated*

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

*Growth Sees Amazon Crowned 2019's BrandZ™ Top 100 Most Valuable Global Brand*, PR NEWSWIRE (June 11, 2019), https://www.prnewswire.com/news-releases/accelerated-growth-sees-amazon-crowned-2019s-brandz-top-100-most-valuable-global-brand-300863486.html.

14.     On information and belief, Amazon Web Services, Inc., is a corporation incorporated in Delaware and has a principal place of business in Seattle, Washington. According to its own press release, "[f]or 14 years, [AWS] has been the world's most comprehensive and broadly adopted cloud platform." *Twitter Selects AWS as Strategic Provider to Serve Timelines*, Press Center, ABOUT AMAZON, (Dec. 15, 2020), https://press.aboutamazon.com/news-releases/news-release-details/twitter-selects-aws-strategic-provider-serve-timelines. That is why "[m]illions of customers—including the fastest-growing startups, largest enterprises, and leading government agencies—trust AWS to power their infrastructure, become more agile, and lower costs." *Id.* In short, AWS is the Cadillac of cloud platform providers. And "[t]he incident [of AWS terminating Parler's service] demonstrates the type of power that Amazon wields *almost uniquely* because so many companies rely on it to deliver computing and data storage." Jordan Novet, *Parler's de-platforming shows the exceptional power of cloud providers like Amazon*, CNBC (Jan. 16, 2021), https://www.cnbc.com/2021/01/16/how-parler-deplatforming-shows-power-of-cloud-providers.html.

### B.   Jurisdiction & Venue

15.     The Superior Court of the State of Washington in and for the County of King has jurisdiction over this dispute.  AWS resides and conducts business in King County, Washington. AWS has therefore submitted to this Court's jurisdiction, and venue is proper pursuant to RCW 4.12.020(3).

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

### III.   FACTS

#### A.   The Parler Platform

16.      Parler's platform is not like Amazon's, Twitter's or Facebook's platforms. Twitter and Facebook gather data on their users and sell it.[1] These tech giants also employ targeted advertising by leveraging user data, something they can charge advertisers more for. *See* Stigler Center for the Study of the Economy and the State, The University of Chicago Booth School of Business, Stigler Committee on Digital Platforms: Final Report (2019) 8, https://www.chicagobooth.edu/research/stigler/news-and-media/committee-on-digital-platforms-final-report, ("[Digital Platforms, such as Facebook, Twitter, Google, and Amazon,] can increase the prices paid by advertisers, many of them small businesses, diverting more and more income to platforms."). Further, Twitter and Facebook use Artificial Intelligence (AI) to direct users to other like-minded users. Similarly, users can form groups on Facebook and Twitter that make it easier to communicate with those who see the world the same. This enables these social media platforms to use targeted advertising, something they can charge more for. But these features also create echo chambers and make it easy to encourage and facilitate group activity. *See* Murtaza Hussain, *How to Understand the Rage Economy,* THE INTERCEPT (Feb. 13, 2021, 6:00 AM), https://theintercept.com/2021/02/13/news-rage-economy-postjournalism-andrey-mir/, ("Facebook's algorithmically generated news feeds meanwhile have the lucrative advantage of always knowing exactly what people want to hear and driving their engagement accordingly, something that is only now bringing the company under regulatory threat for fostering extremism."). And that is by design.

17.      By design, Parler is different. For example, how one experiences Parler is a function of one's individual choices, not driven by AI. So Parler does not encourage its users to see and

---

[1] *See, e.g.,* Dina Srinivasan, "The Antitrust Case Against Facebook: A Monopolist's Journey Towards Pervasive Surveillance in Spite of Consumers' Preference for Privacy," 16 *Berkeley Business Law Journal* 39 (2019).

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

interact with like-minded folks. Similarly, there is no way to organize into groups on Parler, making the coordination of group activity very difficult. And Parler does not gather data on its users and sell it. In other words, Parler does not use surveillance of its users to make money. As Parler tells its users: "We never share or sell data. Privacy is our #1 concern. Your personal data is YOURS." And Parler does not engage in targeted advertising, meaning it can charge less to advertisers. This makes Parler a threat to the surveillance capitalism of Amazon, Twitter, Google, and Facebook by potentially luring away advertisers and users interested in greater privacy. *See* Casey B. Mulligan, *Parler Competes Horizontally with Amazon, Apple, and Google?*, Supply and Demand (In that Order), CASEYMULLIGAN.BLOGSPOT.COM (Jan. 13, 2021, 8:47 AM), http://caseymulligan.blogspot.com/2021/01/parler-competes-horizontally-with.html ("If too many internet users hear and buy into this rhetoric, the incumbent harvesters of personal data—including especially Amazon, Apple, Google, Twitter, and Facebook—will pay more (perhaps in kind) and profit less. From this perspective, AWS' action [of terminating Parler's services] looks like McDonald's severing the electric lines going into Subway [sandwich] locations at a time when Subway was just gaining traction.").

18.     As to how Parler works, a post on Parler, called a "parley" (and equivalent to a "tweet" on Twitter) is content that can be shared with others. Likewise, an "echo" with comment can also be shared with others—it is the equivalent to a retweet with comment. Both a parley and an echo with comment will go out to a person's followers. However, on Parler one cannot share a comment to a parley with others. This is unlike Twitter, for instance, where one can share a comment on a tweet by retweeting it.

19.     Further, to directly message someone requires that one be verified by Parler, unlike on Twitter or Facebook. Thus, on Parler a user must upload a selfie and their identification, generally a driver's license, to be a verified user capable of directing a message to another Parler user. On Twitter, by contrast, anyone can send direct private messages.

COMPLAINT - 7

20.     Also, on Parler there is a difference between impressions and views. The latter is a very small percentage of the former. Thus, if one is following another individual on Parler and that other user posts a parley, that parley will show up in one's feed and be counted as an impression without the recipient ever actually looking at the parley. If one does then look at the parley, it will be counted as a view.

21.     Parler's internal data show that users are on Parler about 22-28 minutes a day, on average, spread over multiple sessions. Thus, when there are hundreds of comments on a parley, few people spend the time to read through all the comments.

22.     Given all of this, the only way for something posted on Parler to get a lot of attention, and thus possibly have influence, is if it is posted by someone with a lot of followers.

23.     Since its inception, Parler has carefully policed any content on its platform that incited violence. It has had in place community standards that expressly disallow users from posting such content. And as soon as such content is brought to Parler's attention, a team assesses the flagged content and votes to remove it if it indeed does incite violence.

### B.   Amazon, Twitter & Facebook Allow Content Promoting Violence

24.     Many social media platforms have increasingly struggled with their inability to completely block content that promotes violence, but especially Twitter, Amazon, and Facebook.

25.     For example, on January 8, 2021, the day before AWS announced it was terminating Parler's service, one of the top trends on Twitter was "Hang Mike Pence," with over 14,000 tweets. *See* Peter Aitken, *'Hang Mike Pence' Trends on Twitter After Platform Suspends Trump for Risk of 'Incitement of Violence'*, FOX NEWS (Jan. 9, 2021), https://www.foxnews.com/politics/twitter-trending-hang-mike-pence. And earlier that week, a Los Angeles Times columnist observed that Twitter and other large social media platforms bore some responsibility for the Capitol Hill riot by allowing rioters to communicate and rile each other up. *See* Erika D. Smith, *How Twitter, Facebook are Partly Culpable for Trump DC Riot*, Los

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

ANGELES TIMES (Jan. 6, 2021, updated Jan. 7, 2021, 8:48 AM), https://www.latimes.com/california/story/2021-01-06/how-twitter-facebook-partly-culpable-trump-dc-riot-capitol.  As previously noted, such coordination would not have been possible on Parler.

26.    Violence-inciting material has also continued to circulate on Twitter after AWS pulled Parler's plug, with such posts receiving wide play. For instance, noted critic of President Trump, Alec Baldwin, tweeted recently that he had had a dream that the ex-president was on trial for sedition and a noose awaited him outside the courthouse. *See* Andrew Mark Miller, *Alec Baldwin tweets about 'dream' of noose at Trump's 'trial for sedition' on MLK's birthday*, WASHINGTON EXAMINER (Jan. 17, 2021, 11:13 AM), https://www.washingtonexaminer.com/news/baldwin-trump-sedition-trial-noose-mlk. At the time a screenshot was taken for a news story, it had over 1,000 likes. On January 20, the daughter of the late Iranian general and terrorist Qasem Soleimani, who was killed in a U.S. missile strike ordered by President Trump, tweeted a threat that Trump will "live[] in fear of foes" indefinitely. A screenshot taken within 24 hours showed nearly five thousand likes and two thousand people tweeting about it. *See* Frances Martel, *Daughter of Iranian Terrorist Soleimani Tells Trump He Will "Live in Fear,"* BREITBART (Jan. 21, 2021), https://www.breitbart.com/middle-east/2021/01/21/daughter-iranian-terrorist-soleimani-tells-trump-he-will-live-fear/.    On January 21, a New York Times contributor tweeted that "If Biden really wanted unity, he'd lynch Mike Pence." *See* Joseph A. Wulfsohn & Samuel Chamberlain, *New York Times Contributor Loses Think Tank Job Over Tweet Suggesting Biden Should 'Lynch Mike Pence,'* FOX NEWS (Jan. 21, 2021), https://www.foxnews.com/media/will-wilkinson-lynch-mike-pence-niskanen-center-ny-times.

27.    This type of violent content on Twitter is not new. On election night in 2020, Kathy Griffin reposted on Twitter a picture of her holding a fake, bloodied head of then-President Trump.

LAW OFFICES
CALFO EAKES LLP
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

*See* Tyler McCarthy, *Kathy Griffin, Madonna and Robert De Niro Mentioned By Name During Trump's Second Impeachment Hearings,* Fox News (Jan. 14, 2021), https://www.foxnews.com/entertainment/kathy-griffin-madonna-robert-de-niro-name-trump-impeachment. The tweet received more than 58,000 likes in less than 48 hours, with Twitter only flagging the tweet as "potentially sensitive content." What is more, the hashtags #assassinatetrump and #killtrump have been allowed on Twitter since 2016. And the former CEO of Twitter tweeted that "Me-first capitalists who think you can separate society from business are going to be the first people lined up against the wall and shot in the revolution. I'll happily provide video commentary." Abram Brown, *Some Business Leaders Should Face a Firing Squad, Former Twitter CEO Dick Costolo Suggests In Angry Tweet,* Forbes (Oct. 1, 2020), https://www.forbes.com/sites/abrambrown/2020/10/01/some-business-leader-should-face-a-firing-squad-former-twitter-ceo-dick-costolo-suggests-in-angry-tweet/?sh=7c8af97b9486.

28.    Additionally, recently a lawsuit was filed against Twitter, alleging that it "refused to take down widely shared pornographic images and videos of a teenage sex trafficking victim because [its] investigation 'didn't find a violation' of the company's 'policies.'" After multiple complaints were filed with Twitter, and after the material had "racked up over 167,000 views and 2,223 retweets," Twitter responded that "[w]e've reviewed the content, and didn't find a violation of our policies, so no action will be taken at this time." It took a federal agent from the Department of Homeland Security to remove the material from Twitter. *See* Gabrielle Fonrouge, *Twitter Refused to Remove Child Porn Because It Didn't 'Violate Policies': Lawsuit,* New York Post (Jan. 21, 2021, 10:35 AM), https://nypost.com/2021/01/21/twitter-sued-for-allegedly-refusing-to-remove-child-porn/.

29.    Further, as is well documented, some groups "use[] Twitter to threaten or harass media members." Jason Rantz, *Here's how Antifa uses Twitter to threaten me and the media,* Fox News (Feb. 6, 2021), https://www.foxnews.com/opinion/antifa-twitter-media-jason-rantz. Yet

COMPLAINT - 10

these egregious violations of AWS's terms of service by Twitter have apparently been ignored by AWS. AWS has agreed to host Twitter on its cloud services at the same time as it has shut down Parler.

30.     Amazon itself also hosts significant amounts of content that incite violence, particularly on its own online store. For example, Amazon allowed people on its site to buy a t-shirt that states "Kill All Republicans," a listing that was even sponsored by Amazon. Or one could have bought on Amazon a t-shirt with a graphic image of former President Trump blowing his brains out. Likewise, Amazon long sold anti-Trump paraphernalia with the message, "Where is Lee Harvey Oswald now that we really need him?" As Newsweek has pointed out, the Neo-Nazi shirts worn by Proud Boys supporters are sold on Amazon. *See* Ewan Palmer, *Neo-Nazi Shirts Worn by Proud Boys Supporters Sold on Amazon,* NEWSWEEK (Dec. 12, 2020, 11:14 AM), https://www.newsweek.com/nazi-amazon-proud-boys-holocaust-1555192. At one time, Amazon allowed shoppers to purchase Auschwitz-themed towels, bottle openers, or Christmas ornaments. Similarly, Amazon shoppers could buy Nazi propaganda, such as an anti-Semitic children's book written by a member of the Nazi Party later executed for his crimes against humanity, or Hitler's *Mein Kampf*. In fact, so common is such material on Amazon that is has been condemned by The Council on American-Islamic Relations for selling white supremacist material. Amazon defended selling such materials based on concerns about censorship. *See* Ewan Palmer, *Auschwitz Musuem Calls Out Jeff Bezos, Amazon For Selling Nazi Propaganda,* NEWSWEEK (Feb. 2, 2021, 10:58 AM), https://www.newsweek.com/amazon-nazi-books-jeff-bezos-propoganda-1488467. And crime rings have used Amazon to sell stolen goods. *See* Kevin Krause, *North Texas Feds Say Crime Ring Traveled U.S. to Steal Retail Goods and Sell On Amazon*, THE DALLAS MORNING NEWS (Mar. 17, 2020, 11:32 AM), https://www.dallasnews.com/news/crime/2020/03/17/north-texas-feds-say-crime-ring-traveled-us-to-steal-retail-goods-and-sell-on-amazon/.

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

31.     The material being sold on Amazon that promotes violence is legion. And while Amazon sometimes pulls some of this material, it is still up for some time, often until someone outside of Amazon brings it to Amazon's attention, causing the Auschwitz Memorial Museum to comment that "it appears people are taking upon themselves the job that Amazon should be doing: 'verifying the products that are uploaded there.'" Nelson Oliveira, *Amazon called out for Auschwitz-themed towel, bottler* [sic] *opener, Christmas ornaments listed on website*, NEW YORK DAILY NEWS (Dec. 2, 2019, 5:08 PM), https://www.nydailynews.com/news/national/ny-auschwitz-merchandise-caught-on-amazon-website-20191202-2nvjbuxj7neo7oxapq6r7pedvq-story.html. Thus, for Amazon to accuse Parler of failing to police violence-inciting material is worse than the pot calling the kettle black. It is a transparent subterfuge.

32.     Nor is Facebook immune. It knew it had problems with violent content on forums for like-minded users called "Groups." *See* Jeff Horwitz, *Facebook knew calls for violence plagued 'Groups,' now plans overhaul*, THE WALL STREET JOURNAL (Jan. 31, 2021, 5:16 PM), https://www.wsj.com/articles/facebook-knew-calls-for-violence-plagued-groups-now-plans-overhaul-11612131374. Last August, Facebook data scientists warned the company's executives that "calls to violence were filling the *majority* of the platform's top 'civic' Groups." *Id.* (emphasis added). "Those Groups are generally dedicated to politics and related issues and collectively reach hundreds of millions of users." *Id.* For example, "'enthusiastic calls for violence every day' filled one 58,000-member Group." *Id.* And "[i]n the weeks after the election, many large Groups—including some named in the August presentation—questioned the results of the vote, organized protests about the results and helped precipitate the protests that preceded the Jan. 6 riot." *Id.*

33.     In fact, in a review of the charging documents of the 223 individuals under investigation by the Department of Justice for the January 6 riot, it was disclosed that 73 of those documents reference Facebook—"far more references than other social networks"—with Google-owned YouTube "the second most-referenced on 24," and "Instagram, a Facebook-owned

LAW OFFICES
CALFO EAKES LLP
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

company, was next on 20 [charging documents]." Thomas Brewster, *Sheryl Sandberg Downplayed Facebook's Role in the Capitol Hill Siege—Justice Department Files Tell a Very Different Story*, FORBES (Feb. 7, 2021), https://www.forbes.com/sites/thomasbrewster/2021/02/07/sheryl-sandberg-downplayed-facebooks-role-in-the-capitol-hill-siege-justice-department-files-tell-a-very-different-story/?sh=273624c710b3. The "data does strongly indicate Facebook was [the] rioters' . . . preferred platform." *Id*. And Facebook has known its content moderation efforts were "grossly inadequate" for some time. Chris O'Brien, *NYU study: Facebook's content moderation efforts are 'grossly inadequate'*, VENTURE BEAT (June 7, 2020, 9:01 PM), https://venturebeat.com/2020/06/07/nyu-study-facebooks-content-moderation-efforts-are-grossly-inadequate/.

34.     Facebook's abject failure to police such content was confirmed in a 2020 survey by the Anti-Defamation League, which discovered that of the people who had suffered online hate and harassment, 77 percent reported that at least some of their harassment occurred on Facebook, 27 percent reported experiencing harassment or hate on Twitter, 18 percent on Google-owned YouTube, and 17 percent on Facebook-owned Instagram. *See* ANTI-DEFAMATION LEAGUE, *Online Hate and Harassment: The American Experience 2020* 14 (2020), https://www.adl.org/media/14643/download. Parler was not listed in the survey results. Because of these findings, the Anti-Defamation League gave Facebook (including Instragram) a "D" grade for its policies and enforcement, Twitter a "C," and Google-owned YouTube a "C." *See* ANTI-DEFAMATION LEAGUE, *Online Holocaust Denial Report Card: An Investigation of Online Platforms' Policies and Enforcement*, https://www.adl.org/holocaust-denial-report-card.

35.     Given the problems with violent content on Amazon, Facebook, Google, Twitter, and other websites and apps, it is simply not accurate to suggest that Parler had or has a disproportionately large problem with such content. Nor can AWS's explanations for taking down

LAW OFFICES
CALFO EAKES LLP
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

Parler hold water. The stated reasons were pretextual, designed to conceal AWS's true motives for cancelling Parler, which were to crush an economic competitor of both itself and a major client.

### C.   The AWS-Parler Relationship Before January 8, 2021

36.     Parler contracted with AWS to provide the cloud computing services Parler needs for its apps and website to function on the internet. Further, both the apps and the website were written to work with AWS's technology. As of January 8, 2021, switching to a different service provider would require extensive work to migrate Parler's platform, meaning Parler would be offline for a financially devastating period. And AWS knew this.

37.     What is more, AWS sought this dependent relationship. It did so in part by repeatedly trying to sell Parler more services that would magnify Parler's dependency on AWS, making it hard to ever leave for another cloud service provider. In industry parlance, this is called "vendor lock."

38.     From the very beginning of the contractual relationship between AWS and Parler, AWS knew about Parler's reactive methods for culling problematic content, as well as Parler's community guidelines. Not once before January 9, 2021, did AWS express any concern that Parler's policies and methods violated either the AWS Acceptable Use Policy or the AWS Customer Agreement. To the contrary, AWS actively led Parler to believe that AWS considered Parler's policies and methods appropriate and consistent with AWS's Customer Agreement.

39.     Up until January 8, 2021, moreover, the relationship between Parler and AWS was a good one, with every indication it would continue into 2021 and beyond. For example, in September 2020, AWS sent Parler an email offering to finance Parler as part of AWS's funding program for startups with high potential. On November 10, 2020, at AWS's invitation, Parler's CEO met with AWS representatives to explore the possibility of Parler's long-term engagement using AWS systems—more "vendor lock"—including a move to Amazon's proprietary database.

COMPLAINT - 14

This would require a great deal of investment and trust on Parler's behalf as it would have to specifically design portions of its software to work only with Amazon-specific products.

40.     At that time, AWS knew there was a possibility that then-President Trump might obtain a Parler account, likely bringing with him a surge of followers to the Parler platform. What is more, around that time Parler had informed AWS that Parler's initial tests using AI to pre-screen inappropriate content, including material that encouraged or incited violence, were returning promising results.

41.     In mid-December 2020, an AWS representative spoke with Parler representatives seeking to sell additionally proprietary AWS services on which Parler might rely for its core functionality. All these offers were done with full knowledge of Parler's existing system for dealing with problematic content, something every social media platform has to deal with.

42.     Also, AWS admitted to Parler in an email on December 16, 2020, from an AWS Technical Account Manager to Parler's Chief Technical Officer, that the AWS manager "used to receive more than a dozen report [sic] per day for another customer" and that "Twitter is moving their timeline workload into AWS[,] which I can imagine will mean more abuse for Twitter too." The AWS manager further stated that, as far as any "abuse report[s]" regarding Parler were concerned, he was "definitely in this journey with you."

43.     To be sure, AWS had from time to time sent Parler problematic content, which content Parler immediately investigated and resolved. The last such communication before January 6, 2021, was on December 19, 2020. As usual, Parler promptly looked into the flagged content, removing anything that might have been problematic. In addition, after that December 19th communication, Parler took additional steps to facilitate any internally escalating problematic material. And Parler continued testing a new AI-based system that would screen problematic content before it was posted, with plans to deploy the AI-system in early 2021.

COMPLAINT - 15

44.     On January 6, 2021, AWS forwarded to Parler a generic complaint about problematic content, but without any particular examples. That same day Parler's Chief Technology Officer responded, informing AWS that Parler had been dealing appropriately with this content, including cooperating with law enforcement, and offered to get on a call do discuss the measures Parler was taking.

45.     The next day, January 7, 2021, AWS responded via email that the previous email was just for Parler's information and to consider the matter "resolved." Thus, before January 8, 2021, Parler had no communication to the effect that AWS considered Parler to have an ongoing problem, that Parler's current and future plans for content moderation were deficient, or that Parler was violating the User Agreement. In fact, AWS had assured Parler of precisely the opposite, inducing Parler's ongoing reliance on AWS's cloud services.

46.     Given all of this, AWS's post-hoc claims that booting Parler was a decision "months in the making" is false. *See* Ashley Stewart & Eugene Kim, *Some Amazon employees are taking credit for Parler's ban,* Business Insider (Jan. 21, 2021, 11:11 AM), https://www.businessinsider.com/amazon-web-services-parler-ban-employee-activism-2021-1.

### D.  AWS Moves to End Parler

47.     Parler is also a competitor of Twitter's and Facebook's, as all three provide a similar platform for users to communicate with short messages, links, and pictures. Like many social media platforms, Parler's business model is not based on subscription fees.

48.     Parler is also a competitor with Amazon, Twitter, Facebook, and Google for internet advertising.

49.     In mid-December 2020, AWS issued a press release announcing a new multi-year deal with Twitter. Under the deal, AWS will "provide global cloud infrastructure to deliver Twitter timelines." *Twitter Selects AWS as Strategic Provider to Serve Timelines*, Press Center,

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

ABOUTAMAZON.COM (Dec. 15, 2020, 9:00 AM), https://press.aboutamazon.com/news-releases/news-release-details/twitter-selects-aws-strategic-provider-serve-timelines.

50.     Twitter, moreover, "will leverage AWS's proven infrastructure and portfolio of services to support delivery of millions of daily Tweets." *Id*. Further, "[t]his expansion onto AWS marks the first time that Twitter is leveraging the public cloud to scale their real-time service." *Id*. This deal "buil[t] on the companies' more than decade-long collaboration, where AWS continues to provide Twitter with storage, compute, database, and content delivery services to support its distribution of images, videos and ad content." *Id*. What is more, together "Twitter and AWS will create an architecture that extends Twitter's on-premises infrastructure to enable them to seamlessly run and scale the real-time service globally, increase its reliability . . ., and rapidly move new features into production around the world." *Id*.

51.     At the same time, Parler began to significantly increase its usership at the expense of Twitter and Facebook. After the election in November, the New York Times reported that "millions have migrated to alternative social media and media sites like Parler . . . ." Mike Isaac & Kellen Browning, *Fact-Checked on Facebook and Twitter, Conservatives Switch Their Apps*, THE NEW YORK TIMES (Nov. 18, 2020), https://www.nytimes.com/2020/11/11/technology/parler-rumble-newsmax.html. In fact, less than a week after Election Day, between November 3rd and November 8th, Parler's app experienced nearly one million downloads. *See* Russell Brandom, *Parler, A Conservative Twitter Clone, Has Seen Nearly 1 Million Downloads Since Election Day*, THE VERGE (Nov. 9, 2020, 3:52 PM), https://www.theverge.com/2020/11/9/21557219/parler-conservative-app-download-new-users-moderation-bias. This resulted in Parler rocketing to be "the #1 free app in the iOS App Store, up from #1,023" just a week earlier. *Id*. Likewise, in that same week the Parler app went from 486th to 1st in the Google Play rankings. *Id*. Not surprisingly, "the app was the 10th most downloaded social media app in 2020 with 8.1 million new installs." *See* Jonathan Schieber, *Parler Jumps to No. 1 on App Store After Facebook and Twitter Ban*

COMPLAINT - 17

*Trump*, TECHCRUNCH (Jan. 9, 2021, 1:45 PM), https://techcrunch.com/2021/01/09/parler-jumps-to-no-1-on-app-store-after-facebook-and-twitter-bans/.  Despite this increase in users, there is no evidence that Parler was used to coordinate the infamous attacks on the Capitol on January 6.

52.     In 2021, this trend both continued and accelerated, thanks to Twitter's and Facebook's announcements that they would permanently ban former President Trump from their platforms. *Id.* As a result, Parler saw installs increase in the United States by 355 percent. *Id.* After Twitter's announcement, conservative politicians and media figures began encouraging their followers to switch to Parler. *See* Yelena Dzhanova, *Top Conservative Figures are Tweeting to Advertise their Parler Accounts After Trump was Permanently Banned from Twitter*, BUSINESS INSIDER (Jan. 9, 2021, 10:17 AM), https://www.businessinsider.com/top-conservatives-moving-to-parler-after-trumps-ban-from-twitter-2021-1. *See also* Joseph A. Wulfsohn, *Conservatives Flee to Parler Following Twitter's Permanent Suspension of Trump*, FOX NEWS (Jan. 9, 2021), https://www.foxnews.com/media/conservatives-join-parler-twitter-trump-ban.

53.     Speculation began to mount that then-President Trump would likewise move to Parler. *Id.* Given the close to 90 million followers the President had on Twitter, this would be an astronomical boon to Parler and a heavy blow to Twitter. *See Donald J. Trump Statistics on Twitter Followers               (@realDonaldTrump),*               SOCIALBAKERS, https://www.socialbakers.com/statistics/twitter/profiles/detail/25073877-realdonaldtrump.

54.     An AWS official, who had known about the possibility that Trump might join Parler, became increasingly inquisitive as to whether Parler's CEO had heard whether that would occur in the wake of Facebook and Twitter banning the former President. On Thursday morning, January 7, 2021, she asked Parler's CEO, given Trump's exclusion from those other platforms, "Does he plan on joining Parler?" On Friday morning, January 8, 2021, she stated, "I see Sean Hannity said Trump has joined Parler." She then asked, "Is that true?" Parler's CEO responded, "I believe Trump has an account. But it's not verified and incognito. Not certain." To which the AWS

COMPLAINT - 18

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

1   representative responded, "No communication from his team?" Not once did this AWS

2   representative raise any concerns about problematic content on Parler.

3        55.    Given the context of Parler's looming competitive threat to Twitter, as well as to

4   AWS, Google, and Facebook, and given the fact that the Facebook and Twitter bans might not

5   long muzzle the former President if he switched to Parler, potentially bringing tens of millions of

6   followers with him, AWS moved to shut down Parler.

7        56.    Shortly after Twitter announced it was banning then-President Trump, on

8   January 8, 2021, Google removed Parler from its Google Play Store. A Google spokesperson

9   falsely said that Google did so because "of continued posting in the Parler app that seeks to incite

10  ongoing violence in the U.S.," which presents an "ongoing and urgent public safety threat." Lucas

11  Matney, *Parler removed from the Google Play store as Apple App Store suspension reportedly

12  looms*, TECH CRUNCH (Jan. 8, 2021, 8:05 PM), https://techcrunch.com/2021/01/08/parler-

13  removed-from-google-play-store-as-apple-app-store-suspension-reportedly-looms/.        Banning

14  Parler from the Google Play Store was significant because the overwhelming majority of Android

15  apps are found on that store. And the Google Play Store ban's explanation was suspect because

16  enormous amounts of content inciting violence could be found on Facebook and Twitter, yet

17  Google did not remove these two apps from the Play Store.

18       57.    The next day, January 9, 2021, at 6:07 pm PST, web news site BuzzFeed posted an

19  article with screenshots of a letter from AWS to Parler, informing Parler that its service would be

20  suspended at 11:59 pm PST on Sunday, less than thirty hours later. *See* John Paczkowski & Ryan

21  Mac, *Amazon Will Suspend Hosting for Pro-Trump Social Network Parler*, BUZZFEED (Jan. 9,

22  2021,        6:07        PM        PST,       updated        7:08        PST),

23  https://www.buzzfeednews.com/article/johnpaczkowski/amazon-parler-aws. What is more, the

24  article with the letter was posted not long after Parler itself received the letter in an email, which

25

COMPLAINT - 19

1    was received at 5:19 pm PST (7:19 CST), less than an hour before the BuzzFeed article went

2    online, meaning AWS leaked the letter to BuzzFeed around the same time as sending it to Parler.

3         58.   That same evening, the Associated Press reported that "Parler may be the leading

4    candidate" for then-President Trump after his Twitter ban as "[e]xperts had predicted Trump might

5    pop up on Parler . . . ." Frank Bajak, *Squelched by Twitter, Trump Seeks New Online Megaphone*,

6    ASSOCIATED PRESS (Jan. 9, 2021), https://apnews.com/article/donald-trump-politics-media-social-

7    media-coronavirus-pandemic-f5b565ca93a792640211e6438f2db842. However, the AP also

8    observed that "Amazon struck [a] blow Saturday [against the chances of Trump adopting the

9    platform], informing Parler it would need to look for a new web-hosting service effective midnight

10   Sunday." *Id.*

11        59.   This termination by AWS could not have come at a worse time for Parler—a time

12   when the company was surging with the potential of even more explosive growth in the next few

13   days. Worse than the timing was the result—Parler tried to find alternative companies to host it

14   and they repeatedly were unable to do so, often because of the public defamation by AWS. This

15   delayed Parler's ability to get back online by over a month. That delay meant many past Parler

16   users have had to move on to other platforms. *See* Arjun Walia, *Telegram Passes 500 Million*

17   *Users As People Seek Facebook & Twitter (Big Tech) Alternatives*, LEWROCKWELL.COM (Jan. 25,

18   2021),   https://www.lewrockwell.com/2021/01/no_author/telegram-passes-500-million-users-as-

19   people-seek-facebook-twitter-big-tech-alternatives/. It is no wonder, then, that competitor

20   Twitter's CEO heartily endorsed efforts to remove Parler from the public sphere. *See* Kevin

21   Shalvey, *Parler's CEO John Matze Responded Angrily After Jack Dorsey Endorsed Apple's*

22   *Removal of the Social Network Favored by Conservatives*, BUSINES INSIDER (Jan. 10, 2021, 5:35

23   AM),   https://www.businessinsider.com/parler-john-matze-responded-angrily-jack-dorsey-apple-

24   ban-2021-1.

25

COMPLAINT - 20

60.     Parler's rival social media apps that are alternatives to Facebook and Twitter are experiencing record growth. *See* Isaac & Browning, *Fact-Checked on Facebook and Twitter*, supra. When Parler was not available, both current users and prospective users turned to alternatives, including but not limited to Twitter or Facebook. And once those users have begun to use another platform, they may not switch or return to Parler after Parler was offline for over a month.

61.     By silencing Parler, moreover, AWS silences the millions of Parler users who do not feel comfortable using Twitter or other social media apps to express their views because, among other things, these other companies take advantage of users' personal data for advertising and other revenue sources.

62.     What is more, by pulling the plug on Parler but leaving Twitter alone despite the posting of massive amounts of troublesome content on Twitter and Amazon itself, AWS has revealed that its expressed reasons for suspending Parler's service are but pretext.

63.     Because, AWS declared, "we cannot provide services to a customer that is unable to effectively identify and remove content that encourages or incites violence against others," AWS announced the pending termination of Parler's service. But AWS knew that its allegations against Parler were specious.

64.     If Parler were a newspaper, AWS would try to portray the content it flagged as appearing on the front page. But as the facts above show, the minimal amount of problematic material that AWS flagged, combined with the fact that much of it was buried and could not be easily shared, meant it was hardly noticed. Thus, if Parler was a newspaper, the problematic content was buried at the bottom right column on page D17, in small type. No one was really seeing or sharing it.

65.     Making matters worse, AWS leaked its termination email to the press, knowing that its allegations in the email claiming that Parler was unable to find and remove content that

COMPLAINT - 21

encouraged violence were false—both because AWS knew of Parler's ongoing projects to utilize AI-aided content screening and because, in the days preceding AWS's email, Parler had removed everything AWS had brought to its attention and more. Yet AWS sought to defame Parler nonetheless. And because of AWS's false claims, Parler has not only lost current and future customers, but for weeks Parler was unable to find an alternative web hosting company. In short, these false claims have made Parler a pariah and severely damaged its once-booming business.

66.     Moreover, although AWS claims it terminated Parler because "Parler was used to incite, organize, and coordinate the January 6 attack on the U.S. Capitol," that claim is a pretext that is not backed by evidence. AWS has identified no evidence that rioters used Parler to foment or coordinate the attack at the time of its termination email and it still has no such evidence.

67.     By contrast, there is increasing evidence that Twitter and Facebook, Parler's much larger competitors, were used to foment and coordinate the riot. For instance, Ashli Babbitt, the woman killed by law enforcement when she forced her way into the Capitol Building, did have a Parler account, but it had not been used since November. Instead, she had a Twitter account that was in use the very day of the riot, January 6, 2021. Further, the federal government has indicated that the attack was coordinated at least in part on Twitter. *See* Michael Balsamo & Erick Tucker, *FBI says it warned about prospect of violence ahead of US Capitol riot*, NAVY TIMES (Jan. 12, 2021), https://www.navytimes.com/news/your-military/2021/01/13/fbi-says-it-warned-about-prospect-of-violence-ahead-of-us-capitol-riot/. And, as already noted, Facebook, Twitter, and Google's YouTube are the top social media sites found in the charging documents for arrested rioters—not Parler.

68.     Finally, to add injury to injury, after AWS shut off all services to Parler, AWS left open Route 53, a highly scalable domain name system (DNS), which directed hackers to Parler's backup datacenters and caused the hackers to initiate a sizeable DNS attack. In other words, AWS essentially illuminated a large neon arrow directing hackers to Parler's backup datacenters. And

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

the hackers got the message, launching an extremely large attack—one 250 times larger and 12-24 times longer than the average Distributed Denial of Service (DDOS) attack.[2] Later, AWS would terminate the Route 53 link, but the damage was already done. And this AWS-facilitated attack was a threat by AWS to all future datacenters that, if they were to host Parler, they too would be attacked by unprecedented hacks.

69.     Finally, since termination, AWS/Amazon has been secretly selling Parler's user data—including images and video—to whomever has an Amazon S3 account and is willing to pay to download the data, thus intentionally interfering with Parler's contracts with its current users. Amazon is sharing Parler user data in violation of AWS's own contract with Parler—and profiting to boot. This is direct evidence of tortious interference with Parler's contracts with its current Parler users. This AWS-enabled black market for Parler user data also enables others to access this data and then engage in mass doxing and harassment of Parler users. These AWS-enabled activities will hamper Parler's ability to get new users and cause it to lose existing users, who will be wary of Parler's ability to protect their privacy.

## IV.     CAUSES OF ACTION

### A.  Pre-Termination & Termination Conduct

### Count One: Washington Consumer Protection Act

**Before the termination, and in connection with the termination, AWS engaged in deceptive and unfair trade practices, injuring Parler.**

70.     Parler restates, re-alleges, and incorporates by reference each of the allegations set forth in the Complaint as if fully set forth herein.

71.     The Washington Consumer Protection Act provides that "unfair or deceptive acts or practices in the conduct of any trade or commerce are . . . unlawful." RCW 19.86.020.

---

[2] The hackers launched a DDOS attack of 250 gbps (gigabytes per second) for 12 hours. The average DDOS attack is only one gbps and lasts for 30-60 minutes. *See* Sam Cook, *DDoS Attack Statistics and Facts for 2018-2020*, COMPARITECH (Nov. 10, 2020, updated Feb. 10, 2021), https://www.comparitech.com/blog/information-security/ddos-statistics-facts/.

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

72.     Under the Act, "'[a]ny person who is injured in his or her business or property' by a violation of the act may bring a civil suit for injunctive relief, damages, attorney fees and costs, and treble damages." *Panag v. Farmers Ins. Co. of Washington*, 166 Wn.2d 27, 37, 204 P.3d 885 (2009) (citing RCW 19.86.090). And to prevail in such a claim, "the plaintiff must prove (1) an unfair or deceptive act or practice, (2) occurring in trade or commerce, (3) affecting the public interest, (4) injury to a person's business or property, and (5) causation." *Id.*

73.     AWS engaged in an unfair and deceptive series of acts and practices, in bad faith, in the course of trade and commerce, that caused substantial injury to Parler.  Further, AWS's acts and practices are harmful to the public interest.

74.     The AWS Customer Agreement is a contract of adhesion, which AWS forces each customer to accept, without negotiation, in order to use AWS's services.  Upon information and belief, many of AWS's customers are a captive audience who do not have ready access to an effective and affordable alternative to AWS's services.  AWS is fully aware that the AWS Customer Agreement is a contract of adhesion, which is exemplified by the fact that the agreement itself provides that AWS may unilaterally modify the agreement at any time, with or without notice to its customers.  *See* Exhibit A § 12. (AWS "may modify this Agreement (including any Policies) at any time by posting a revised version on the AWS Site . . . .  By continuing to use the Service Offerings after the effective date of any modifications to this Agreement, you agree to be bound by the modified terms.  It is your responsibility to check the AWS Site regularly for modifications to this Agreement.").

75.     AWS unilaterally drafted the AWS Customer Agreement in a manner that unfairly, deceptively, and unconscionably advantages AWS and harms its customers.  By way of example only, AWS knows that customers will use AWS services to provide a platform for third party end users to post content.  AWS is aware that it is not possible to completely prevent those third party end users from posting objectionable content that violates AWS's policies.  Nevertheless, AWS

COMPLAINT - 24

contends that a customer breaches this contract of adhesion if any third-party end user does post such objectionable content, irrespective of whether the customer has adopted or is working to adopt appropriate measures to block or remove such content.  In effect, by AWS's own interpretation (which interpretation Parler disputes), AWS has knowingly drafted its contract of adhesion in a manner that will *force* its customers to breach the contract en masse.  In turn, AWS contends that it has the right to terminate the contract "for cause" in the event of such a breach, with no notice to, and no meaningful remedies for, any of its customers. AWS has done so despite having full knowledge that its customers rely upon the continuation of AWS's services for the very survival of their businesses.

76.    When AWS and Parler entered into the AWS Customer Agreement for cloud computing services that Parler needs for its apps and website to function on the internet, AWS knew that it would be impossible to ensure that no end user would ever post objectionable content on Parler's platform.  Indeed, it would be technologically impossible for any microblogging platform to completely prevent the posting of objectionable content by end users.  Rather, at best, a microblogging platform like Parler has the capacity to remediate such content after it has been posted by an end user and becomes known to Parler.  By definition, AWS was aware of and implicitly accepted these technological limitations throughout the time when it entered into and performed its contract with Parler.

77.    Parler performed under the contract in good faith by, among other things, paying for AWS's services.  AWS repeatedly made representations to Parler which were designed to and did give Parler the assurance that AWS did not view the posting of allegedly objectionable user content on Parler's platform as a breach of the parties' contract, especially in light of Parler's efforts to remediate such content.  By way of example only, on January 7, 2021, AWS assured Parler that a prior complaint regarding objectionable content on Parler had been "resolved."  At the same time, AWS solicited additional business from Parler.  Parler worked with AWS to expand

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

1  the scope of the products and services that it purchased from AWS, based in-part on the assurances

2  it received from AWS.

3      78.    Further, during that same time period, Parler was in talks with AWS to acquire new

4  AI from Amazon to perform superior content moderation on its platform.  AWS was fully aware

5  that Parler was working, with Amazon's assistance, to adopt the best automated practices available

6  on the market to prevent and remove objectionable content from its platform.

7      79.    On January 7-8, 2021, AWS learned that former President Donald Trump and other

8  known conservatives, including Sean Hannity, had switched or were likely to switch from Twitter

9  to Parler.  AWS was clearly concerned about that possibility and sent inquiries regarding those

10  concerns to representatives of Parler.

11      80.    On Sunday, January 9, 2021, AWS notified Parler via email that AWS was

12  immediately suspending Parler's account.  In reality, this so-called suspension was a termination,

13  as AWS made clear over the phone and in the same email that Parler would need to migrate its

14  data to new servers.

15      81.    In AWS's email purporting to suspend and/or terminate the contract, AWS

16  identified its purported reasons for the termination.  Specifically, AWS asserted that Parler did not

17  have an adequate plan to identify and remove dangerous content from its platform, because Parler's

18  only plan was to do so "manually with volunteers."  AWS was aware that this purported basis for

19  suspending and/or terminating the contract was untrue.  AWS previously had given Parler explicit

20  and/or implicit assurances that its concerns about objectionable content on Parler would not result

21  in termination of the contract.  Further, AWS knew that Parler was in the midst of acquiring AI

22  from Amazon that Parler could use to identify and remove dangerous content from its platform,

23  directly contrary to AWS's claim that Parler intended to perform this function "manually with

24  volunteers."

25

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

82.     The true reason why AWS decided to suspend and/or terminate its contract with Parler was not because of any alleged breach of the contract, but because AWS did not want Parler to be able to provide a new platform to conservative voices, including Donald Trump, or to compete effectively with other microblogging platforms such as Twitter.

83.     On the same day that AWS terminated its contract with Parler, it also publicized false information about Parler to the media.  Specifically, on January 9, 2021, AWS announced it would indefinitely suspend Parler's service, falsely claiming that Parler was unable or unwilling "to remove content that encourages or incites violence against others."

84.     AWS's series of acts and practices was deceptive and unfair.  AWS uniformly requires its customers to enter into a contract of adhesion containing unfair and unconscionable terms that benefit AWS and harm its customers. AWS entered into such a contract with Parler, knowing and accepting that it would be impossible for Parler, like AWS's other customers, to completely prevent the posting of objectionable content on its platform.  During the performance of the contract, AWS was aware of the methods Parler was using and developing to remediate such content, and induced Parler to continue to pay for and even expand its business relationship with AWS through assurances that Parler's content moderation methods were adequate.  Nevertheless, AWS subsequently terminated its contract with Parler based on a characterization of Parler's content moderation methods which AWS knew to be false.  AWS published the same false characterization of Parler to the media.

85.     AWS's unfair and deceptive acts and practices impact the public interest.  AWS not only made deceptive statements to Parler directly, but also made deceptive statements about Parler to the public at-large.  AWS's decision to terminate Parler's contract was motivated at least in-part by, and in fact furthered, AWS's goal of eliminating a platform for a large segment of the political spectrum in the United States.  Further, upon information and belief, AWS provides the same services through the same contract of adhesion to many other customers who are likewise

COMPLAINT - 27

unable to fully prevent the posting of objectionable content on their platforms.  Upon information and belief, many of those customers rely on their contracts of adhesion with AWS for the survival of their businesses, and they are at risk of having their contracts terminated "for cause" (and their businesses severely injured) by AWS at any time.

86.     AWS's unfair and deceptive acts and practices have resulted in substantial damages to Parler, including but not limited to the loss of millions of dollars of revenue from advertisements.

**Count Two: Defamation**

**By leaking false allegations to the press, AWS defamed Parler, damaging its reputation and ability to attract future service providers, users, and advertisers.**

87.     Parler restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

88.     Under Washington law, the "required elements for a defamation claim are (1) falsity, (2) an unprivileged communication, (3) fault, and (4) damages." *Stiles v. Kearney*, 168 Wn. App. 250, 262, 277 P.3d 9 (2012) (citing *Mark v. Seattle Times*, 96 Wn.2d 473, 486, 635 P.2d 1081 (1981)).

89.     On January 9, 2021, AWS sent an email to Parler declaring that AWS would indefinitely suspend Parler's service, claiming that Parler was unable or unwilling "to remove content that encourages or incites violence against others." AWS or one of its employees publicly leaked that email in bad faith to BuzzFeed at or around the same time AWS sent the email to Parler.

90.     AWS's email was false and AWS knew it was false. Parler was willing and able to remove such content and AWS knew that, because there was a lengthy history between the parties of Parler removing such content as quickly as AWS brought it to Parler's attention. What is more, AWS was well aware that Parler was testing a new AI-based system to remove such content before it was even posted, that Parler had success with initial testing of the program, and that Parler had in fact shared those testing results with AWS.

91.     The AWS email received wide play in the media.

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

1    92.   The AWS email was not a privileged communication as it did not involve

2  communication between an attorney and client, a doctor and patient, spouses, or any other of the

3  recognized privileges under Washington law.

4    93.   To establish fault as a private figure, a plaintiff "must prove negligence by a

5  preponderance of the evidence." *Alpine Indus. Computers, Inc. v. Cowles Pub. Co.*, 114 Wn. App.

6  371, 388, 57 P.3d 1178 (2002), *amended*, 64 P.3d 49 (2003). This means that the plaintiff "must

7  show fault by the publisher in not acting reasonably to ensure that the report is accurate and

8  complete." *Id.* at 390 (citation omitted).

9    94.   Additionally, to show fault "concerning a subject of general or public interest," a

10  private figure must show "that in publishing the statement, the defendant knew or, in the exercise

11  of reasonable care, should have known that the statement was false, or would create a false

12  impression in some material respect." *Id.* at 389 (citation omitted).

13    95.   Moreover, "a public figure plaintiff must prove by clear and convincing evidence that

14  the defendant uttered the offensive statement with actual malice, that is, with knowledge of falsity

15  or reckless disregard of the truth or falsity of the statement." *Id.* at 387-88 (citing *New York Times*

16  *Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964); *Herron v. Tribune Publ'g Co.*, 108 Wn.2d 162, 169-

17  79, 736 P.2d 249 (1987)).

18    96.   Parler is not a public figure and the success of its "content moderation" policies was

19  not a matter of public concern *until* Google and AWS decided to make it one, but the defendant

20  cannot by a defamatory statement turn a private matter into a public one or all matters would be

21  public in nature.

22    97.   AWS did not take reasonable care to investigate and ensure that its statements were

23  accurate and complete, thus acting negligently.

24    98.   But even if Parler is considered a public figure or Parler's "content moderation"

25  process was deemed to be of public interest, AWS acted with actual malice.

COMPLAINT - 29

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

99.   Actual malice exists when there is "knowledge of the falsity or reckless disregard of the truth or falsity of the statement." *Maison de France, Ltd. v. Mais Oui!, Inc.*, 126 Wn. App. 34, 44, 108 P.3d 787 (2005). Reckless disregard "requires evidence that the publisher was plagued with serious doubts as to the truth of the statement." *Alpine Indus. Computers, Inc.*, 114 Wn. App. at 394. AWS is chargeable with the knowledge possessed by its agents or employees.  *See, e.g., State ex rel. Hayes Oyster Co. v. Keypoint Oyster Co.*, 64 Wn.2d 375, 386, 394 P.2d 979 (1964).

100.   On January 10 and 11, AWS published and released statements to news media repeating its assertion that Parler had been "unwilling or unable" to "remove" "content . . . that encourages and incites violence against others." *See, e.g.*, Matt Day, *Amazon's Parler Removal Shows Cloud Unit's Rarely Used Power*, BLOOMBERG BUSINESSWEEK (Jan. 11, 2021), bloomberg.com/news/articles/2021-01-11/amazon-s-removal-of-parler-shows-cloud-unit-s-rarely-used-power.

101.   But on January 8, when AWS brought to Parler's attention 75 posts and comments that allegedly encouraged or incited violence, Parler promptly deleted all 75 of them, and agents or employees of AWS were aware of that fact.  Parler, in other words, was both willing and able to remove any problematic content.

102.   Moreover, on January 9, when AWS brought to Parler's attention another 33 posts and comments that allegedly encouraged or incited violence, Parler promptly deleted all 33 of them, and agents or employees of AWS were aware of that fact.  Here again, AWS was aware that Parler was both willing and able to remove content.

103.   Indeed, as of the night of January 10, when AWS terminated service to Parler, Parler had promptly identified and deleted *all* the posts brought to its attention by AWS, and agents or employees of AWS were aware of that fact.

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

104. In addition, AWS agents or employees were aware as of January 9 that Parler had had successful initial test results with its own AI content-moderation program designed to identify and remove such content before it was even posted.

105. Thus, AWS's statements made on January 10 and 11, that Parler had been unwilling or unable to remove such content, were not only false, at the time AWS published these statements, AWS knew they were false, or had a high degree of awareness of their probable falsity. Thus, AWS acted with actual malice.

106. AWS's defamatory conduct did not relate to or arise out of its contract with Parler, nor any of its services or products.

107. Because of AWS's malicious defamatory statements, Parler's public reputation suffered severe damage and Parler has had many potential service providers refuse to work with it, hampering and delaying its ability to get back online. In addition, Parler employees have been targeted with threats. And the number of lost users and advertisement revenues stemming from Parler's inability to find someone to quickly host it can be counted in the millions.

108. The service of this complaint, together with a summons, satisfies the requirements of the Uniform Correction or Clarification of Defamation Act, without the need for a prior request for correction, because it "[s]pecifies with particularity the statement alleged to be false and defamatory or otherwise actionable and, to the extent known, the time and place of publication," and it "[a]lleges the defamatory meaning of the statement[s][.]" *See* RCW 7.96.040(3)(b)-(c).

109. AWS's defamatory leaks to the media were extraneous to the AWS Customer Agreement and did not arise from that contract. Rather, they were purely malicious actions taken by AWS outside the course of performance of the contract.

110. Parler is entitled to actual and exemplary damages, including but not limited to damages for reputational harm and lost profits.

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

1

**Count Three: Breach of Contract**

2

**AWS breached its contract with Parler by terminating it without sufficient cause under the contract, and by not providing 30 days' notice.**

3

4      111.    Parler restates, re-alleges, and incorporates by reference each of the allegations set

forth in the rest of this Complaint as if fully set forth herein.

5

6      112.    Parler entered into a contract with AWS known as the Customer Agreement.  AWS

7    repudiated and breached the Customer Agreement in bad faith and thereby caused damage to

8    Parler.  Under Washington law, "[a] breach of contract is actionable only if the contract imposes

9    a duty, the duty is breached, and the breach proximately causes damage to the claimant." *See*

10   *Northwest Independent Forest Manufacturers v. Department of Labor and Industries*, 78 Wn. App.

707, 712, 899 P.2d 6 (1995). Each of those elements is satisfied here.

11

12     113.    As to duty: The AWS Customer Agreement with Parler allows either party to

13   terminate the agreement "for cause if the other party is in material breach of this Agreement and

the material breach remains uncured for a period of 30 days from receipt of notice by the other

14   party." Thus, the contract imposes a duty of a 30-day notice before for-cause termination based on

15   an uncured material breach.

16     114.    This 30-day notice and opportunity to cure is absolutely critical to a big social

17   media platform like Parler. Immediate termination—going dark—is unbelievably damaging.

18   Getting 30 days either to cure or find another host is absolutely essentially to avoid millions of

19   dollars in damages and potentially irreparable harm. Parler would not have signed up with AWS

20   without that protection. Nor would any reasonable social media platform sign up with AWS

21   without that protection. It was therefore reasonable for Parler to believe that that protection meant

22   something.

23     115.    From November 17, 2020, through January 6, 2021, AWS periodically sent Parler

24   problematic material AWS had found on Parler's website. Parler always quickly removed that

25

COMPLAINT - 32

material. And on January 7, 2021, AWS informed Parler that all issues with such material were resolved and everything was "okay."

116.   On January 8, 2021, AWS brought concerns to Parler about user content that encouraged violence. That same day, Parler addressed those concerns.

117.   On January 9, 2021, AWS brought more "bad" content to Parler and Parler took down all of that content by the evening. When Parler asked AWS how it had found this material, AWS refused to say. AWS had taken a screenshot of one of the problematic posts/comments just nine seconds after it was put on Parler. Parler alleges on information and belief that that post/comment, and perhaps others, were orchestrated by AWS in order to create the false impression that Parler was failing to police user content for material that violated AWS's use policy.

118.   As of the end of January 9, 2021, Parler had not breached the agreement and certainly had not committed any uncured material breach of the Agreement for 30 days, as required for termination. Parler had performed in a manner consistent with the terms of the contract and the parties' course of dealing. Further, Parler had appropriately remediated problematic content to the satisfaction of AWS. There was no cause for AWS to suspend or terminate its AWS Customer Agreement with Parler.

119.   Yet, late on January 9, 2021, AWS informed Parler via email that AWS would "suspend Parler's account effective Sunday, January 10th, at 11:59 PM PST."

120.   That so-called suspension was in fact a termination. First, the very email announcing the suspension declared that AWS "will ensure that all of your data is preserved for you to migrate to your own servers, and will work with you as best as we can to help your migration." Thus, the email makes clear that, although AWS was still preserving Parler's data, it was not doing so to effectuate a future return to AWS. Instead, AWS was looking to give Parler its data so Parler could find some other way to get back online. That is not a suspension, but a

LAW OFFICES
CALFO EAKES LLP
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

termination within the meaning of the Customer Agreement. Further, AWS communicated to Parler over the phone that this was effectively a termination, rather than a suspension.

121.    Parler even offered to adopt AWS's own AI-based content moderation, but AWS refused. As there was nothing Parler could do to satisfy AWS, AWS cannot rely on the portion of the contract that allows for a "temporary" suspension. The contract does not allow for permanent *suspensions*—and a permanent suspension is in law and fact a termination. AWS thus breached its duty to Parler when it terminated service on January 10, 2021, without 30 days' notice or an opportunity to cure.

122.    Nor can AWS elide its contractual duty to provide a 30-day notice by pointing to other provisions of the contract. Specifically, § 7.2(b)(ii) allows AWS to immediately provide notice of termination for any reason for which it could temporarily suspend under § 6. And § 6 allows AWS to suspend Parler's service if Parler breaches the contract. Thus, AWS's logic goes, the contract as a whole provides AWS the right to either immediately suspend or to terminate in the event Parler or one of its users is in breach.

123.    AWS's interpretation of the contract misses the point because Parler was not in breach of the contract, so AWS was not entitled to suspend, terminate, or otherwise repudiate the contract under *either* § 6 or § 7 of the Customer Agreement.  Moreover, AWS's reading overlooks four crucial doctrines, which strongly support Parler's reading of the contract.

124.    First, the contract at issue is a form contract drafted by AWS that Parler had no ability to negotiate. Washington courts "generally construe ambiguities against the contract's drafter." *Pierce County v. State*, 144 Wn. App. 783, 813, 185 P.3d 594 (2008), *as amended on denial of reconsideration* (July 15, 2008). Thus, the Customer Agreement must be construed against AWS when there are any doubts as to its meaning. And AWS's reading of the temporary suspension clause is doubtful to say the least.

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

125.    Second, under Washington law, "the parties' course of dealing"—defined as "a sequence of prior conduct between the parties that establishes a common basis for interpreting other conduct and expression"—is used by courts "to interpret contract provisions" when there is no conflict with express terms. *Smith v. Skone & Connors Produce, Inc.*, 107 Wn. App. 199, 208, 26 P.3d 981 (2001) (citing *Badgett v. Security State Bank*, 116 Wn.2d 563, 572-73, 807 P.2d 356 (1991)).

126.    AWS seems to argue that Parler was in breach of the contract in two ways. First, Parler was required to "ensure" that Parler users' posted content was not violent or harmful to others. Second, AWS argues that Parler must "immediately suspend access" to content that violates the contract. But the word "ensure" is ambiguous as to what methods of content moderation would constitute a violation of that term, and the word "immediately" applies to the suspension of offending End Users and does not impose a time frame on the removal of offending content itself. As to "ensure," under AWS's reading, the instant such content is posted, Parler would have failed to "ensure" it won't be, and thus would violate the contract. But that reading would be unreasonable for any content moderation system since none perfectly prevent problematic material, let alone for a reactive model which AWS, from the very outset, knew that Parler employed. If that were not enough, the course of dealing between these parties shows that AWS's current interpretation of "ensure" was never employed until now, as a post hoc justification for termination. Not until January 9, 2021, after a consistent pattern of AWS occasionally flagging small amounts of content as problematic under its interpretation of its standards and Parler quickly responding, did AWS claim Parler was in breach of its contract merely because such content had been posted on Parler at all. AWS knew from the beginning of its contractual relationship that Parler used a reactive and non-instantaneous system to find and remove problematic content. Yet not once did AWS say that Parler's reactive system was a per se violation of the contract.

LAW OFFICES
CALFO EAKES LLP
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

127.   As to the "immediately suspend" language: as noted above, AWS's misplaced reliance on a provision governing the potential suspension of "End Users" accounts (§ 4.5) cannot reasonably support a reading in which the term "immediately" provides a time frame in which Parler was to remove offending posts under a provision governing "Your Content" (§ 4.2). And even if the term "immediately" could reasonably be read to impose a time limitation on Parler's removal of offending content, which it cannot, the term is nevertheless vague as to how such a time frame should be measured. How long is immediately in the context of an organizational response—a millisecond? a minute? twenty-four hours? And for processes that take a non-zero amount of time, is an "immediate" response measured from its initiation, its conclusion, or something else? Parler was always quickly responsive whenever it found problematic content and whenever AWS brought such content to Parler's attention. And that responsiveness had never lead AWS to declare that Parler was in breach of its contract until January 9, 2021. The ambiguous terms in the contract must be construed in light of the parties' course of dealing, and those dealings show that AWS's reading is wrong and that Parler was not in violation of the contract.

128.   Third, under AWS's reading, Section 7.2(b)(ii) would render Section 7.2(b)(i) superfluous by *always* allowing AWS an easy escape from the 30-day notice and cure requirement. After all, if AWS is authorized to terminate the contract immediately for any breach because of Section 7.2(b)(ii), there would never be any reason to invoke Section (b)(i), which requires 30 days' notice for a *material* breach. Such a reading violates the Surplusage Canon, which forbids an interpretation that makes a contract provision meaningless. *See, e.g., Veit, ex rel. Nelson v. Burlington Northern Santa Fe Corp.*, 171 Wn.2d 88, 113, 249 P.3d 607 (2011).

129.   Fourth, the erroneous reading of the contract violates the Absurdity Doctrine: "[A]bsurd results are to be avoided and internal inconsistencies in the [legal document] must be dealt with." *United States v. Turkette*, 452 U.S. 576, 580, 101 S. Ct. 2524, 69 L. Ed. 2d 246 (1981). AWS's reading of the contract turns it into an at-will contract by completely reading out the 30-

COMPLAINT - 36

day notice protections, which are obviously designed to allow companies like Parler to find an alternative hosting site without disruption to its service. No reasonable customer would agree to an at-will contract that allows AWS to terminate the contract without adequate notice and based on a single objectionable post by a user of the customer's service. "[S]uch an interpretation could lead to absurd results, which we are bound to avoid when we can do so without doing violence to the words of the [legal document]." *State v. Hall*, 168 Wn.2d 726, 737, 230 P.3d 1048 (2010).

130.    AWS's breach of contract has proximately caused substantial damage to Parler by depriving Parler of being online for over a month beginning at 12:10 AM PST on January 11, 2021. This has resulted in a loss of millions of dollars of revenue from advertisements targeted at Parler's millions of users—a number that was growing significantly each day before AWS's termination.

131.    Parler is therefore entitled to damages for AWS's breach of contract.

### Count Four: Breach of the Duty of Good Faith and Fair Dealing

**AWS breached the duty of good faith and fair dealing by exercising its purported discretion under the contract in bad faith**

132.    Parler restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

133.    Washington law imposes on "every contract an implied duty of good faith and fair dealing that obligates the parties to cooperate with each other so that each may obtain the full benefit of performance." *Rekhter v. State Dept. of Social and Health Services.*, 180 Wn.2d 102, 112-13, 323 P.3d 1036 (2014) (internal quotation omitted). The duty arises when the contract gives one party discretionary authority to determine a contract term. *Id.* Thus, when a party elects to terminate an agreement for "cause," Washington law requires that the party's exercise of that contractual power be made in good faith. *See Baldwin v. Sisters of Providence in Washington, Inc.*, 112 Wn.2d 127, 136-39, 769 P.2d 298 (1989) (imposing good faith duty on decision to terminate employment agreement for "just cause").

COMPLAINT - 37

134.    "It is the fact-finder's job … to determine whether a party breached its duty of good faith and fair dealing," and "the duty varies somewhat with the context in which it arises." *Microsoft Corp. v. Motorola, Inc.*, 963 F. Supp. 2d 1176, 1184 (W.D. Wash. 2013) (reviewing authorities). Under Washington law, the question of whether the defendant's conduct breached the duty may depend, among other things, on: "whether the defendant's actions were contrary to the reasonable and justified expectations of other parties to the contract"; whether the defendant's conduct "conformed with ordinary custom or practice in the industry"; and "subjective factors such as the defendant's intent and motive." *Id.* (collecting Washington cases).

135.    As explained above, under § 7.2 of the Customer Agreement, AWS did not have a good faith basis to terminate the parties' contract; AWS could not have effected a "termination of convenience" without providing 30 days' notice; and AWS could not terminate for cause on the basis of material breach without providing 30 days to cure. Because AWS patently failed to observe either 30-day requirement, it could not purport to terminate the agreement except by claiming authorization—still "for cause"—under the suspension power of § 7.2(b)(ii). However, even had that power been available to AWS, the facts show that AWS terminated its services to Parler for pretextual reasons and in contravention of both Parler's justified expectations and customary practice.

136.    First, as already mentioned, AWS entered into the Customer Agreement knowing that it was neither contemplated nor possible for Parler to ensure that no end user would ever post objectionable content on its platform. Indeed, it was and is technologically impossible for any microblogging platform to wholly prevent the posting of objectionable content by end users. Because AWS entered into the contractual relationship knowing and consenting to Parler's then-existing content moderation model and the technological impossibility of precluding any and all content violative of its Acceptable Use Policy, Parler had a reasonable and justified expectation that AWS would not terminate services based either on Parler's inability to wholly prevent the

COMPLAINT - 38

initial posting of violative content or on the inevitable, non-zero lapse of time between the posting
and removal of such content, which was also consistent with the terms of the contract.

137.    The parties' course of conduct further cemented this reasonable expectation. As
mentioned in greater detail above, until January 8, 2021, AWS had repeatedly shown that it did
not consider the occasional identification of objectionable content on Parler's platform as a
terminable breach of the parties' contract. Indeed, as late as January 7, 2021, AWS assured Parler
that a prior complaint regarding content on Parler had been "resolved." AWS's statements to Parler
made clear that it did not consider any objectionable content posted on Parler to date, nor Parler's
responses to that content to date, to be a reason to suspend or terminate the parties' contract. Parler
relied on those statements in good faith. Further, the lingering presence of objectionable content
on many other AWS and Amazon-affiliated sites demonstrates that the more draconian measures
AWS ultimately employed against Parler were and are a significant departure from Amazon's
customary practices.

138.    The pretextual nature of AWS's purportedly longstanding concerns with Parler's
content—and Parler's reasonable and justified expectations against abrupt termination—are also
evident in the timing of the termination, coming in the midst of AWS's extended efforts to expand
its vendor relationship with Parler and Parler's own expressions of interest in Amazon's content-
moderation AI. Despite its sudden, feigned concern over Parler's supposed inability to moderate
violative content, at the time of termination AWS was fully aware that Parler was working to adopt
the best automated practices available on the market to prevent and remove objectionable content
from its platform and that Parler had even offered to use AWS's own AI system. AWS's stated
concerns were mere misdirection for AWS's true, bad faith motives for shutting Parler down.

139.    Here again, AWS's timing is telling. On January 7-8, 2021, AWS learned that
former President Donald Trump and other known conservatives, including Sean Hannity, had
switched or were likely to switch from Twitter to Parler. AWS was clearly concerned about that

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

1   possibility, and made repeated inquiries regarding those concerns to Parler. Mere hours later, once

2   it appeared that President Trump might well be joining Parler, on Sunday, January 9, 2021, AWS

3   notified Parler via email that AWS was immediately suspending—and effectively terminating—

4   Parler's account and all related services.

5       140.    In AWS's email suspending and terminating the contract, AWS identified

6   purported reasons for the termination. Specifically, AWS asserted that Parler did not have an

7   adequate plan to identify and remove dangerous content from its platform, because Parler's only

8   plan was to do so "manually with volunteers." As shown above, this purported rationale for

9   termination was not only an abrupt departure from the parties' course of conduct but also plainly

10  inaccurate.   Moreover, AWS had been aware for months that Parler was in the process of

11  overhauling its content moderation system to incorporate AI including, potentially, AI acquired

12  from Amazon itself. If that were not enough, Amazon's own employees have been vocal in

13  contradicting AWS's official narrative of why the termination occurred.

14      141.    The true reason why AWS decided to suspend and/or terminate its contract with

15  Parler was not because of any alleged breach of the contract, but because AWS did not want Parler

16  to be able to provide a new platform to conservative voices, including Donald Trump, to compete

17  effectively with other microblogging platforms such as Twitter, or to compete with tech companies

18  (including Amazon) for advertising revenue.

19      142.    Accordingly, AWS breached its duty of good faith and fair dealing when it

20  exercised its purported discretion to determine that content on Parler's site violated the parties'

21  contract and to suspend and/or terminate the contract on January 9, 2021. AWS's breach of the

22  duty of good faith and fair dealing proximately caused substantial damage to Parler by depriving

23  Parler of being online as of January 11, 2021. This has resulted in a loss of millions of dollars of

24  revenue from advertisements targeted at Parler's millions of users.

25

COMPLAINT - 40

**Count Five: Tortious Interference with a Contract or Business Expectancy**

**By improperly terminating services to Parler, AWS intentionally interfered with Parler's contracts with advertisers and with millions of its present users, as well as future advertisers and the millions of users Parler was projected to gain in the near future.**

143.  Parler restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

144.  Under Washington law, to establish a claim for tortious interference with a contract or expectancy, a plaintiff must prove: "(1) the existence of a valid contractual relationship or business expectancy; (2) the defendant's knowledge of that relationship; (3) an intentional interference inducing or causing a breach or termination of the relationship or expectancy; (4) the defendant's interference for an improper purpose or by improper means; and (5) resulting damage." *Koch v. Mutual of Enumclaw Insurance Company*, 108 Wn. App. 500, 506, 31 P.3d 698 (2001). Each of these elements is satisfied here.

145.  Prior to AWS's actions, Parler had over 12 million users under contract when AWS terminated its services, as well as contracts with multiple advertisers. And Parler expected to add millions more in the coming weeks given its growth the last few days it was online and the growing voice of conservatives encouraging their Twitter followers to switch to Parler, which would bring additional advertisers into contracts with Parler. Additionally, unlike AWS/Amazon, Twitter, Google and Facebook, Parler's business model enabled it to obtain advertising revenues without the user surveillance necessary to target ads to users based upon personal information collected by the platform—a feature very attractive to many users and, hence, to advertisers seeking to reach them. And because conservative voices were finding greater engagement on Parler than on other platforms, the number of users was expected to continue to increase significantly.

146.  AWS knew about Parler's users and current trends. AWS also knew that Parler was negotiating with it to increase its server capacity given this ongoing and expected growth. And AWS further knew of public speculation that Trump, with his nearly 90 million Twitter followers,

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

was going to switch to Parler, likely bringing tens of millions of followers with him, as well as the advertisers that targeted those followers. And AWS knew that Trump had a Parler account that he had yet to activate, and that Parler was in negotiations with Trump's team about moving to Parler after he left office. Finally, AWS knew from public statements that Parler was about to go to the market to raise money.

147. AWS intentionally interfered with Parler's current contracts and future expected customer relationships and advertising contracts in bad faith by (1) terminating Parler's Agreement with it under the pretext that Parler was in violation of that contract when AWS knew Parler was not in violation (and when Twitter was engaging in identical conduct but AWS did not terminate its contract with Twitter); and (2) knowingly sending false allegations against Parler to the media.

148. AWS's willful interference was for the improper purpose of restraining trade in violation of the Sherman Act, assisting Twitter's attempts at monopolization in violation of the Sherman Act, gaining additional income in violation of their contracts, and/or for political reasons in violation of their contracts with Parler.

149. The resulting damage of AWS's tortious interference is that Parler has lost millions of dollars in revenues and suffered reputational damage with the public at large and with its own users. Parler has also lost users who would have joined Parler except for AWS's improper interference, but have now gone to competitors of Parler.

150. AWS's conduct was willful and malicious. Parler is entitled to actual and exemplary damages.

## Count Six: Washington Consumer Protection Act

**AWS unfairly used Parler's dependence on AWS before it terminated the contract to thwart Parler's expansion of its share of the global internet advertising market, in which AWS itself was competing.**

151. Parler restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

COMPLAINT - 42

152. Washington's Consumer Protection Act provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are . . . unlawful." RCW 19.86.020. The Act's purpose is to "complement the body of federal law governing restraints of trade, unfair competition and unfair, deceptive and fraudulent acts and practices in order to protect the public and foster fair and honest competition." RCW 19.86.920. And the Act is to be "liberally construed that its beneficial purposes may be served." *Id*.

153. Further, the act provides that "[e]very contract, combination, in the form of trust or otherwise, or conspiracy in restraint of trade or commerce is hereby declared unlawful." RCW 19.86.030.

154. Under the Act, "'[a]ny person who is injured in his or her business or property' by a violation of the act may bring a civil suit for injunctive relief, damages, attorney fees and costs, and treble damages." *Panag*, 166 Wn.2d at 39 (citing RCW 19.86.090). And to prevail in such a claim, "the plaintiff must prove (1) an unfair or deceptive act or practice, (2) occurring in trade or commerce, (3) affecting the public interest, (4) injury to a person's business or property, and (5) causation." *Id*.

155. Amazon, Google, Facebook, and Twitter together account for over 56 percent of the $436 billion global internet advertisement market.

156. Before January 11, 2021, Parler also actively competed for internet advertising on its app and web platforms. Moreover, Parler's ability to compete in that market was about to skyrocket as a result of (a) Twitter's announcement that it had terminated former President Trump from the Twitter platform, and (b) President Trump's indication that he would move to the Parler platform, along with a large share of his 89 million Twitter followers. This dramatically increased traffic on the Parler platform would have enabled Parler to substantially increase its sales of internet advertising, with a concomitant reduction in advertising on platforms owned by Amazon, as well as platforms owned by Google, Facebook, and Twitter.

COMPLAINT - 43

157.   These four tech giants make money in this market in two ways. First, they track users to target ads to each user, and they charge advertisers more for targeted ads. Second, these companies collect and sell users' data. Together these practices make up their surveillance capitalism business model. Parler, however, did not track its users, sell their data, or use targeted ads. This enabled Parler not only to offer more privacy to its users, but also to charge lower rates for advertisements on its platform. This alternative business model posed a direct and serious threat to the surveillance capitalism model that generates massive profits for Amazon, as well as Google, Facebook, and Twitter.

158.   Because of this threat, Facebook, for example, began targeting Parler content on its platform in a way that it did not target Twitter content. Thus, identical postings on Parler and Twitter would be flagged as problematic in some way if they came from Parler but not if they came from Twitter.

159.   In mid-December 2020, Twitter, entered into a multi-year contract with AWS under which AWS would provide cloud computing services to Twitter in exchange for large sums of money.  On information and belief, part of the unwritten agreement between Twitter and AWS was that the latter would use its position as the provider of Parler's cloud services to minimize Parler's threat to the internet advertising market.

160.   On January 8, 2021, Google banned the Parler app from its Play Store, making it difficult for new customers with phones using the Android operating system developed by Google to download and use the Parler app. This severely restrained Parler's ability to increase its internet advertising market.

161.   On January 9, 2021, AWS announced it would terminate its services to Parler, preventing all existing Parler users from accessing the app and completely removing Parler from the global internet advertising market.  Subsequently, at about 12:10 am on January 11, 2021,

LAW OFFICES
CALFO EAKES LLP
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

1  AWS made good on that threat and cut off all services to Parler, thereby removing Parler from that

2  market and compromising its ability to compete in that market in the future.

3      162.  These actions restrained trade in and caused actual injury to competition in the global

4  internet advertisement market.

5      163.  These concerted actions and their effects were not undertaken by accident.   On

6  information and belief, AWS conspired with other entities to prevent Parler from increasing its

7  share of the microblogging market and, concomitantly, its share of the internet advertising market.

8  AWS and its co-conspirators undertook these actions with the intention to restrain trade in the

9  internet advertising market – again, by preventing Parler from obtaining a larger share of that

10  market and losing the share it already – and thus protecting AWS and its co-conspirators' market

11  shares.

12      164.  AWS's action in the global internet advertisement market was unfair. It affected the

13  public interest because thousands of Washingtonians who are Parler users could not use their Parler

14  accounts and were deprived of accessing internet advertising—something even more important

15  during a pandemic with lockdowns to traditional stores—that was not targeted at them.  AWS's

16  actions also compromised the ability of existing and future Parler users to use a social-media

17  platform whose business model does not require constant user surveillance.

18      165.  AWS/Amazon caused severe economic injury to Parler by depriving it of millions of

19  dollars of advertising revenues and by preventing Parler from getting online, which injury AWS

20  knew would occur given Parler's dependency on AWS and the time it would take for Parler to not

21  only find a new service provider, but also migrate its website to that provider and attempt to recover

22  from the reputational injury it had suffered at AWS's hands.

23      166.  AWS/Amazon's actions, which were taken in bad faith, violated the Washington

24  Consumer Protection Act, including but not limited to RCW 19.86.030.

25      167.  Parler is entitled to damages, attorney's fees and costs, and treble damages.

COMPLAINT - 45

**Count Seven: Washington Consumer Protection Act**

**AWS unfairly and falsely criticized Parler's moderation system as a way to preserve its market share in the global cloud services infrastructure market, after AWS decided to eject Parler from its system.**

168.  Parler restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

169.  Washington's Consumer Protection Act provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are . . . unlawful." RCW 19.86.020. The Act's purpose is to "complement the body of federal law governing restraints of trade, unfair competition and unfair, deceptive and fraudulent acts and practices in order to protect the public and foster fair and honest competition." RCW 19.86.920. And the Act is to be "liberally construed that its beneficial purposes may be served." *Id.*

170.  Further, the Act provides that "[i]t shall be unlawful for any person to monopolize, or attempt to monopolize or combine or conspire with any other person or persons to monopolize any part of trade or commerce." RCW 19.86.040.

171.  Under the Act, "'[a]ny person who is injured in his or her business or property' by a violation of the act may bring a civil suit for injunctive relief, damages, attorney fees and costs, and treble damages." *Panag*, 166 Wn.2d at 39 (citing RCW 19.86.090). And to prevail in such a claim, "the plaintiff must prove (1) an unfair or deceptive act or practice, (2) occurring in trade or commerce, (3) affecting the public interest, (4) injury to a person's business or property, and (5) causation." *Id.*

172.  AWS is the largest and one of just three integrated cloud service infrastructure providers in the world, making up 57 percent of the global integrated cloud service infrastructure market. This market provides not just web hosting, but the full services necessary to be online, as well as scalable infrastructure that enables companies to use more or less server capacity based on changing needs.

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

173.  On January 9, 2021, AWS announced it would indefinitely suspend Parler's service, falsely claiming that Parler was unable or unwilling "to remove content that encourages or incites violence against others." AWS publicly leaked that email to BuzzFeed, where it received much play in the media, and it did so with the intent of harming Parler.

174.  As a foreseeable result of these actions and public statements by AWS, Parler could not find an integrated cloud service infrastructure provider to host it and its millions of users. These actions and public statements thus ensured that AWS would not lose market share in this market by a competitor stepping in to provide those services to Parler.  AWS's actions thus were unfair and deceptive in nature, causing tremendous injury to Parler.

175.  Additionally, AWS's actions affected the public interest given that (1) thousands of Washingtonians who had Parler accounts were unable to communicate via Parler, (2) AWS eliminated competition in the market, and (3) many other current and former AWS customers face the threat of similar anti-competitive conduct by AWS.

176.  Upon information and belief, AWS engaged in these actions in an attempt to monopolize a part of trade or commerce, and/or to conspire with other entities to enable them to monopolize a part of trade or commerce.

177.  AWS's actions, which were taken in bad faith, violated the Washington Consumer Protection Act, including but not limited to RCW 19.86.040.

178.  Parler is entitled to damages, attorneys fees and costs, and treble damages.

## Count Eight: Seattle Fair Contracting Practices Ordinance

**AWS/Amazon violated the Ordinance by discriminating against Parler, in its contracting decisions, on the basis of Parler's perceived political ideology and the political content published on Parler's platform.**

179.  Parler restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

COMPLAINT - 47

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

180. The City of Seattle has enacted a Fair Contracting Practices Ordinance that declares it to be an "unfair contracting practice for any . . . Business enterprise . . . to discriminate against any person with respect to . . . the conditions, terms, price, or performance standards, [or] other provisions of a contract." Seattle, Mun. Code § 14.10.030(A). Under the Ordinance, Parler is a "person" and AWS and Amazon are "business enterprises." *Id.* § 14.10.020.

181. Under the Ordinance, to discriminate "means any act . . . whether by itself or as part of a practice, the effect of which is to adversely effect or differentiate between or among individuals or groups of individuals by reason of . . . political ideology . . . ." *Id.* And political ideology "means any idea or belief, or coordinated body of ideas or beliefs, relating to the purpose, conduct, organization, function or basis of government and related institutions and activities, whether or not characteristic of any political party or group. This term includes membership in a political party or group and includes conduct, reasonably related to political ideology, which does not interfere with job performance." *Id*. And Parler's contract with AWS was a "contract," as defined in Seattle's Fair Contracting Practices Ordinance. *Id.*

182. AWS only raised concerns about Parler after it looked like then-President Trump would join Parler and bring millions of conservative Twitter users with him. In fact, the AWS representative who was repeatedly inquiring into whether Trump was going to come to Parler was, by her Twitter account, a rabid Joe Biden fan.

183. Further, Amazon employees pressured Amazon and AWS to drop Parler, claiming credit for the move. *See* Ashley Stewart & Eugene Kim, *Some Amazon Employees Are Taking Credit for Parler's Ban*, Business Insider (Jan. 20, 2021). Additionally, "[s]ome AWS employees who . . . have speculated the decision was driven by a combination of employee unrest and major customers complaining to company leadership." *Id.* "The largest customers have executive sponsors who they can call directly, in many cases, and [Jassy, CEO of AWS] himself." *Id.* "One

COMPLAINT - 48

former senior AWS employee said the decision to boot Parler 'broke new ground' in terms of the company's enforcement actions." *Id.*

184.   One of AWS's "major customers" is Twitter. Not only did Twitter's CEO tweet his approval of AWS's actions against Parler, but "President Biden was the clear favorite of Twitter employees when it came to campaign donations during the 2020 election," and Twitter employee "donations to Democrats versus Republicans was a 98% to 2% split." Evie Fordham, *Twitter Employees Heavily Favored Biden Over Trump Ahead of 'Priceless' Ban*, Fox News (Jan. 31, 2021), https://www.foxnews.com/politics/twitter-biden-trump-ban-2020-election-donations. "Big Tech employees . . . landed top posts on the Biden-Harris transition team," with "[a]t least nine different Biden transition team members or advisors [having] previously held positions at Facebook, Google, or Twitter. Several transition team members worked in the Obama administration before joining one of the tech giants and then later reentering politics as part of the Biden team." *Id.*

185.   And it wasn't just Twitter. "Donors and political action committees affiliated with Amazon.com Inc. and other Big Tech companies are thr[ew] their money behind former Vice President Joe Biden's presidential campaign." Katie Arcieri, *Donors Affiliated with Amazon, Big Tech Throw Support Behind Biden Campaign*, S&P Global (Oct. 7, 2020), https://www.spglobal.com/marketintelligence/en/news-insights/latest-news-headlines/donors-affiliated-with-amazon-big-tech-throw-support-behind-biden-campaign-60403546.   In   fact, "[e]mployees of Google's parent, Alphabet Inc., and Microsoft Corp., Amazon.com Inc., Apple Inc. and Facebook Inc. were the *five largest sources of money* for Mr. Biden's campaign and joint fundraising committees among those identifying corporate employers, according to a Wall Street Journal analysis of campaign finance reports." Brody Mullins & Emily Glazer, *Big Tech Employees Opened Wallets for Biden Campaign*, Wall Street Journal (Feb. 20, 2021, 10:00

LAW OFFICES
CALFO EAKES LLP
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

AM) (emphasis added), https://www.wsj.com/articles/big-tech-employees-opened-wallets-for-biden-campaign-11613833201.

186.  It is not surprising, then, that news has emerged of efforts by Big Tech to stop Trump. For example, Twitter and Facebook decided to deny the then-President a platform to put out his message. *See* Dylan Byers, *How Facebook and Twitter Decided to Take Down Trump's Accounts*, NBC NEWS (Jan. 14, 2021, 5:01 PM), https://www.nbcnews.com/tech/tech-news/how-facebook-twitter-decided-take-down-trump-s-accounts-n1254317. But it was an open secret that Trump's next platform would very likely be Parler.

187.  What is more, Big Tech is worried about what a Biden Administration might do, and so has sought to curry favor with it. Thus, in early January, "Big Tech has moved swiftly to ban President Donald Trump from social media platforms, . . . and crush the upstart right-wing Twitter alternative Parler." Ryan Grim, *Behind Big Tech's Crackdown On the Right Is A Fight Over Biden Antitrust Policy*, THE INTERCEPT (Jan. 13, 2021, 10:42 AM), https://theintercept.com/2021/01/13/big-tech-antitrust-biden-ftc/. "The crackdown was . . . celebrated by Democrats across the political spectrum—precisely the audience Big Tech now needs to please." *Id.* Referring to the Georgia Senate elections, one Democratic operative observed, "It has not escaped my attention that the day social media companies decided there actually IS more they could do to police [Trump] was the same day they learned Democrats would chair all the congressional committees that oversee them." *Id.*

188.  Pressure from congressional Democrats had been mounting on Big Tech for the last few years. For example, in April 2019, after a congressional hearing directed at online hate speech and white nationalist content, Democratic Congressman Cedric Richmond, now a top White House adviser,  informed Big Tech companies that they had "better" restrict what he and other members of Congress deemed as harmful content or, "We're going to make [regulation] swift, we're going to make it strong, and we're going to hold them very accountable." Tony Romm, *Analysis | The*

LAW OFFICES
CALFO EAKES LLP
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

*Technology 202: Lawmakers Plan to Ratchet Up Pressure on Tech Companies' Content Moderation Policies*, WASHINGTON POST (Apr. 9, 2019, 8:58 AM). Democratic Congressman and chair of the House Judiciary Committee Jerry Nadler added, "Let's see what happens by just pressuring them." *Id.*

189.   That same month, Speaker of the House Nancy Pelosi warned that a "new era" of regulating tech giants was coming and that Section 230 could be "in jeopardy." Emily Birnbaum, *Pelosi Puts Tech On Notice With Warning of 'New Era' In Regulation*, THE HILL (Apr. 12, 2019, 1:48 PM), https://thehill.com/policy/technology/438652-pelosi-warns-its-a-new-era-for-regulating-big-tech. Speaker Pelosi further commented that "the era of self-regulation" in this country for Big Tech is "probably" over, and that "[w]hen we come to 230, you really get their attention . . . it is not out of the question that that could be removed" because "for the privilege of 230, there has to be a bigger sense of responsibility on it." *Id.*

190.   In June 2020, Speaker Pelosi declared that "social media executives have utterly failed to stop the spread of disinformation on their platforms." William Turvill, *Nancy Pelosi: Social Media Bosses Have 'Utterly Failed' to Combat Covid-19 Disinformation*, PRESSGAZETTE (June 17, 2020), https://www.pressgazette.co.uk/nancy-pelosi-social-media-bosses-have-utterly-failed-to-combat-covid-19-disinformation/. And she then warned that Congress and others "must send a message to social media executives: You will be held accountable for your misconduct." *Id.*

191.   In July 2020, a House antitrust committee questioned the CEOs of the biggest tech internet platforms, including Jeff Bezos of Amazon, as to whether those platforms were engaging in monopolistic or other anticompetitive conduct in violation of federal antitrust law. At these hearings, Democratic Congressman Jamie Raskin accused the tech companies of not taking strong enough action to block "the rapid spread of hate messages online, the presence of boogaloo and other right-wing extremist groups trying to infiltrate and disrupt Black Lives Matter protests and

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

the fact that alt-right racists and anti-Semitic content flourishes on Facebook." STAFF OF H. COMM. ON THE JUDICIARY, 116TH CONG., MAJORITY STAFF REPORT AND RECOMMENDATIONS: INVESTIGATION OF COMPETITION IN DIGITAL MARKETS 68 (Comm. Print 2020). The subcommittee report, which proposed sweeping antitrust measures that if acted upon would have drastic economic consequences for Big Tech platforms, including AWS, expressly flagged the failure of Big Tech to curb such content as supposed evidence of the lack of meaningful competition in their markets. *Id.* at 67. The implication of these remarks was that the Big Tech platforms' failure to take stronger action to block content Democratic congressmen deemed dangerous would increase the likelihood of a Democratic administration pursuing devastating antitrust remedies against the Big Tech giants.

192.   In October 2020, the Senate Commerce Committee held another congressional hearing on the failure of Big Tech to curb "hate speech and misinformation" online, voting to subpoena Big Tech CEOs if they didn't agree to testify voluntarily. Marcy Gordon, *CEOs of 3 Tech Giants To Testify at Oct. 28 Senate Hearing*, ABC NEWS, (Oct. 5, 2020, 5:01 PM), https://abcnews.go.com/Business/wireStory/ceos-social-media-giants-testify-senate-hearing-73433414. The Committee once again threatened adverse legal consequences against the major tech platforms, with Democratic committee members again focusing on "the need for more content moderation." Lauren Feiner, *Big Tech CEO Senate Hearing Ends with Little Discussion on How To Fix Companies' Liability Shield*, CNBC (Oct. 28, 2020, 2:03 PM), https://www.cnbc.com/2020/10/28/facebook-google-and-twitter-ceos-testify-in-congress-over-section-230-live-updates.html.

193.   The next month, in November 2020, President-elect Biden announced that Congressman Richmond would be joining the White House in January 2021 to serve as a Senior Advisor to the President. *See* Bart Jansen, *Joe Biden Names 9 Top White House Appointees, Including Rep. Cedric Richmond and Campaign Manager O'Malley Dillon*, USA TODAY

LAW OFFICES
CALFO EAKES LLP
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

(Nov. 17, 2020, 11:04 AM). And Facebook is "under the close eye of the Biden administration, which has signaled its displeasure with Facebook's handling of its platforms in the months leading to the election." Horwitz, *supra* ¶ 32.

194.  It's no coincidence that AWS didn't move to muzzle Parler until after the Georgia Senate runoff elections showed that the Democratic Party would control both houses of Congress and the White House. Senator Richard Blumenthal even attributed the actions by Big Tech in early January to "a shift in the political winds." Richard Blumenthal, (@SenBlumenthal), TWITTER (Jan. 8, 2021, 8:44 PM), https://twitter.com/SenBlumenthal/status/1347720813076733954.

195.  And on January 8, 2021, Democratic Congressman Ro Khanna tweeted that "Parler is hosted by Amazon Web Services (AWS)," and "Amazon should deny Parler services until Jan 21 unless they commit to removing all posts related to incitement of violence concerning inauguration." Ro Khanna (@RoKhanna), TWITTER (Jan. 8, 2021, 7:56 PM), https://twitter.com/rokhanna/status/1347708745070030850?lang=en. And AWS obliged, but wilfully ignored Parler's successful efforts.

196.  Upon information and belief, AWS and Amazon discriminated against Parler due to the conservative content its users frequently posted, as well to deny then-President Trump a platform to espouse his political views. AWS and Amazon did this to curry favor both with their own employees and with the incoming Biden administration, as well as out of the organization's own dominant political ideology.

197.  AWS and Amazon were not, however, acting pursuant to any federal or state laws. And Parler is not seeking any redress against any government official whose statements and/or actions may have played a role in these companies' decisions about Parler.

198.  As described above, the political discrimination against Parler violated Seattle's Fair Contracting Practices Ordinance.  And Parler has been injured by the unfair contracting practices of AWS and Amazon.

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

199.  Under the Ordinance, Parler is entitled to lost profits, attorney's fees, and actual and exemplary damages. Seattle, Mun. Code § 14.10.110(A).

### B. Post-Termination Conduct

### Count Nine: Breach of Contract

**AWS violated Sections 3.1 and 3.2 of the contract by selling Parler users' data to third parties.**

200.  Parler restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

201.  Under Washington law, "[a] breach of contract is actionable only if the contract imposes a duty, the duty is breached, and the breach proximately causes damage to the claimant." *See Northwest Independent Forest Manufacturers*, 78 Wn. App. at 712. Each of those elements is satisfied here.

202.  As to duty: the contract (AWS Customer Agreement) imposes a duty on AWS that it "will implement reasonable and appropriate measures designed to help you secure [Parler's] Content against accidental or unlawful loss, access or disclosure." § 3.1. Additionally, the contract imposes a duty on AWS that AWS "will not . . . disclose [Parler's] Content to any government or third party, . . . except in each case as necessary to comply with the law or a binding order of a governmental body." § 3.2.

203.  AWS has breached these duties in bad faith, as Parler has discovered that Amazon has been secretly selling Parler's user data—specifically images and video—to whomever has an Amazon S3 account and is willing to pay to download it. Thus, Amazon is sharing Parler user data in violation of AWS's contract with Parler—and profiting to boot. And no law or government body has required such profiteering.

204.  AWS's actions proximately caused severe reputational and financial harm to Parler as users will no longer trust Parler to keep their private data safe. This will both cause Parler to

COMPLAINT - 54

lose current users, but also make it harder for Parler to obtain future users, significantly reducing Parler's advertising revenues.

*205.* Parler is entitled to damages and exemplary damages.

**Count Ten: Tortious Interference with a Contract or Business Expectancy**

**By selling Parler's user data after it terminated the Parler contract, AWS intentionally interfered with Parler's contracts with current and future users.**

206. Parler restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

207. Under Washington law, to establish a claim for tortious interference with a contract or expectancy, a plaintiff must prove: "(1) the existence of a valid contractual relationship or business expectancy; (2) the defendant's knowledge of that relationship; (3) an intentional interference inducing or causing a breach or termination of the relationship or expectancy; (4) the defendant's interference for an improper purpose or by improper means; and (5) resulting damage." *Koch*, 108 Wn. App. at 506.

208. AWS knew that Parler had contracts with its millions of current users and expected to enter into contracts with millions more in the near future given how quickly Parler was bringing on new users.

209. After the termination, AWS intentionally interfered in bad faith with these current and future contracts by secretly selling Parler's user data—specifically images and video—to whomever has an Amazon S3 account and is willing to pay to download it.

210. AWS's actions have caused Parler to breach its contracts with its current users as it has allowed these users' private data to be obtained by third parties without the users' consent. This will also cause many future users to not sign up for a Parler account for fear that Parler will likewise not be able to protect their data.

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

211. AWS sold this data to harm Parler—making AWS's tortious interference one of improper purpose. As pertinent here, moreover, AWS's conduct did not relate to or arise out of its contract with Parler, nor any of AWS's products or services.

212. AWS's actions caused severe reputational and financial harm to Parler as users will no longer trust Parler to keep their private data safe. This will both cause Parler to lose current users, but also make it harder for Parler to obtain future users, significantly reducing Parler's advertising revenues.

213. Parler is entitled to damages and exemplary damages.

### Count Eleven: Washington Consumer Protection Act

**After the termination, AWS engaged in additional deceptive and unfair trade practices, injuring Parler.**

214. Parler restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

215. The Washington Consumer Protection Act provides that "unfair or deceptive acts or practices in the conduct of any trade or commerce are . . . unlawful." RCW 19.86.020.

216. Under the Act, "'[a]ny person who is injured in his or her business or property' by a violation of the act may bring a civil suit for injunctive relief, damages, attorney fees and costs, and treble damages." *Panag*, 166 Wn.2d at 39 (citing RCW 19.86.090). And to prevail in such a claim, "the plaintiff must prove (1) an unfair or deceptive act or practice, (2) occurring in trade or commerce, (3) affecting the public interest, (4) injury to a person's business or property, and (5) causation." *Id.*

217. After terminating its contract with Parler, AWS engaged in an unfair and deceptive series of acts and practices, in bad faith, in the course of trade and commerce, that caused substantial injury to Parler. Further, AWS's acts and practices were and are harmful to the public interest.

COMPLAINT - 56

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

218.  After terminating Parler's services and the contract between them, AWS continued to inhibit Parler's ability to compete in the microblogging and digital advertising markets by facilitating the hacking of Parler's backup servers, and by selling the private data of Parler users. These actions inflicted enormous competitive harm on Parler, and further delayed its ability to recover the revenues and potential market value it enjoyed and reasonably anticipated before AWS's actions.

219.  AWS's series of acts and practices was deceptive and unfair. AWS deceived Parler into believing that, once services were terminated, AWS would take no further actions that would harm Parler. AWS also deceived Parler into believing that Parler's user data was safe with AWS.

220.  AWS's unfair and deceptive acts and practices impact the public interest. Among other things, through these acts and practices, millions of Americans' voices were silenced, including thousands in Washington. Further, thousands of Washingtonians' Parler data was secretly sold, compromising their privacy.

221.  As pertinent here, AWS's conduct did not relate to or arise out of its contract with Parler, nor any of AWS's products or services.

222.  AWS's unfair and deceptive acts and practices have resulted in substantial damages to Parler, including but not limited to the loss of millions of dollars of revenue from advertisements.

### Count Twelve: Negligence

**By negligently directing hackers to Parler's backup databases after it terminated the Parler contract, AWS caused massive financial and reputational harm to Parler.**

223.  Parler restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

224.  To prove negligence in Washington requires four elements: "(1) the existence of a duty, (2) breach of that duty, (3) resulting injury, and (4) proximate cause." *Degel v. Majestic Mobile Manor, Inc.*, 129 Wn.2d 43, 48, 914 P.2d 728 (1996).

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

225.  AWS, possessing as it did the technically ability to harm Parler as its former customer, possessed at least a duty of reasonable care to avoid causing Parler injury, if not a heightened duty of care given its ability to harm Parler in a way that other entities not providing Parler services could not.

226.  AWS breached that duty when, after shutting off all its services to Parler, AWS negligently left open Route 53, a highly scalable domain name system (DNS), which conveniently directed hackers to Parler's backup datacenters and allowed the hackers to initiate a sizeable DNS attack. In other words, AWS essentially illuminated a large neon arrow directing hackers to Parler's backup datacenters. And the hackers got the message, launching an extremely large attack—one 250 times larger and 12-24 times longer than the average Direct Denial of Service (DDOS) attack. Later AWS terminated the Route 53 link, but the damage was done. Thus, AWS proximately caused this hacking attack and the damage to Parler's ability to enter into service contracts with other providers, which resulted in Parler being unable to get back online.

227.  AWS was not only negligent; it also acted in bad faith. This AWS-facilitated attack functioned as a threat to all future datacenters that, if they were to host Parler, they would be attacked by unprecedented hacks. AWS created the toxic notoriety of massive hacking attacks for Parler, driving away nearly all other hosting services that Parler had hoped to use.

228.  As pertinent here, AWS's conduct did not relate to or arise out of its contract with Parler, nor any of AWS's products or services.

229.  This negligence has resulted in significant injury to Parler, massively delaying Parler's ability to get back online, directly depriving Parler of millions of dollars of advertising revenue, and harming Parler's reputation and ability to attract users, which users are now flocking to other platforms.

230.  Parler is therefore entitled to damages.

COMPLAINT - 58

**Count Thirteen: Tortious Interference with a Contract or Business Expectancy**

**By directing hackers to Parler's backup databases after terminating the Parler contract, AWS intentionally and maliciously interfered with Parler's expected future contracts with other service providers.**

231.  Parler restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

232.  Under Washington law, to establish a claim for tortious interference with a contract or expectancy, a plaintiff must prove: "(1) the existence of a valid contractual relationship or business expectancy; (2) the defendant's knowledge of that relationship; (3) an intentional interference inducing or causing a breach or termination of the relationship or expectancy; (4) the defendant's interference for an improper purpose or by improper means; and (5) resulting damage." *Koch*, 108 Wn. App. at 506.

233.  AWS knew that as soon as it booted Parler, Parler would seek an alternative hosting service. Thus, AWS knew of the business expectancy Parler would have with another hosting service.

234.  After AWS shut off all services to Parler, AWS intentionally left open Route 53, a highly scalable domain name system (DNS), which directed hackers to Parler's backup datacenters and caused the hackers to initiate a sizeable DNS attack. In other words, AWS essentially illuminated a large neon arrow directing hackers to Parler's backup datacenters. AWS acted in bad faith. And the hackers got the message, launching an extremely large attack—one 250 times larger and 12-24 times longer than the average Distributed Denial of Service (DDOS) attack. Later AWS terminated the Route 53 link, but the damage was done. And this AWS-facilitated attack was an intentionally facilitated threat by AWS to all future datacenters that, if they were to host Parler, they would be attacked by unprecedented hacks. In short, AWS intentionally and maliciously created a toxic notoriety of massive hacking attacks for Parler, driving away nearly all other

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

hosting services that Parler had hoped to use, thereby interfering the Parler's ability to engage in those critical business relationships.

235.   There is no legitimate reason for AWS intentionally to leave open Route 53 and direct hackers to Parler's backup datacenter. AWS did so to harm Parler. It thus intentionally and maliciously interfered with Parler's expected future business with service providers by improper means and for an improper purpose.

236.   As pertinent here, AWS's conduct did not relate to or arise out of its contract with Parler, nor any of AWS's products or services.

237.   Because of AWS's actions, Parler has suffered substantial damage in the form of delay in getting back online, losing millions of dollars in advertising revenue, suffering reputational damage, and losing millions of future users who are now joining or have joined other platforms.

238.   AWS's conduct was willful and malicious. Parler is therefore entitled to actual and exemplary damages.

## Count Fourteen: Washington Consumer Protection Act

**AWS unfairly used Parler's dependence on AWS after it terminated the contract to thwart Parler's expansion of its share of the global internet advertising market, in which AWS itself was competing.**

239.   Parler restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

240.   Washington's Consumer Protection Act provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are . . . unlawful." RCW 19.86.020. The Act's purpose is to "complement the body of federal law governing restraints of trade, unfair competition and unfair, deceptive and fraudulent acts and practices in order to protect the public and foster fair and honest competition." RCW 19.86.920. And the Act is to be "liberally construed that its beneficial purposes may be served." *Id.*

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

241. Further, the act provides that "[e]very contract, combination, in the form of trust or otherwise, or conspiracy in restraint of trade or commerce is hereby declared unlawful." RCW 19.86.030.

242. Under the Act, "'[a]ny person who is injured in his or her business or property' by a violation of the act may bring a civil suit for injunctive relief, damages, attorney fees and costs, and treble damages." *Panag*, 166 Wn.2d at 39 (citing RCW 19.86.090). And to prevail in such a claim, "the plaintiff must prove (1) an unfair or deceptive act or practice, (2) occurring in trade or commerce, (3) affecting the public interest, (4) injury to a person's business or property, and (5) causation." *Id.*

243. Amazon, Google, Facebook, and Twitter together account for over 56 percent of the $436 billion global internet advertisement market.

244. Before January 11, 2021, Parler also actively competed for internet advertising on its app and web platforms. Moreover, Parler's ability to compete in that market was about to skyrocket as a result of (a) Twitter's announcement that it had terminated former President Trump from the Twitter platform, and (b) President Trump's indication that he would move to the Parler platform, along with a large share of his 89 million Twitter followers. This dramatically increased traffic on the Parler platform would have enabled Parler to substantially increase its sales of internet advertising, with a concomitant reduction in advertising on platforms owned by Amazon, as well as platforms owned by Google, Facebook, and Twitter.

245. These four tech giants make money in this market in two ways. First, they track users to target ads to each user, and they charge advertisers more for targeted ads. Second, these companies collect and sell users' data. Together these practices make up their surveillance capitalism business model. Parler, however, did not track its users, sell their data, or use targeted ads. This enabled Parler not only to offer more privacy to its users, but also to charge lower rates for advertisements on its platform. This alternative business model posed a direct and serious threat

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

to the surveillance capitalism model that generates massive profits for Amazon, as well as Google, Facebook, and Twitter.

246.  After AWS terminated its contract with Parler and Parler's services, AWS continued to inhibit Parler's ability to compete in the global internet advertising market by facilitating the hacking of Parler's backup servers, and by selling the private data of Parler users.  These actions inflicted enormous competitive harm on Parler, and further delayed its ability to recover the revenues and potential market value it enjoyed and reasonably anticipated before AWS's actions.

247.  All of these actions restrained trade in and caused actual injury to competition in the global internet advertisement market.

248.  These concerted actions and their effects were not undertaken by accident.   On information and belief, AWS conspired with other entities to prevent Parler from taking advantage of Twitter's decision to terminate Trump's Twitter account, thereby preventing Parler from dramatically increasing its share of the microblogging market and, concomitantly, its share of the internet advertising market.   AWS and its co-conspirators undertook these actions with the intention to restrain trade in the internet advertising market – again, by preventing Parler from obtaining a larger share of that market and losing the share it already – and thus protecting AWS and its co-conspirators' market shares.

249.  AWS's action in the global internet advertisement market was unfair. It affected the public interest because thousands of Washingtonians who are Parler users could not use their Parler accounts and were deprived of accessing internet advertising—something even more important during a pandemic with lockdowns to traditional stores—that was not targeted at them.  AWS's actions also compromised the ability of existing and future Parler users to use a social-media platform whose business model does not require constant user surveillance.

250.  AWS caused severe economic injury to Parler by depriving it of millions of dollars of advertising revenues and by making it extremely difficult for Parler to get back online with

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

1    another service provider, which injury AWS knew would occur given the reputational injury Parler

2    had suffered at AWS's hands.

3         251.   As pertinent to this claim, AWS's conduct did not relate to or arise out of its contract

4    with Parler, nor any of AWS's products or services.

5         252.   AWS/Amazon's actions, which were taken in bad faith, violated the Washington

6    Consumer Protection Act, including but not limited to RCW 19.86.030.

7         253.   Parler is entitled to damages, attorney's fees and costs, and treble damages.

8    **Count Fifteen: Washington Consumer Protection Act**

9    **AWS unfairly compromised Parler's reputation after its termination as a way to preserve
     its market share in the global cloud services infrastructure market, once AWS decided to
10   eject Parler from its system.**

11        254.   Parler restates, re-alleges, and incorporates by reference each of the allegations set

12   forth in the rest of this Complaint as if fully set forth herein.

13        255.   Washington's Consumer Protection Act provides that "[u]nfair methods of

14   competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are

15   . . . unlawful." RCW 19.86.020. The Act's purpose is to "complement the body of federal law

16   governing restraints of trade, unfair competition and unfair, deceptive and fraudulent acts and

17   practices in order to protect the public and foster fair and honest competition." RCW 19.86.920.

18   And the Act is to be "liberally construed that its beneficial purposes may be served." Id.

19        256.   Further, the Act provides that "[i]t shall be unlawful for any person to monopolize,

20   or attempt to monopolize or combine or conspire with any other person or persons to monopolize

21   any part of trade or commerce." RCW 19.86.040.

22        257.   Under the Act, "'[a]ny person who is injured in his or her business or property' by a

23   violation of the act may bring a civil suit for injunctive relief, damages, attorney fees and costs,

24   and treble damages." *Panag*, 166 Wn.2d at 39 (citing RCW 19.86.090). And to prevail in such a

25   claim, "the plaintiff must prove (1) an unfair or deceptive act or practice, (2) occurring in trade or

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

1   commerce, (3) affecting the public interest, (4) injury to a person's business or property, and (5)

2   causation." *Id.*

3   258.  AWS is the largest and one of just three integrated cloud service infrastructure

4   providers in the world, making up 57 percent of the global integrated cloud service infrastructure

5   market. This market provides not just web hosting, but the full services necessary to be online, as

6   well as scalable infrastructure that enables companies to use more or less server capacity based on

7   changing needs.

8   259.  After shutting down all of Parler's services and terminating its contract with Parler,

9   AWS left open Route 53, a highly scalable domain name system. This directed hackers to Parler's

10   backup datacenters, causing hackers to initiate a sizable DNS attack. AWS's action sent a message

11   to any other cloud service company that, if it hosted Parler, it would also be subjected to

12   unprecedented hacker attacks. AWS did so with the intent of preventing Parler from obtaining

13   hosting services from other cloud service providers in order to further AWS's attempt to

14   monopolize the market for the global integrated cloud service infrastructure market.

15   260.  As a foreseeable result of these actions by AWS, Parler could not find an integrated

16   cloud service infrastructure provider to host it and its millions of users.  AWS's actions thus

17   ensured that AWS would not lose market share in this market by a competitor stepping in to

18   provide those services to Parler.  AWS's actions thus were unfair and deceptive in nature, causing

19   tremendous injury to Parler.

20   261.  Additionally, AWS's actions affected the public interest given that thousands of

21   Washingtonians who had Parler accounts were unable to communicate via Parler.

22   262.  Upon information and belief, AWS engaged in these actions in an attempt to

23   monopolize a part of trade or commerce, and/or to conspire with other entities to enable them to

24   monopolize a part of trade or commerce.

25

COMPLAINT - 64

263.  AWS's actions, which were taken in bad faith, violated the Washington Consumer Protection Act, including but not limited to RCW 19.86.040.

264.  As pertinent here, AWS's conduct did not relate to or arise out of its contract with Parler, nor any of AWS's products or services.

265.  Parler is entitled to damages, attorneys fees and costs, and treble damages.

## V.    PRAYER FOR RELIEF

Parler prays for judgment against AWS as follows:

1. Provide a jury trial on any issue triable of right by a jury.

2. Grant Parler damages, including trebled and exemplary damages, in an amount to be determined at trial.

3. Grant Parler attorney's fees and costs.

4. Grant Parler other such relief as the Court deems just and proper.

DATED this 2nd day of March 2021.

**CALFO EAKES LLP**


By *s/   Angelo J. Calfo*
Angelo J. Calfo, WSBA# 27079
CALFO EAKES LLP
1301 Second Avenue, Suite 2800
Seattle, WA  98101
(206) 407-2200 | Phone
(206) 407-2224 | Fax
Email:  angeloc@calfoeakes.com

COMPLAINT - 65

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

David J. Groesbeck, WSBA No. 24749
DAVID J. GROESBECK, P.S.
1333 E. Johns Prairie Rd.
Shelton, WA  98584 (509) 747-2800
Email:  david@groesbecklaw.com

Gene C. Schaerr
H. Christopher Bartolomucci
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
*(pro hac motions to be filed)*

*Counsel for Plaintiff Parler LLC*

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL, (206) 407-2200   FAX, (206) 407-2224

**FILED**
2021 MAR 02 04:27 PM
KING COUNTY
SUPERIOR COURT CLERK
E-FILED
CASE #: 21-2-02856-6 SEA

**IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON**
**FOR THE COUNTY OF KING**

| | |
|---|---|
| PARLER LLC | NO. 21-2-02856-6  SEA |
| Plaintiff(s) | ORDER SETTING CIVIL CASE SCHEDULE |
| vs | |
| | ASSIGNED JUDGE: LUM, Dept. 12 |
| INC. AMAZON WEB SERVICES, INC. AND AMAZON.COM | |
| | FILED DATE: 03/02/2021 |
| Defendant(s) | TRIAL DATE:02/28/2022 |

A civil case has been filed in the King County Superior Court and will be managed by the Case Schedule on Page 3 as ordered by the King County Superior Court Presiding Judge.

### I. NOTICES

**NOTICE TO PLAINTIFF:** The Plaintiff may serve a copy of this **Order Setting Case Schedule (Schedule)** on the Defendant(s) along with the **Summons and Complaint/Petition.** Otherwise, the Plaintiff shall serve the *Schedule* on the Defendant(s) within 10 days after the later of: (1) the filing of the **Summons and Complaint/Petition** or (2) service of the Defendant's first response to the **Complaint/Petition**, whether that response is a **Notice of Appearance**, a response, or a Civil Rule 12 (CR 12) motion.  The **Schedule** may be served by regular mail, with proof of mailing to be filed promptly in the form required by Civil Rule 5 (CR 5).

**NOTICE TO ALL PARTIES:**
All attorneys and parties should make themselves familiar with the King County Local Rules [*KCLCR*] -- especially those referred to in this **Schedule**. In order to comply with the **Schedule**, it will be necessary for attorneys and parties to pursue their cases vigorously from the day the case is filed. For example, discovery must be undertaken promptly in order to comply with the deadlines for joining additional parties, claims, and defenses, for disclosing possible witnesses [*See KCLCR 26*], and for meeting the discovery cutoff date [*See KCLCR 37(g)*].
              **You are required to give a copy of these documents to all parties in this case.**

3

### I. NOTICES (continued)

**CROSSCLAIMS, COUNTERCLAIMS AND THIRD PARTY COMPLAINTS:**
A filing fee of **$240** must be paid when any answer that includes additional claims is filed in an existing case.

**KCLCR 4.2(a)(2)**
A Confirmation of Joinder, Claims and Defenses or a Statement of Arbitrability must be filed by the deadline in the schedule.  The court will review the confirmation of joinder document to determine if a hearing is required.  If a Show Cause order is issued, all parties cited in the order must appear before their Chief Civil Judge.

**PENDING DUE DATES CANCELED BY FILING PAPERS THAT RESOLVE THE CASE:**
When a final decree, judgment, or order of dismissal of all parties and claims is filed with the Superior Court Clerk's Office, and a courtesy copy delivered to the assigned judge, all pending due dates in this *Schedule* are automatically canceled, including the scheduled Trial Date. It is the responsibility of the parties to 1) file such dispositive documents within 45 days of the resolution of the case, and 2) strike any pending motions by notifying the bailiff to the assigned judge.

 Parties may also authorize the Superior Court to strike all pending due dates and the Trial Date by filing a *Notice of Settlement* pursuant to KCLCR 41, and forwarding a courtesy copy to the assigned judge. If a final decree, judgment or order of dismissal of all parties and claims is not filed by 45 days after a *Notice of Settlement*, the case may be dismissed with notice.

**If you miss your scheduled Trial Date**, the Superior Court Clerk is authorized by KCLCR 41(b)(2)(A) to present an *Order of Dismissal*, without notice, for failure to appear at the scheduled Trial Date.

**NOTICES OF APPEARANCE OR WITHDRAWAL AND ADDRESS CHANGES:**
*All parties to this action must keep the court informed of their addresses.* When a Notice of Appearance/Withdrawal or Notice of Change of Address is filed with the Superior Court Clerk's Office, parties must provide the assigned judge with a courtesy copy.

 **ARBITRATION FILING AND TRIAL DE NOVO POST ARBITRATION FEE:**
A Statement of Arbitrability must be filed by the deadline on the schedule **if the case is subject to mandatory arbitration** and service of the original complaint and all answers to claims, counterclaims and cross-claims have been filed.  If mandatory arbitration is required after the deadline, parties must obtain an order from the assigned judge transferring the case to arbitration. **Any party filing a Statement must pay a $250 arbitration fee**. If a party seeks a trial de novo when an arbitration award is appealed, a fee of $400 and the request for trial de novo must be filed with the Clerk's Office Cashiers.

**NOTICE OF NON-COMPLIANCE FEES:**
**All** parties will be assessed a fee authorized by King County Code 4A.630.020 whenever the Superior Court Clerk must send notice of non-compliance of schedule requirements and/or Local Civil Rule 41.

**King County Local Rules are available for viewing at www.kingcounty.gov/courts/clerk.**

## II. CASE SCHEDULE

| * | CASE EVENT | EVENT DATE |
|---|---|---|
| | Case Filed and Schedule Issued. | 03/02/2021 |
| * | Last Day for Filing Statement of Arbitrability without a Showing of Good Cause for Late Filing [*See KCLMAR 2.1(a) and Notices on Page 2*]. **$220 arbitration fee must be paid** | 08/10/2021 |
| * | **DEADLINE** to file Confirmation of Joinder if not subject to Arbitration [*See KCLCR 4.2(a) and Notices on Page 2*]. | 08/10/2021 |
| | **DEADLINE** for Hearing Motions to Change Case Assignment Area [*KCLCR 82(e)*]. | 08/24/2021 |
| | **DEADLINE** for Disclosure of Possible Primary Witnesses [*See KCLCR 26(k)*]. | 09/27/2021 |
| | **DEADLINE** for Disclosure of Possible Additional Witnesses [*See KCLCR 26(k)*]. | 11/08/2021 |
| | **DEADLINE** for Jury Demand [*See KCLCR 38(b)(2)*]. | 11/22/2021 |
| | **DEADLINE** for a Change in Trial Date [*See KCLCR 40(e)(2)*]. | 11/22/2021 |
| | **DEADLINE** for Discovery Cutoff [*See KCLCR 37(g)*]. | 01/10/2022 |
| | **DEADLINE** for Engaging in Alternative Dispute Resolution [*See KCLCR 16(b)*]. | 01/31/2022 |
| | **DEADLINE**: Exchange Witness & Exhibit Lists & Documentary Exhibits [*KCLCR 4(j)*]. | 02/07/2022 |
| * | **DEADLINE** to file Joint Confirmation of Trial Readiness [*See KCLCR 16(a)(1)*] | 02/07/2022 |
| | **DEADLINE** for Hearing Dispositive Pretrial Motions [*See KCLCR 56; CR 56*]. | 02/14/2022 |
| * | Joint Statement of Evidence [*See KCLCR 4 (k)*] | 02/22/2022 |
| | **DEADLINE** for filing Trial Briefs, Proposed Findings of Fact and Conclusions of Law and Jury Instructions (Do not file proposed Findings of Fact and Conclusions of Law with the Clerk) | 02/22/2022 |
| | Trial Date [*See KCLCR 40*]. | 02/28/2022 |

The * indicates a document that must be filed with the Superior Court Clerk's Office by the date shown.

## III. ORDER

Pursuant to King County Local Rule 4 [*KCLCR 4*], IT IS ORDERED that the parties shall comply with the schedule listed above. Penalties, including but not limited to sanctions set forth in Local Rule 4(g) and

_____

PRESIDING JUDGE

## IV. ORDER ON CIVIL PROCEEDINGS FOR ASSIGNMENT TO JUDGE

**READ THIS ORDER BEFORE CONTACTING YOUR ASSIGNED JUDGE.**
This case is assigned to the Superior Court Judge whose name appears in the caption of this case schedule.  The assigned Superior Court Judge will preside over and manage this case for all pretrial matters.

**COMPLEX LITIGATION:**  If you anticipate an unusually complex or lengthy trial, please notify the assigned court as soon as possible.

**APPLICABLE RULES:**  Except as specifically modified below, all the provisions of King County Local Civil Rules 4 through 26 shall apply to the processing of civil cases before Superior Court Judges.  The local civil rules can be found at www.kingcounty.gov/courts/clerk/rules/Civil.

**CASE SCHEDULE AND REQUIREMENTS:**  Deadlines are set by the case schedule, issued pursuant to Local Civil Rule 4.

**THE PARTIES ARE RESPONSIBLE FOR KNOWING AND COMPLYING WITH ALL DEADLINES IMPOSED BY THE COURT'S LOCAL CIVIL RULES.**

### A. Joint Confirmation regarding Trial Readiness Report
No later than twenty one (21) days before the trial date, parties shall complete and file (with a copy to the assigned judge) a joint confirmation report setting forth whether a jury demand has been filed, the expected duration of the trial, whether a settlement conference has been held, and special problems and needs (e.g., interpreters, equipment).

The Joint Confirmation Regarding Trial Readiness form is available at www.kingcounty.gov/courts/scforms. If parties wish to request a CR 16 conference, they must contact the assigned court.  Plaintiff's/petitioner's counsel is responsible for contacting the other parties regarding the report.

### B. Settlement/Mediation/ADR
a. Forty five (45) days before the trial date, counsel for plaintiff/petitioner shall submit a written settlement demand.  Ten (10) days after receiving plaintiff's/petitioner's written demand, counsel for defendant/respondent shall respond (with a counter offer, if appropriate).

b. Twenty eight (28) days before the trial date, a Settlement/Mediation/ADR conference shall have been held.  FAILURE TO COMPLY WITH THIS SETTLEMENT CONFERENCE REQUIREMENT MAY RESULT IN SANCTIONS.

### C. Trial
Trial is scheduled for 9:00 a.m. on the date on the case schedule or as soon thereafter as convened by the court.  The Friday before trial, the parties should access the court's civil standby calendar on the King County Superior Court website www.kingcounty.gov/courts/superiorcourt to confirm the trial judge assignment.

## MOTIONS PROCEDURES

### A. Noting of Motions

**Dispositive Motions:**  All summary judgment or other dispositive motions will be heard with oral argument before the assigned judge.  The moving party must arrange with the hearing judge a date and time for the hearing, consistent with the court rules.  Local Civil Rule 7 and Local Civil Rule 56 govern procedures for summary judgment or other motions that dispose of the case in whole or in part.  The local civil rules can be found at www.kingcounty.gov/courts/clerk/rules/Civil.

**Non-dispositive Motions:**  These motions, which include discovery motions, will be ruled on by the assigned judge without oral argument, unless otherwise ordered.  All such motions must be noted for a date by which the ruling is requested; this date must likewise conform to the applicable notice requirements.  Rather than noting a time of day, the Note for Motion should state "Without Oral Argument."  Local Civil Rule

3

7 governs these motions, which include discovery motions.  The local civil rules can be found at www.kingcounty.gov/courts/clerk/rules/Civil.

**Motions in Family Law Cases not involving children:** Discovery motions to compel, motions in limine, motions relating to trial dates and motions to vacate judgments/dismissals shall be brought before the assigned judge.  All other motions should be noted and heard on the Family Law Motions calendar.  Local Civil Rule 7 and King County Family Law Local Rules govern these procedures.  The local rules can be found at www.kingcounty.gov/courts/clerk/rules.

**Emergency Motions:**   Under the court's local civil rules, emergency motions will usually be allowed only upon entry of an Order Shortening Time.  However, some emergency motions may be brought in the Ex Parte and Probate Department as expressly authorized by local rule.  In addition,  discovery disputes may be addressed by telephone call and without written motion, if the judge approves in advance.

**B.  Original Documents/Working Copies/ Filing of Documents:  All original documents must be filed with the Clerk's Office.**  Please see information on the Clerk's Office website at www.kingcounty.gov/courts/clerk regarding the requirement outlined in LGR 30 that attorneys must e-file documents in King County Superior Court.  The exceptions to the e-filing requirement are also available on the Clerk's Office website. The local rules can be found at www.kingcounty.gov/courts/clerk/rules.

The working copies of all documents in support or opposition must be marked on the upper right corner of the first page with the date of consideration or hearing and the name of the assigned judge.  The assigned judge's working copies must be delivered to his/her courtroom or the Judges' mailroom.  Working copies of motions to be heard on the Family Law Motions Calendar should be filed with the Family Law Motions Coordinator.  Working copies can be submitted through the Clerk's office E-Filing application at www.kingcounty.gov/courts/clerk/documents/eWC.

**Service of documents:** Pursuant to Local General Rule 30(b)(4)(B), e-filed documents shall be electronically served through the e-Service feature within the Clerk's eFiling application.  Pre-registration to accept e-service is required.  E-Service generates a record of service document that can be e-filed.  Please see the Clerk's office website at www.kingcounty.gov/courts/clerk/documents/efiling regarding E-Service.

**Original Proposed Order:** Each of the parties must include an original proposed order granting requested relief with the working copy materials submitted on any motion.  **Do not file the original of the proposed order with the Clerk of the Court**.   Should any party desire a copy of the order as signed and filed by the judge, a pre-addressed, stamped envelope shall accompany the proposed order.  The court may distribute orders electronically.  Review the judge's website for information: www.kingcounty.gov/courts/SuperiorCourt/judges.

**Presentation of Orders for Signature:** All orders must be presented to the assigned judge or to the Ex Parte and Probate Department, in accordance with Local Civil Rules 40 and 40.1. Such orders, if presented to the Ex Parte and Probate Department, shall be submitted through the E-Filing/Ex Parte via the Clerk application by the attorney(s) of record. E-filing is not required for self-represented parties (non-attorneys). If the assigned judge is absent, contact the assigned court for further instructions.  If another judge enters an order on the case, counsel is responsible for providing the assigned judge with a copy.

**Proposed orders finalizing settlement and/or dismissal by agreement of all parties shall be presented to the  Ex Parte and Probate Department.**  Such orders shall be submitted through the E-Filing/Ex Parte via the Clerk application by the attorney(s) of record. E-filing is not required for self-represented parties (non-attorneys). Formal proof in Family Law cases must be scheduled before the assigned judge by contacting the bailiff, or formal proof may be entered in the Ex Parte Department.  **If final order and/or formal proof are entered in the Ex Parte and Probate Department, counsel is responsible for providing the assigned judge with a copy.**

**C. Form**
Pursuant to Local Civil Rule 7(b)(5)(B), the initial motion and opposing memorandum shall not exceed 4,200 words and reply memoranda shall not exceed 1,750 words without authorization of the court. The word count

includes all portions of the document, including headings and footnotes, except 1) the caption; 2) table of contents and/or authorities, if any; and 3): the signature block. Over-length memoranda/briefs and motions supported by such memoranda/briefs may be stricken.

***IT IS SO ORDERED.  FAILURE TO COMPLY WITH THE PROVISIONS OF THIS ORDER MAY RESULT IN DISMISSAL OR OTHER SANCTIONS.  PLAINTIFF/PEITITONER SHALL FORWARD A COPY OF THIS ORDER AS SOON AS PRACTICABLE TO ANY PARTY WHO HAS NOT RECEIVED THIS ORDER.***

_____
PRESIDING JUDGE

3

FILED
2021 MAR 02 04:27 PM
KING COUNTY
SUPERIOR COURT CLERK
E-FILED
CASE #: 21-2-02856-6 SEA

**IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON**
**FOR THE COUNTY OF KING**

| | |
|---|---|
| PARLER LLC<br><br>vs<br><br>AMAZON WEB SERVICES, INC. AND<br>AMAZON.COM | No. 21-2-02856-6  SEA<br><br>**CASE INFORMATION COVER SHEET AND**<br>**AREA DESIGNATION**<br><br>(CICS) |

**CAUSE OF ACTION**

COM - Commercial

**AREA OF DESIGNATION**

SEA             Defined as all King County north of Interstate 90 and including all of Interstate 90
                right of way, all of the cities of Seattle, Mercer Island, Issaquah, and North Bend, and
                all of Vashon and Maury Islands.

1

2

3

4

5

**FILED**
2021 MAR 02 04:27 PM
KING COUNTY
SUPERIOR COURT CLERK
E-FILED
CASE #: 21-2-02856-6 SEA

6

7

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR THE COUNTY OF KING

8

9

10

11

12

13

14

| | |
|---|---|
| PARLER LLC, | NO. |
| Plaintiff, | SUMMONS |
| vs. | |
| AMAZON WEB SERVICES, INC., and AMAZON.COM, INC., | |
| Defendants. | |

15

16

17

**TO DEFENDANTS:**  AMAZON WEB SERVICES, INC., a Delaware corporation, and

AMAZON.COM, INC., a Delaware corporation.

18

19

20

A lawsuit has been started against you in King County Superior Court by PARLER LLC,

a Delaware corporation, Plaintiff.  Plaintiff's claims are stated in the written Complaint, a copy of

which is served upon you with this Summons.

21

22

23

24

In order to defend against this lawsuit, you must respond to the Complaint by stating your

defense in writing and by serving a copy upon the undersigned attorneys for Plaintiff within twenty

(20) days after the service of this Summons, excluding the day of service, or a default judgment

may be entered against you without notice.  A default judgment is one where Plaintiff is entitled

25

SUMMONS - 1

to what it asks for because you have not responded.  If you serve a notice of appearance on the undersigned person, you are entitled to notice before a default judgment may be entered.

You may demand that the Plaintiff file this Summons and Complaint with the court.  If you do so, the demand must be in writing and must be served upon the person signing this Summons. Within fourteen (14) days after you serve the demand, the Plaintiff must file this lawsuit with the Court or the service on you of this Summons and Complaint will be void.

If you wish to seek the advice of an attorney in this matter, you should do so promptly so that your written response, if any, may be served on time.

This Summons is issued pursuant to Rule 4 of the Superior Court Civil Rules of the State of Washington.

DATED this 2nd day of March, 2021.

**CALFO EAKES LLP**

By *s/   Angelo J. Calfo*
Angelo J. Calfo, WSBA# 27079
1301 Second Avenue, Suite 2800
Seattle, WA  98101
(206) 407-2200 | Phone
(206) 407-2224 | Fax
Email:  angeloc@calfoeakes.com

David J. Groesbeck, WSBA No. 24749
DAVID J. GROESBECK, P.S.
1333 E. Johns Prairie Rd.
Shelton, WA  98584 (509) 747-2800
david@groesbecklaw.com

Gene C. Schaerr
H. Christopher Bartolomucci
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
*(pro hac motions to be filed)*

*Counsel for Parler LLC*

SUMMONS - 2

FILED
2021 MAR 02 04:27 PM
KING COUNTY
SUPERIOR COURT CLERK
E-FILED
CASE #: 21-2-02856-6 SEA

**KING COUNTY SUPERIOR COURT**

**CASE ASSIGNMENT AREA DESIGNATION and CASE INFORMATION COVER SHEET**

**(CICS)**

Pursuant to King County Code 4A.630.060, a faulty document fee of $15 may be assessed to new case filings missing this sheet.

**CASE NUMBER:** _____

(Provided by the Clerk)

**CASE CAPTION:**  **Parler LLC v. Amazon Web Services, Inc., and Amazon.com, Inc.**

(New case: Print name of person starting case **vs.** name of person or agency you are filing against.)

(When filing into an existing family law case, the case caption remains the same as the original filing.)

Please mark one of the boxes below:

☒    **Seattle Area,** defined as:

> All of King County north of Interstate 90 and including all of the Interstate 90 right-of-way; all the cities of Seattle, Mercer Island, Bellevue, Issaquah and North Bend; and all of Vashon and Maury Islands.

☐    **Kent Area,** defined as:

> All of King County south of Interstate 90 except those areas included in the Seattle Case Assignment Area.

I certify that this case meets the case assignment criteria, described in King County LCR 82(e).

_s/Angelo J. Calfo_          _27079_____          _March 2, 2021_____
Signature of Attorney         WSBA Number          Date

or

_____          _____
Signature of person who is starting case                  Date

_____
Address, City, State, Zip Code of person who is starting case if not represented by attorney

**KING COUNTY SUPERIOR COURT**
**CASE ASSIGNMENT AREA DESIGNATION and CASE INFORMATION COVER SHEET**

# CIVIL

Please check the category that best describes this case.

**APPEAL/REVIEW**

☐ Administrative Law Review (ALR 2)*

(Petition to the Superior Court for review of rulings made by state administrative agencies.( e.g. DSHS Child Support, Good to Go passes, denial of benefits from Employment Security, DSHS)

☐ Board of Industrial Insurance Appeals – Workers Comp (ALRLI 2)*

(Petition to the Superior Court for review of rulings made by Labor & Industries.)

☐ DOL Revocation (DOL 2)*

(Appeal of a DOL revocation Implied consent-Test refusal ONLY.) RCW 46.20.308(9)

☐ Subdivision Election Process Review (SER 2)*

(Intent to challenge election process)

☐ Voter Election Process Law Review (VEP 2)*

(Complaint for violation of voting rights act)

☐ Petition to Appeal/Amend Ballot Title (BAT 2)

**CONTRACT/COMMERCIAL**

☐ Breach of Contract (COM 2)*

(Complaint involving money dispute where a breach of contract is involved.)

☒ Commercial Contract (COM 2)*

(Complaint involving money dispute where a contract is involved.)

☐ Commercial Non-Contract (COL 2)*

(Complaint involving money dispute where no contract is involved.)

☐ Third Party Collection (COL 2)*

(Complaint involving a third party over a money dispute where no contract is involved.)

**JUDGMENT**

☐ Abstract, Judgment, Another County (ABJ 2)

(A certified copy of a judgment docket from another Superior Court within the state.)

☐ Confession of Judgment (CFJ 2)*

(The entry of a judgment when a defendant admits liability and accepts the amount of agreed-upon damages but does not pay or perform as agreed upon.)

☐ Foreign Judgment (from another State or Country) (FJU 2)

(Any judgment, decree, or order of a court of the United States, or of any state or territory, which is entitled to full faith and credit in this state.)

☐ Tax Warrant or Warrant (TAX 2)

(A notice of assessment by a state agency or self-insured company creating a judgment/lien in the county in which it is filed.)

☐ Transcript of Judgment (TRJ 2)

(A certified copy of a judgment from a court of limited jurisdiction (e.g. District or Municipal court) to a Superior Court.)

**PROPERTY RIGHTS**

☐ Condemnation/Eminent Domain (CON 2)*

(Complaint involving governmental taking of private property with payment, but not necessarily with consent.)

Page **2** of **4**

☐ Foreclosure (FOR 2)*

(Complaint involving termination of ownership rights when a mortgage or tax foreclosure is involved, where ownership is not in question.)

☐ Land Use Petition (LUP 2)*

(Petition for an expedited judicial review of a land use decision made by a local jurisdiction.) RCW 36.70C.040

☐ Property Fairness Act (PFA 2)*

(Complaint involving the regulation of private property or restraint of land use by a government entity brought forth by Title 64.)

☐ Quiet Title (QTI 2)*

(Complaint involving the ownership, use, or disposition of land or real estate other than foreclosure.)

☐ Residential Unlawful Detainer (Eviction) (UND 2)

(Complaint involving the unjustifiable retention of lands or attachments to land, including water and mineral rights.)

☐ Non-Residential Unlawful Detainer (Eviction) (UND 2)

(Commercial property eviction.)

**OTHER COMPLAINT/PETITION**

☐ Action to Compel/Confirm Private Binding Arbitration (CAA 2)

(Petition to force or confirm private binding arbitration.)

☐ Assurance of Discontinuance (AOD 2)

(Filed by Attorney General's Office to prevent businesses from engaging in improper or misleading practices.)

☐ Birth Certificate Change(PBC 2)

(Petition to amend birth certificate)

☐ Bond Justification (PBJ 2)

(Bail bond company desiring to transact surety bail bonds in King County facilities.)

☐ Change of Name (CHN 5)

(Petition for name change, when domestic violence/anti-harassment issues require confidentiality.)

☐ Certificate of Rehabilitation (CRR 2)

(Petition to restore civil and political rights.)

☐ Certificate of Restoration Opportunity(CRP 2)

(Establishes eligibility requirements for certain professional licenses)

☐ Civil Commitment (sexual predator) (PCC 2)

(Petition to detain an individual involuntarily.)

☐ Notice of Deposit of Surplus Funds (DSF 2)

(Deposit of extra money from a foreclosure after payment of expenses from sale and obligation secured by the deed of trust.)

☐ Emancipation of Minor (EOM 2)

(Petition by a minor for a declaration of emancipation.)

☐ Foreign Subpoena (OSS 2)

(To subpoena a King County resident or entity for an out of state case.)

☐ Foreign Protection Order (FPO 2)

(Registering out of state protection order)

☐ Frivolous Claim of Lien (FVL 2)

(Petition or Motion requesting a determination that a lien against a mechanic or materialman is excessive or unwarranted.)

☐ Application for Health & Safety Inspection (HSI 2)

Page **3** of **4**

☐ Injunction (INJ 2)*

(Complaint/petition to require a person to do or refrain from doing a particular thing.)

☐ Interpleader (IPL 2)

(Petition for the deposit of disputed earnest money from real estate, insurance proceeds, and/or other transaction(s).)

☐ Malicious Harassment (MHA 2)*

(Suit involving damages resulting from malicious harassment.) RCW 9a.36.080

☐ Non-Judicial Filing (NJF 2)

(See probate section for TEDRA agreements. To file for the record document(s) unrelated to any other proceeding and where there will be no judicial review.)

☐ Other Complaint/Petition (MSC 2)*

(Filing a Complaint/Petition for a cause of action not listed)

☐ Minor Work Permit (MWP 2)

(Petition for a child under 14 years of age to be employed)

☐ Perpetuation of Testimony (PPT 2)

(Action filed under CR 27)

☐ Petition to Remove Restricted Covenant (RRC 2)
Declaratory judgment action to strike discriminatory provision of real property contract.

☐ Public records Act (PRA 2)*

(Action filed under RCW 42.56)

☐ Receivership (RCV 2)

(The process of appointment by a court of a receiver to take custody of the property, business, rents and profits of a party to a lawsuit pending a final decision on disbursement or an agreement.)

☐ Relief from Duty to Register (RDR 2)

(Petition seeking to stop the requirement to register.)

☐ Restoration of Firearm Rights (RFR 2)

(Petition seeking restoration of firearms rights under RCW 9.41.040 and 9.41.047.)

☐ School District-Required Action Plan (SDR 2)

(Petition filed requesting court selection of a required action plan proposal relating to school academic performance.)

☐ Seizure of Property from the Commission of a Crime-Seattle (SPC 2)*

(Seizure of personal property which was employed in aiding, abetting, or commission of a crime, from a defendant after conviction.)

☐ Seizure of Property Resulting from a Crime-Seattle (SPR 2)*

(Seizure of tangible or intangible property which is the direct or indirect result of a crime, from a defendant following criminal conviction. (e.g., remuneration for, or contract interest in, a depiction or account of a crime.))

☐ Structured Settlements- Seattle (TSS 2)*

(A financial or insurance arrangement whereby a claimant agrees to resolve a personal injury tort claim by receiving periodic payments on an agreed schedule rather than as a lump sum.)

☐ Vehicle Ownership (PVO 2)*

(Petition to request a judgment awarding ownership of a vehicle.)

**TORT, ASBESTOS**
☐ Personal Injury (ASP 2)*

(Complaint alleging injury resulting from asbestos exposure.)

☐ Wrongful Death (ASW 2)*

(Complaint alleging death resulting from asbestos exposure.)

**TORT, MEDICAL MALPRACTICE**

☐ Hospital  (MED 2)*

(Complaint involving injury or death resulting from a hospital.)

☐ Medical Doctor (MED 2)*

(Complaint involving injury or death resulting from a medical doctor.)

☐ Other Health care Professional (MED 2)*

(Complaint involving injury or death resulting from a health care professional other than a medical doctor.)

**TORT, MOTOR VEHICLE**

☐ Death (TMV 2)*

(Complaint involving death resulting from an incident involving a motor vehicle.)

☐ Non-Death Injuries (TMV 2)*

(Complaint involving non-death injuries resulting from an incident involving a motor vehicle.)

☐ Property Damages Only (TMV 2)*

(Complaint involving only property damages resulting from an incident involving a motor vehicle.)

☐ Victims Vehicle Theft (VVT 2)*

(Complaint filed by a victim of car theft to recover damages.)  RCW 9A.56.078

**TORT, NON-MOTOR VEHICLE**

☐ Other Malpractice (MAL 2)*

(Complaint involving injury resulting from other than professional medical treatment.)

☐ Personal Injury (PIN 2)*

(Complaint involving physical injury not resulting from professional medical treatment, and where a motor vehicle is not involved.)

☐ Products Liability (TTO 2)*

(Complaint involving injury resulting from a commercial product.)

☐ Property Damages (PRP 2)*

(Complaint involving damage to real or personal property excluding motor vehicles.)

☐ Property Damages-Gang (PRG 2)*

(Complaint to recover damages to property related to gang activity.)

☐ Tort, Other (TTO 2)*

(Any other petition not specified by other codes.)

☐ Wrongful Death (WDE 2)*

(Complaint involving death resulting from other than professional medical treatment.)

**WRIT**

☐ Habeas Corpus (WHC 2)

(Petition for a writ to bring a party before the court.)

☐ Mandamus (WRM 2)**

(Petition for writ commanding performance of a particular act or duty.)

☐ Review (WRV 2)**

(Petition for review of the record or decision of a case pending in the lower court; does not include lower court appeals or administrative law reviews.)

*The filing party will be given an appropriate case schedule at time of filing.
** Case schedule will be issued after hearing and findings.