The Honorable Barbara J. Rothstein

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

PARLER LLC,

               Plaintiff,

    v.

AMAZON WEB SERVICES, INC., and
AMAZON.COM, INC.,

               Defendants.

No. 2:21-cv-00270

ANSWER AND DEFENSES TO
COMPLAINT

Defendants Amazon Web Services, Inc. ("AWS") and Amazon.com, Inc. ("Amazon") (collectively, "Defendants") file this answer to Plaintiff Parler LLC's complaint.  To the extent that any allegation in the complaint is not specifically admitted, the allegation is denied. Defendants answer the corresponding numbered paragraphs of the complaint as follows:

## I.     NATURE OF THE ACTION

1.     Defendants Amazon.com, Inc. (Amazon) and its subsidiary Amazon Web Services, Inc. (AWS) are commercial Goliaths.  Amazon is the fourth most valuable company in the world with a worth of nearly $1.7 trillion, about the annual GDP of Russia.  Amazon is also the largest of the Big Five "Big Tech" companies in the United States and has the fourth largest share of the global internet advertising market.  And Amazon Web Services, Inc. (AWS) is the world's leading cloud service provider, capturing nearly a third of the global market.  *See* Felix Richter, *Amazon Leads $130-Billion Cloud Market*, STATISTA (Feb. 4, 2021), https://www.statista.com/chart/18819/worldwide-market-share-of-leading-cloud-infrastructure-

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

service-providers/.  AWS generates tens of billions of dollars in revenue annually for Amazon. *Id*.  And, when companies are this big, it's easy to be a bully.  Many start-up companies that have appeared to be a threat to Amazon and AWS have felt their wrath.  Plaintiff Parler LLC is merely the latest casualty—a victim of Amazon's efforts to destroy an up-and-coming technology company through deceptive, defamatory, anticompetitive, and bad faith conduct.

**ANSWER:** Defendants respond that this paragraph contains legal argument, to which no response is required.  To the extent a response is required, Defendants admit that AWS provides cloud computing services and is a subsidiary of Amazon.  Defendants further admit that AWS is the world's most comprehensive and broadly adopted cloud platform, offering over 200 fully featured services from data centers globally.  Defendants further admit that millions of customers use AWS and that AWS competes with numerous providers of IT services in a highly competitive market for IT services.  Defendants otherwise lack knowledge or information sufficient to form a belief as to the truth of the allegations, or the allegations otherwise state a legal conclusion or legal argument, and Defendants therefore deny the remaining allegations.

2.      Before the actions complained of here, Plaintiff Parler LLC had one of the hottest rising apps on the internet.  A young start-up company that sought to disrupt the digital advertising and microblogging markets with a unique approach, Parler positioned itself as an alternative to the likes of Twitter or Facebook.  To do so, Parler did *not* employ what some have called "surveillance capitalism":  Unlike its social-media competitors, Parler refused to track and sell its users' private data and target advertising based on that data.  This made Parler a beacon to those who sought a free and safe place to espouse political and other views that other microblogging and social media platforms sought to censor.  And it allowed Parler to offer lower rates to digital advertisers.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations, and therefore deny the allegations.

ANSWER TO COMPLAINT - 2

3.      But this rising popularity and alternative business model also made Parler a competitive threat to the likes of Amazon, Twitter, Facebook, and Google—four giants of the internet who derive enormous revenue from digital advertising.  And that threat grew very real in late 2020 and early 2021 when Parler was poised to explode in growth.  So together, Amazon, AWS, and others attempted to kill Parler.  *See* Glenn Greenwald, *How Silicon Valley, in a Show of Monopolistic Force, Destroyed Parler*, SUBSTACK (Jan. 12, 2021), https://greenwald.substack.com/p/how-silicon-valley-in-a-show-of-monopolistic.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in the first two sentences, and therefore deny those allegations. Defendants deny the remaining allegations.

4.      On January 9, 2021, AWS repudiated and breached its contract to host Parler's website and app on AWS's cloud services, in bad faith.  AWS tried to justify the repudiation based on allegations against Parler that AWS knew were false.  AWS then leaked the same false allegations to the media, in a successful effort to tarnish and defame Parler's business.

**ANSWER:** Defendants deny the allegations.

5.      These strongarm tactics were unlawful and tortious.  They were also surprising to Parler:  It had a good relationship with AWS with no signs of trouble until about a day before AWS terminated Parler's services.  The reason AWS gave for terminating Parler's services—that Parler ostensibly was not pursuing appropriate methods to control the content espousing violence on its platform—was untrue.  Indeed, Parler stood in sharp contrast to the likes of Twitter, Facebook, and even Amazon itself, all of whom host substantial amounts of violence-inciting content.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in the last sentence of paragraph 5, and therefore deny those allegations.  Defendants deny the remaining allegations.

ANSWER TO COMPLAINT - 3

1

2

3      6.      Further, there was nothing new about the operation and content of Parler's

4  platform the day AWS announced it would be terminating Parler's services (in roughly 24 hours)

5  compared to anytime in the two years AWS had been hosting Parler.  Then, as before, Parler

6  quickly removed any arguably inappropriate content brought to its attention.  And never during

7  those two years before that fateful day had AWS expressed any major concerns with Parler

8  regarding the matter.  In fact, just two days before the termination announcement, AWS had

9  assured Paler [sic] that it was "okay" as to problematic content.  Parler relied on this

10  representation and similar representations from AWS, to the detriment of its own business.

       **ANSWER:** Defendants deny the allegations.

11

12

13     7.      Finally, from the beginning of their contractual relationship, AWS had known that

14  Parler used a reactive system to deal with problematic content—and not once had AWS said that

15  such a system was insufficient or in violation of the parties' contract.  What is more, AWS knew

16  that Parler was testing out a new *proactive* system that would catch problematic content before it

17  was even posted.

18     **ANSWER:** Defendants deny the allegations.

19

20     8.      But two things had changed for AWS.  First, a few weeks before terminating

21  Parler's services, AWS had signed a major new contract with Parler's principal competitor,

22  Twitter.  Second, when Facebook and Twitter moved to ban former President Trump from their

23  platforms in early January, it was expected that Trump would move to Parler, bringing many of

24  his 90 million followers with him.  And AWS knew that Trump and Parler had been in

25  negotiations over such a move.  If this were to materialize, Parler would suddenly be a huge

26  threat to Twitter in the microblogging market, and to Amazon itself in the digital advertising

27  market.

ANSWER TO COMPLAINT - 4

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

**ANSWER:** Defendants admit that AWS announced on December 15, 2020 that Twitter had signed a deal with AWS for Twitter to use AWS services to host Twitter timelines. Defendants admit that Twitter had not previously and does not currently use AWS services to host Twitter timelines.  Defendants deny the remaining allegations.

9.      Thus, AWS pulled Parler's plug.  And to further kick Parler while it was down, after it had terminated the contract, AWS directed hackers to Parler's back-up databases and has been secretly selling Parler user data to anyone with a certain type of Amazon account.

**ANSWER:** Defendants admit that AWS suspended Parler's use of AWS services to make Parler publicly available.  Defendants deny the remaining allegations.

10.     Because of these actions, Parler was unable to be online for over a month.  And even as of the date of this complaint, Parler has been unable to regain the reputation and success it enjoyed before AWS terminated its services.  Not surprisingly, when an internet-based company cannot get on the internet, the damage is extraordinary.  And when confidential user data is hacked or sold to others, the company suffers enormous reputational damage.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations, or the allegations otherwise state a legal conclusion, and Defendants therefore deny the remaining allegations.

11.     Just before all this occurred, Parler was about to seek funding and was valued at one billion dollars—something AWS also knew.  As a result of the unlawful actions of Amazon and AWS, Parler has permanently lost tens of millions of current and prospective future users— many of whom have migrated to other platforms—and hundreds of millions of dollars in annual advertising revenue.  Parler therefore brings this suit for multiple violations of Washington's contract, tort, unfair-competition, and consumer protection laws.

ANSWER TO COMPLAINT - 5

**ANSWER:** Defendants admit Plaintiff brings certain Washington claims against Defendants.  Defendants deny the remaining allegations.

## II.      PARTIES, JURISDICTION, AND VENUE

### A.      Parties

12.      Parler is "the solution to problems that have surfaced in recent years due to changes in Big Tech policy influenced by various special-interest groups."  *Our Company*, PARLER COM (Feb. 15, 2021, 5:45 AM), https://company.parler.com.  Thus, "Parler is built upon a foundation of respect for privacy and personal data, free speech, free markets, and ethical, transparent corporate policy."  *Id.*

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations, and therefore deny the allegations.

13.      On information and belief, Amazon.com, Inc., is a corporation incorporated in Delaware and has a principal place of business in Seattle, Washington.  On information and belief, Amazon.com, Inc., is the ultimate parent company of the other companies that make up "Amazon," including AWS.  Amazon is considered to be the world's most valuable brand.  *See Accelerated Growth Sees Amazon Crowned 2019's BrandZrM Top 100 Most Valuable Global Brand*, PR NEWSWIRE (June 11, 2019), https://www.prnewswire.com/news-releases/accelerated-growth-sees-amazon-crowned-2019 s-brandz-top-100-most-valuable-global-brand-300863486.html.

**ANSWER:** Defendants admit that Amazon is incorporated in Delaware, has its principal place of business in Seattle, Washington, and is the parent company of AWS.  Defendants admit that the referenced article states that "Amazon has become the world's most valuable brand, according to the 2019 BrandZ™ Top 100 Most Valuable Global Brands ranking released today by WPP and Kantar at the New York Stock Exchange."  Defendants deny the remaining allegations.

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

14.     On information and belief, Amazon Web Services, Inc., is a corporation incorporated in Delaware and has a principal place of business in Seattle, Washington. According to its own press release, "[f]or 14 years, [AWS] has been the world's most comprehensive and broadly adopted cloud platform." *Twitter Selects AWS as Strategic Provider to Serve Timelines*, Press Center, ABOUT AMAZON, (Dec. 15, 2020), https://press.aboutamazon.com/news-releases/news-release-details/twitter-selects-aws-strategic-provider-serve-timelines.  That is why "[m]illions of customers—including the fastest-growing startups, largest enterprises, and leading government agencies—trust AWS to power their infrastructure, become more agile, and lower costs." *Id*.  In short, AWS is the Cadillac of cloud platform providers.  And "[t]he incident [of AWS terminating Parler's service] demonstrates the type of power that Amazon wields almost uniquely because so many companies rely on it to deliver computing and data storage."  Jordan Novet, *Parler's de-platforming shows the exceptional power of cloud providers like Amazon*, CNBC (Jan. 16, 2021), https://www.cnbc.com/2021/01/16/how-parler-deplatforming-shows-power-of-cloud-providers.html.

**ANSWER:** Defendants admit that AWS is incorporated in Delaware and has its principal place of business in Seattle, Washington.  Defendants admit that the referenced press release states that "[f]or 14 years, Amazon Web Services has been the world's most comprehensive and broadly adopted cloud platform"; and "[m]illions of customers—including the fastest-growing startups, largest enterprises, and leading government agencies—trust AWS to power their infrastructure, become more agile, and lower costs."  Defendants admit that the referenced CNBC article states that "[t]he incident demonstrates a type of power that Amazon wields almost uniquely because so many companies rely on it to deliver computing and data storage."  Defendants deny the remaining allegations.

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

**B.    Jurisdiction and Venue**

15.    The Superior Court of the State of Washington in and for the County of King has jurisdiction over this dispute.  AWS resides and conducts business in King County, Washington.  AWS has therefore submitted to this Court's jurisdiction, and venue is proper pursuant to RCW 4.12.020(3).

**ANSWER:** Defendants admit that AWS has its principal place of business in King County, Washington.  Defendants admit this Court has subject matter jurisdiction over the claims and that venue is proper in this matter.

### III.    FACTS

**A.    The Parler Platform**

16.    Parler's platform is not like Amazon's, Twitter's or Facebook's platforms.  Twitter and Facebook gather data on their users and sell it.[1]  These tech giants also employ targeted advertising by leveraging user data, something they can charge advertisers more for.  *See* Stigler Center for the Study of the Economy and the State, *The University of Chicago Booth School of Business, Stigler Committee on Digital Platforms: Final Report (2019) 8*, https://www.chicagobooth.edu/research/stigler/news-and-media/committee-on-digital-platforms-final-report, ("[Digital Platforms, such as Facebook, Twitter, Google, and Amazon,] can increase the prices paid by advertisers, many of them small businesses, diverting more and more income to platforms.").  Further, Twitter and Facebook use Artificial Intelligence (AI) to direct users to other like-minded users.  Similarly, users can form groups on Facebook and Twitter that make it easier to communicate with those who see the world the same.  This enables these social media platforms to use targeted advertising, something they can charge more for.  But these features also create echo chambers and make it easy to encourage and facilitate group activity.  *See* Murtaza Hussain, *How to Understand the Rage Economy*, THE INTERCEPT (Feb. 13, 2021,

---

[1] *See, e.g.*, Dina Srinivasan, "*The Antitrust Case Against Facebook: A Monopolist's Journey Towards Pervasive Surveillance in Spite of Consumers' Preference for Privacy*," 16 Berkeley Business Law Journal 39 (2019).

ANSWER TO COMPLAINT - 8

6:00 AM), https://theintercept.com/2021/02/13/news-rage-economy-postjournalism-andrey-mie,
("Facebook's algorithmically generated news feeds meanwhile have the lucrative advantage of
always knowing exactly what people want to hear and driving their engagement accordingly,
something that is only now bringing the company under regulatory threat for fostering
extremism."). And that is by design.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to
the truth of the allegations, and therefore deny the allegations.

17.     By design, Parler is different. For example, how one experiences Parler is a
function of one's individual choices, not driven by AI. So Parler does not encourage its users to
see and interact with like-minded folks. Similarly, there is no way to organize into groups on
Parler, making the coordination of group activity very difficult. And Parler does not gather data
on its users and sell it. In other words, Parler does not use surveillance of its users to make
money. As Parler tells its users: "We never share or sell data. Privacy is our #1 concern. Your
personal data is YOURS." And Parler does not engage in targeted advertising, meaning it can
charge less to advertisers. This makes Parler a threat to the surveillance capitalism of Amazon,
Twitter, Google, and Facebook by potentially luring away advertisers and users interested in
greater privacy. *See* Casey B. Mulligan, *Parler Competes Horizontally with Amazon, Apple, and
Google?, Supply and Demand (In that Order)*, CASEYMULLIGAN.BLOGSPOT.COM (Jan.
13, 2021, 8:47 AM), http://caseymulligan.blogspot.com/2021/01/parler-competes-horizontally-
with.html ("If too many internet users hear and buy into this rhetoric, the incumbent harvesters
of personal data—including especially Amazon, Apple, Google, Twitter, and Facebook—will
pay more (perhaps in kind) and profit less. From this perspective, AWS' action [of terminating
Parler's services] looks like McDonald's severing the electric lines going into Subway
[sandwich] locations at a time when Subway was just gaining traction.").

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to
the truth of the allegations, and therefore deny the allegations.

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

1

2

3          18.     As to how Parler works, a post on Parler, called a "parley" (and equivalent to a

4  "tweet" on Twitter) is content that can be shared with others.  Likewise, an "echo" with comment

5  can also be shared with others—it is the equivalent to a retweet with comment.  Both a parley

6  and an echo with comment will go out to a person's followers.  However, on Parler one cannot

7  share a comment to a parley with others.  This is unlike Twitter, for instance, where one can

8  share a comment on a tweet by retweeting it.

9          **ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to

10 the truth of the allegations, and therefore deny the allegations.

11

12         19.     Further, to directly message someone requires that one be verified by Parler,

13 unlike on Twitter or Facebook.  Thus, on Parler a user must upload a selfie and their

14 identification, generally a driver's license, to be a verified user capable of directing a message to

15 another Parler user.  On Twitter, by contrast, anyone can send direct private messages.

16         **ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to

17 the truth of the allegations, and therefore deny the allegations.

18

19         20.     Also, on Parler there is a difference between impressions and views.  The latter is

20 a very small percentage of the former.  Thus, if one is following another individual on Parler and

21 that other user posts a parley, that parley will show up in one's feed and be counted as an

22 impression without the recipient ever actually looking at the parley.  If one does then look at the

23 parley, it will be counted as a view.

24         **ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to

25 the truth of the allegations, and therefore deny the allegations.

26

27

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

21.     Parler's internal data show that users are on Parler about 22-28 minutes a day, on average, spread over multiple sessions.  Thus, when there are hundreds of comments on a parley, few people spend the time to read through all the comments.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations, and therefore deny the allegations.

22.     Given all of this, the only way for something posted on Parler to get a lot of attention, and thus possibly have influence, is if it is posted by someone with a lot of followers.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations, and therefore deny the allegations.

23.     Since its inception, Parler has carefully policed any content on its platform that incited violence.  It has had in place community standards that expressly disallow users from posting such content.  And as soon as such content is brought to Parler's attention, a team assesses the flagged content and votes to remove it if it indeed does incite violence.

**ANSWER:** Defendants deny the allegations.

**B.     Amazon, Twitter & Facebook Allow Content Promoting Violence**

24.     Many social media platforms have increasingly struggled with their inability to completely block content that promotes violence, but especially Twitter, Amazon, and Facebook.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations, and therefore deny the allegations.

25.     For example, on January 8, 2021, the day before AWS announced it was terminating Parler's service, one of the top trends on Twitter was "Hang Mike Pence," with over 14,000 tweets.  *See* Peter Aitken, '*Hang Mike Pence' Trends on Twitter After Platform Suspends Trump for Risk of 'Incitement of Violence'*, Fox NEWS (Jan. 9, 2021),

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

https://www.foxnews.com/politics/twitter-trending-hang-mike-pence.  And earlier that week, a

Los Angeles Times columnist observed that Twitter and other large social media platforms bore

some responsibility for the Capitol Hill riot by allowing rioters to communicate and rile each

other up.  *See* Erika D. Smith, *How Twitter, Facebook are Partly Culpable for Trump DC Riot*,

Los ANGELES TIMES (Jan. 6, 2021, updated Jan. 7, 2021, 8:48 AM),

https://www.latimes.com/california/story/2021-01-06/how-twitter-facebook-partly-culpable-

trump-dc-riot-capitol.  As previously noted, such coordination would not have been possible on

Parler.

     **ANSWER:** Defendants deny that AWS announced it was terminating Parler's service or

that it terminated Parler's service, and admits that AWS suspended Parler's use of AWS services

to make Parler publicly available.  Defendants lack knowledge or information sufficient to form

a belief as to the truth of the remaining allegations, and therefore deny the allegations.


     26.    Violence-inciting material has also continued to circulate on Twitter after AWS

pulled Parley's [sic] plug, with such posts receiving wide play.  For instance, noted critic of

President Trump, Alec Baldwin, tweeted recently that he had had a dream that the ex-president

was on trial for sedition and a noose awaited him outside the courthouse.  *See* Andrew Mark

Miller, *Alec Baldwin tweets about 'dream' of noose at Trump's 'trial for sedition' on MLK's

birthday*, WASHINGTON EXAMINER (Jan. 17, 2021, 11:13        AM),

https://www.washingtonexaminer.com/news/baldwin-trump-sedition-trial-noose-mlk.  At the

time a screenshot was taken for a news story, it had over 1,000 likes.  On January 20, the

daughter of the late Iranian general and terrorist Qasem Soleimani, who was killed in a U.S.

missile strike ordered by President Trump, tweeted a threat that Trump will "live[] in fear of

foes" indefinitely.  A screenshot taken within 24 hours showed nearly five thousand likes and

two thousand people tweeting about it.  *See* Frances Martel, *Daughter of Iranian Terrorist

Soleimani Tells Trump He Will "Live in Fear*," BREITBART (Jan. 21, 2021),

https://www.breitbart.com/middle-east/2021/01/21/daughter-iranian-terrorist-soleimani-tells-

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

trump-he-will-live-fear/.  On January 21, a New York Times contributor tweeted that "If Biden really wanted unity, he'd lynch Mike Pence."  *See* Joseph A. Wulfsohn & Samuel Chamberlain, *New York Times Contributor Loses Think Tank Job Over Tweet Suggesting Biden Should 'Lynch Mike Pence,'* Fox NEWS (Jan. 21, 2021), https://www.foxnews.com/media/will-wilkinson-lynch-mike-pence-niskanen-center-ny-times.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations, and therefore deny the allegations.

27.     This type of violent content on Twitter is not new.  On election night in 2020, Kathy Griffin reposted on Twitter a picture of her holding a fake, bloodied head of then-President Trump.  *See* Tyler McCarthy, *Kathy Griffin, Madonna and Robert De Niro Mentioned By Name During Trump's Second Impeachment Hearings*, Fox NEWS (Jan. 14, 2021), https://www.foxnews.com/entertainment/kathy-griffin-madonna-robert-de-niro-name-trump-impeachment.  The tweet received more than 58,000 likes in less than 48 hours, with Twitter only flagging the tweet as "potentially sensitive content."  What is more, the hashtags #assassinatetrump and #killtrump have been allowed on Twitter since 2016.  And the former CEO of Twitter tweeted that "Me-first capitalists who think you can separate society from business are going to be the first people lined up against the wall and shot in the revolution.  I'll happily provide video commentary."  Abram Brown, *Some Business Leaders Should Face a Firing Squad, Former Twitter CEO Dick Costolo Suggests In Angry Tweet*, FORBES (Oct. 1, 2020), https://www.forties.com/sites/abrambrown/2020/10/01/some-business-leader-should-face-a-firing-squad-former-twitter-ceo-dick-costolo-suggests-in-angry-tweet/?sh=7c8af97b9486.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations, and therefore deny the allegations.

28.     Additionally, recently a lawsuit was filed against Twitter, alleging that it "refused to take down widely shared pornographic images and videos of a teenage sex trafficking victim

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

1

2   because [its] investigation 'didn't find a violation' of the company's 'policies.'"  After multiple

3   complaints were filed with Twitter, and after the material had "racked up over 167,000 views

4   and 2,223 retweets," Twitter responded that "[w]e've reviewed the content, and didn't find a

5   violation of our policies, so no action will be taken at this time."  It took a federal agent from the

6   Department of Homeland Security to remove the material from Twitter.  *See* Gabrielle Fonrouge,

7   *Twitter Refused to Remove Child Porn Because It Didn't 'Violate Policies'*: Lawsuit, NEW

8   YORK POST (Jan. 21, 2021, 10:35 AM), https://nypost.com/2021/01/21/twitter-sued-for-

9   allegedly-refusing-to-remove-child-porn/.

10      **ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to

11   the truth of the allegations, and therefore deny the allegations.

12

13      29.     Further, as is well documented, some groups "use[] Twitter to threaten or harass

14   media members."  Jason Rantz, *Here's how Antifa uses Twitter to threaten me and the media*,

15   Fox NEWS (Feb. 6, 2021), https://www.foxnews.com/opinion/antifa-twitter-media-jason-rantz.

16   Yet these egregious violations of AWS's terms of service by Twitter have apparently been

17   ignored by AWS.  AWS has agreed to host Twitter on its cloud services at the same time as it

18   has shut down Parler.

19      **ANSWER:** Defendants admit that AWS announced on December 15, 2020 that Twitter

20   had signed a deal with AWS for Twitter to use AWS services to host Twitter

21   timelines.  Defendants admit that Twitter had not previously and does not currently use AWS

22   services to host Twitter timelines.  Defendants deny the allegations that AWS ignored violations

23   of its terms of service regarding Twitter's use of AWS's services.  Defendants otherwise lack

24   knowledge or information sufficient to form a belief as to the truth of the allegations, and

25   therefore deny the remaining allegations.

26

27      30.     Amazon itself also hosts significant amounts of content that incite violence,

particularly on its own online store.  For example, Amazon allowed people on its site to buy a t-

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

1

2   shirt that states "Kill All Republicans," a listing that was even sponsored by Amazon.  Or one

3   could have bought on Amazon a t-shirt with a graphic image of former President Trump blowing

4   his brains out.  Likewise, Amazon long sold anti-Trump paraphernalia with the message, "Where

5   is Lee Harvey Oswald now that we really need him?"  As Newsweek has pointed out, the Neo-

6   Nazi shirts worn by Proud Boys supporters are sold on Amazon.  *See* Ewan Palmer, *Neo-Nazi*

7   *Shirts Worn by Proud Boys Supporters Sold on Amazon*, NEWSWEEK (Dec. 12, 2020, 11:14

8   AM), https://www.newsweek.com/nazi-amazon-proud-boys-holocaust-1555192.  At one time,

9   Amazon allowed shoppers to purchase Auschwitz-themed towels, bottle openers, or Christmas

10  ornaments.  Similarly, Amazon shoppers could buy Nazi propaganda, such as an anti-Semitic

11  children's book written by a member of the Nazi Party later executed for his crimes against

12  humanity, or Hitler's Mein Kampf.  In fact, so common is such material on Amazon that is has

13  been condemned by The Council on American-Islamic Relations for selling white supremacist

14  material.  Amazon defended selling such materials based on concerns about censorship.  *See*

15  Ewan Palmer, *Auschwitz Musuem Calls Out Jeff Bezos, Amazon For Selling Nazi Propaganda*,

16  NEWSWEEK (Feb. 2, 2021, 10:58 AM), https://www.newsweek.com/amazon-nazi-booksJeff-

17  bezos-propoganda-1488467.  And crime rings have used Amazon to sell stolen goods.  *See*

18  Kevin Krause, *North Texas Feds Say Crime Ring Traveled U.S. to Steal Retail Goods and Sell*

19  *On Amazon*, THE DALLAS MORNING NEWS (Mar. 17, 2020, 11:32 AM),

20  https://www.dallasnews.com/news/crime/2020/03/17/north-texas-feds-say-crime-ring-traveled-

21  us-to-steal-retail-goods-and-sell-on-amazon/.

22      **ANSWER:** Defendants admit that Parler is not the only company that has attempted to

23  use Amazon's services in violation of Amazon's policies.  Defendants further admit that Amazon

24  actively reviews and removes content that violate its policies from its consumer store, regularly

25  terminates the accounts of sellers who violate these policies, and employs a number of internal

26  teams and dedicates significant resources to enforce those policies.  For example, in 2019 alone

27  Amazon invested over $500 million and employed more than 8,000 people to protect our store

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

31.     The material being sold on Amazon that promotes violence is legion.  And while Amazon sometimes pulls some of this material, it is still up for some time, often until someone outside of Amazon brings it to Amazon's attention, causing the Auschwitz Memorial Museum to comment that "it appears people are taking upon themselves the job that Amazon should be doing: 'verifying the products that are uploaded there.'"  Nelson Oliveira, *Amazon called out for Auschwitz-themed towel, bottler [sic] opener, Christmas ornaments listed on website*, NEW YORK DAILY NEWS (Dec. 2, 2019, 5:08 PM), https://www.nydailynews.com/news/national/ny-auschwitz-merchandise-caught-on-amazon-website-20191202-2nvjbuxj7neo7oxapq6r7pedvq-story.html.  Thus, for Amazon to accuse Parler of failing to police violence-inciting material is worse than the pot calling the kettle black.  It is a transparent subterfuge.

**ANSWER:** Defendants admit that Parler is not the only company that has attempted to use Amazon's services in violation of Amazon's policies.  Defendants further admit that Amazon actively reviews and removes content that violate its policies from its consumer store, regularly terminates the accounts of sellers who violate these policies, and employs a number of internal teams and dedicates significant resources to enforce those policies.  For example, in 2019 alone Amazon invested over $500 million and employed more than 8,000 people to protect our store from fraud and abuse.  Defendants otherwise lack knowledge or information sufficient to form a belief as to the truth of the allegations, and therefore deny the remaining allegations.

32.     Nor is Facebook immune.  It knew it had problems with violent content on forums for like-minded users called "Groups."  *See* Jeff Horwitz, *Facebook knew calls for violence plagued 'Groups,' now plans overhaul*, THE WALL STREET JOURNAL (Jan. 31, 2021, 5:16 PM), https://www.wsj.com/articles/facebook-knew-calls-for-violence-plagued-groups-now-

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

1

2  plans-overhaul-11612131374.  Last August, Facebook data scientists warned the company's

3  executives that "calls to violence were filling the majority of the platform's top 'civic' Groups."

4  *Id.* (emphasis added).  "Those Groups are generally dedicated to politics and related issues and

5  collectively reach hundreds of millions of users."  *Id.*  For example, "'enthusiastic calls for

6  violence every day' filled one 58,000-member Group."  *Id.*  And "[i]n the weeks after the

7  election, many large Groups—including some named in the August presentation—questioned the

8  results of the vote, organized protests about the results and helped precipitate the protests that

9  preceded the Jan. 6 riot."  *Id.*

10      **ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to

11  the truth of the allegations, and therefore deny the allegations.

12

13      33.      In fact, in a review of the charging documents of the 223 individuals under

14  investigation by the Department of Justice for the January 6 riot, it was disclosed that 73 of those

15  documents reference Facebook—"far more references than other social networks"—with

16  Google-owned YouTube "the second most-referenced on 24," and "Instagram, a Facebook-

17  owned company, was next on 20 [charging documents]."  Thomas Brewster, *Sheryl Sandberg*

18  *Downplayed Facebook's Role in the Capitol Hill Siege—Justice Department Files Tell a Very*

19  *Different Story*, FORBES (Feb. 7, 2021),

20  https://www.forbes.com/sites/thomasbrewster/2021/02/07/sheryl-sandberg-downplayed-

21  facebooks-role-in-the-capitol-hill-siege-justice-department-files-tell-a-very-different-

22  story/?sh=273624c710b3.  The "data does strongly indicate Facebook was [the] rioters'. . .

23  preferred platform."  *Id.*  And Facebook has known its content moderation efforts were "grossly

24  inadequate" for some time.  Chris O'Brien, *NYU study: Facebook's content moderation efforts*

25  *are grossly inadequate*, VENTURE BEAT (June 7, 2020, 9:01 PM),

26  https://venturebeat.com/2020/06/07/nyu-study-facebooks-content-moderation-efforts-are-

27  grossly-inadequate/.

ANSWER TO COMPLAINT - 17

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations, and therefore deny the allegations.

34.     Facebook's abject failure to police such content was confirmed in a 2020 survey by the Anti-Defamation League, which discovered that of the people who had suffered online hate and harassment, 77 percent reported that at least some of their harassment occurred on Facebook, 27 percent reported experiencing harassment or hate on Twitter, 18 percent on Google-owned YouTube, and 17 percent on Facebook-owned Instagram.  *See* ANTI-DEFAMATION LEAGUE, *Online Hate and Harassment: The American Experience 2020 14 (2020)*, https://www.adl.org/media/14643/download.  Parler was not listed in the survey results. Because of these findings, the Anti-Defamation League gave Facebook (including Instragram) a "D" grade for its policies and enforcement, Twitter a "C," and Google-owned YouTube a "C." *See* ANTI-DEFAMATION LEAGUE, *Online Holocaust Denial Report Card: An Investigation of Online Platforms' Policies and Enforcement*, https://www.adl.org/holocaust-denial-report-card.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations, and therefore deny the allegations.

35.     Given the problems with violent content on Amazon, Facebook, Google, Twitter, and other websites and apps, it is simply not accurate to suggest that Parler had or has a disproportionately large problem with such content.  Nor can AWS's explanations for taking down Parler hold water.  The stated reasons were pretextual, designed to conceal AWS's true motives for cancelling Parler, which were to crush an economic competitor of both itself and a major client.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence, and therefore deny those allegations.  Defendants deny the remaining allegations.

ANSWER TO COMPLAINT - 18

**C.      The AWS-Parler Relationship Before January 8, 2021**

36.      Parler contracted with AWS to provide the cloud computing services Parler needs for its apps and website to function on the internet.  Further, both the apps and the website were written to work with AWS's technology.  As of January 8, 2021, switching to a different service provider would require extensive work to migrate Parler's platform, meaning Parler would be offline for a financially devastating period.  And AWS knew this.

**ANSWER:** Defendants admit that Plaintiff became an AWS customer on June 12, 2018. Defendants otherwise lack knowledge or information sufficient to form a belief as to the truth of the allegations and therefore deny the remaining allegations.

37.      What is more, AWS sought this dependent relationship.  It did so in part by repeatedly trying to sell Parler more services that would magnify Parler's dependency on AWS, making it hard to ever leave for another cloud service provider.  In industry parlance, this is called "vendor lock."

**ANSWER:** Defendants deny the allegations.

38.      From the very beginning of the contractual relationship between AWS and Parler, AWS knew about Parler's reactive methods for culling problematic content, as well as Parler's community guidelines.  Not once before January 9, 2021, did AWS express any concern that Parler's policies and methods violated either the AWS Acceptable Use Policy or the AWS Customer Agreement.  To the contrary, AWS actively led Parler to believe that AWS considered Parler's policies and methods appropriate and consistent with AWS's Customer Agreement.

**ANSWER:** Defendants deny the allegations.

39.      Up until January 8, 2021, moreover, the relationship between Parler and AWS was a good one, with every indication it would continue into 2021 and beyond.  For example, in

ANSWER TO COMPLAINT - 19

September 2020, AWS sent Parler an email offering to finance Parler as part of AWS's funding program for startups with high potential.  On November 10, 2020, at AWS's invitation, Parler's CEO met with AWS representatives to explore the possibility of Parler's long-term engagement using AWS systems—more "vendor lock"—including a move to Amazon's proprietary database. This would require a great deal of investment and trust on Parler's behalf as it would have to specifically design portions of its software to work only with Amazon-specific products.

**ANSWER:** Defendants admit that AWS invited Plaintiff to participate in a program for financing from third parties and that Plaintiff declined that invitation.  Defendants deny the remaining allegations.

40.     At that time, AWS knew there was a possibility that then-President Trump might obtain a Parler account, likely bringing with him a surge of followers to the Parler platform. What is more, around that time Parler had informed AWS that Parler's initial tests using AI to pre-screen inappropriate content, including material that encouraged or incited violence, were returning promising results.

**ANSWER:** Defendants admit that Parler had communicated to AWS that President Trump might one day join the Parler platform.  Defendants deny the remaining allegations.

41.     In mid-December 2020, an AWS representative spoke with Parler representatives seeking to sell additionally proprietary AWS services on which Parler might rely for its core functionality.  All these offers were done with full knowledge of Parler's existing system for dealing with problematic content, something every social media platform has to deal with.

**ANSWER:** Defendants admit that AWS offered services to Plaintiff and met with its representatives regarding those services.  Defendants deny the remaining allegations.

42.     Also, AWS admitted to Parler in an email on December 16, 2020, from an AWS Technical Account Manager to Parler's Chief Technical Officer, that the AWS manager "used to

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

receive more than a dozen report [sic] per day for another customer" and that "Twitter is moving their timeline workload into AWS[,] which I can imagine will mean more abuse for Twitter too." The AWS manager further stated that, as far as any "abuse report[s]" regarding Parler were concerned, he was "definitely in this journey with you."

**ANSWER:** Defendants admit that an AWS employee communicated with Plaintiff's representative on December 16, 2020, and those communications included the quoted phrases. Defendants deny the remaining allegations.

43.     To be sure, AWS had from time to time sent Parler problematic content, which content Parler immediately investigated and resolved.  The last such communication before January 6, 2021, was on December 19, 2020.  As usual, Parler promptly looked into the flagged content, removing anything that might have been problematic.  In addition, after that December 19th communication, Parler took additional steps to facilitate any internally escalating problematic material.  And Parler continued testing a new AI-based system that would screen problematic content before it was posted, with plans to deploy the AI-system in early 2021.

**ANSWER:** Defendants admit that AWS provided notice to Plaintiff regarding content on Plaintiff's platform that violated AWS's terms and deny that Plaintiff immediately resolved those issues or removed the content.  Defendants otherwise lack knowledge or information sufficient to form a belief as to the truth of the allegations, and therefore deny the remaining allegations.

44.     On January 6, 2021, AWS forwarded to Parler a generic complaint about problematic content, but without any particular examples.  That same day Parler's Chief Technology Officer responded, informing AWS that Parler had been dealing appropriately with this content, including cooperating with law enforcement, and offered to get on a call do discuss the measures Parler was taking.

ANSWER TO COMPLAINT - 21

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

1

2      **ANSWER:** Defendants admit the that AWS provided notice to Plaintiff on January 6,

3   2021 of content on Plaintiff's platform that violated AWS's terms and that Plaintiff's

4   representative responded.  Defendants deny the remaining allegations.

5

6      45.      The next day, January 7, 2021, AWS responded via email that the previous email

7   was just for Parler's information and to consider the matter "resolved."  Thus, before January 8,

8   2021, Parler had no communication to the effect that AWS considered Parler to have an ongoing

9   problem, that Parler's current and future plans for content moderation were deficient, or that

10  Parler was violating the User Agreement.  In fact, AWS had assured Parler of precisely the

11  opposite, inducing Parler's ongoing reliance on AWS's cloud services.

12      **ANSWER:** Defendants admit that AWS communicated with Plaintiff on January 7,

13  2021.  Defendants otherwise deny the allegations.

14

15      46.      Given all of this, AWS's post-hoc claims that booting Parler was a decision

16  "months in the making" is false.  *See* Ashley Stewart & Eugene Kim, *Some Amazon employees*

17  *are taking credit for Parler's ban*, BUSINESS INSIDER (Jan. 21, 2021, 11:11 AM),

18  https://www.busines sinsider.com/amazon-web-services-parler-ban-employee-activism-2021-1.

19      **ANSWER:** Defendants deny the allegations.

20

21  **D.      AWS Moves to End Parler**

22      47.      Parler is also a competitor of Twitter's and Facebook's, as all three provide a

23  similar platform for users to communicate with short messages, links, and pictures.  Like many

24  social media platforms, Parler's business model is not based on subscription fees.

25      **ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to

26  the truth of the allegations, and therefore deny the allegations.

27

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

48.     Parler is also a competitor with Amazon, Twitter, Facebook, and Google for internet advertising.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations, and therefore deny the allegations.

49.     In mid-December 2020, AWS issued a press release announcing a new multi-year deal with Twitter.  Under the deal, AWS will "provide global cloud infrastructure to deliver Twitter timelines."  *Twitter Selects AWS as Strategic Provider to Serve Timelines, Press Center*, ABOUTAMAZON.COM (Dec. 15, 2020, 9:00 AM), https://press.aboutamazon.com/news-releases/news-release-details/twitter-selects-aws-strategic-provider-serve-timelines.

**ANSWER:** Defendants admit that AWS issued a press release on December 15, 2020, and that the press release contains the quoted language and states that the arrangement between Twitter and AWS is a "multi-year deal."  Defendants deny any remaining allegations.

50.     Twitter, moreover, "will leverage AWS's proven infrastructure and portfolio of services to support delivery of millions of daily Tweets."  *Id.*  Further, "[t]his expansion onto AWS marks the first time that Twitter is leveraging the public cloud to scale their real-time service."  *Id.*  This deal "buil[t] on the companies' more than decade-long collaboration, where AWS continues to provide Twitter with storage, compute, database, and content delivery services to support its distribution of images, videos and ad content."  *Id.*  What is more, together "Twitter and AWS will create an architecture that extends Twitter's on-premises infrastructure to enable them to seamlessly run and scale the real-time service globally, increase its reliability . . . , and rapidly move new features into production around the world."  *Id.*

**ANSWER:** Defendants admit that the December 15, 2020, press release contains the quoted language.  Defendants admit that Twitter had not previously and does not currently use AWS services to host Twitter timelines.  Defendants deny the remaining allegations.

ANSWER TO COMPLAINT - 23

51.     At the same time, Parler began to significantly increase its usership at the expense of Twitter and Facebook.  After the election in November, the New York Times reported that "millions have migrated to alternative social media and media sites like Parler . . . ."  Mike Isaac & Kellen Browning, *Fact-Checked on Facebook and Twitter, Conservatives Switch Their Apps*, THE NEW YORK TIMES (Nov. 18, 2020), https://www.nytimes.com/2020/11/11/technology/parler-rumble-newsmax.html.  In fact, less than a week after Election Day, between November 3rd and November 8th, Parler's app experienced nearly one million downloads.  *See* Russell Brandom, Parler, *A Conservative Twitter Clone, Has Seen Nearly 1 Million Downloads Since Election Day*, THE VERGE (Nov. 9, 2020, 3:52 PM), https://www.theverge.com/2020/11/9/21557219/parler-conservative-app-download-new-users-moderation-bias.  This resulted in Parler rocketing to be "the #1 free app in the iOS App Store, up from #1,023" just a week earlier.  *Id.*  Likewise, in that same week the Parler app went from 486th to 1st in the Google Play rankings.  *Id.*  Not surprisingly, "the app was the 10th most downloaded social media app in 2020 with 8.1 million new installs."  *See* Jonathan Schieber, *Parler Jumps to No. 1 on App Store After Facebook and Twitter Ban Trump*, TECHCRUNCH (Jan. 9, 2021, 1:45 PM), https://techcrunch.com/2021/01/09/parler-jumps-to-no-1-on-app-store-after-facebook-and-twitter-bans/.  Despite this increase in users, there is no evidence that Parler was used to coordinate the infamous attacks on the Capitol on January 6.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations, and therefore deny the allegations.

52.     In 2021, this trend both continued and accelerated, thanks to Twitter's and Facebook's announcements that they would permanently ban former President Trump from their platforms.  *Id.*  As a result, Parler saw installs increase in the United States by 355 percent.  *Id.*  After Twitter's announcement, conservative politicians and media figures began encouraging their followers to switch to Parler.  *See* Yelena Dzhanova, *Top Conservative Figures are Tweeting to Advertise their Parler Accounts After Trump was Permanently Banned from Twitter*,

ANSWER TO COMPLAINT - 24

1

2   BUSINESS INSIDER (Jan. 9, 2021, 10:17 AM), https://www.businessinsider.com/top-

3   conservatives-moving-to-parler-after-trumps-ban-from-twitter-2021-1.  *See also* Joseph A.

4   Wulfsohn*, Conservatives Flee to Parler Following Twitter's Permanent Suspension of Trump*,

5   Fox NEWS (Jan. 9, 2021), https://www.foxnews.com/media/conservativesjoin-parler-twitter-

6   trump-ban.

7        **ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to

8   the truth of the allegations, and therefore deny the allegations.

9

10        53.        Speculation began to mount that then-President Trump would likewise move to

11   Parler.  *Id.*  Given the close to 90 million followers the President had on Twitter, this would be

12   an astronomical boon to Parler and a heavy blow to Twitter.  *See* Donald J. Trump, *Statistics on*

13   *Twitter Followers (@realDonaldTrump)*, SOCIALBAKERS,

14   https://www.socialbakers.com/statistics/twitter/profiles/detail/25073877-realdonaldtrump.

15        **ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to

16   the truth of the allegations, and therefore deny the remaining allegations.

17

18        54.        An AWS official, who had known about the possibility that Trump might join

19   Parler, became increasingly inquisitive as to whether Parler's CEO had heard whether that would

20   occur in the wake of Facebook and Twitter banning the former President.  On Thursday morning,

21   January 7, 2021, she asked Parler's CEO, given Trump's exclusion from those other platforms,

22   "Does he plan on joining Parler?"  On Friday morning, January 8, 2021, she stated, "I see Sean

23   Hannity said Trump has joined Parler."  She then asked, "Is that true?"  Parler's CEO responded,

24   "I believe Trump has an account.  But it's not verified and incognito.  Not certain."  To which

25   the AWS representative responded, "No communication from his team?"  Not once did this

26   AWS representative raise any concerns about problematic content on Parler.

27        **ANSWER:** Defendants admit that an AWS employee communicated with Plaintiff's

representative on January 7 and 8, 2021, that the communications included the quoted phrases,

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

1
2    and that Parler had communicated to AWS that President Trump might one day join the Parler
3    platform.  Defendants deny the remaining allegations.
4
5         55.    Given the context of Parler's looming competitive threat to Twitter, as well as to
6    AWS, Google, and Facebook, and given the fact that the Facebook and Twitter bans might not
7    long muzzle the former President if he switched to Parler, potentially bringing tens of millions of
8    followers with him, AWS moved to shut down Parler.
9         **ANSWER:** Defendants deny the allegations.
10
11        56.    Shortly after Twitter announced it was banning then-President Trump, on January
12   8, 2021, Google removed Parler from its Google Play Store.  A Google spokesperson falsely said
13   that Google did so because "of continued posting in the Parler app that seeks to incite ongoing
14   violence in the U.S.," which presents an "ongoing and urgent public safety threat."  Lucas
15   Manley, Parler removed from the Google Play store as Apple App Store suspension reportedly
16   looms, TECH CRUNCH (Jan. 8, 2021, 8:05 PM), https://techcrunch.com/2021/01/08/parler-
17   removed-from-google-play-store-as-apple-app-store-suspension-reportedly-looms/.  Banning
18   Parler from the Google Play Store was significant because the overwhelming majority of
19   Android apps are found on that store.  And the Google Play Store ban's explanation was suspect
20   because enormous amounts of content inciting violence could be found on Facebook and Twitter,
21   yet Google did not remove these two apps from the Play Store.
22        **ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to
23   the truth of the allegations, and therefore deny the allegations.
24
25        57.    The next day, January 9, 2021, at 6:07 pm PST, web news site BuzzFeed posted
26   an article with screenshots of a letter from AWS to Parler, informing Parler that its service would
27   be suspended at 11:59 pm PST on Sunday, less than thirty hours later.  *See* John Paczkowski &
     Ryan Mac, *Amazon Will Suspend Hosting for Pro-Trump Social Network Parler*, BuzzFEED

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

(Jan. 9, 2021, 6:07 PM PST, updated 7:08 PST),

https://www.buzzfeednews.com/article/johnpaczkowski/amazon-parler-aws.  What is more, the

article with the letter was posted not long after Parler itself received the letter in an email, which

was received at 5:19 pm PST (7:19 CST), less than an hour before the BuzzFeed article went

online, meaning AWS leaked the letter to BuzzFeed around the same time as sending it to Parler.

**ANSWER:** Defendants admit that after AWS sent its January 9, 2021 notice to Plaintiff,

it provided a copy of the notice to a reporter for Buzzfeed to ensure that the public and the press

would have accurate information about the reason for the upcoming suspension.  Defendants

deny the remaining allegations.

58.    That same evening, the Associated Press reported that "Parler may be the leading

candidate" for then-President Trump after his Twitter ban as "[e]xperts had predicted Trump

might pop up on Parler . . . ."  Frank Bajak, Squelched by Twitter, *Trump Seeks New Online*

*Megaphone*, ASSOCIATED PRESS (Jan. 9, 2021), https://apnews.com/article/donald-trump-

politics-media-social-media-coronavirus-pandemic-f5b565ca93a792640211e6438f2db842.

However, the AP also observed that "Amazon struck [a] blow Saturday [against the chances of

Trump adopting the platform], informing Parler it would need to look for a new web-hosting

service effective midnight Sunday."  *Id.*

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to

the truth of the allegations, and therefore deny the allegations.

59.    This termination by AWS could not have come at a worse time for Parler—a time

when the company was surging with the potential of even more explosive growth in the next few

days.  Worse than the timing was the result—Parler tried to find alternative companies to host it

and they repeatedly were unable to do so, often because of the public defamation by AWS.  This

delayed Parler's ability to get back online by over a month.  That delay meant many past Parler

users have had to move on to other platforms.  *See* Arjun Walia, *Telegram Passes 500 Million*

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

*Users As People Seek Facebook & Twitter (Big Tech) Alternatives*, LEWROCKWELL.COM
(Jan. 25, 2021), https://www.lewrockwell.com/2021/01/no_author/telegram-passes-500-million-
users-as-people-seek-facebook-twitter-big-tech-alternatives/.  It is no wonder, then, that
competitor Twitter's CEO heartily endorsed efforts to remove Parler from the public sphere.  *See*
Kevin Shalvey, *Parler's CEO John Matze Responded Angrily After Jack Dorsey Endorsed*
*Apple's Removal of the Social Network Favored by Conservatives*, BUSINES INSIDER (Jan. 10,
2021, 5:35 AM), https://www.businessinsider.com/parlerjohn-matze-responded-angrily-jack-
dorsey-apple-ban-2021-1.

**ANSWER:** Defendants deny the allegation that AWS defamed Parler or terminated its
service and admit that AWS suspended Parler's use of AWS services to make Parler publicly
available.  Defendants otherwise lack knowledge or information sufficient to form a belief as to
the truth of the allegations, and therefore deny the remaining allegations.

60.     Parler's rival social media apps that are alternatives to Facebook and Twitter are
experiencing record growth.  *See* Isaac & Browning, *Fact-Checked on Facebook and Twitter,*
*supra*.  When Parler was not available, both current users and prospective users turned to
alternatives, including but not limited to Twitter or Facebook.  And once those users have begun
to use another platform, they may not switch or return to Parler after Parler was offline for over a
month.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to
the truth of the allegations, and therefore deny the allegations.

61.     By silencing Parler, moreover, AWS silences the millions of Parler users who do
not feel comfortable using Twitter or other social media apps to express their views because,
among other things, these other companies take advantage of users' personal data for advertising
and other revenue sources.

**ANSWER:** Defendants deny the allegations.

ANSWER TO COMPLAINT - 28

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

62.     What is more, by pulling the plug on Parler but leaving Twitter alone despite the posting of massive amounts of troublesome content on Twitter and Amazon itself, AWS has revealed that its expressed reasons for suspending Parler's service are but pretext.

**ANSWER:** Defendants deny the allegations.

63.     Because, AWS declared, "we cannot provide services to a customer that is unable to effectively identify and remove content that encourages or incites violence against others," AWS announced the pending termination of Parler's service.  But AWS knew that its allegations against Parler were specious.

**ANSWER:** Defendants admit that it made the statement alleged in this paragraph as part of its notice to Parler.  Defendants deny the remaining allegations.

64.     If Parler were a newspaper, AWS would try to portray the content it flagged as appearing on the front page.  But as the facts above show, the minimal amount of problematic material that AWS flagged, combined with the fact that much of it was buried and could not be easily shared, meant it was hardly noticed.  Thus, if Parler was a newspaper, the problematic content was buried at the bottom right column on page D17, in small type.  No one was really seeing or sharing it.

**ANSWER:** Defendants deny the allegations.

65.     Making matters worse, AWS leaked its termination email to the press, knowing that its allegations in the email claiming that Parler was unable to find and remove content that encouraged violence were false—both because AWS knew of Parler's ongoing projects to utilize AI-aided content screening and because, in the days preceding AWS's email, Parler had removed everything AWS had brought to its attention and more.  Yet AWS sought to defame Parler nonetheless.  And because of AWS's false claims, Parler has not only lost current and future

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

customers, but for weeks Parler was unable to find an alternative web hosting company.  In short, these false claims have made Parler a pariah and severely damaged its once-booming business.

**ANSWER:** Defendants admit that after AWS sent its January 9, 2021 notice to Plaintiff, it provided a copy of the notice to a reporter for Buzzfeed to ensure that the public and the press would have accurate information about the reason for the upcoming suspension.  Defendants deny the remaining allegations.

66.     Moreover, although AWS claims it terminated Parler because "Parler was used to incite, organize, and coordinate the January 6 attack on the U.S. Capitol," that claim is a pretext that is not backed by evidence.  AWS has identified no evidence that rioters used Parler to foment or coordinate the attack at the time of its termination email and it still has no such evidence.

**ANSWER:** Defendants deny the allegations.

67.     By contrast, there is increasing evidence that Twitter and Facebook, Parler's much larger competitors, were used to foment and coordinate the riot.  For instance, Ashli Babbitt, the woman killed by law enforcement when she forced her way into the Capitol Building, did have a Parler account, but it had not been used since November.  Instead, she had a Twitter account that was in use the very day of the riot, January 6, 2021.  Further, the federal government has indicated that the attack was coordinated at least in part on Twitter.  *See* Michael Balsamo & Erick Tucker, *FBI says it warned about prospect of violence ahead of US Capitol riot*, NAVY TIMES (Jan. 12, 2021), https://www.navytimes.com/news/your-military/2021/01/13/fbi-says-it-warned-about-prospect-of-violence-ahead-of-us-capitol-riot/.  And, as already noted, Facebook, Twitter, and Google's YouTube are the top social media sites found in the charging documents for arrested rioters—not Parler.

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

1

2      **ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to

3   the truth of the allegations, and therefore deny the allegations.

4

5      68.      Finally, to add injury to injury, after AWS shut off all services to Parler, AWS left

6   open Route 53, a highly scalable domain name system (DNS), which directed hackers to Parler's

7   backup datacenters and caused the hackers to initiate a sizeable DNS attack.  In other words,

8   AWS essentially illuminated a large neon arrow directing hackers to Parler's backup datacenters.

9   And the hackers got the message, launching an extremely large attack—one 250 times larger and

10  12-24 times longer than the average Distributed Denial of Service (DDOS) attack.[2]  Later, AWS

11  would terminate the Route 53 link, but the damage was already done.  And this AWS-facilitated

12  attack was a threat by AWS to all future datacenters that, if they were to host Parler, they too

13  would be attacked by unprecedented hacks.

14      **ANSWER:** Defendants deny that AWS shut off all services to Parler; directed hackers to

15  Parler's backup datacenters; caused hackers to initiate a DNS attack; or otherwise facilitated any

16  attack on Parler or its datacenters, much less threatened attack on future datacenters hosting.

17  Defendants otherwise lack knowledge or information sufficient to form a belief as to the truth of

18  the allegations, and therefore deny the remaining allegations.

19

20      69.      Finally, since termination, AWS/Amazon has been secretly selling Parler's user

21  data—including images and video—to whomever has an Amazon S3 account and is willing to

22  pay to download the data, thus intentionally interfering with Parler's contracts with its current

23  users.  Amazon is sharing Parler user data in violation of AWS's own contract with Parler—and

24  profiting to boot.  This is direct evidence of tortious interference with Parler's contracts with its

25  current Parler users.  This AWS-enabled black market for Parler user data also enables others to

26

27  [2] The hackers launched a DDOS attack of 250 gbps (gigabytes per second) for 12 hours.  The average DDOS attack
is only one gbps and lasts for 30-60 minutes.  *See* Sam Cook, *DDoS Attack Statistics and Facts for 2018-2020*,
COMPARITECH (Nov. 10, 2020, updated Feb. 10, 2021), https://www.comparitech.com/blog/information-
security/ddos-statistics-facts/.

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

access this data and then engage in mass doxing and harassment of Parler users.  These AWS-enabled activities will hamper Parler's ability to get new users and cause it to lose existing users, who will be wary of Parler's ability to protect their privacy.

**ANSWER:** Defendants deny the allegations.

## I.    CAUSES OF ACTION

**A.    Pre-Termination & Termination Conduct**

**Count One: Washington Consumer Protection Act**

70.    Parler restates, re-alleges, and incorporates by reference each of the allegations set forth in the Complaint as if fully set forth herein.

**ANSWER:** Defendants incorporate and repeat as if fully set forth herein their responses to the allegations in paragraphs 1 through 69 of the Complaint.

71.    The Washington Consumer Protection Act provides that "unfair or deceptive acts or practices in the conduct of any trade or commerce are . . . unlawful."  RCW 19.86.020.

**ANSWER:** Defendants respond that this paragraph states a legal conclusion, to which no response is required.  To the extent a response is required, Defendants deny the allegations.

72.    Under the Act, "'[a]ny person who is injured in his or her business or property' by a violation of the act may bring a civil suit for injunctive relief, damages, attorney fees and costs, and treble damages."  *Panag v. Farmers Ins. Co. of Washington*, 166 Wn.2d 27, 37, 204 P.3d 885 (2009) (citing RCW 19.86.090).  And to prevail in such a claim, "the plaintiff must prove (1) an unfair or deceptive act or practice, (2) occurring in trade or commerce, (3) affecting the public interest, (4) injury to a person's business or property, and (5) causation."  *Id.*

**ANSWER:** Defendants respond that this paragraph states a legal conclusion, to which no response is required.  To the extent a response is required, Defendants deny the allegations.

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

73.     AWS engaged in an unfair and deceptive series of acts and practices, in bad faith, in the course of trade and commerce, that caused substantial injury to Parler.  Further, AWS's acts and practices are harmful to the public interest.

**ANSWER:** Defendants deny the allegations.

74.     The AWS Customer Agreement is a contract of adhesion, which AWS forces each customer to accept, without negotiation, in order to use AWS's services.  Upon information and belief, many of AWS's customers are a captive audience who do not have ready access to an effective and affordable alternative to AWS's services.  AWS is fully aware that the AWS Customer Agreement is a contract of adhesion, which is exemplified by the fact that the agreement itself provides that AWS may unilaterally modify the agreement at any time, with or without notice to its customers.  *See* Exhibit A § 12.  (AWS "may modify this Agreement (including any Policies) at any time by posting a revised version on the AWS Site . . . .  By continuing to use the Service Offerings after the effective date of any modifications to this Agreement, you agree to be bound by the modified terms.  It is your responsibility to check the AWS Site regularly for modifications to this Agreement.").

**ANSWER:** Defendants deny the allegations.

75.     AWS unilaterally drafted the AWS Customer Agreement in a manner that unfairly, deceptively, and unconscionably advantages AWS and harms its customers.  By way of example only, AWS knows that customers will use AWS services to provide a platform for third party end users to post content.  AWS is aware that it is not possible to completely prevent those third party end users from posting objectionable content that violates AWS's policies.  Nevertheless, AWS contends that a customer breaches this contract of adhesion if any third-party end user does post such objectionable content, irrespective of whether the customer has adopted or is working to adopt appropriate measures to block or remove such content.  In effect, by

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

AWS's own interpretation (which interpretation Parler disputes), AWS has knowingly drafted its contract of adhesion in a manner that will force its customers to breach the contract en masse. In turn, AWS contends that it has the right to terminate the contract "for cause" in the event of such a breach, with no notice to, and no meaningful remedies for, any of its customers. AWS has done so despite having full knowledge that its customers rely upon the continuation of AWS's services for the very survival of their businesses.

**ANSWER:** Defendants deny the allegations.

76.     When AWS and Parler entered into the AWS Customer Agreement for cloud computing services that Parler needs for its apps and website to function on the internet, AWS knew that it would be impossible to ensure that no end user would ever post objectionable content on Parler's platform. Indeed, it would be technologically impossible for any microblogging platform to completely prevent the posting of objectionable content by end users. Rather, at best, a microblogging platform like Parler has the capacity to remediate such content after it has been posted by an end user and becomes known to Parler. By definition, AWS was aware of and implicitly accepted these technological limitations throughout the time when it entered into and performed its contract with Parler.

**ANSWER:** Defendants deny the allegations.

77.     Parler performed under the contract in good faith by, among other things, paying for AWS's services. AWS repeatedly made representations to Parler which were designed to and did give Parler the assurance that AWS did not view the posting of allegedly objectionable user content on Parler's platform as a breach of the parties' contract, especially in light of Parler's efforts to remediate such content. By way of example only, on January 7, 2021, AWS assured Parler that a prior complaint regarding objectionable content on Parler had been "resolved." At the same time, AWS solicited additional business from Parler. Parler worked

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

with AWS to expand the scope of the products and services that it purchased from AWS, based in-part on the assurances it received from AWS.

**ANSWER:** Defendants admit that Parler paid for AWS's services, and that AWS employees communicated with Parler regarding content on its platform that violated AWS's terms and regarding Parler's use of AWS services.  Defendants deny the remaining allegations.

78.     Further, during that same time period, Parler was in talks with AWS to acquire new AI from Amazon to perform superior content moderation on its platform.  AWS was fully aware that Parler was working, with Amazon's assistance, to adopt the best automated practices available on the market to prevent and remove objectionable content from its platform.

**ANSWER:** Defendants admit that AWS employees communicated with Parler regarding potential services.  Defendants deny the remaining allegations.

79.     On January 7-8, 2021, AWS learned that former President Donald Trump and other known conservatives, including Sean Hannity, had switched or were likely to switch from Twitter to Parler.  AWS was clearly concerned about that possibility and sent inquiries regarding those concerns to representatives of Parler.

**ANSWER:** Defendants admit that AWS employees received communications from Parler regarding Sean Hannity and President Trump's potential use of the platform.  Defendants deny the remaining allegations.

80.     On Sunday, January 9, 2021, AWS notified Parler via email that AWS was immediately suspending Parler's account.  In reality, this so-called suspension was a termination, as AWS made clear over the phone and in the same email that Parler would need to migrate its data to new servers.

ANSWER TO COMPLAINT - 35

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

1

2      **ANSWER:** Defendants admit that on January 9, 2021, AWS sent a notice to Parler

3  informing it that AWS would suspend Parler's use of AWS services to make Parler publicly

4  available.  Defendants deny the remaining allegations.

5

6      81.     In AWS's email purporting to suspend and/or terminate the contract, AWS

7  identified its purported reasons for the termination.  Specifically, AWS asserted that Parler did

8  not have an adequate plan to identify and remove dangerous content from its platform, because

9  Parler's only plan was to do so "manually with volunteers."  AWS was aware that this purported

10 basis for suspending and/or terminating the contract was untrue.  AWS previously had given

11 Parler explicit and/or implicit assurances that its concerns about objectionable content on Parler

12 would not result in termination of the contract.  Further, AWS knew that Parler was in the midst

13 of acquiring AI from Amazon that Parler could use to identify and remove dangerous content

14 from its platform, directly contrary to AWS's claim that Parler intended to perform this function

15 "manually with volunteers."

16     **ANSWER:** Defendants admit that AWS's January 9, 2021 notice to Parler included the

17 basis for the AWS's suspension of Parler's cloud computing services.  Defendants deny the

18 remaining allegations.

19

20     82.     The true reason why AWS decided to suspend and/or terminate its contract with

21 Parler was not because of any alleged breach of the contract, but because AWS did not want

22 Parler to be able to provide a new platform to conservative voices, including Donald Trump, or

23 to compete effectively with other microblogging platforms such as Twitter.

24     **ANSWER:** Defendants deny the allegations.

25

26     83.     On the same day that AWS terminated its contract with Parler, it also publicized

27 false information about Parler to the media.  Specifically, on January 9, 2021, AWS announced it

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

would indefinitely suspend Parler's service, falsely claiming that Parler was unable or unwilling "to remove content that encourages or incites violence against others."

**ANSWER:** Defendants admit that on January 9, 2021, AWS sent a notice to Parler informing it that AWS would suspend Parler's use of AWS services to make Parler publicly available and that the notice contains the quoted language. Defendants deny the remaining allegations.

84. AWS's series of acts and practices was deceptive and unfair. AWS uniformly requires its customers to enter into a contract of adhesion containing unfair and unconscionable terms that benefit AWS and harm its customers. AWS entered into such a contract with Parler, knowing and accepting that it would be impossible for Parler, like AWS's other customers, to completely prevent the posting of objectionable content on its platform. During the performance of the contract, AWS was aware of the methods Parler was using and developing to remediate such content, and induced Parler to continue to pay for and even expand its business relationship with AWS through assurances that Parler's content moderation methods were adequate. Nevertheless, AWS subsequently terminated its contract with Parler based on a characterization of Parler's content moderation methods which AWS knew to be false. AWS published the same false characterization of Parler to the media.

**ANSWER:** Defendants deny the allegations.

85. AWS's unfair and deceptive acts and practices impact the public interest. AWS not only made deceptive statements to Parler directly, but also made deceptive statements about Parler to the public at-large. AWS's decision to terminate Parler's contract was motivated at least in-part by, and in fact furthered, AWS's goal of eliminating a platform for a large segment of the political spectrum in the United States. Further, upon information and belief, AWS provides the same services through the same contract of adhesion to many other customers who are likewise unable to fully prevent the posting of objectionable content on their platforms.

ANSWER TO COMPLAINT - 37

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

1

2   Upon information and belief, many of those customers rely on their contracts of adhesion with

3   AWS for the survival of their businesses, and they are at risk of having their contracts terminated

4   "for cause" (and their businesses severely injured) by AWS at any time.

5          **ANSWER:** Defendants deny the allegations.

6

7          86.    AWS's unfair and deceptive acts and practices have resulted in substantial

8   damages to Parler, including but not limited to the loss of millions of dollars of revenue from

9   advertisements.

10         **ANSWER:** Defendants deny the allegations.

11

12                          **Count Two: Defamation**

13         87.    Parler restates, re-alleges, and incorporates by reference each of the allegations set

14  forth in the rest of this Complaint as if fully set forth herein.

15         **ANSWER:** Defendants incorporate and repeat as if fully set forth herein their responses

16  to the allegations in paragraphs 1 through 86 of the Complaint.

17

18         88.    Under Washington law, the "required elements for a defamation claim are (1)

19  falsity, (2) an unprivileged communication, (3) fault, and (4) damages." *Stiles v. Kearney*, 168

20  Wn. App. 250, 262, 277 P.3d 9 (2012) (citing *Mark v. Seattle Times*, 96 Wn.2d 473, 486, 635

21  P.2d 1081 (1981)).

22         **ANSWER:** Defendants respond that this paragraph states a legal conclusion, to which no

23  response is required.  To the extent a response is required, Defendants deny the allegations.

24

25         89.    On January 9, 2021, AWS sent an email to Parler declaring that AWS would

26  indefinitely suspend Parler's service, claiming that Parler was unable or unwilling "to remove

27  content that encourages or incites violence against others."  AWS or one of its employees

ANSWER TO COMPLAINT - 38

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

1

2   publicly leaked that email in bad faith to BuzzFeed at or around the same time AWS sent the

3   email to Parler.

4       **ANSWER:** Defendants admit that on January 9, 2021, AWS sent a notice to Parler

5   informing it that AWS would suspend Parler's use of AWS services to make Parler publicly

6   available and that the notice contains the quoted language.  Defendants admit that after AWS

7   sent its January 9, 2021 notice to Plaintiff, it provided a copy of the notice to a reporter for

8   Buzzfeed to ensure that the public and the press would have accurate information about the

9   reason for the upcoming suspension.  Defendants deny the remaining allegations.

10

11      90.     AWS's email was false and AWS knew it was false.  Parler was willing and able

12  to remove such content and AWS knew that, because there was a lengthy history between the

13  parties of Parler removing such content as quickly as AWS brought it to Parler's attention.  What

14  is more, AWS was well aware that Parler was testing a new AI-based system to remove such

15  content before it was even posted, that Parler had success with initial testing of the program, and

16  that Parler had in fact shared those testing results with AWS.

17      **ANSWER:** Defendants deny the allegations.

18

19      91.     The AWS email received wide play in the media.

20      **ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to

21  the truth of the allegation, and therefore deny the allegation.

22

23      92.     The AWS email was not a privileged communication as it did not involve

24  communication between an attorney and client, a doctor and patient, spouses, or any other of the

25  recognized privileges under Washington law.

26      **ANSWER:** Defendants respond that this paragraph states a legal conclusion or contains

27  legal argument, to which no response is required.  To the extent a response is required,

Defendants deny the allegations.

ANSWER TO COMPLAINT - 39

93.     To establish fault as a private figure, a plaintiff "must prove negligence by a preponderance of the evidence." *Alpine Indus. Computers, Inc. v. Cowles Pub. Co*., 114 Wn. App. 371, 388, 57 P.3d 1178 (2002), amended, 64 P.3d 49 (2003).  This means that the plaintiff "must show fault by the publisher in not acting reasonably to ensure that the report is accurate and complete."  *Id.* at 390 (citation omitted).

**ANSWER:** Defendants respond that this paragraph states a legal conclusion, to which no response is required.  To the extent a response is required, Defendants deny the allegations.

94.     Additionally, to show fault "concerning a subject of general or public interest," a private figure must show "that in publishing the statement, the defendant knew or, in the exercise of reasonable care, should have known that the statement was false, or would create a false impression in some material respect."  *Id.* at 389 (citation omitted).

**ANSWER:** Defendants respond that this paragraph states a legal conclusion, to which no response is required.  To the extent a response is required, Defendants deny the allegations.

95.     Moreover, "a public figure plaintiff must prove by clear and convincing evidence that the defendant uttered the offensive statement with actual malice, that is, with knowledge of falsity or reckless disregard of the truth or falsity of the statement."  *Id.* at 387-88 (citing *New York Times Co. v. Sullivan, 376 U.S.  254, 279-80 (1964); Herron v. Tribune Publ'g Co*., 108 Wn.2d 162, 169-79, 736 P.2d 249 (1987)).

**ANSWER:** Defendants respond that this paragraph states a legal conclusion, to which no response is required.  To the extent a response is required, Defendants deny the allegations.

96.     Parler is not a public figure and the success of its "content moderation" policies was not a matter of public concern until Google and AWS decided to make it one, but the

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

defendant cannot by a defamatory statement turn a private matter into a public one or all matters would be public in nature.

**ANSWER:** Defendants respond that this paragraph states a legal conclusion, to which no response is required.  To the extent a response is required, Defendants deny the allegations.

97.     AWS did not take reasonable care to investigate and ensure that its statements were accurate and complete, thus acting negligently.

**ANSWER:** Defendants deny the allegations.

98.     But even if Parler is considered a public figure or Parler's "content moderation" process was deemed to be of public interest, AWS acted with actual malice.

**ANSWER:** Defendants deny the allegations.

99.     Actual malice exists when there is "knowledge of the falsity or reckless disregard of the truth or falsity of the statement." *Maison de France, Ltd. v. Mais Oui!, Inc*., 126 Wn. App. 34, 44, 108 P.3d 787 (2005).  Reckless disregard "requires evidence that the publisher was plagued with serious doubts as to the truth of the statement." *Alpine Indus. Computers, Inc*., 114 Wn. App. at 394.  AWS is chargeable with the knowledge possessed by its agents or employees. *See, e.g., State ex rel. Hayes Oyster Co. v. Keypoint Oyster Co*., 64 Wn.2d 375, 386, 394 P.2d 979 (1964).

**ANSWER:** Defendants respond that this paragraph states a legal conclusion, to which no response is required.  To the extent a response is required, Defendants deny the allegations.

100.     On January 10 and 11, AWS published and released statements to news media repeating its assertion that Parler had been "unwilling or unable" to "remove" "content . . .  that encourages and incites violence against others."  *See, e.g.*, Matt Day, *Amazon's Parler Removal Shows Cloud Unit's Rarely Used Power*, BLOOMBERG BUSINESSWEEK (Jan. 11, 2021),

ANSWER TO COMPLAINT - 41

bloomberg.com/news/articles/2021-01-11/amazon-s-removal-of-parler-shows-cloud-unit-s-rarely-used-power.

**ANSWER:** Defendants admit that AWS released statements regarding the reasons for its suspension of Parler's cloud computing services, state that those statements speak for themselves, deny that Parler has adequately or accurately characterized the statements, and otherwise deny the allegations.

101.    But on January 8, when AWS brought to Parler's attention 75 posts and comments that allegedly encouraged or incited violence, Parler promptly deleted all 75 of them, and agents or employees of AWS were aware of that fact.  Parler, in other words, was both willing and able to remove any problematic content.

**ANSWER:** Defendants deny the allegations.

102.    Moreover, on January 9, when AWS brought to Parler's attention another 33 posts and comments that allegedly encouraged or incited violence, Parler promptly deleted all 33 of them, and agents or employees of AWS were aware of that fact.  Here again, AWS was aware that Parler was both willing and able to remove content.

**ANSWER:** Defendants deny the allegations.

103.    Indeed, as of the night of January 10, when AWS terminated service to Parler, Parler had promptly identified and deleted all the posts brought to its attention by AWS, and agents or employees of AWS were aware of that fact.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations, and therefore deny the allegations.

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

1

2    104.    In addition, AWS agents or employees were aware as of January 9 that Parler had

3    had successful initial test results with its own AI content-moderation program designed to

4    identify and remove such content before it was even posted.

5        **ANSWER:** Defendants deny the allegations.

6

7    105.    Thus, AWS's statements made on January 10 and 11, that Parler had been

8    unwilling or unable to remove such content, were not only false, at the time AWS published

9    these statements, AWS knew they were false, or had a high degree of awareness of their probable

10   falsity.  Thus, AWS acted with actual malice.

11       **ANSWER:** Defendants deny the allegations.

12

13   106.    AWS's defamatory conduct did not relate to or arise out of its contract with

14   Parler, nor any of its services or products.

15       **ANSWER:** Defendants deny the allegations.

16

17   107.    Because of AWS's malicious defamatory statements, Parler's public reputation

18   suffered severe damage and Parler has had many potential service providers refuse to work with

19   it, hampering and delaying its ability to get back online.  In addition, Parler employees have been

20   targeted with threats.  And the number of lost users and advertisement revenues stemming from

21   Parler's inability to find someone to quickly host it can be counted in the millions.

22       **ANSWER:** Defendants deny they made any defamatory statements or that Parler's

23   alleged damages were caused by Defendants.  Defendants otherwise lack knowledge or

24   information sufficient to form a belief as to the truth of the allegations, and therefore deny the

25   remaining allegations.

26

27   108.    The service of this complaint, together with a summons, satisfies the requirements

of the Uniform Correction or Clarification of Defamation Act, without the need for a prior

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

1

2  request for correction, because it "[s]pecifies with particularity the statement alleged to be false

3  and defamatory or otherwise actionable and, to the extent known, the time and place of

4  publication," and it "[a]lleges the defamatory meaning of the statement[s][.]" *See* RCW

5  7.96.040(3)(b)-(c).

6      **ANSWER:** Defendants respond that this paragraph states a legal conclusion, to which no

7  response is required.  To the extent a response is required, Defendants deny the allegations.

8

9      109.    AWS's defamatory leaks to the media were extraneous to the AWS Customer

10  Agreement and did not arise from that contract.  Rather, they were purely malicious actions

11  taken by AWS outside the course of performance of the contract.

12      **ANSWER:** Defendants deny the allegations.

13

14      110.    Parler is entitled to actual and exemplary damages, including but not limited to

15  damages for reputational harm and lost profits.

16      **ANSWER:** Defendants deny the allegations.

17

18                    **Count Three: Breach of Contract**

19  **AWS breached its contract with Parler by terminating it without sufficient cause under the**
   **contract, and by not providing 30 days' notice.**

20

21      111.    Parler restates, re-alleges, and incorporates by reference each of the allegations set

22  forth in the rest of this Complaint as if fully set forth herein.

23      **ANSWER:** Defendants incorporate and repeat as if fully set forth herein their responses

24  to the allegations in paragraphs 1 through 110 of the Complaint.

25

26      112.    Parler entered into a contract with AWS known as the Customer Agreement.

27  AWS repudiated and breached the Customer Agreement in bad faith and thereby caused damage

to Parler.  Under Washington law, "[a] breach of contract is actionable only if the contract

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

imposes a duty, the duty is breached, and the breach proximately causes damage to the claimant." *See Northwest Independent Forest Manufacturers v. Department of Labor and Industries*, 78 Wn. App. 707, 712, 899 P.2d 6 (1995).  Each of those elements is satisfied here.

**ANSWER:** Defendants respond that this paragraph states a legal conclusion or contains legal argument, to which no response is required.  To the extent a response is required, Defendants admit that Parler became an AWS customer on June 12, 2018 and deny the remaining allegations.

113.    As to duty: The AWS Customer Agreement with Parler allows either party to terminate the agreement "for cause if the other party is in material breach of this Agreement and the material breach remains uncured for a period of 30 days from receipt of notice by the other party."  Thus, the contract imposes a duty of a 30-day notice before for-cause termination based on an uncured material breach.

**ANSWER:** Defendants deny the allegations.

114.    This 30-day notice and opportunity to cure is absolutely critical to a big social media platform like Parler.  Immediate termination—going dark—is unbelievably damaging. Getting 30 days either to cure or find another host is absolutely essentially to avoid millions of dollars in damages and potentially irreparable harm.  Parler would not have signed up with AWS without that protection.  Nor would any reasonable social media platform sign up with AWS without that protection.  It was therefore reasonable for Parler to believe that that protection meant something.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations, and therefore deny the allegations.

115.    From November 17, 2020, through January 6, 2021, AWS periodically sent Parler problematic material AWS had found on Parler's website.  Parler always quickly removed that

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

material.  And on January 7, 2021, AWS informed Parler that all issues with such material were resolved and everything was "okay."

**ANSWER:** Defendants admit that AWS employees repeatedly notified Parler regarding content on Parler's platform that violated AWS's terms.  Defendants deny the remaining allegations.

116.    On January 8, 2021, AWS brought concerns to Parler about user content that encouraged violence.  That same day, Parler addressed those concerns.

**ANSWER:** Defendants admit that AWS employees sent notice to Parler regarding content on Parler's platform that violated AWS's terms on January 8, 2021.  Defendants deny the remaining allegations.

117.    On January 9, 2021, AWS brought more "bad" content to Parler and Parler took down all of that content by the evening.  When Parler asked AWS how it had found this material, AWS refused to say.  AWS had taken a screenshot of one of the problematic posts/comments just nine seconds after it was put on Parler.  Parler alleges on information and belief that that post/comment, and perhaps others, were orchestrated by AWS in order to create the false impression that Parler was failing to police user content for material that violated AWS's use policy.

**ANSWER:** Defendants admit that AWS employees sent notice to Parler regarding content on Parler's platform that violated AWS's terms on January 9, 2021.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence, and therefore deny those allegations.  Defendants deny the remaining allegations.

118.    As of the end of January 9, 2021, Parler had not breached the agreement and certainly had not committed any uncured material breach of the Agreement for 30 days, as

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

required for termination.  Parler had performed in a manner consistent with the terms of the

contract and the parties' course of dealing.  Further, Parler had appropriately remediated

problematic content to the satisfaction of AWS.  There was no cause for AWS to suspend or

terminate its AWS Customer Agreement with Parler.

    **ANSWER:** Defendants deny the allegations.


    119.    Yet, late on January 9, 2021, AWS informed Parler via email that AWS would

"suspend Parler's account effective Sunday, January 10th, at 11:59 PM PST."

    **ANSWER:** Defendants admit that on January 9, 2021, AWS sent a notice to Parler

informing it that AWS would suspend Parler's use of AWS services to make Parler publicly

available and that the notice contains that language.


    120.    That so-called suspension was in fact a termination.  First, the very email

announcing the suspension declared that AWS "will ensure that all of your data is preserved for

you to migrate to your own servers, and will work with you as best as we can to help your

migration."  Thus, the email makes clear that, although AWS was still preserving Parler's data, it

was not doing so to effectuate a future return to AWS.  Instead, AWS was looking to give Parler

its data so Parler could find some other way to get back online.  That is not a suspension, but a

termination within the meaning of the Customer Agreement.  Further, AWS communicated to

Parler over the phone that this was effectively a termination, rather than a suspension.

    **ANSWER:** Defendants deny the allegations.


    121.    Parler even offered to adopt AWS's own AI-based content moderation, but AWS

refused.  As there was nothing Parler could do to satisfy AWS, AWS cannot rely on the portion

of the contract that allows for a "temporary" suspension.  The contract does not allow for

permanent suspensions—and a permanent suspension is in law and fact a termination.  AWS

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

1

2  thus breached its duty to Parler when it terminated service on January 10, 2021, without 30 days'

3  notice or an opportunity to cure.

4      **ANSWER:** Defendants deny the allegations.

5

6      122.    Nor can AWS elide its contractual duty to provide a 30-day notice by pointing to

7  other provisions of the contract.  Specifically, § 7.2(b)(ii) allows AWS to immediately provide

8  notice of termination for any reason for which it could temporarily suspend under § 6.  And § 6

9  allows AWS to suspend Parler's service if Parler breaches the contract.  Thus, AWS's logic goes,

10  the contract as a whole provides AWS the right to either immediately suspend or to terminate in

11  the event Parler or one of its users is in breach.

12      **ANSWER:** Defendants admit that Section 7.2(b)(ii) of the AWS Customer Agreement

13  states that "[w]e may also terminate this Agreement immediately upon notice to you (A) for

14  cause if we have the right to suspend under Section 6, (B) if our relationship with a third-party

15  partner who provides software or other technology we use to provide the Service Offerings

16  expires, terminates or requires us to change the way we provide the software or other technology

17  as part of the Services, or (C) in order to comply with the law or requests of governmental

18  entities."  Defendants admit that Section 6 of the Agreement states that "[w]e may suspend your

19  or any End User's right to access or use any portion or all of the Service Offerings immediately

20  upon notice to you if we determine: (a) your or an End User's use of the Service Offerings (i)

21  poses a security risk to the Service Offerings or any third party, (ii) could adversely impact our

22  systems, the Service Offerings or the systems or Content of any other AWS customer, (iii) could

23  subject us, our affiliates, or any third party to liability, or (iv) could be fraudulent; (b) you are, or

24  any End User is, in breach of this Agreement;  (c) you are in breach of your payment obligations

25  under Section 5; or (d) you have ceased to operate in the ordinary course, made an assignment

26  for the benefit of creditors or similar disposition of your assets, or become the subject of any

27  bankruptcy, reorganization, liquidation, dissolution or similar proceeding."  Defendants deny the

remaining allegations.

ANSWER TO COMPLAINT - 48

1

2

3      123.    AWS's interpretation of the contract misses the point because Parler was not in

4  breach of the contract, so AWS was not entitled to suspend, terminate, or otherwise repudiate the

5  contract under either § 6 or § 7 of the Customer Agreement.  Moreover, AWS's reading

6  overlooks four crucial doctrines, which strongly support Parler's reading of the contract.

7      **ANSWER:** Defendants deny the allegations.

8

9      124.    First, the contract at issue is a form contract drafted by AWS that Parler had no

10  ability to negotiate.  Washington courts "generally construe ambiguities against the contract's

11  drafter."  *Pierce County v. State*, 144 Wn.  App. 783, 813, 185 P.3d 594 (2008), as amended on

12  denial of reconsideration (July 15, 2008).  Thus, the Customer Agreement must be construed

13  against AWS when there are any doubts as to its meaning.  And AWS's reading of the temporary

14  suspension clause is doubtful to say the least.

15      **ANSWER:** Defendants respond that this paragraph states a legal conclusion or contains

16  legal arguments, to which no response is required.  To the extent a response is required,

17  Defendants admit that AWS drafted the agreement at issue and deny the remaining allegations.

18

19      125.    Second, under Washington law, "the parties' course of dealing"—defined as "a

20  sequence of prior conduct between the parties that establishes a common basis for interpreting

21  other conduct and expression"—is used by courts "to interpret contract provisions" when there is

22  no conflict with express terms.  *Smith v. Skone & Connors Produce, Inc*., 107 Wn. App. 199,

23  208, 26 P.3d 981 (2001) (citing *Badgett v. Security State Bank*, 116 Wn.2d 563, 572-73, 807

24  P.2d 356 (1991)).

25      **ANSWER:** Defendants respond that this paragraph states a legal conclusion, to which no

26  response is required.  To the extent a response is required, Defendants deny the allegations.

27

ANSWER TO COMPLAINT - 49

1

2          126.    AWS seems to argue that Parler was in breach of the contract in two ways.  First,

3  Parler was required to "ensure" that Parler users' posted content was not violent or harmful to

4  others.  Second, AWS argues that Parler must "immediately suspend access" to content that

5  violates the contract.  But the word "ensure" is ambiguous as to what methods of content

6  moderation would constitute a violation of that term, and the word "immediately" applies to the

7  suspension of offending End Users and does not impose a time frame on the removal of

8  offending content itself.  As to "ensure," under AWS's reading, the instant such content is

9  posted, Parler would have failed to "ensure" it won't be, and thus would violate the contract.  But

10  that reading would be unreasonable for any content moderation system since none perfectly

11  prevent problematic material, let alone for a reactive model which AWS, from the very outset,

12  knew that Parler employed.  If that were not enough, the course of dealing between these parties

13  shows that AWS's current interpretation of "ensure" was never employed until now, as a post

14  hoc justification for termination.  Not until January 9, 2021, after a consistent pattern of AWS

15  occasionally flagging small amounts of content as problematic under its interpretation of its

16  standards and Parler quickly responding, did AWS claim Parler was in breach of its contract

17  merely because such content had been posted on Parler at all.  AWS knew from the beginning of

18  its contractual relationship that Parler used a reactive and non-instantaneous system to find and

19  remove problematic content.  Yet not once did AWS say that Parler's reactive system was a per

20  se violation of the contract.

21          **ANSWER:** Defendants deny the allegations.

22

23          127.    As to the "immediately suspend" language: as noted above, AWS's misplaced

24  reliance on a provision governing the potential suspension of "End Users" accounts (§ 4.5)

25  cannot reasonably support a reading in which the term "immediately" provides a time frame in

26  which Parler was to remove offending posts under a provision governing "Your Content" (§ 4.2).

27  And even if the term "immediately" could reasonably be read to impose a time limitation on

Parler's removal of offending content, which it cannot, the term is nevertheless vague as to how

ANSWER TO COMPLAINT - 50

1

2    such a time frame should be measured.  How long is immediately in the context of an

3    organizational response—a millisecond? a minute? twenty-four hours?  And for processes that

4    take a non-zero amount of time, is an "immediate" response measured from its initiation, its

5    conclusion, or something else?  Parler was always quickly responsive whenever it found

6    problematic content and whenever AWS brought such content to Parler's attention.  And that

7    responsiveness had never lead AWS to declare that Parler was in breach of its contract until

8    January 9, 2021.  The ambiguous terms in the contract must be construed in light of the parties'

9    course of dealing, and those dealings show that AWS's reading is wrong and that Parler was not

10   in violation of the contract.

11        **ANSWER:** Defendants deny the allegations.

12

13   128.    Third, under AWS's reading, Section 7.2(b)(ii) would render Section 7.2(b)(i)

14   superfluous by always allowing AWS an easy escape from the 30-day notice and cure

15   requirement.  After all, if AWS is authorized to terminate the contract immediately for any

16   breach because of Section 7.2(b)(ii), there would never be any reason to invoke Section (b)(i),

17   which requires 30 days' notice for a material breach.  Such a reading violates the Surplusage

18   Canon, which forbids an interpretation that makes a contract provision meaningless.  *See*, *e.g.*,

19   *Veit, ex rel. Nelson v. Burlington Northern Santa Fe Corp.*, 171 Wn.2d 88, 113, 249 P.3d 607

20   (2011).

21        **ANSWER:** Defendants respond that this paragraph states a legal conclusion or contains

22   legal argument, to which no response is required.  To the extent a response is required,

23   Defendants deny the allegations.

24

25   129.    Fourth, the erroneous reading of the contract violates the Absurdity Doctrine:

26   "[A]bsurd results are to be avoided and internal inconsistencies in the [legal document] must be

27   dealt with."  *United States v. Turkette*, 452 U.S.  576, 580, 101 S. Ct. 2524, 69 L. Ed. 2d 246

     (1981).  AWS's reading of the contract turns it into an at-will contract by completely reading out

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

1

2　the 30-day notice protections, which are obviously designed to allow companies like Parler to

3　find an alternative hosting site without disruption to its service.  No reasonable customer would

4　agree to an at-will contract that allows AWS to terminate the contract without adequate notice

5　and based on a single objectionable post by a user of the customer's service.  "[S]uch an

6　interpretation could lead to absurd results, which we are bound to avoid when we can do so

7　without doing violence to the words of the [legal document]."  *State v. Hall*, 168 Wn.2d 726,

8　737, 230 P.3d 1048 (2010).

9　　　　**ANSWER:** Defendants respond that this paragraph states a legal conclusion or contains

10　legal argument, to which no response is required.  To the extent a response is required,

11　Defendants deny the allegations.

12

13　　　　130.　　AWS's breach of contract has proximately caused substantial damage to Parler by

14　depriving Parler of being online for over a month beginning at 12:10 AM PST on January 11,

15　2021.  This has resulted in a loss of millions of dollars of revenue from advertisements targeted

16　at Parler's millions of users—a number that was growing significantly each day before AWS's

17　termination.

18　　　　**ANSWER:** Defendants deny the allegations.

19

20　　　　131.　　Parler is therefore entitled to damages for AWS's breach of contract.

21　　　　**ANSWER:** Defendants deny the allegations.

22

23　　　　**Count Four: Breach of the Duty of Good Faith and Fair Dealing**

24　　　　**AWS breached the duty of good faith and fair dealing by exercising its purported discretion under the contract in bad faith.**

25

26　　　　132.　　Parler restates, re-alleges, and incorporates by reference each of the allegations set

27　forth in the rest of this Complaint as if fully set forth herein.

ANSWER TO COMPLAINT - 52

**ANSWER:** Defendants incorporate and repeat as if fully set forth herein their responses to the allegations in paragraphs 1 through 131 of the Complaint.

133.     Washington law imposes on "every contract an implied duty of good faith and fair dealing that obligates the parties to cooperate with each other so that each may obtain the full benefit of performance." *Rekhter v. State Dept. of Social and Health Services*, 180 Wn.2d 102, 112-13, 323 P.3d 1036 (2014) (internal quotation omitted).  The duty arises when the contract gives one party discretionary authority to determine a contract term.  *Id.*  Thus, when a party elects to terminate an agreement for "cause," Washington law requires that the party's exercise of that contractual power be made in good faith.  *See Baldwin v. Sisters of Providence in Washington, Inc*., 112 Wn.2d 127, 136-39, 769 P.2d 298 (1989) (imposing good faith duty on decision to terminate employment agreement for "just cause").

**ANSWER:** Defendants respond that this paragraph states a legal conclusion, to which no response is required.  To the extent a response is required, Defendants deny the allegations.

134.     "It is the fact-finder's job ...  to determine whether a party breached its duty of good faith and fair dealing," and "the duty varies somewhat with the context in which it arises." *Microsoft Corp. v. Motorola, Inc*., 963 F. Supp.  2d 1176, 1184 (W.D. Wash. 2013) (reviewing authorities).  Under Washington law, the question of whether the defendant's conduct breached the duty may depend, among other things, on: "whether the defendant's actions were contrary to the reasonable and justified expectations of other parties to the contract"; whether the defendant's conduct "conformed with ordinary custom or practice in the industry"; and "subjective factors such as the defendant's intent and motive." *Id.* (collecting Washington cases).

**ANSWER:** Defendants respond that this paragraph states a legal conclusion, to which no response is required.  To the extent a response is required, Defendants deny the allegations.

ANSWER TO COMPLAINT - 53

135.    As explained above, under § 7.2 of the Customer Agreement, AWS did not have a good faith basis to terminate the parties' contract; AWS could not have effected a "termination of convenience" without providing 30 days' notice; and AWS could not terminate for cause on the basis of material breach without providing 30 days to cure.  Because AWS patently failed to observe either 30-day requirement, it could not purport to terminate the agreement except by claiming authorization—still "for cause"—under the suspension power of § 7.2(b)(ii).  However, even had that power been available to AWS, the facts show that AWS terminated its services to Parler for pretextual reasons and in contravention of both Parler's justified expectations and customary practice.

**ANSWER:** Defendants deny the allegations.

136.    First, as already mentioned, AWS entered into the Customer Agreement knowing that it was neither contemplated nor possible for Parler to ensure that no end user would ever post objectionable content on its platform.  Indeed, it was and is technologically impossible for any microblogging platform to wholly prevent the posting of objectionable content by end users. Because AWS entered into the contractual relationship knowing and consenting to Parler's then-existing content moderation model and the technological impossibility of precluding any and all content violative of its Acceptable Use Policy, Parler had a reasonable and justified expectation that AWS would not terminate services based either on Parler's inability to wholly prevent the initial posting of violative content or on the inevitable, non-zero lapse of time between the posting and removal of such content, which was also consistent with the terms of the contract.

**ANSWER:** Defendants deny the allegations.

137.    The parties' course of conduct further cemented this reasonable expectation.  As mentioned in greater detail above, until January 8, 2021, AWS had repeatedly shown that it did not consider the occasional identification of objectionable content on Parler's platform as a terminable breach of the parties' contract.  Indeed, as late as January 7, 2021, AWS assured

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

Parler that a prior complaint regarding content on Parler had been "resolved."  AWS's statements to Parler made clear that it did not consider any objectionable content posted on Parler to date, nor Parler's responses to that content to date, to be a reason to suspend or terminate the parties' contract.  Parler relied on those statements in good faith.  Further, the lingering presence of objectionable content on many other AWS and Amazon-affiliated sites demonstrates that the more draconian measures AWS ultimately employed against Parler were and are a significant departure from Amazon's customary practices.

**ANSWER:** Defendants deny the allegations.

138.    The pretextual nature of AWS's purportedly longstanding concerns with Parler's content—and Parler's reasonable and justified expectations against abrupt termination—are also evident in the timing of the termination, coming in the midst of AWS's extended efforts to expand its vendor relationship with Parler and Parler's own expressions of interest in Amazon's content-moderation AI.  Despite its sudden, feigned concern over Parler's supposed inability to moderate violative content, at the time of termination AWS was fully aware that Parler was working to adopt the best automated practices available on the market to prevent and remove objectionable content from its platform and that Parler had even offered to use AWS's own AI system.  AWS's stated concerns were mere misdirection for AWS's true, bad faith motives for shutting Parler down.

**ANSWER:** Defendants deny the allegations.

139.    Here again, AWS's timing is telling.  On January 7-8, 2021, AWS learned that former President Donald Trump and other known conservatives, including Sean Hannity, had switched or were likely to switch from Twitter to Parler.  AWS was clearly concerned about that possibility, and made repeated inquiries regarding those concerns to Parler.  Mere hours later, once it appeared that President Trump might well be joining Parler, on Sunday, January 9, 2021,

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

AWS notified Parler via email that AWS was immediately suspending—and effectively terminating—Parler's account and all related services.

**ANSWER:** Defendants deny the allegations.

140.    In AWS's email suspending and terminating the contract, AWS identified purported reasons for the termination.  Specifically, AWS asserted that Parler did not have an adequate plan to identify and remove dangerous content from its platform, because Parler's only plan was to do so "manually with volunteers."  As shown above, this purported rationale for termination was not only an abrupt departure from the parties' course of conduct but also plainly inaccurate.  Moreover, AWS had been aware for months that Parler was in the process of overhauling its content moderation system to incorporate AI including, potentially, AI acquired from Amazon itself.  If that were not enough, Amazon's own employees have been vocal in contradicting AWS's official narrative of why the termination occurred.

**ANSWER:** Defendants admit that on January 9, 2021, AWS sent a notice to Parler informing it that AWS would suspend Parler's use of AWS services to make Parler publicly available and that notice contains the quoted language.  Defendants deny the remaining allegations.

141.    The true reason why AWS decided to suspend and/or terminate its contract with Parler was not because of any alleged breach of the contract, but because AWS did not want Parler to be able to provide a new platform to conservative voices, including Donald Trump, to compete effectively with other microblogging platforms such as Twitter, or to compete with tech companies (including Amazon) for advertising revenue.

**ANSWER:** Defendants deny the allegations.

142.    Accordingly, AWS breached its duty of good faith and fair dealing when it exercised its purported discretion to determine that content on Parler's site violated the parties'

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

1

2    contract and to suspend and/or terminate the contract on January 9, 2021.  AWS's breach of the

3    duty of good faith and fair dealing proximately caused substantial damage to Parler by depriving

4    Parler of being online as of January 11, 2021.  This has resulted in a loss of millions of dollars of

5    revenue from advertisements targeted at Parler's millions of users.

6        **ANSWER:** Defendants deny the allegations.

7

8        **Count Five: Tortious Interference with a Contract or Business Expectancy**

9        143.    Parler restates, re-alleges, and incorporates by reference each of the allegations set

10   forth in the rest of this Complaint as if fully set forth herein.

11       **ANSWER:** Defendants incorporate and repeat as if fully set forth herein their responses

12   to the allegations in paragraphs 1 through 142 of the Complaint.

13

14       144.    Under Washington law, to establish a claim for tortious interference with a

15   contract or expectancy, a plaintiff must prove: "(1) the existence of a valid contractual

16   relationship or business expectancy; (2) the defendant's knowledge of that relationship; (3) an

17   intentional interference inducing or causing a breach or termination of the relationship or

18   expectancy; (4) the defendant's interference for an improper purpose or by improper means; and

19   (5) resulting damage." *Koch v. Mutual of Enumclaw Insurance Company*, 108 Wn. App. 500,

20   506, 31 P.3d 698 (2001).  Each of these elements is satisfied here.

21       **ANSWER:** Defendants respond that this paragraph states a legal conclusion or contains

22   legal arguments, to which no response is required.  To the extent a response is required,

23   Defendants deny the allegations.

24

25       145.    Prior to AWS's actions, Parler had over 12 million users under contract when

26   AWS terminated its services, as well as contracts with multiple advertisers.  And Parler expected

27   to add millions more in the coming weeks given its growth the last few days it was online and

     the growing voice of conservatives encouraging their Twitter followers to switch to Parler, which

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

1

2   would bring additional advertisers into contracts with Parler.  Additionally, unlike

3   AWS/Amazon, Twitter, Google and Facebook, Parler's business model enabled it to obtain

4   advertising revenues without the user surveillance necessary to target ads to users based upon

5   personal information collected by the platform—a feature very attractive to many users and,

6   hence, to advertisers seeking to reach them.  And because conservative voices were finding

7   greater engagement on Parler than on other platforms, the number of users was expected to

8   continue to increase significantly.

9        **ANSWER:** Defendants deny that it terminated Parler's services.  Defendants otherwise

10   lack knowledge or information sufficient to form a belief as to the truth of the allegations, and

11   therefore deny the remaining allegations.

12

13        146.    AWS knew about Parler's users and current trends.  AWS also knew that Parler

14   was negotiating with it to increase its server capacity given this ongoing and expected growth.

15   And AWS further knew of public speculation that Trump, with his nearly 90 million Twitter

16   followers, was going to switch to Parler, likely bringing tens of millions of followers with him,

17   as well as the advertisers that targeted those followers.  And AWS knew that Trump had a Parler

18   account that he had yet to activate, and that Parler was in negotiations with Trump's team about

19   moving to Parler after he left office.  Finally, AWS knew from public statements that Parler was

20   about to go to the market to raise money.

21        **ANSWER:** AWS admits that AWS employees had discussions with Parler about

22   potential capacity needs and usage.  Defendants deny the remaining allegations.

23

24        147.    AWS intentionally interfered with Parler's current contracts and future expected

25   customer relationships and advertising contracts in bad faith by (1) terminating Parler's

26   Agreement with it under the pretext that Parler was in violation of that contract when AWS knew

27   Parler was not in violation (and when Twitter was engaging in identical conduct but AWS did

ANSWER TO COMPLAINT - 58

1

2   not terminate its contract with Twitter); and (2) knowingly sending false allegations against

3   Parler to the media.

4      **ANSWER:** Defendants deny the allegations.

5

6      148.    AWS's willful interference was for the improper purpose of restraining trade in

7   violation of the Sherman Act, assisting Twitter's attempts at monopolization in violation of the

8   Sherman Act, gaining additional income in violation of their contracts, and/or for political

9   reasons in violation of their contracts with Parler.

10     **ANSWER:** Defendants deny the allegations.

11

12     149.    The resulting damage of AWS's tortious interference is that Parler has lost

13  millions of dollars in revenues and suffered reputational damage with the public at large and with

14  its own users.  Parler has also lost users who would have joined Parler except for AWS's

15  improper interference, but have now gone to competitors of Parler.

16     **ANSWER:** Defendants deny the allegations.

17

18     150.    AWS's conduct was willful and malicious.  Parler is entitled to actual and

19  exemplary damages.

20     **ANSWER:** Defendants deny the allegations.

21

22              **Count Six: Washington Consumer Protection Act**

23     151.    Parler restates, re-alleges, and incorporates by reference each of the allegations set

24  forth in the rest of this Complaint as if fully set forth herein.

25     **ANSWER:** Defendants incorporate and repeat as if fully set forth herein their responses

26  to the allegations in paragraphs 1 through 150 of the Complaint.

27

ANSWER TO COMPLAINT - 59

152.     Washington's Consumer Protection Act provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are . . . unlawful."  RCW 19.86.020.  The Act's purpose is to "complement the body of federal law governing restraints of trade, unfair competition and unfair, deceptive and fraudulent acts and practices in order to protect the public and foster fair and honest competition."  RCW 19.86.920. And the Act is to be "liberally construed that its beneficial purposes may be served."  *Id.*

**ANSWER:** Defendants respond that this paragraph states a legal conclusion, to which no response is required.  To the extent a response is required, Defendants deny the allegations.

153.     Further, the act provides that "[e]very contract, combination, in the form of trust or otherwise, or conspiracy in restraint of trade or commerce is hereby declared unlawful." RCW 19.86.030.

**ANSWER:** Defendants respond that this paragraph states a legal conclusion, to which no response is required.  To the extent a response is required, Defendants deny the allegations.

154.     Under the Act, "'[a]ny person who is injured in his or her business or property' by a violation of the act may bring a civil suit for injunctive relief, damages, attorney fees and costs, and treble damages."  *Panag*, 166 Wn.2d at 39 (citing RCW 19.86.090).  And to prevail in such a claim, "the plaintiff must prove (1) an unfair or deceptive act or practice, (2) occurring in trade or commerce, (3) affecting the public interest, (4) injury to a person's business or property, and (5) causation."  *Id.*

**ANSWER:** Defendants respond that this paragraph states a legal conclusion, to which no response is required.  To the extent a response is required, Defendants deny the allegations.

155.     Amazon, Google, Facebook, and Twitter together account for over 56 percent of the $436 billion global internet advertisement market.

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations, and therefore deny the allegations.

156.    Before January 11, 2021, Parler also actively competed for internet advertising on its app and web platforms.  Moreover, Parler's ability to compete in that market was about to skyrocket as a result of (a) Twitter's announcement that it had terminated former President Trump from the Twitter platform, and (b) President Trump's indication that he would move to the Parler platform, along with a large share of his 89 million Twitter followers.  This dramatically increased traffic on the Parler platform would have enabled Parler to substantially increase its sales of internet advertising, with a concomitant reduction in advertising on platforms owned by Amazon, as well as platforms owned by Google, Facebook, and Twitter.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations, and therefore deny the remaining allegations.

157.    These four tech giants make money in this market in two ways.  First, they track users to target ads to each user, and they charge advertisers more for targeted ads.  Second, these companies collect and sell users' data.  Together these practices make up their surveillance capitalism business model.  Parler, however, did not track its users, sell their data, or use targeted ads.  This enabled Parler not only to offer more privacy to its users, but also to charge lower rates for advertisements on its platform.  This alternative business model posed a direct and serious threat to the surveillance capitalism model that generates massive profits for Amazon, as well as Google, Facebook, and Twitter.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations and therefore deny the allegations.

158.    Because of this threat, Facebook, for example, began targeting Parler content on its platform in a way that it did not target Twitter content.  Thus, identical postings on Parler and

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

1

2 Twitter would be flagged as problematic in some way if they came from Parler but not if they

3 came from Twitter.

4     **ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to

5 the truth of the allegations, and therefore deny the allegations.

6

7     159.    In mid-December 2020, Twitter, entered into a multi-year contract with AWS

8 under which AWS would provide cloud computing services to Twitter in exchange for large

9 sums of money.  On information and belief, part of the unwritten agreement between Twitter and

10 AWS was that the latter would use its position as the provider of Parler's cloud services to

11 minimize Parler's threat to the internet advertising market.

12     **ANSWER:** Defendants admit that AWS announced on December 15, 2020 that Twitter

13 had signed a deal with AWS for Twitter to use AWS services to host Twitter timelines.

14 Defendants admit that Twitter had not previously and does not currently use AWS services to

15 host Twitter timelines.  Defendants deny the remaining allegations.

16

17     160.    On January 8, 2021, Google banned the Parler app from its Play Store, making it

18 difficult for new customers with phones using the Android operating system developed by

19 Google to download and use the Parler app.  This severely restrained Parler's ability to increase

20 its internet advertising market.

21     **ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to

22 the truth of the allegations, and therefore deny the allegations.

23

24     161.    On January 9, 2021, AWS announced it would terminate its services to Parler,

25 preventing all existing Parler users from accessing the app and completely removing Parler from

26 the global internet advertising market.  Subsequently, at about 12:10 am on January 11, 2021,

27 AWS made good on that threat and cut off all services to Parler, thereby removing Parler from

that market and compromising its ability to compete in that market in the future.

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

1

2      **ANSWER:** Defendants admit that on January 9, 2021, AWS sent a notice to Parler

3 informing it that AWS would suspend Parler's use of AWS services to make Parler publicly

4 available and that AWS suspended those services on January 11, 2021.  Defendants deny the

5 remaining allegations.

6

7      162.    These actions restrained trade in and caused actual injury to competition in the

8 global internet advertisement market.

9      **ANSWER:** Defendants deny the allegations.

10

11      163.    These concerted actions and their effects were not undertaken by accident.  On

12 information and belief, AWS conspired with other entities to prevent Parler from increasing its

13 share of the microblogging market and, concomitantly, its share of the internet advertising

14 market.  AWS and its co-conspirators undertook these actions with the intention to restrain trade

15 in the internet advertising market — again, by preventing Parler from obtaining a larger share of

16 that market and losing the share it already — and thus protecting AWS and its co-conspirators'

17 market shares.

18      **ANSWER:** Defendants deny the allegations.

19

20      164.    AWS's action in the global internet advertisement market was unfair.  It affected

21 the public interest because thousands of Washingtonians who are Parler users could not use their

22 Parler accounts and were deprived of accessing internet advertising—something even more

23 important during a pandemic with lockdowns to traditional stores—that was not targeted at them.

24 AWS's actions also compromised the ability of existing and future Parler users to use a social-

25 media platform whose business model does not require constant user surveillance.

26      **ANSWER:** Defendants deny the allegations.

27

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

165.    AWS/Amazon caused severe economic injury to Parler by depriving it of millions of dollars of advertising revenues and by preventing Parler from getting online, which injury AWS knew would occur given Parler's dependency on AWS and the time it would take for Parler to not only find a new service provider, but also migrate its website to that provider and attempt to recover from the reputational injury it had suffered at AWS's hands.

**ANSWER:** Defendants deny the allegations.

166.    AWS/Amazon's actions, which were taken in bad faith, violated the Washington Consumer Protection Act, including but not limited to RCW 19.86.030.

**ANSWER:** Defendants deny the allegations.

167.    Parler is entitled to damages, attorney's fees and costs, and treble damages.

**ANSWER:** Defendants deny the allegations.

### Count Seven: Washington Consumer Protection Act

168.    Parler restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

**ANSWER:** Defendants incorporate and repeat as if fully set forth herein their responses to the allegations in paragraphs 1 through 167 of the Complaint.

169.    Washington's Consumer Protection Act provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are . . . unlawful." RCW 19.86.020. The Act's purpose is to "complement the body of federal law governing restraints of trade, unfair competition and unfair, deceptive and fraudulent acts and practices in order to protect the public and foster fair and honest competition." RCW 19.86.920. And the Act is to be "liberally construed that its beneficial purposes may be served." *Id.*

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

**ANSWER:** Defendants respond that this paragraph states a legal conclusion, to which no response is required.  To the extent a response is required, Defendants deny the allegations.

170.    Further, the Act provides that "[i]t shall be unlawful for any person to monopolize, or attempt to monopolize or combine or conspire with any other person or persons to monopolize any part of trade or commerce."  RCW 19.86.040.

**ANSWER:** Defendants respond that this paragraph states a legal conclusion, to which no response is required.  To the extent a response is required, Defendants deny the allegations.

171.    Under the Act, "'[a]ny person who is injured in his or her business or property' by a violation of the act may bring a civil suit for injunctive relief, damages, attorney fees and costs, and treble damages."  *Panag*, 166 Wn.2d at 39 (citing RCW 19.86.090).  And to prevail in such a claim, "the plaintiff must prove (1) an unfair or deceptive act or practice, (2) occurring in trade or commerce, (3) affecting the public interest, (4) injury to a person's business or property, and (5) causation."  *Id.*

**ANSWER:** Defendants respond that this paragraph states a legal conclusion, to which no response is required.  To the extent a response is required, Defendants deny the allegations.

172.    AWS is the largest and one of just three integrated cloud service infrastructure providers in the world, making up 57 percent of the global integrated cloud service infrastructure market.  This market provides not just web hosting, but the full services necessary to be online, as well as scalable infrastructure that enables companies to use more or less server capacity based on changing needs.

**ANSWER:** Defendants admit that AWS is the world's most comprehensive and broadly adopted cloud platform, offering over 200 fully featured services from data centers globally. Defendants further admit that millions of customers use AWS and that AWS competes with numerous providers of IT services in a highly competitive market for IT services.  Defendants

ANSWER TO COMPLAINT - 65

1
2  otherwise lack knowledge or information sufficient to form a belief as to the truth of the

3  allegations, and therefore deny any remaining allegations.

4

5  173.  On January 9, 2021, AWS announced it would indefinitely suspend Parler's

6  service, falsely claiming that Parler was unable or unwilling "to remove content that encourages

7  or incites violence against others."  AWS publicly leaked that email to BuzzFeed, where it

8  received much play in the media, and it did so with the intent of harming Parler.

9  **ANSWER:** Defendants admit that on January 9, 2021, AWS sent a notice to Parler

10  informing it that AWS would suspend Parler's use of AWS services to make Parler publicly

11  available, and that the notice contains the quoted language.  Defendants admit that after AWS

12  sent its January 9, 2021 notice to Plaintiff, it provided a copy of the notice to a reporter for

13  Buzzfeed to ensure that the public and the press would have accurate information about the

14  reason for the upcoming suspension.  Defendants deny the remaining allegations.  Defendants

15  deny the remaining allegations.

16

17  174.  As a foreseeable result of these actions and public statements by AWS, Parler

18  could not find an integrated cloud service infrastructure provider to host it and its millions of

19  users.  These actions and public statements thus ensured that AWS would not lose market share

20  in this market by a competitor stepping in to provide those services to Parler.  AWS's actions

21  thus were unfair and deceptive in nature, causing tremendous injury to Parler.

22  **ANSWER:** Defendants deny the allegations.

23

24  175.  Additionally, AWS's actions affected the public interest given that (1) thousands

25  of Washingtonians who had Parler accounts were unable to communicate via Parler, (2) AWS

26  eliminated competition in the market, and (3) many other current and former AWS customers

27  face the threat of similar anti-competitive conduct by AWS.

**ANSWER:** Defendants deny the allegations.

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

176.     Upon information and belief, AWS engaged in these actions in an attempt to monopolize a part of trade or commerce, and/or to conspire with other entities to enable them to monopolize a part of trade or commerce.

**ANSWER:** Defendants deny the allegations.

177.     AWS's actions, which were taken in bad faith, violated the Washington Consumer Protection Act, including but not limited to RCW 19.86.040.

**ANSWER:** Defendants deny the allegations.

178.     Parler is entitled to damages, attorneys fees and costs, and treble damages.

**ANSWER:** Defendants deny the allegations.

**Count Eight: Seattle Fair Contracting Practices Ordinance**

179.     Parler restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

**ANSWER:** Defendants incorporate and repeat as if fully set forth herein their responses to the allegations in paragraphs 1 through 178 of the Complaint.

180.     The City of Seattle has enacted a Fair Contracting Practices Ordinance that declares it to be an "unfair contracting practice for any . . . Business enterprise . . . to discriminate against any person with respect to . . . the conditions, terms, price, or performance standards, [or] other provisions of a contract." Seattle, Mun. Code § 14.10.030(A).  Under the Ordinance, Parler is a "person" and AWS and Amazon are "business enterprises." *Id.* § 14.10.020.

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

1

2    **ANSWER:** Defendants respond that this paragraph states a legal conclusion or contains

3    legal argument, to which no response is required.  To the extent a response is required,

4    Defendants deny the allegations.

5

6    181.    Under the Ordinance, to discriminate "means any act . . .  whether by itself or as

7    part of a practice, the effect of which is to adversely effect or differentiate between or among

8    individuals or groups of individuals by reason of . . . political ideology . . . ."  *Id.*  And political

9    ideology "means any idea or belief, or coordinated body of ideas or beliefs, relating to the

10   purpose, conduct, organization, function or basis of government and related institutions and

11   activities, whether or not characteristic of any political party or group.  This term includes

12   membership in a political party or group and includes conduct, reasonably related to political

13   ideology, which does not interfere with job performance."  *Id.*  And Parler's contract with AWS

14   was a "contract," as defined in Seattle's Fair Contracting Practices Ordinance.  *Id.*

     **ANSWER:** Defendants respond that this paragraph states a legal conclusion or contains

15   legal argument, to which no response is required.  To the extent a response is required,

16

17   Defendants deny the allegations.

18

19   182.    AWS only raised concerns about Parler after it looked like then-President Trump

20   would join Parler and bring millions of conservative Twitter users with him.  In fact, the AWS

21   representative who was repeatedly inquiring into whether Trump was going to come to Parler

22   was, by her Twitter account, a rabid Joe Biden fan.

23   **ANSWER:** Defendants deny the allegations.

24

25   183.    Further, Amazon employees pressured Amazon and AWS to drop Parler, claiming

26   credit for the move.  *See* Ashley Stewart & Eugene Kim, *Some Amazon Employees Are Taking*

27   *Credit for Parler's Ban*, BUSINESS INSIDER (Jan. 20, 2021).  Additionally, "[s]ome AWS

     employees who . . . have speculated the decision was driven by a combination of employee

ANSWER TO COMPLAINT - 68

1

2    unrest and major customers complaining to company leadership." *Id.* "The largest customers

3    have executive sponsors who they can call directly, in many cases, and [Jassy, CEO of AWS]

4    himself" *Id.* "One former senior AWS employee said the decision to boot Parler 'broke new

5    ground' in terms of the company's enforcement actions." *Id.*

6           **ANSWER:** Defendants deny the allegations.

7

8           184.    One of AWS's "major customers" is Twitter. Not only did Twitter's CEO tweet

9    his approval of AWS's actions against Parler, but "President Biden was the clear favorite of

10   Twitter employees when it came to campaign donations during the 2020 election," and Twitter

11   employee "donations to Democrats versus Republicans was a 98% to 2% split." Evie Fordham,

12   *Twitter Employees Heavily Favored Biden Over Trump Ahead of 'Priceless' Ban*, Fox NEWS

13   (Jan. 31, 2021), https://www.foxnews.com/politics/twitter-biden-trump-ban-2020-election-

14   donations. "Big Tech employees . . . landed top posts on the Biden-Harris transition team," with

15   "[a]t least nine different Biden transition team members or advisors [having] previously held

16   positions at Facebook, Google, or Twitter. Several transition team members worked in the

17   Obama administration before joining one of the tech giants and then later reentering politics as

18   part of the Biden team." *Id.*

19          **ANSWER:** Defendants admit Twitter is a customer of AWS. Defendants otherwise lack

20   knowledge or information sufficient to form a belief as to the truth of the allegations, and

21   therefore deny the remaining allegations.

22

23          185.    And it wasn't just Twitter. "Donors and political action committees affiliated

24   with Amazon.com Inc. and other Big Tech companies are thr[ew] their money behind former

25   Vice President Joe Biden's presidential campaign." Katie Arcieri, *Donors Affiliated with*

26   *Amazon, Big Tech Throw Support Behind Biden Campaign*, S&P GLOBAL (Oct. 7, 2020),

27   https://www.spglobal.com/marketintelligence/en/news-insights/latest-news-headlines/donors-

     affiliated-with-amazon-big-tech-throw-support-behind-biden-campaign-60403546. In fact,

ANSWER TO COMPLAINT - 69

1

2   "[e]mployees of Google's parent, Alphabet Inc., and Microsoft Corp., Amazon.com Inc., Apple

3   Inc. and Facebook Inc. were the five largest sources of money for Mr. Biden's campaign and

4   joint fundraising committees among those identifying corporate employers, according to a Wall

5   Street Journal analysis of campaign finance reports."  Brody Mullins & Emily Glazer, *Big Tech*

6   *Employees Opened Wallets for Biden Campaign*, WALL STREET JOURNAL (Feb.  20, 2021,

7   10:00 AM) (emphasis added), https://www.wsj.com/articles/big-tech-employees-opened-wallets-

8   for-biden-campaign-11613833201.

9        **ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to

10  the truth of the allegations, and therefore deny the allegations.

11

12       186.    It is not surprising, then, that news has emerged of efforts by Big Tech to stop

13  Trump.  For example, Twitter and Facebook decided to deny the then-President a platform to put

14  out his message.  *See* Dylan Byers, *How Facebook and Twitter Decided to Take Down Trump's*

15  *Accounts*, NBC NEWS (Jan. 14, 2021, 5:01 PM), https://www.nbcnews.com/tech/tech-

16  news/how-facebook-twitter-decided-take-down-trump-s-accounts-n1254317.  But it was an open

17  secret that Trump's next platform would very likely be Parler.

18       **ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to

19  the truth of the allegations, and therefore deny the allegations.

20

21       187.    What is more, Big Tech is worried about what a Biden Administration might do,

22  and so has sought to curry favor with it.  Thus, in early January, "Big Tech has moved swiftly to

23  ban President Donald Trump from social media platforms, . . . and crush the upstart right-wing

24  Twitter alternative Parler."  Ryan Grim, *Behind Big Tech's Crackdown On the Right Is A Fight*

25  *Over Biden Antitrust Policy*, THE INTERCEPT (Jan. 13, 2021, 10:42 AM),

26  https://theintercept.com/2021/01/13/big-tech-antitrust-biden-ftc/.  "The crackdown was . .

27  celebrated by Democrats across the political spectrum—precisely the audience Big Tech now

     needs to please."  *Id.*  Referring to the Georgia Senate elections, one Democratic operative

ANSWER TO COMPLAINT - 70

observed, "It has not escaped my attention that the day social media companies decided there actually IS more they could do to police [Trump] was the same day they learned Democrats would chair all the congressional committees that oversee them." *Id.*

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations, and therefore deny the allegations.

188.    Pressure from congressional Democrats had been mounting on Big Tech for the last few years.  For example, in April 2019, after a congressional hearing directed at online hate speech and white nationalist content, Democratic Congressman Cedric Richmond, now a top White House adviser, informed Big Tech companies that they had "better" restrict what he and other members of Congress deemed as harmful content or, "We're going to make [regulation] swift, we're going to make it strong, and we're going to hold them very accountable."  Tony Romm, *Analysis I The Technology 202: Lawmakers Plan to Ratchet Up Pressure on Tech Companies' Content Moderation Policies*, WASHINGTON POST (Apr. 9, 2019, 8:58 AM). Democratic Congressman and chair of the House Judiciary Committee Jerry Nadler added, "Let's see what happens by just pressuring them." *Id.*

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations, and therefore deny the allegations.

189.    That same month, Speaker of the House Nancy Pelosi warned that a "new era" of regulating tech giants was coming and that Section 230 could be "in jeopardy."  Emily Birnbaum, *Pelosi Puts Tech On Notice With Warning of 'New Era' In Regulation*, THE HILL (Apr. 12, 2019,1:48PM), https://thehill.com/policy/technology/438652-pelosi-warns-its-a-new-era-for-regulating-big-tech.  Speaker Pelosi further commented that "the era of self-regulation" in this country for Big Tech is "probably" over, and that "[w]hen we come to 230, you really get their attention . . . it is not out of the question that that could be removed" because "for the privilege of 230, there has to be a bigger sense of responsibility on it." *Id.*

ANSWER TO COMPLAINT - 71

1

2   **ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to

3   the truth of the allegations, and therefore deny the allegations.

4

5   190.    In June 2020, Speaker Pelosi declared that "social media executives have utterly

6   failed to stop the spread of disinformation on their platforms."  William Turvill, Nancy Pelosi:

7   *Social Media Bosses Have 'Utterly Failed' to Combat Covid-19 Disinformation*,

8   PRESSGAZETTE (June 17, 2020), https://www.pressgazette.co.uldnancy-pelosi-social-media-

9   bosses-have-utterly-failed-to-combat-covid-19-disinformation/.  And she then warned that

10  Congress and others "must send a message to social media executives: You will be held

11  accountable for your misconduct."  *Id.*

12  **ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to

13  the truth of the allegations, and therefore deny the allegations.

14

15  191.    In July 2020, a House antitrust committee questioned the CEOs of the biggest

16  tech internet platforms, including Jeff Bezos of Amazon, as to whether those platforms were

17  engaging in monopolistic or other anticompetitive conduct in violation of federal antitrust law.

18  At these hearings, Democratic Congressman Jamie Raskin accused the tech companies of not

19  taking strong enough action to block "the rapid spread of hate messages online, the presence of

20  boogaloo and other right-wing extremist groups trying to infiltrate and disrupt Black Lives

21  Matter protests and the fact that alt-right racists and anti-Semitic content flourishes on

22  Facebook."  STAFF OF H. COMM. ON THE JUDICIARY, 116TH CONG., MAJORITY

23  STAFF REPORT AND RECOMMENDATIONS: INVESTIGATION OF COMPETITION IN

24  DIGITAL MARKETS 68 (Comm. Print 2020).  The subcommittee report, which proposed

25  sweeping antitrust measures that if acted upon would have drastic economic consequences for

26  Big Tech platforms, including AWS, expressly flagged the failure of Big Tech to curb such

27  content as supposed evidence of the lack of meaningful competition in their markets.  *Id.* at 67.

The implication of these remarks was that the Big Tech platforms' failure to take stronger action

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

to block content Democratic congressmen deemed dangerous would increase the likelihood of a Democratic administration pursuing devastating antitrust remedies against the Big Tech giants.

**ANSWER:** Defendants admit that Amazon's CEO testified to U.S. Congress members in July 2020. This paragraph otherwise characterizes statements that are a matter of public record that speak for themselves, Defendants deny that the paragraph accurately or adequately summarizes the statements, and otherwise deny the allegations.

192. In October 2020, the Senate Commerce Committee held another congressional hearing on the failure of Big Tech to curb "hate speech and misinformation" online, voting to subpoena Big Tech CEOs if they didn't agree to testify voluntarily. Marcy Gordon, *CEOs of 3 Tech Giants To Testify at Oct. 28 Senate Hearing*, ABC NEWS, (Oct. 5, 2020, 5:01 PM), https://abcnews.go.com/Business/wire Story/ceos-social-media-giants-testify-senate-hearing-73433414. The Committee once again threatened adverse legal consequences against the major tech platforms, with Democratic committee members again focusing on "the need for more content moderation." Lauren Feiner, *Big Tech CEO Senate Hearing Ends with Little Discussion on How To Fix Companies' Liability Shield*, CNBC (Oct. 28, 2020, 2:03 PM), https://www.cnbc.com/2020/10/28/facebook-google-and-twitter-ceos-testify-in-congress-over-section-230-live-updates.html.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations, and therefore deny the allegations.

193. The next month, in November 2020, President-elect Biden announced that Congressman Richmond would be joining the White House in January 2021 to serve as a Senior Advisor to the President. *See* Bart Jansen, *Joe Biden Names 9 Top White House Appointees, Including Rep. Cedric Richmond and Campaign Manager O'Malley Dillon*, USA TODAY (Nov. 17, 2020, 11:04 AM). And Facebook is "under the close eye of the Biden administration,

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

which has signaled its displeasure with Facebook's handling of its platforms in the months

leading to the election." *Horwitz, supra* ¶ 32.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to

the truth of the allegations, and therefore deny the allegations.


194.    It's no coincidence that AWS didn't move to muzzle Parler until after the Georgia

Senate runoff elections showed that the Democratic Party would control both houses of Congress

and the White House.  Senator Richard Blumenthal even attributed the actions by Big Tech in

early January to "a shift in the political winds."  Richard Blumenthal, (@SenBlumenthal),

TWITTER (Jan. 8, 2021, 8:44 PM),

https://twitter.com/SenBlumenthal/status/1347720813076733954.

**ANSWER:** Defendants admit that the Georgia Senate runoff election took place on

January 5, 2021.  Defendants further admit that on January 9, 2021, AWS sent a notice to Parler

informing it that AWS would suspend Parler's use of AWS services to make Parler publicly

available.  Defendants deny that they "muzzled" Parler.  Defendants otherwise lack knowledge

or information sufficient to form a belief as to the truth of the allegations, and therefore deny the

remaining allegations.


195.    And on January 8, 2021, Democratic Congressman Ro Khanna tweeted that

"Parler is hosted by Amazon Web Services (AWS)," and "Amazon should deny Parler services

until Jan 21 unless they commit to removing all posts related to incitement of violence

concerning inauguration."  Ro Khanna (@RoKhanna), TWITTER (Jan. 8, 2021, 7:56 PM),

https://twitter.com/rokharma/status/1347708745070030850?lang=en.  And AWS obliged, but

willfully ignored Parler's successful efforts.

**ANSWER:** Defendants deny the allegations that AWS "obliged" Congressman Khanna

or "willfully ignored Parler's successful efforts."  Defendants otherwise lack knowledge or

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

information sufficient to form a belief as to the truth of the allegations, and therefore deny the remaining allegations.

196.    Upon information and belief, AWS and Amazon discriminated against Parler due to the conservative content its users frequently posted, as well to deny then-President Trump a platform to espouse his political views.  AWS and Amazon did this to curry favor both with their own employees and with the incoming Biden administration, as well as out of the organization's own dominant political ideology.

**ANSWER:** Defendants deny the allegations.

197.    AWS and Amazon were not, however, acting pursuant to any federal or state laws.  And Parler is not seeking any redress against any government official whose statements and/or actions may have played a role in these companies' decisions about Parler.

**ANSWER:** Defendants admit that Parler has not brought claims in this suit against a government actor.  Defendants deny the remaining allegations.

198.    As described above, the political discrimination against Parler violated Seattle's Fair Contracting Practices Ordinance.  And Parler has been injured by the unfair contracting practices of AWS and Amazon.

**ANSWER:** Defendants deny the allegations.

199.    Under the Ordinance, Parler is entitled to lost profits, attorney's fees, and actual and exemplary damages.  Seattle, Mun.  Code § 14.10.110(A).

**ANSWER:** Defendants deny the allegations.

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

1

2     **B.**     **Post-Termination Conduct**

3                 <u>**Count Nine: Breach of Contract**</u>

4        200.    Parler restates, re-alleges, and incorporates by reference each of the allegations set

5 forth in the rest of this Complaint as if fully set forth herein.

6       <u>**ANSWER:**</u> Defendants incorporate and repeat as if fully set forth herein their responses

7 to the allegations in paragraphs 1 through 199 of the Complaint.

8

9        201.    Under Washington law, "[a] breach of contract is actionable only if the contract

10 imposes a duty, the duty is breached, and the breach proximately causes damage to the

11 claimant." *See Northwest Independent Forest Manufacturers*, 78 Wn. App. at 712. Each of

12 those elements is satisfied here.

13       <u>**ANSWER:**</u> Defendants respond that this paragraph states a legal conclusion or contains

14 legal argument, to which no response is required. To the extent a response is required,

15 Defendants deny the allegations.

16

17        202.    As to duty: the contract (AWS Customer Agreement) imposes a duty on AWS

18 that it "will implement reasonable and appropriate measures designed to help you secure

19 [Parler's] Content against accidental or unlawful loss, access or disclosure." § 3.1. Additionally,

20 the contract imposes a duty on AWS that AWS "will not . . . disclose [Parler's] Content to any

21 government or third party, . . . except in each case as necessary to comply with the law or a

22 binding order of a governmental body." § 3.2.

23       <u>**ANSWER:**</u> Defendants respond that this paragraph states a legal conclusion or contains

24 legal argument, to which no response is required. Insofar as a response is required, Defendants

25 deny that Parler has adequately or accurately summarized the parties' contract, which speaks for

26 itself, and otherwise denies the allegations.

27

ANSWER TO COMPLAINT - 76

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

203.     AWS has breached these duties in bad faith, as Parler has discovered that Amazon has been secretly selling Parler's user data—specifically images and video—to whomever has an Amazon S3 account and is willing to pay to download it.  Thus, Amazon is sharing Parler user data in violation of AWS's contract with Parler—and profiting to boot.  And no law or government body has required such profiteering.

**ANSWER:** Defendants deny the allegations.

204.     AWS's actions proximately caused severe reputational and financial harm to Parler as users will no longer trust Parler to keep their private data safe.  This will both cause Parler to lose current users, but also make it harder for Parler to obtain future users, significantly reducing Parler's advertising revenues.

**ANSWER:** Defendants deny the allegations.

205.     Parler is entitled to damages and exemplary damages.

**ANSWER:** Defendants deny the allegations.

### Count Ten: Tortious Interference with a Contract or Business Expectancy

206.     Parler restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

**ANSWER:** Defendants incorporate and repeat as if fully set forth herein their responses to the allegations in paragraphs 1 through 205 of the Complaint.

207.     Under Washington law, to establish a claim for tortious interference with a contract or expectancy, a plaintiff must prove: "(1) the existence of a valid contractual relationship or business expectancy; (2) the defendant's knowledge of that relationship; (3) an intentional interference inducing or causing a breach or termination of the relationship or

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

expectancy; (4) the defendant's interference for an improper purpose or by improper means; and (5) resulting damage." Koch, 108 Wn. App. at 506.

**ANSWER:** Defendants respond that this paragraph states a legal conclusion, to which no response is required. To the extent a response is required, Defendants deny the allegations.

208. AWS knew that Parler had contracts with its millions of current users and expected to enter into contracts with millions more in the near future given how quickly Parler was bringing on new users.

**ANSWER:** Defendants deny the allegations.

209. After the termination, AWS intentionally interfered in bad faith with these current and future contracts by secretly selling Parler's user data—specifically images and video—to whomever has an Amazon S3 account and is willing to pay to download it.

**ANSWER:** Defendants deny the allegations.

210. AWS's actions have caused Parler to breach its contracts with its current users as it has allowed these users' private data to be obtained by third parties without the users' consent. This will also cause many future users to not sign up for a Parler account for fear that Parler will likewise not be able to protect their data.

**ANSWER:** Defendants deny the allegations.

211. AWS sold this data to harm Parler—making AWS's tortious interference one of improper purpose. As pertinent here, moreover, AWS's conduct did not relate to or arise out of its contract with Parler, nor any of AWS's products or services.

**ANSWER:** Defendants deny the allegations.

ANSWER TO COMPLAINT - 78

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

212.    AWS's actions caused severe reputational and financial harm to Parler as users will no longer trust Parler to keep their private data safe.  This will both cause Parler to lose current users, but also make it harder for Parler to obtain future users, significantly reducing Parler's advertising revenues.

**ANSWER:** Defendants deny the allegations.

213.    Parler is entitled to damages and exemplary damages.

**ANSWER:** Defendants deny the allegations.

## Count Eleven: Washington Consumer Protection Act

214.    Parler restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

**ANSWER:** Defendants incorporate and repeat as if fully set forth herein their responses to the allegations in paragraphs 1 through 213 of the Complaint.

215.    The Washington Consumer Protection Act provides that "unfair or deceptive acts or practices in the conduct of any trade or commerce are . . . unlawful."  RCW 19.86.020.

**ANSWER:** Defendants respond that this paragraph states a legal conclusion, to which no response is required.  To the extent a response is required, Defendants deny the allegations.

216.    Under the Act, "'[a]ny person who is injured in his or her business or property' by a violation of the act may bring a civil suit for injunctive relief, damages, attorney fees and costs, and treble damages."  *Panag*, 166 Wn.2d at 39 (citing RCW 19.86.090).  And to prevail in such a claim, "the plaintiff must prove (1) an unfair or deceptive act or practice, (2) occurring in trade or commerce, (3) affecting the public interest, (4) injury to a person's business or property, and (5) causation."  *Id.*

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

1

2   **ANSWER:** Defendants respond that this paragraph states a legal conclusion, to which no

3   response is required.  To the extent a response is required, Defendants deny the allegations.

4

5   217.   After terminating its contract with Parler, AWS engaged in an unfair and

6   deceptive series of acts and practices, in bad faith, in the course of trade and commerce, that

7   caused substantial injury to Parler.  Further, AWS's acts and practices were and are harmful to

8   the public interest.

9   **ANSWER:** Defendants deny the allegations.

10

11   218.   After terminating Parler's services and the contract between them, AWS

12   continued to inhibit Parler's ability to compete in the microblogging and digital advertising

13   markets by facilitating the hacking of Parler's backup servers, and by selling the private data of

14   Parler users.  These actions inflicted enormous competitive harm on Parler, and further delayed

15   its ability to recover the revenues and potential market value it enjoyed and reasonably

16   anticipated before AWS's actions.

17   **ANSWER:** Defendants deny the allegations.

18

19   219.   AWS's series of acts and practices was deceptive and unfair.  AWS deceived

20   Parler into believing that, once services were terminated, AWS would take no further actions that

21   would harm Parler.  AWS also deceived Parler into believing that Parler's user data was safe

22   with AWS.

23   **ANSWER:** Defendants deny the allegations.

24

25   220.   AWS's unfair and deceptive acts and practices impact the public interest.  Among

26   other things, through these acts and practices, millions of Americans' voices were silenced,

27   including thousands in Washington.  Further, thousands of Washingtonians' Parler data was

secretly sold, compromising their privacy.

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

**ANSWER:** Defendants deny the allegations.

221.    As pertinent here, AWS's conduct did not relate to or arise out of its contract with Parler, nor any of AWS's products or services.

**ANSWER:** Defendants deny the allegations.

222.    AWS's unfair and deceptive acts and practices have resulted in substantial damages to Parler, including but not limited to the loss of millions of dollars of revenue from advertisements.

**ANSWER:** Defendants deny the allegations.

## Count Twelve: Negligence

223.    Parler restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

**ANSWER:** Defendants incorporate and repeat as if fully set forth herein their responses to the allegations in paragraphs 1 through 222 of the Complaint.

224.    To prove negligence in Washington requires four elements: "(1) the existence of a duty, (2) breach of that duty, (3) resulting injury, and (4) proximate cause." *Degel v. Majestic Mobile Manor, Inc*., 129 Wn.2d 43, 48, 914 P.2d 728 (1996).

**ANSWER:** Defendants respond that this paragraph states a legal conclusion, to which no response is required.  To the extent a response is required, Defendants deny the allegations.

225.    AWS, possessing as it did the technically ability to harm Parler as its former customer, possessed at least a duty of reasonable care to avoid causing Parler injury, if not a heightened duty of care given its ability to harm Parler in a way that other entities not providing Parler services could not.

ANSWER TO COMPLAINT - 81

1

2      **ANSWER:** Defendants deny the allegations.

3

4      226.    AWS breached that duty when, after shutting off all its services to Parler, AWS

5   negligently left open Route 53, a highly scalable domain name system (DNS), which

6   conveniently directed hackers to Parler's backup datacenters and allowed the hackers to initiate a

7   sizeable DNS attack.  In other words, AWS essentially illuminated a large neon arrow directing

8   hackers to Parler's backup datacenters.  And the hackers got the message, launching an

9   extremely large attack—one 250 times larger and 12-24 times longer than the average Direct

10  Denial of Service (DDOS) attack.  Later AWS terminated the Route 53 link, but the damage was

11  done.  Thus, AWS proximately caused this hacking attack and the damage to Parler's ability to

12  enter into service contracts with other providers, which resulted in Parler being unable to get

13  back online.

14     **ANSWER:** Defendants deny that AWS breached any duty to Parler; shut off all services

15  to Parler; directed hackers to Parler's backup datacenters; caused hackers to initiate a DNS

16  attack; or otherwise facilitated any attack on Parler or its datacenters.  Defendants otherwise lack

17  knowledge or information sufficient to form a belief as to the truth of the allegations, and

18  therefore deny the remaining allegations.

19

20     227.    AWS was not only negligent; it also acted in bad faith.  This AWS-facilitated

21  attack functioned as a threat to all future datacenters that, if they were to host Parler, they would

22  be attacked by unprecedented hacks.  AWS created the toxic notoriety of massive hacking

23  attacks for Parler, driving away nearly all other hosting services that Parler had hoped to use.

24     **ANSWER:** Defendants deny the allegations.

25

26     228.    As pertinent here, AWS's conduct did not relate to or arise out of its contract with

27  Parler, nor any of AWS's products or services.

       **ANSWER:** Defendants deny the allegations.

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

229.    This negligence has resulted in significant injury to Parler, massively delaying Parler's ability to get back online, directly depriving Parler of millions of dollars of advertising revenue, and harming Parler's reputation and ability to attract users, which users are now flocking to other platforms.

**ANSWER:** Defendants deny the allegations.

230.    Parler is therefore entitled to damages.

**ANSWER:** Defendants deny the allegations.

### Count Thirteen: Tortious Interference with a Contract or Business Expectancy

231.    Parler restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

**ANSWER:** Defendants incorporate and repeat as if fully set forth herein their responses to the allegations in paragraphs 1 through 230 of the Complaint.

232.    Under Washington law, to establish a claim for tortious interference with a contract or expectancy, a plaintiff must prove: "(1) the existence of a valid contractual relationship or business expectancy; (2) the defendant's knowledge of that relationship; (3) an intentional interference inducing or causing a breach or termination of the relationship or expectancy; (4) the defendant's interference for an improper purpose or by improper means; and (5) resulting damage."  Koch, 108 Wn. App. at 506.

**ANSWER:** Defendants respond that this paragraph states a legal conclusion to which no response is required.  To the extent a response is required, Defendants deny the allegations.

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

233.     AWS knew that as soon as it booted Parler, Parler would seek an alternative hosting service.  Thus, AWS knew of the business expectancy Parler would have with another hosting service.

**ANSWER:** Defendants deny the allegations.

234.     After AWS shut off all services to Parler, AWS intentionally left open Route 53, a highly scalable domain name system (DNS), which directed hackers to Parler's backup datacenters and caused the hackers to initiate a sizeable DNS attack.  In other words, AWS essentially illuminated a large neon arrow directing hackers to Parler's backup datacenters. AWS acted in bad faith.  And the hackers got the message, launching an extremely large attack—one 250 times larger and 12-24 times longer than the average Distributed Denial of Service (DDOS) attack.  Later AWS terminated the Route 53 link, but the damage was done. And this AWS-facilitated attack was an intentionally facilitated threat by AWS to all future datacenters that, if they were to host Parler, they would be attacked by unprecedented hacks.  In short, AWS intentionally and maliciously created a toxic notoriety of massive hacking attacks for Parler, driving away nearly all other hosting services that Parler had hoped to use, thereby interfering the Parler's ability to engage in those critical business relationships.

**ANSWER:** Defendants deny the allegations.

235.     There is no legitimate reason for AWS intentionally to leave open Route 53 and direct hackers to Parler's backup datacenter.  AWS did so to harm Parler.  It thus intentionally and maliciously interfered with Parler's expected future business with service providers by improper means and for an improper purpose.

**ANSWER:** Defendants deny the allegations.

236.     As pertinent here, AWS's conduct did not relate to or arise out of its contract with Parler, nor any of AWS's products or services.

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

1

2    **ANSWER:** Defendants deny the allegations.

3

4    237.    Because of AWS's actions, Parler has suffered substantial damage in the form of

5    delay in getting back online, losing millions of dollars in advertising revenue, suffering

6    reputational damage, and losing millions of future users who are now joining or have joined

7    other platforms.

8    **ANSWER:** Defendants deny the allegations.

9

10    238.    AWS's conduct was willful and malicious.  Parler is therefore entitled to actual

11    and exemplary damages.

12    **ANSWER:** Defendants deny the allegations.

13

14    **Count Fourteen: Washington Consumer Protection Act**

15    239.    Parler restates, re-alleges, and incorporates by reference each of the allegations set

16    forth in the rest of this Complaint as if fully set forth herein.

17    **ANSWER:** Defendants incorporate and repeat as if fully set forth herein their responses

18    to the allegations in paragraphs 1 through 238 of the Complaint.

19

20    240.    Washington's Consumer Protection Act provides that "[u]nfair methods of

21    competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are

22    . . .  unlawful." RCW 19.86.020.  The Act's purpose is to "complement the body of federal law

23    governing restraints of trade, unfair competition and unfair, deceptive and fraudulent acts and

24    practices in order to protect the public and foster fair and honest competition." RCW 19.86.920.

25    And the Act is to be "liberally construed that its beneficial purposes may be served." *Id.*

26    **ANSWER:** Defendants respond that this paragraph states a legal conclusion to which no

27    response is required.  To the extent a response is required, Defendants deny the allegations.

ANSWER TO COMPLAINT - 85

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

241.    Further, the act provides that "[e]very contract, combination, in the form of trust or otherwise, or conspiracy in restraint of trade or commerce is hereby declared unlawful." RCW 19.86.030.

**ANSWER:** Defendants respond that this paragraph states a legal conclusion to which no response is required.  To the extent a response is required, Defendants deny the allegations.

242.    Under the Act, "'[a]ny person who is injured in his or her business or property' by a violation of the act may bring a civil suit for injunctive relief, damages, attorney fees and costs, and treble damages." *Panag*, 166 Wn.2d at 39 (citing RCW 19.86.090).  And to prevail in such a claim, "the plaintiff must prove (1) an unfair or deceptive act or practice, (2) occurring in trade or commerce, (3) affecting the public interest, (4) injury to a person's business or property, and (5) causation." *Id.*

**ANSWER:** Defendants respond that this paragraph states a legal conclusion to which no response is required.  To the extent a response is required, Defendants deny the allegations.

243.    Amazon, Google, Facebook, and Twitter together account for over 56 percent of the $436 billion global internet advertisement market.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations, and therefore deny the allegations.

244.    Before January 11, 2021, Parler also actively competed for internet advertising on its app and web platforms.  Moreover, Parler's ability to compete in that market was about to skyrocket as a result of (a) Twitter's announcement that it had terminated former President Trump from the Twitter platform, and (b) President Trump's indication that he would move to the Parler platform, along with a large share of his 89 million Twitter followers.  This dramatically increased traffic on the Parler platform would have enabled Parler to substantially

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

1

2   increase its sales of internet advertising, with a concomitant reduction in advertising on platforms

3   owned by Amazon, as well as platforms owned by Google, Facebook, and Twitter.

4       **ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to

5   the truth of the allegations, and therefore deny the allegations.

6

7       245.    These four tech giants make money in this market in two ways.  First, they track

8   users to target ads to each user, and they charge advertisers more for targeted ads.  Second, these

9   companies collect and sell users' data.  Together these practices make up their surveillance

10  capitalism business model.  Parler, however, did not track its users, sell their data, or use targeted

11  ads.  This enabled Parler not only to offer more privacy to its users, but also to charge lower rates

12  for advertisements on its platform.  This alternative business model posed a direct and serious

13  threat to the surveillance capitalism model that generates massive profits for Amazon, as well as

14  Google, Facebook, and Twitter.

15      **ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to

16  the truth of the allegations, and therefore deny the allegations.

17

18      246.    After AWS terminated its contract with Parler and Parler's services, AWS

19  continued to inhibit Parler's ability to compete in the global internet advertising market by

20  facilitating the hacking of Parler's backup servers, and by selling the private data of Parler users.

21  These actions inflicted enormous competitive harm on Parler, and further delayed its ability to

22  recover the revenues and potential market value it enjoyed and reasonably anticipated before

23  AWS's actions.

24      **ANSWER:** Defendants deny the allegations.

25

26      247.    All of these actions restrained trade in and caused actual injury to competition in

27  the global internet advertisement market.

        **ANSWER:** Defendants deny the allegations.

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

1

2

248.     These concerted actions and their effects were not undertaken by accident.  On information and belief, AWS conspired with other entities to prevent Parler from taking advantage of Twitter's decision to terminate Trump's Twitter account, thereby preventing Parler from dramatically increasing its share of the microblogging market and, concomitantly, its share of the internet advertising market.  AWS and its co-conspirators undertook these actions with the intention to restrain trade in the internet advertising market — again, by preventing Parler from obtaining a larger share of that market and losing the share it already — and thus protecting AWS and its co-conspirators' market shares.

**ANSWER:** Defendants deny the allegations.

249.     AWS's action in the global internet advertisement market was unfair.  It affected the public interest because thousands of Washingtonians who are Parler users could not use their Parler accounts and were deprived of accessing internet advertising—something even more important during a pandemic with lockdowns to traditional stores—that was not targeted at them. AWS's actions also compromised the ability of existing and future Parler users to use a social-media platform whose business model does not require constant user surveillance.

**ANSWER:** Defendants deny the allegations.

250.     AWS caused severe economic injury to Parler by depriving it of millions of dollars of advertising revenues and by making it extremely difficult for Parler to get back online with another service provider, which injury AWS knew would occur given the reputational injury Parler had suffered at AWS's hands.

**ANSWER:** Defendants deny the allegations.

251.     As pertinent to this claim, AWS's conduct did not relate to or arise out of its contract with Parler, nor any of AWS's products or services.

ANSWER TO COMPLAINT - 88

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

1

2 **ANSWER:** Defendants deny the allegations.

3

4 252.     AWS/Amazon's actions, which were taken in bad faith, violated the Washington

5 Consumer Protection Act, including but not limited to RCW 19.86.030.

6 **ANSWER:** Defendants deny the allegations.

7

8 253.     Parler is entitled to damages, attorney's fees and costs, and treble damages.

9 **ANSWER:** Defendants deny the allegations.

10

11 **Count Fifteen: Washington Consumer Protection Act**

12 254.     Parler restates, re-alleges, and incorporates by reference each of the allegations set

13 forth in the rest of this Complaint as if fully set forth herein.

14 **ANSWER:** Defendants incorporate and repeat as if fully set forth herein their responses

15 to the allegations in paragraphs 1 through 253 of the Complaint.

16

17 255.     Washington's Consumer Protection Act provides that "[u]nfair methods of

18 competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are

19 . . . unlawful."  RCW 19.86.020.  The Act's purpose is to "complement the body of federal law

20 governing restraints of trade, unfair competition and unfair, deceptive and fraudulent acts and

21 practices in order to protect the public and foster fair and honest competition."  RCW 19.86.920.

22 And the Act is to be "liberally construed that its beneficial purposes may be served."  *Id.*

23 **ANSWER:** Defendants respond that this paragraph states a legal conclusion, to which no

24 response is required.  To the extent a response is required, Defendants deny the allegations.

25

26 256.     Further, the Act provides that "[i]t shall be unlawful for any person to

27 monopolize, or attempt to monopolize or combine or conspire with any other person or persons

to monopolize any part of trade or commerce."  RCW 19.86.040.

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

1

**ANSWER:** Defendants respond that this paragraph states a legal conclusion, to which no response is required.  To the extent a response is required, Defendants deny the allegations.

257.     Under the Act, "'[a]ny person who is injured in his or her business or property' by a violation of the act may bring a civil suit for injunctive relief, damages, attorney fees and costs, and treble damages." *Panag*, 166 Wn.2d at 39 (citing RCW 19.86.090).  And to prevail in such a claim, "the plaintiff must prove (1) an unfair or deceptive act or practice, (2) occurring in trade or commerce, (3) affecting the public interest, (4) injury to a person's business or property, and (5) causation." *Id.*

**ANSWER:** Defendants respond that this paragraph states a legal conclusion, to which no response is required.  To the extent a response is required, Defendants deny the allegations.

258.     AWS is the largest and one of just three integrated cloud service infrastructure providers in the world, making up 57 percent of the global integrated cloud service infrastructure market.  This market provides not just web hosting, but the full services necessary to be online, as well as scalable infrastructure that enables companies to use more or less server capacity based on changing needs.

**ANSWER:** Defendants admit that AWS is the world's most comprehensive and broadly adopted cloud platform, offering over 200 fully featured services from data centers globally.  Defendants further admit that millions of customers use AWS and that AWS competes with numerous providers of IT services in a highly competitive market for IT services.   Defendants otherwise lack knowledge or information sufficient to form a belief as to the truth of the allegations, and therefore deny any remaining allegations.

259.     After shutting down all of Parler's services and terminating its contract with Parler, AWS left open Route 53, a highly scalable domain name system.  This directed hackers to Parler's backup datacenters, causing hackers to initiate a sizable DNS attack.  AWS's action

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

sent a message to any other cloud service company that, if it hosted Parler, it would also be

subjected to unprecedented hacker attacks.  AWS did so with the intent of preventing Parler from

obtaining hosting services from other cloud service providers in order to further AWS's attempt

to monopolize the market for the global integrated cloud service infrastructure market.

**ANSWER:** Defendants deny that AWS shut off all services to Parler; directed hackers to

Parler's backup datacenters; caused hackers to initiate a DNS attack; or otherwise facilitated any

attack on Parler or its datacenters, much less threatened future datacenters that datacenters that

host Parler would be attacked.  Defendants deny the remaining allegations.

260.    As a foreseeable result of these actions by AWS, Parler could not find an

integrated cloud service infrastructure provider to host it and its millions of users.  AWS's

actions thus ensured that AWS would not lose market share in this market by a competitor

stepping in to provide those services to Parler.  AWS's actions thus were unfair and deceptive in

nature, causing tremendous injury to Parler.

**ANSWER:** Defendants deny the allegations.

261.    Additionally, AWS's actions affected the public interest given that thousands of

Washingtonians who had Parler accounts were unable to communicate via Parler.

**ANSWER:** Defendants deny the allegations.

262.    Upon information and belief, AWS engaged in these actions in an attempt to

monopolize a part of trade or commerce, and/or to conspire with other entities to enable them to

monopolize a part of trade or commerce.

**ANSWER:** Defendants deny the allegations.

263.    AWS's actions, which were taken in bad faith, violated the Washington

Consumer Protection Act, including but not limited to RCW 19.86.040.

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

1

2      **ANSWER:** Defendants deny the allegations.

3

4      264.    As pertinent here, AWS's conduct did not relate to or arise out of its contract with

5      Parler, nor any of AWS's products or services.

6      **ANSWER:** Defendants deny the allegations.

7

8      265.    Parler is entitled to damages, attorneys fees and costs, and treble damages.

9      **ANSWER:** Defendants deny the allegations.

10

11                              **II.      PRAYER FOR RELIEF**

12     The remainder of the Complaint is a prayer for relief that requires no response.

13     Defendants deny that Plaintiff is entitled to any of the requested relief.

14

15                        **AFFIRMATIVE AND OTHER DEFENSES**

16     Below are Defendants' affirmative defenses.  By setting forth these affirmative defenses,

17     Defendants do not assume any burden of proof as to any fact issue or other element of any cause

18     of action that properly belongs to Plaintiff.  Defendants reserve the right to amend or supplement

19     their affirmative defenses.

20     1.      Plaintiff failed to state a claim on which relief can be granted.

21     2.      Plaintiff's claims are barred in whole or in part under immunity or privilege

22     granted by common law, contract, or by reason of state and federal statutes, and the Washington

23     and U.S. Constitutions.

24     3.      Plaintiff's claims are barred, in whole or in part, by Section 230 of the

25     Communications Decency Act, 47 U.S.C. § 230.

26     4.      Plaintiff's injuries or damages, if any, were caused in whole or in part by its own

27     acts or omissions.

ANSWER TO COMPLAINT - 92

1

2       5.      Plaintiff's claims are barred, in whole or in part, because of Plaintiff's failure to

3  mitigate its alleged damages.

4       6.      Plaintiff's claims are barred, in whole or in part, because Plaintiff anticipatorily

5  breached and/or repudiated the parties' agreement.

6

7      DATED this 26th day of March, 2021.

8                            Davis Wright Tremaine LLP

9                            Attorneys for Defendants Amazon Web
                             Services, Inc. and Amazon.com, Inc.

10                        By *s/Ambika K. Doran*

11                             Ambika Kumar Doran, WSBA #38237
                             920 Fifth Avenue, Suite 3300

12                             Seattle, WA  98104-1610
                             Telephone: 206-622-3150

13                             E-mail: ambikadoran@dwt.com

14                             Alonzo Wickers IV (*pro hac vice*)

15                             865 S. Figueroa Street, Suite 2400
                             Los Angeles, CA 90017

16                             Telephone: 213-633-6800
                             E-mail: alonzowickers@dwt.com

17

18

19

20

21

22

23

24

25

26

27

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

1

2

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that counsel of record has been served a true and correct copy of the

3

4

foregoing *Answer to Complaint* by electronic mail and by U.S. mail at the below address:

5

6

7

8

Angelo J. Calfo, WSBA# 27079
CALFO EAKES LLP
1301 Second Avenue, Suite 2800
Seattle, WA 98101
Email: angeloc@calfoeakes.com

9

10

11

David J. Groesbeck, WSBA No. 24749
DAVID J. GROESBECK, P.S.
1333 E. Johns Prairie Rd.
Shelton, WA 98584
Email: david@groesbecklaw.com

12

13

DATED this 26th day of March, 2021.

14

15

Davis Wright Tremaine LLP
Attorney for Defendants

16

17

18

19

By *s/ Ambika K. Doran*
    Ambika K. Doran, WSBA # 38237
    920 Fifth Avenue, Suite 3300
    Seattle, WA  98104-1610
    Telephone: 206-757-8030
    E-mail: ambikadoran@dwt.com

20

21

22

23

24

25

26

27

ANSWER TO COMPLAINT - 94