THE HONORABLE BARBARA J. ROTHSTEIN

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| PARLER LLC, | Case No. 21-cv-00270-BJR |
| Plaintiff, | **DECLARATION OF ALONZO WICKERS IN SUPPORT OF DFENDANTS' RESPONSE TO PLAINTIFF'S AMENDED MOTION FOR REMAND OR IN THE ALTERNATIVE FOR DISMISSAL WITHOUT PREJUDICE** |
| v. | |
| AMAZON WEB SERVICES, INC., and AMAZON.COM, INC., | |
| Defendants. | |

I, Alonzo Wickers, declare:

1.      I am a partner in the law firm Davis Wright Tremaine LLP, counsel for Defendants Amazon Web Services, Inc. and Amazon.com, Inc. (collectively, "Amazon").  I make this declaration from personal knowledge, publicly available databases and information, and records my firm keeps in the regular course of business, and I could testify competently to the same.

2.      Just after 6:00 p.m. Pacific Time on March 2, 2021, I and my co-counsel learned that Parler had filed the complaint in this case in King County Superior Court.  My partner received an email from Parler's counsel at 12:06 a.m. Pacific Time on March 3, 2021, in which

DECLARATION OF ALONZO WICKERS IN SUPPORT OF DEFENDANTS'
RESPONSE TO PLAINTIFF'S AMENDED MOTION FOR REMAND - 1
(No. 21-cv-00270-BJR)
4850-3089-0469v.3 0051461-003531

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

1   Parler's counsel included a copy of the state court complaint and the voluntary dismissal of

2   Parler's initial suit in this Court.

3          3.     Parler's counsel did not meet and confer with me or my co-counsel before filing

4   Parler's motion to remand on March 4, 2021 (Dkt. 3).

5          4.     On March 5, 2021, I had phone conference with Parler's counsel.  During the call,

6   Parler's counsel agreed to a one-week extension of Amazon's deadline to respond to the motion

7   for remand, as well as to extend Amazon's deadline to respond to the complaint until after a

8   decision on the motion.  But when I wrote to confirm this agreement, Parler's counsel stated the

9   agreement was contingent on Amazon agreeing not to respond to the complaint at all.  Attached

10  as **Exhibit A** is a true and correct copy of an email thread between myself and Parler's counsel

11  related to the proposed extension of time for Amazon to respond to Parler's complaint and

12  motion to remand.

13         5.     Attached as **Exhibit B** is a true and correct copy of an email thread between my

14  co-counsel and Parler's counsel related to Parler's position that the parties to this action lack

15  diversity of citizenship.

16         6.     Attached as **Exhibit C** is a true and correct copy of a letter dated March 30, 2021,

17  sent by my co-counsel to Parler's counsel.

18         7.     Attached as **Exhibit D** is a true and correct copy of a letter dated March 25, 2021

19  from attorneys representing Parler to U.S. Representative Carolyn B. Maloney, which is also

20  available here: https://republicans-oversight.house.gov/wp-content/uploads/2021/03/Parler-

21  Letter-to-Chairwoman-Maloney.pdf.

22         8.     Attached as **Exhibit E** is a true and correct copy of a true and correct copy of the

23  complaint filed by former Parler CEO John Matze against Parler in Nevada state court.

24         9.     Attached as **Exhibit F** is a true and correct copy of a letter dated April 7, 2021

25  from Parler's counsel to my co-counsel, in which Parler's counsel refuses to provide information

26  related to the Rebekah Mercer 2020 Irrevocable Trust.

27  DECLARATION OF ALONZO WICKERS IN SUPPORT OF DEFENDANTS'
    RESPONSE TO PLAINTIFF'S AMENDED MOTION FOR REMAND - 2
    (No. 21-cv-00270-BJR)
    4850-3089-0469v.3 0051461-003531

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

10.     Attached as **Exhibit G** is a true and correct copy of a letter dated April 7, 2021 from Parler's counsel to my co-counsel, in which Parler's counsel threatens to seek sanctions against counsel for Amazon.

11.     Attached as **Exhibit H** is a true and correct copy of a February 18, 2021 post on The Epoch Times, *Video: Parler Interim CEO Mark Meckler Talks Relaunch, Data Privacy, and Building A New Independent Tech Stack*, available at https://www.theepochtimes.com/video-parler-interim-ceo-mark-meckler-talks-relaunch-data-privacy-and-building-a-new-independent-tech-stack_3702725.html?utm_source=pushengage.

I declare under perjury of penalty that the foregoing is true and correct.

Signed at Los Angeles, California, this 12th day of April, 2021.

_____
Alonzo Wickers IV

DECLARATION OF ALONZO WICKERS IN SUPPORT OF DEFENDANTS'
RESPONSE TO PLAINTIFF'S AMENDED MOTION FOR REMAND - 3
(No. 21-cv-00270-BJR)
4850-3089-0469v.3 0051461-003531

## **CERTIFICATE OF SERVICE**

I hereby certify that on April 12, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to those attorneys of record registered on the CM/ECF system.  All other parties (if any) shall be served in accordance with the Federal Rules of Civil Procedure.

Declared under penalty of perjury under the laws of the state of Washington, dated at Mountlake Terrace, Washington, this 12th day of April, 2021.

*s/ Michelle Stark*
Michelle Stark

DECLARATION OF ALONZO WICKERS IN SUPPORT OF DEFENDANTS'
RESPONSE TO PLAINTIFF'S AMENDED MOTION FOR REMAND - 4
(No. 21-cv-00270-BJR)
4850-3089-0469v.3 0051461-003531

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

# EXHIBIT A

**Miller, Robert**

| | |
|---|---|
| **From:** | Wickers, Alonzo |
| **Sent:** | Monday, March 08, 2021 12:53 PM |
| **To:** | Angelo Calfo |
| **Cc:** | david@groesbecklaw.com; Kumar, Ambika |
| **Subject:** | RE: Parler case |

Hi Angelo,

We're not willing to forego our right to respond to the complaint.  We still would appreciate a one-week extension of time to file our opposition to the motion to remand, and are happy to provide Parler with a reciprocal one-week extension of its time to file its reply.  We also would appreciate an extension of time to respond to the complaint.  If Parler is unwilling to provide these courtesies, please let me know.

Thank you.

Al

**Alonzo Wickers IV** | Davis Wright Tremaine LLP
865 S Figueroa Street, Suite 2400 | Los Angeles, CA 90017
Tel: (213) 633-6865 | Fax: (213) 633-4281 | Mobile: (323) 559-4201
Email: alonzowickers@dwt.com | Website: www.dwt.com

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Washington, D.C.

**From:** Angelo Calfo <angeloc@calfoeakes.com>
**Sent:** Sunday, March 07, 2021 7:45 AM
**To:** Wickers, Alonzo <alonzowickers@dwt.com>
**Cc:** david@groesbecklaw.com; Kumar, Ambika <AmbikaKumar@dwt.com>
**Subject:** RE: Parler case

[EXTERNAL]

Hi Alonzo,

Okay, please let me know.  Unfortunately, based on our call, I advised the client that we had reached an agreement.  I'll wait to hear from you on Monday.

Many thanks.

Angelo

**From:** Wickers, Alonzo <alonzowickers@dwt.com>
**Sent:** Saturday, March 6, 2021 10:24 PM
**To:** Angelo Calfo <angeloc@calfoeakes.com>
**Cc:** david@groesbecklaw.com; Kumar, Ambika <AmbikaKumar@dwt.com>
**Subject:** RE: Parler case

Hi Angelo,

1

Thank you for the clarification.  We'll discuss with our client on Monday morning and get back to you.  Hope the game goes well tomorrow.

Al

**Alonzo Wickers IV** | Davis Wright Tremaine LLP
865 S Figueroa Street, Suite 2400 | Los Angeles, CA 90017
Tel: (213) 633-6865 | Fax: (213) 633-4281 | Mobile: (323) 559-4201
Email: alonzowickers@dwt.com | Website: www.dwt.com

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Washington, D.C.

---

**From:** Angelo Calfo <angeloc@calfoeakes.com>
**Sent:** Friday, March 05, 2021 4:50 PM
**To:** Wickers, Alonzo <alonzowickers@dwt.com>
**Cc:** david@groesbecklaw.com; Kumar, Ambika <AmbikaKumar@dwt.com>
**Subject:** RE: Parler case

[EXTERNAL]

Thanks, Alonzo.

Just want to make sure we're on the same page.  My understanding is that Defendants agree not to respond to the complaint, or bring any motions, until after the remand motion and the motion for voluntary dismissal without prejudice is decided or resolved.  In exchange, we agree to re-note the pending motions to April 2.  There's no need to change the date our reply brief is due, but we appreciate the offer.  Let me know if that is acceptable.

My recommendation is that we wait and see how Parler's pending motion is resolved before we set a deadline for responding to the state complaint.  We will be reasonable in addressing any requests to extend Defendants' response date whether the case remains in federal court or is remanded to superior court.

Regards, and Gonzaga will need luck because LMU has one of the better teams in the country this year.

Angelo

---

**From:** Wickers, Alonzo <alonzowickers@dwt.com>
**Sent:** Friday, March 5, 2021 4:26 PM
**To:** Angelo Calfo <angeloc@calfoeakes.com>
**Cc:** david@groesbecklaw.com; Kumar, Ambika <AmbikaKumar@dwt.com>
**Subject:** RE: Parler case

Hi Angelo,

Good talking with you.  We appreciate the extension of time to respond to Parler's motion to remand and to its complaint.  As we discussed, Parler will give AWS/Amazon an extra week to respond to the motion, making our brief due on March 29, and will extend our clients' time to respond to the complaint until after the remand motion is decided.  And our clients will grant Parler additional time for your reply brief.  Once you've spoken with your colleagues, just let us know how much additional time you'd like and we'll prepare a stipulation.  When we next talk, we should also discuss how much time AWS/Amazon will have to respond to the complaint once the remand motion is decided.

Thanks again and good luck to your son's team this weekend.

Al

**Alonzo Wickers IV** | Davis Wright Tremaine LLP
865 S Figueroa Street, Suite 2400 | Los Angeles, CA 90017
Tel: (213) 633-6865 | Fax: (213) 633-4281 | Mobile: (323) 559-4201
Email: alonzowickers@dwt.com | Website: www.dwt.com

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Washington, D.C.

---

**From:** Angelo Calfo <angeloc@calfoeakes.com>
**Sent:** Friday, March 05, 2021 3:24 PM
**To:** Wickers, Alonzo <alonzowickers@dwt.com>; Kumar, Ambika <AmbikaKumar@dwt.com>
**Cc:** david@groesbecklaw.com
**Subject:** RE: Parler case

[EXTERNAL]

---

Yes, please do.  Thanks.

---

**From:** Wickers, Alonzo <alonzowickers@dwt.com>
**Sent:** Friday, March 5, 2021 3:04 PM
**To:** Angelo Calfo <angeloc@calfoeakes.com>; Kumar, Ambika <AmbikaKumar@dwt.com>
**Cc:** david@groesbecklaw.com
**Subject:** RE: Parler case

Hi Angelo,

Ambika is tied up this afternoon, but I'm free at 3:30.  Should I call your mobile?  Thank you.

Al

**Alonzo Wickers IV** | Davis Wright Tremaine LLP
865 S Figueroa Street, Suite 2400 | Los Angeles, CA 90017
Tel: (213) 633-6865 | Fax: (213) 633-4281 | Mobile: (323) 559-4201
Email: alonzowickers@dwt.com | Website: www.dwt.com

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Washington, D.C.

---

**From:** Angelo Calfo <angeloc@calfoeakes.com>
**Sent:** Friday, March 05, 2021 2:33 PM
**To:** Kumar, Ambika <AmbikaKumar@dwt.com>
**Cc:** Wickers, Alonzo <alonzowickers@dwt.com>; david@groesbecklaw.com
**Subject:** Re: Parler case

[EXTERNAL]

---

Sorry, I meant to say 3:30 pm

Angelo J. Calfo
Calfo Eakes LLP
(206) 407-2210 (office)
(206) 229-3441 (cell)
www.calfoeakes.com

---

**From:** Kumar, Ambika <AmbikaKumar@dwt.com>
**Sent:** Friday, March 5, 2021 12:37:58 PM
**To:** Angelo Calfo <angeloc@calfoeakes.com>
**Cc:** Wickers, Alonzo <alonzowickers@dwt.com>; david@groesbecklaw.com <david@groesbecklaw.com>
**Subject:** Re: Parler case

Thanks, Angelo. We look forward to your response.

**Ambika Kumar** | Davis Wright Tremaine LLP
Partner | Co-Chair, Media Law Practice
920 Fifth Avenue, Suite 3300 | Seattle, WA 98104
Tel: (206) 757-8030 | Fax: (206) 757-7030 | Mobile: (206) 356-0397
Email: ambikakumar@dwt.com | Bio: https://www.dwt.com/people/k/kumar-ambika
-
Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Washington, D.C.


On Mar 4, 2021, at 7:06 PM, Angelo Calfo <angeloc@calfoeakes.com> wrote:

Hi Ambika,

Many thanks for the introduction. I was unavailable this afternoon but will be in touch tomorrow to respond to your message below.

Best,

Angelo

**From:** Kumar, Ambika <AmbikaKumar@dwt.com>
**Sent:** Thursday, March 4, 2021 3:04 PM
**To:** Angelo Calfo <angeloc@calfoeakes.com>
**Cc:** Wickers, Alonzo <alonzowickers@dwt.com>; david@groesbecklaw.com
**Subject:** Parler case

Angelo,
I don't think we've had the pleasure of meeting, but I'm a partner at DWT and counsel for the Amazon defendants in the Parler matter.

I'm writing to ask for the courtesy of a one-week extension on our deadline to respond to your remand motion—owing to the schedule of our Amazon client contact.  We would, of course, be open to a reciprocal extension for your reply.

If you agree, we are happy to draft a stipulation.  Please let me know.

Regards,
Ambika

**Ambika Kumar** | Davis Wright Tremaine LLP
Partner | Co-Chair, Media Law Practice
920 Fifth Avenue, Suite 3300 | Seattle, WA 98104
Tel: (206) 757-8030 | Fax: (206) 757-7030 | Mobile: (206) 356-0397
Email: ambikakumar@dwt.com | Bio: https://www.dwt.com/people/k/kumar-ambika

# EXHIBIT B

## Miller, Robert

| | |
|---|---|
| **From:** | Angelo Calfo <angeloc@calfoeakes.com> |
| **Sent:** | Saturday, March 20, 2021 10:43 AM |
| **To:** | Kumar, Ambika; Wickers, Alonzo |
| **Cc:** | Henry Phillips; Andrew DeCarlow; Smith, Lesley |
| **Subject:** | RE: Further meet and confer |

**[EXTERNAL]**

Ambika,

Following up on your message below, and my email to you yesterday, we again request that the Amazon defendants stipulate to a remand.  If we do not reach agreement on this by noon on Monday, March 22, we will file our amended motion to remand and we will request fees.

Your responsive messages seeking jurisdictional discovery continue to fail to address the improper way that the Amazon defendants leveraged their way to federal court:  through knowing or reckless misstatements and a questionable "snap removal" procedure that has been characterized as a form of "gamesmanship" by many district courts.  We reiterate that you are not entitled to discovery, that the diligence you are trying to perform now is what the Amazon defendants should have performed prior to filing its removal notice but purposefully didn't do in order to avoid service of the state court complaint prior to removal.  Parler not only has no obligation to provide discovery at this time, but doing so would reward the Amazon defendants' improper and sanctionable conduct in removing this case to federal court without having conducted a reasonable legal or factual investigation into its allegations regarding Parler's citizenship.

In any event, as we have explained, the Amazon defendants will never be able to show complete diversity because Parler is a Delaware citizen under clear Ninth Circuit precedent.

I trust the additional time we have provided you and your clients to consider our position has been helpful.

Best regards,

Angelo

**From:** Angelo Calfo
**Sent:** Friday, March 19, 2021 1:59 PM
**To:** Kumar, Ambika <AmbikaKumar@dwt.com>; Wickers, Alonzo <alonzowickers@dwt.com>
**Cc:** Henry Phillips <HenryP@calfoeakes.com>; Andrew DeCarlow <andrewd@calfoeakes.com>; Smith, Lesley <LesleySmith@dwt.com>; cbartolomucci@schaerr-jaffe.com
**Subject:** RE: Further meet and confer

Ambika,

My co-counsel from Washington D.C. are in trial this week and I'm not available to consult with them on a response to your email below. In the interim, has your client made a decision on whether to stipulate to remand? Whether or not you are in a position to respond to that ultimate question, it would be helpful to know, by close of business today if at all possible, whether Amazon's position is that it will not agree to a remand unless we provide discovery. I expect to be speaking with our co-counsel later this evening or tomorrow morning.

Thank you,

Angelo

---

**From:** Kumar, Ambika <AmbikaKumar@dwt.com>
**Sent:** Thursday, March 18, 2021 11:13 AM
**To:** Angelo Calfo <angeloc@calfoeakes.com>; Wickers, Alonzo <alonzowickers@dwt.com>
**Cc:** Henry Phillips <HenryP@calfoeakes.com>; Andrew DeCarlow <andrewd@calfoeakes.com>; Smith, Lesley <LesleySmith@dwt.com>; cbartolomucci@schaerr-jaffe.com
**Subject:** RE: Further meet and confer

Angelo,
Thank you. We are familiar with *Demarest*, which as you know, concludes with the statement "*Americold* might have somewhat complicated **how we should ascertain the citizenship of a trust**, but it upset neither Navarro nor our precedent in cases where, as here, the trustee of a traditional trust is sued in its own name. Because HSBC and the other Defendants were not, like Demarest, citizens of California, there was complete diversity, and the district court properly exercised diversity jurisdiction." 920 F.3d at 1231.

*Demarest* and other cases also make clear the relevance of the nature of the trust. So we believe we are entitled to additional information, namely the trust instrument and beneficiaries. We can agree to treat that information as attorneys' eyes only, to the extent there are confidentiality concerns.

With respect to your intention to file by noon today, we again respectfully request that you defer that motion until we have a chance to flesh out the issues and fully consult with our client, who is on vacation, and who has not made a decision on your proposed stipulation.

To the extent that basis is not sufficient, our client contact, Jeff Dean, has indicated he is friends with Chris Bartolomucci, and asked that we convey to Chris (copied) that Jeff would very much appreciate the courtesy on a personal level, as Jeff is on vacation with his wife and young children.

Regards,
Ambika

**Ambika Kumar** | Davis Wright Tremaine LLP
Partner | Co-Chair, Media Law Practice
920 Fifth Avenue, Suite 3300 | Seattle, WA 98104
Tel: (206) 757-8030 | Fax: (206) 757-7030 | Mobile: (206) 356-0397
Email: ambikakumar@dwt.com | Bio: https://www.dwt.com/people/k/kumar-ambika

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Washington, D.C.

---

**From:** Angelo Calfo <angeloc@calfoeakes.com>
**Sent:** Thursday, March 18, 2021 7:43 AM
**To:** Kumar, Ambika <AmbikaKumar@dwt.com>; Wickers, Alonzo <alonzowickers@dwt.com>
**Cc:** Henry Phillips <HenryP@calfoeakes.com>; Andrew DeCarlow <andrewd@calfoeakes.com>; Smith, Lesley <LesleySmith@dwt.com>
**Subject:** RE: Further meet and confer

Ambika,

I understand that the Amazon defendants now wish to conduct due diligence into the propriety of their removal notice, which, at the time of filing, was based upon a misstatement of law and an inaccurate statement of fact (namely, that Parler's citizenship was to be determined on the basis of the state of its organization and that Parler was a citizen of Nevada). Those misstatements were or should have been known to the Amazon defendants at the time the removal notice was filed.

2

The Amazon defendants had an obligation to conduct diligence *prior* to filing their removal notice, and their attempt only now to seek information to support their invalid removal notice is improper.  As you know, the Amazon defendants hastily removed this case to federal court without doing proper due diligence in order to take advantage of the questionable "snap removal" procedure.  Had the Amazon defendants conducted due diligence prior to filing, they would have been served with the state court complaint and their ability to take advantage of the disfavored snap removal procedure would have been lost.  It is unfair and, in our view, further gamesmanship to seek removal on new  grounds only after Amazon removed the case from state court based on misstatements of law and fact.

Amazon's speculation that the Rebekah Mercer Trust is somehow subject to a different rule of citizenship post-*Americold* is erroneous.  The Amazon defendants are grasping at straws now that they have to acknowledge that their original removal notice was improvidently filed without proper due diligence.  The controlling case post-dating *Americold* is the Ninth Circuit's decision in *Demarest v. HSBC Bank USA, N.A. as Tr. for registered holders of Nomura Home Equity Loan, Inc., Asset-Backed Certificates, Series 2006-HE2*, 920 F.3d 1223, 1229–30 (9th Cir. 2019).  There, the Ninth Circuit made clear that the citizenship of traditional trusts continues to be determined by the citizenship of their trustees, post-*Americold*.  *See also Rosas v. NFI Indus.,* No. 221CV00046WBSCKD, 2021 WL 672989, at *3 (E.D. Cal. Feb. 22, 2021) ("to analyze the citizenship of a traditional trust for the purposes of diversity jurisdiction, courts must look to the citizenship of the trustee or trustees, not the beneficiaries. . .") (citations and quotations omitted).

We hope that the Amazon defendants will discontinue their efforts at after-the-fact discovery and tardy explanations for their improper original filing.  Please let us know by noon today if the Amazon defendants will stipulate to a remand order.  If not, we will plan to file our amended remand motion and request fees.

Angelo

---

**From:** Kumar, Ambika <AmbikaKumar@dwt.com>
**Sent:** Wednesday, March 17, 2021 1:43 PM
**To:** Angelo Calfo <angeloc@calfoeakes.com>; Wickers, Alonzo <alonzowickers@dwt.com>
**Cc:** Henry Phillips <HenryP@calfoeakes.com>; Andrew DeCarlow <andrewd@calfoeakes.com>; Smith, Lesley <LesleySmith@dwt.com>
**Subject:** RE: Further meet and confer

Angelo,
Thanks for your response.  We are talking with our client at 8:30 p.m. and should have an answer for you after that (tonight or first thing in the morning).

In addition, we'd like to ask you to share the following information with us: the trust instrument, the beneficiaries, and the citizenship of the beneficiaries.  This information is relevant.  It appears to us that *Johnson*'s holding was limited by the Supreme Court's decision in *Americold Realty Trust v. ConAgra Foods, Inc.*, such that the trust's beneficiaries, not trustees, are relevant for diversity purposes in certain cases.  *See, e.g., RTP LLC v. ORIX Real Est. Cap., Inc.*, 827 F.3d 689 (7th Cir. 2016).

We will report back on Amazon's decision once we've talked to our client this evening.

Regards,
Ambika

**Ambika Kumar** | Davis Wright Tremaine LLP
Partner | Co-Chair, Media Law Practice
920 Fifth Avenue, Suite 3300 | Seattle, WA 98104
Tel: (206) 757-8030 | Fax: (206) 757-7030 | Mobile: (206) 356-0397
Email: ambikakumar@dwt.com | Bio: https://www.dwt.com/people/k/kumar-ambika

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Washington, D.C.

**From:** Angelo Calfo <angeloc@calfoeakes.com>
**Sent:** Tuesday, March 16, 2021 5:46 PM
**To:** Kumar, Ambika <AmbikaKumar@dwt.com>; Wickers, Alonzo <alonzowickers@dwt.com>
**Cc:** Henry Phillips <HenryP@calfoeakes.com>; Andrew DeCarlow <andrewd@calfoeakes.com>; Smith, Lesley <LesleySmith@dwt.com>
**Subject:** RE: Further meet and confer

Thank you, Ambika.

The case provided to you in my initial email below, *Johnson v. Columbia Properties Anchorage, LP*, 437 F.3d 894, 899 (9th Cir. 2006), stated that "[a] trust has the citizenship of its trustee or trustees" in the diversity jurisdiction analysis. *Johnson* specifically analyzed the citizenship of an LLC where one of the LLC's members was a trust. The trustee of that trust was incorporated in Delaware and had its principal place of business in Minnesota. We're aware of no case that states that the analysis of an LLC's citizenship is different when it is a plaintiff or a defendant, and there's no rational basis for believing that the analysis would be different. That said, here's a case that demonstrates just that: *Park Lane-Reno Partners, LLC v. Syufy Enterprises*, No. 320CV00596MMDCLB, 2020 WL 6445092, at *2 (D. Nev. Nov. 3, 2020).

We have given you ample time to consider our position. This is not a complicated issue, and the case law is consistent throughout the country on the issue whether a trust has the citizenship of its trustees—it clearly does.

Judge Rothstein suggests three business days as an allotment for allowing an opposing party time to meet and confer. If we don't hear back from you by tomorrow at close of business, our client would like to move the matter forward and file its amended motion.

Please do not hesitate to let me know if you have any questions.

Angelo

---

**From:** Kumar, Ambika <AmbikaKumar@dwt.com>
**Sent:** Tuesday, March 16, 2021 3:42 PM
**To:** Angelo Calfo <angeloc@calfoeakes.com>; Wickers, Alonzo <alonzowickers@dwt.com>
**Cc:** Henry Phillips <HenryP@calfoeakes.com>; Andrew DeCarlow <andrewd@calfoeakes.com>; Smith, Lesley <LesleySmith@dwt.com>
**Subject:** RE: Further meet and confer

Hi Angelo,
No, you should not read anything into our filings today, which had been queued up to file regardless of our decision on the remand issue.

Our client has asked us to investigate further the removal issues, and we cannot give you a firm answer today. If you have a case where a trust was a member of the plaintiff LLC and its citizenship was that of its trustee, that would be of great help. In the meantime, we hope to get you an answer within the next couple of days.

Regards,
Ambika

**Ambika Kumar** | Davis Wright Tremaine LLP
Partner | Co-Chair, Media Law Practice
920 Fifth Avenue, Suite 3300 | Seattle, WA 98104

Tel: (206) 757-8030 | Fax: (206) 757-7030 | Mobile: (206) 356-0397
Email: ambikakumar@dwt.com | Bio: https://www.dwt.com/people/k/kumar-ambika

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Washington, D.C.

**From:** Angelo Calfo <angeloc@calfoeakes.com>
**Sent:** Tuesday, March 16, 2021 2:32 PM
**To:** Kumar, Ambika <AmbikaKumar@dwt.com>; Wickers, Alonzo <alonzowickers@dwt.com>
**Cc:** Henry Phillips <HenryP@calfoeakes.com>; Andrew DeCarlow <andrewd@calfoeakes.com>; Smith, Lesley <LesleySmith@dwt.com>
**Subject:** RE: Further meet and confer

Hi Ambika and Alonzo,

I'm checking in to see if we should expect to hear back from you today. I saw that you filed a verification of the state record and also moved Alonzo into the case pro hac vice, which indicates to me that you do not intend to stipulate to a remand. Please let me know.

Angelo

**From:** Angelo Calfo
**Sent:** Saturday, March 13, 2021 10:41 AM
**To:** 'Kumar, Ambika' <AmbikaKumar@dwt.com>; Wickers, Alonzo <alonzowickers@dwt.com>
**Cc:** Henry Phillips <HenryP@calfoeakes.com>; Andrew DeCarlow <andrewd@calfoeakes.com>; Smith, Lesley <LesleySmith@dwt.com>
**Subject:** RE: Further meet and confer

Hi Ambika and Alonzo,

Thank you for agreeing to confer with us yesterday afternoon.

As we mentioned, Parler intends to file an amended notice of remand on additional two grounds. First, as noted in our email below, Defendants Amazon.com and Amazon Web Services removed this case to federal court based on an allegation that they knew or should have known was inaccurate—namely, that, for diversity purposes, Parler's state of citizenship was Nevada because it is an LLC organized under the laws of that state. It is well-established that an LLC's citizenship for diversity purposes is determined by the citizenship of its members and not by the state in which it was formed. *See Johnson v. Columbia Props. Anchorage, LP*, 437 F.3d 894, 899 (9th Cir. 2006). We are concerned that Defendants decided to make this inaccurate allegation in order to take advantage of the questionable "snap removal" procedure. Had Defendants taken the time to conduct due diligence into Parler's citizenship for purposes of determining diversity jurisdiction, they would not have been able to file their notice of removal prior to being served with Parler's state court complaint. We asked yesterday what due diligence Defendants performed into Parler's citizenship for diversity purposes prior to filing the notice of removal and you declined to answer.

The second basis for Parler's amended motion to remand is that there is not, in fact, complete diversity of the parties. As the corporate disclosure statement we provided on March 11 shows, one of Parler's members, NDM Ascendant LLC, is a Delaware LLC, and one member of that LLC is a trust formed under Delaware law. One of the trustees, J.P. Morgan Trust Company of Delaware, is both headquartered and incorporated in Delaware, making it a citizen of Delaware. *See Johnson*, 437 F.3d at 899 (holding that a "trust has the citizenship of its trustee or trustees"). Because Defendants are also Delaware citizens for diversity purposes, there is not complete diversity of the parties, which is a requirement for the exercise of federal jurisdiction in

this case.  *Lincoln Prop. Co. v. Roche*, 546 U.S. 81, 84, 126 S. Ct. 606, 609, 163 L. Ed. 2d 415 (2005) (citing  *Strawbridge v. Curtiss,* 3 Cranch 267, 2 L.Ed. 435 (1806) (noting that the statutory formulation "between ... citizens of different States" requires complete diversity between all plaintiffs and all defendants).

We do intend to request attorneys' fees for our efforts to have this matter remanded to state court because we do not believe there was an objectively reasonable basis for Defendants to file a notice of removal.

During our conversation, you asked whether NDM Ascendant LLC's citizenship had changed since the filing of the state court complaint.  The suggestion was that the composition of NDM Ascendant's members changed since the filing of the notice of removal in order to defeat diversity jurisdiction.  As I told you, it is not our burden to prove diversity—it is Defendants'.  Notwithstanding, I represented to you during our call and I represent to you now that NDM Ascendant's citizenship is the same today as it was on the date the state court complaint was filed.

You asked why we hadn't identified this issue earlier.  As I mentioned, we took Defendants notice of removal at face value.  It represented that Parler's citizenship for diversity purposes was Nevada.  As we gathered the information relating to Parler's members citizenship, and reviewed Ninth Circuit law, we determined that our trust in the legal and factual representations in Defendants' notice of removal was misplaced.  Once we had done our due diligence and determined the inaccuracy of the assertion in the notice of removal, we notified you immediately.  We respectfully suggest that Defendants should have engaged in that same due diligence prior to filing a notice of removal.

Our request is that Defendants stipulate to an order remanding the case.  If you so stipulate, we will agree to waive our right to attorneys' fees.  You stated that you would not be able to respond until early next week, as you needed time to confer with your clients.  We hope to hear from you by Tuesday close of business.

Thank you for engaging in the meet and confer and for considering our position set forth above.

Angelo

**From:** Kumar, Ambika <AmbikaKumar@dwt.com>
**Sent:** Friday, March 12, 2021 12:41 PM
**To:** Angelo Calfo <angeloc@calfoeakes.com>; Wickers, Alonzo <alonzowickers@dwt.com>
**Cc:** Henry Phillips <HenryP@calfoeakes.com>; Andrew DeCarlow <andrewd@calfoeakes.com>; Smith, Lesley <LesleySmith@dwt.com>
**Subject:** RE: Further meet and confer

Angelo,
Thanks for your email.  We're not sure what motion you are asking to confer about (since a motion for remand is already pending), but we can respond to the substance of your email.

The basis for the allegation is Parler's original complaint in the federal action, in which it alleged that "Plaintiff Parler LLC is a Nevada limited liability corporation with its principal place of business in Henderson, Nevada."

That said, we recognize the citizenship of an LLC is determined by the citizenship of its members at the time of removal.  Parler's corporate disclosure statement in the federal action stated that its members are John Matze and NDM Ascendant LLC, and that NDM Ascendant LLC's members are Rebekah Mercer and the Rebekah Mercer 2020 Irrevocable Trust.  Public reports suggest Ms. Mercer resides in New York, and we have no reason to believe the Trust destroys diversity.

If you still intend to file a motion of some sort, let's have a call.

Finally, with regard to the extension request, we no longer need it. Judge Rothstein's orders require a response within 21 days, so our response will be due March 25, not March 22.

Regards,
Ambika

**Ambika Kumar** | Davis Wright Tremaine LLP
Partner | Co-Chair, Media Law Practice
920 Fifth Avenue, Suite 3300 | Seattle, WA 98104
Tel: (206) 757-8030 | Fax: (206) 757-7030 | Mobile: (206) 356-0397
Email: ambikakumar@dwt.com | Bio: https://www.dwt.com/people/k/kumar-ambika

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Washington, D.C.

**From:** Angelo Calfo <angeloc@calfoeakes.com>
**Sent:** Thursday, March 11, 2021 3:31 PM
**To:** Kumar, Ambika <AmbikaKumar@dwt.com>; Wickers, Alonzo <alonzowickers@dwt.com>
**Cc:** Henry Phillips <HenryP@calfoeakes.com>; Andrew DeCarlow <andrewd@calfoeakes.com>
**Subject:** Further meet and confer

Ambika & Alonzo,

We write to schedule another meet and confer relating to our motion to remand.

Your notice of removal makes the following allegation:

> 21          9.    Parler is a Nevada limited liability corporation with its principal place of business
> 22    in Henderson, Nevada.  *See* Federal Complaint ¶ 10.  Parler therefore is a citizen of Nevada.

You do not cite a case for this proposition and it also appears that it is an incorrect statement of the law and of fact, which would have been evident had the most basic legal research and investigation been performed. *See Johnson v. Columbia Props. Anchorage, LP*, 437 F.3d 894, 899 (9th Cir. 2006).

As you know, it is necessary that Amazon have had an "objectively reasonable basis" for removal of a matter to federal court. It is quite clear that it did not, and its notice of removal concealed that. Please advise us of the investigation conducted by Amazon to determine the veracity of paragraph 9 both respect to law and fact.

We would like to meet and confer either today or tomorrow. I'm available the rest of the afternoon and most all of tomorrow as well.

Best regards,

Angelo

Angelo J. Calfo
**CALFO EAKES LLP**
1301 Second Avenue, Suite 2800 | Seattle, WA 98101
T: 206 407 2210 | C: 206 229 3441 | www.calfoeakes.com

*Notice:  this internet e-mail message may contain confidential, privileged information that is intended only for the addressee. If you have received this e-mail message in error, please call us immediately at (206) 407-2210 and ask to speak to the message sender. Thank you. We appreciate your assistance in correcting this matter.*

# EXHIBIT C



Suite 3300
920 Fifth Avenue
Seattle, WA  98104-1610

**Ambika Kumar**
206-757-8030 tel
206-757-7030 fax

ambikakumar@dwt.com

March 30, 2021

**SENT VIA EMAIL**

Mr. Angelo Calfo
Calfo Eakes LLP
1301 Second Ave, Suite 2800
Seattle, WA 98101
angeloc@calfoeakes.com

Re:     *Parler vs. Amazon Web Services* – Information relevant to remand

Dear Angelo:

I write to request, once again, that you provide information necessary for Amazon to evaluate your request that we stipulate to remand of this case, and to inform you that if you do not provide this information, we will ask that the Court allow limited discovery.

Based on our discussions and Parler LLC's corporate disclosure statement, I understand that one of Parler's members is NDM Ascendant LLC ("NDM"), one of the members of NDM is the Rebekah Mercer 2020 Irrevocable Trust ("the Trust"), and one of the trustees of that trust is J.P. Morgan Trust Company of Delaware—a Delaware corporation.  You claim that the trustee's citizenship is determinative for diversity purposes, and, as a result, the Court lacks jurisdiction because both Amazon defendants are also citizens of Delaware.

As I have explained, Ninth Circuit precedent confirms that a named trustee is the "real party to the controversy for purposes of diversity jurisdiction" where the trustee exercises "real and substantial control over" the assets of a "traditional" trust.  *Demarest v. HSBC Bank USA, N.A.*, 920 F.3d 1223, 1226-1228 (9th Cir. 2019).  At the same time, a court may look instead to the citizenship of the beneficiaries where, for example, the trustee lacks "customary powers" or the trust resembles a "business" trust or some other entity with independent legal status.  *See id.* (citing *Americold Realty Tr. v. Conagra Foods, Inc.*, 136 S. Ct. 1012, 1015-16 (2016)).  The point is this: "business reality is taken into account for purposes of determining whether a trustee is the real party to the controversy."  *Demarest*, 920 F.3d at 1227 (quoting *Carden v. Arkoma Assocs.*, 494 U.S. 185, 191-92 (1990)).

Your amended remand motion lacks the information necessary to determine the nature of the trust, the role of the trustees, and the residence of the beneficiaries, among other relevant facts.

**DWT.COM**

Anchorage | Bellevue | Los Angeles | New York
Portland | San Francisco | Seattle | Washington, D.C.

Angelo Calfo
March 30, 2021
Page 2


We have no way to evaluate the "business reality" of the trust you claim destroys diversity jurisdiction without information only your client can provide.  As a result, we respectfully request that you supply the following:

- A copy of the trust instrument;

- The state where each beneficiary of the Trust is domiciled; and

- Documentation reflecting the date the Trust became a member of NDM, and the date J.P. Morgan Trust Company of Delaware became a trustee of the Trust.

We will treat this information as highly confidential and limit distribution to attorneys' eyes only.

We will stipulate to remand this case if the information you provide confirms that the Court lacks jurisdiction.  If you do not provide this information, we will ask the Court for discovery, which is within its discretion.  *See, e.g.*, *Daisy Tr. v. JP Morgan Chase Bank*, No. 213CV00966RCJVCF, 2016 WL 7107762, at *1 (D. Nev. Dec. 6, 2016) (permitting removing defendants to "conduct jurisdictional discovery" regarding "the nature of" the plaintiff trust to determine diversity). Providing information now would avoid an unnecessary dispute, saving the parties and the Court significant time.

We appreciate your prompt consideration of this request.

Sincerely,

Davis Wright Tremaine LLP

Ambika Kumar

# EXHIBIT D

# Vinson&Elkins

Michael S. Dry mdry@velaw.com
**Tel +**202.639.6525 **Fax +**202.879.8865

March 25, 2021

The Honorable Carolyn B. Maloney, Chairwoman
Committee on Oversight and Reform
U.S. House of Representatives
2157 Rayburn House Office Building
Washington, DC 20515

      Re:    Parler LLC

Dear Chairwoman Maloney:

      On behalf of Parler LLC ("Parler" or the "Company"), we write to respond to your February 8, 2021 letter to Parler (the "Committee's Letter") and request for a voluntary production of documents. Parler thanks the Committee for the opportunity to respond and address the widespread disinformation campaign that Big Tech has waged in the media against Parler, which appears to have piqued the Committee's interest.

      There is no truth to the absurd conspiracy theories that have been put forth by Big Tech and its media allies to unfairly malign the Company and which were referenced in the Committee's Letter. Contrary to what has been reported, and as explained in more detail below: the Company is and always has been American-owned and controlled; Parler has never engaged in any collusion with "the Russians"; and Parler never offered President Donald J. Trump an ownership interest in the Company.

      The Committee's interest in Parler appears to stem from a coordinated and widespread disinformation campaign designed to scapegoat Parler for the riots at the U.S. Capitol on January 6, 2021, and to justify Big Tech's unlawful and anticompetitive decision to de-platform Parler just when Parler was beginning to grow in size and strength, thereby presenting a viable threat to Big Tech's stranglehold on social media. As Big Tech companies have become more brazen in their politically biased censorship,[1] Americans have grown increasingly alarmed and distrustful of platforms like Facebook and Twitter, abandoning them for Parler's refreshingly hands-off and viewpoint-neutral approach to political speech. By November 2020, Parler was the primary beneficiary of this shift away from the corporate Big Tech oligarchs, and Parler was in fact the most downloaded app on Apple's U.S. App Store and on Google's

---

[1] Big Tech censorship has become an increasing problem in recent years, and people are starting to notice. Nearly three-fourths of American adults believe that it is either likely or highly likely that social media platforms intentionally censor viewpoints they deem "objectionable." *See* PEW RESEARCH CENTER, *Most Americans Think Social Media Sites Censor Political Viewpoints* (Aug. 19, 2020), https://www.pewresearch.org/internet/2020/08/19/most-americans-think-social-media-sites-censor-political-viewpoints/.

**Vinson & Elkins LLP Attorneys at Law**
Austin Dallas Dubai Houston London Los Angeles New York
Richmond Riyadh San Francisco Tokyo Washington

2200 Pennsylvania Avenue NW, Suite 500 West
Washington, DC 20037-1701
**Tel** +1.202.639.6500 **Fax** +1.202.639.6604 velaw.com



U.S. Play Store, becoming more popular than TikTok, Zoom, and YouTube.[2]  By the end of 2020, Parler was the tenth most downloaded app for the year, and Parler again boasted the most downloaded app on January 8, 2021, the day after Facebook and Twitter banned President Trump from their platforms.[3] Parler's rising popularity made the Company a competitive threat to the likes of Twitter and Facebook— Big Tech giants which use manipulative algorithms to drive traffic and derive enormous profits from digital advertising. And that threat grew very real in late 2020 and early 2021, when Parler was poised for even more explosive growth given the widespread expectation that President Trump would move his social media presence to Parler, bringing many of his 90 million followers with him.[4]  So, together, the Big Tech companies colluded with Amazon[5] to destroy Parler and used the horrific attacks on the Capitol on January 6, 2021 as a shameful excuse.[6]

Parler now writes to set the record straight and provide new information about the positive role Parler played in the days and weeks leading up to January 6th, which should finally put an end to the spurious allegations against the Company.  Everyone knows that Parler stands proudly for the fundamental American values of freedom of speech and expression. However, Parler has always recognized that there are legal limitations on free speech.  The Company has acted to remove incitement and threats of violence from its platform and did so numerous times in the days before the unlawful rioting at the Capitol.  As Parler grew substantially in the latter half of 2020, the Company took the extraordinary initiative to develop formal lines of communication with the Federal Bureau of Investigation ("FBI") to facilitate proactive cooperation and referrals of violent threats and incitement to law enforcement. **In fact, in the days and weeks leading up to January 6th, Parler referred violent content from its platform to the FBI for investigation over 50 times, and Parler even alerted law enforcement to specific threats of violence being planned at the Capitol**.[7]

Far from being the far-right instigator and rogue company that Big Tech has portrayed Parler to be, the facts conclusively demonstrate that Parler has been a responsible and law-abiding company focused on ensuring that only free and lawful speech exists on its platform.  It is thus time for Big Tech's scapegoating of Parler to stop and for Congress to start investigating the real story here: how Big Tech giants colluded to destroy a small start-up company just as it began to pose a credible threat to their dominance on social media.

\*   \*   \*

---

[2] *See, e.g.*, Aaron Pressman, *Conservative social media site Parler shoots to the top of the download charts postelection*, FORTUNE (Nov. 9, 2020), https://fortune.com/2020/11/09/parler-conservatives-social-media-2020-election-trump-loses-most-downloaded-app/.

[3] *See* Jonathan Shieber, *Parler jumps to No. 1 on App Store after Facebook and Twitter ban Trump*, TECHCRUNCH, Jan. 9, 2021, https://techcrunch.com/2021/01/09/parler-jumps-to-no-1-on-app-store-after-facebook-and-twitter-bans/.

[4] Former President Trump never moved his social media presence to Parler. Of course, Parler welcomes President Trump, President Biden and all politicians from across the political spectrum to join Parler's non-partisan platform to engage in free and open debate.

[5] Only a few weeks before terminating Parler's services, Amazon Web Services signed a major new contract with Parler's principal competitor, Twitter.  *See* Matt Day & Kurt Wagner, *Twitter Will Use Amazon Web Services to Power Feeds*, BLOOMBERG, Dec. 15, 2020, https://www.bloomberg.com/news/articles/2020-12-15/twitter-will-use-amazon-web-services-to-power-user-feeds.

[6] *See, e.g.*, Glenn Greenwald, *How Silicon Valley, in a Show of Monopolistic Force, Destroyed Parler*, SUBSTACK, Jan. 12, 2021, https://greenwald.substack.com/p/how-silicon-valley-in-a-show-of-monopolistic.

[7] *See* Ex. A (selected correspondence and referrals by Parler to the FBI for investigation into incitement on Parler's platform).



I.    **Parler Is Not Big Tech:  Parler Stands for Free Speech, Never Sells User Data, and Refuses to Deploy Algorithms to Drive User "Engagement Through Enragement"**

Founded in 2018, Parler is a small, American-owned and American-controlled start-up social media company with fewer than 50 full-time employees.[8]  The Supreme Court recently recognized that social media plays a special role in promoting free speech in America today,[9] and Parler has enjoyed massive growth as Americans have come to learn that Parler respects its users and is fundamentally different from its Big Tech rivals in many critically important ways:

- **Free and Lawful Speech and Expression on a Viewpoint-Neutral Platform**. Unlike its Big Tech rivals which use their immense power to censor speech and to promote their policy preferences and political agendas,[10] Parler offers users a non-partisan, content-neutral platform dedicated to the American values of free speech and the fostering of tolerance through open and lawful debate.[11]

- **No Algorithms or "Engagement Through Enragement."**  Unlike its Big Tech rivals which use manipulative algorithms on unwitting consumers to fuel the "engagement through enragement" that maximizes their profits, while exacerbating existing divides in our country and coarsening our

---

[8] Your February 8, 2021 letter requests a capitalization table providing for ownership interests in Parler; a list of individuals and entities with control over Parler; and a list of Parler creditors who hold or held at least $10,000 of debt.  *See* Committee Letter at 2 (Request Nos. 1-3).  The capitalization table is attached as Ex. B.  Parler is owned by NDMascendent, LLC ("NDM"), which is owned and controlled by Rebekah Mercer.  Other owners include Bongino, Inc., which Parler understands to be owned and controlled by Dan Bongino, and 13 past and present employees of the Company, none of whom is Russian.  Parler is currently controlled by Rebekah Mercer and interim CEO Mark Meckler.  Parler was also previously controlled by former CEO John Matze.  We understand that Parler's current and past creditors are:  Rebekah Mercer, who holds two notes in her name valued at approximately $5,000,071 with an interest rate of 2.5% and scheduled maturity dates of September 4, 2021 and February 22, 2022; a note in NDM's name valued at $750,000 with an interest rate of 6%; and two passive investment vehicles which hold convertible notes with a principal amount outstanding of $1,355,000, with an interest rate of 6% and scheduled maturity dates falling on December 20, 2021, June 8, 2022, June 10, 2022, June 11, 2022, June 15, 2022, June 16, 2022, June 24, 2022, June 25, 2022, June 26, 2022, June 29, 2022, July 28, 2022, and November 2, 2022.  Jeffrey Wernick is the managing member of one of the passive investment vehicles.  According to Mr. Wernick, the passive investment vehicles have never had any Russian members and are not otherwise subject to the control of any Russian individual or entity.  *See* Ex. C (affidavit of Jeffrey Wernick).

[9] In *Packingham v. North Carolina*, the Supreme Court explained:

> A fundamental principle of the First Amendment is that all persons have access to places where they can speak and listen, and then, after reflection, speak and listen once more. . . .  While in the past there may have been difficulty identifying the most important places (in a spatial sense) for the exchange of views, today the answer is clear.  It is cyberspace . . . and social media in particular.

137 S. Ct. 1730, 1735 (2017) (citation omitted).

[10] In one recent and particularly egregious example, Twitter and Facebook both acted to suppress the distribution of a *New York Post* article that exposed then-Democratic presidential nominee Joe Biden's controversial foreign business entanglements just weeks before the presidential election.  *See* Shannon Bond, *Facebook and Twitter Limit Sharing 'New York Post' Story About Joe Biden*, NPR, Oct. 14, 2020, https://www.npr.org/2020/10/14/923766097/facebook-and-twitter-limit-sharing-new-york-post-story-about-joe-biden.

[11] *See* PARLER, VALUES, https://company.parler.com/values ("content curation exacerbates hate. . . Parler's viewpoint-neutral policies foster a community of individuals who tolerate the expression of all non-violent ideas").



national discourse,[12] Parler empowers its users to choose the content they want to see and engage with the voices they want to hear.[13]

- **No Tracking and Selling of User Data to Third Parties.**  Unlike its Big Tech rivals which profit from creepy forms of "surveillance capitalism" and track their users' personal data and preferences so that they can sell that data to third parties,[14] Parler respects its users' privacy and never commoditizes human beings by selling their personal information.[15]

- **Respect for Democracy and the Rule of Law.**  Finally, unlike its Big Tech rivals which have sacrificed liberal democratic principles and catered to foreign despots and dictators to suppress free speech and dissent[16] and who have even enabled genocide and political violence abroad,[17] Parler promotes the free and healthy exchange of ideas around the globe and across the political spectrum, and as explained below, the Company has proactively partnered with law enforcement whenever necessary to fight unlawful speech and keep incitement off of its platform.

---

[12] *See generally* THE SOCIAL DILEMMA (Netflix 2020).  According to one internal report from Facebook, these dangerous algorithms "exploit the human brain's attraction to divisiveness."  *See, e.g.*, J. Edward Moreno, *Internal Facebook report found algorithms drove people apart: report*, THE HILL, May 26, 2020, https://thehill.com/policy/technology/499611-internal-facebook-report-found-algorithms-drove-people-apart-report.  For all their talk of moderating online "hate," Big Tech profits most from the algorithms they use to encourage hateful rhetoric on their platforms.  *See* Emily DeCiccio, *Capitol Riot a 'Rocket Ship' for Twitter and Facebook, Ad Media Expert Says*, CNBC, Jan. 7, 2021, https://www.cnbc.com/2021/01/07/capitol-riot-a-rocket-ship-for-twitter-and-facebook-ad-media-expert-says.html.

[13] *See* PARLER, VALUES, https://company.parler.com/values ("your profile, your way: Parler empowers you with tools to keep your profile and feed safe. Our moderation features allow you to curate your own experience on Parler.").

[14] *See* John Laidler, *High tech is watching you*, THE HARVARD GAZETTE, Mar. 4, 2019, https://news.harvard.edu/gazette/story/2019/03/harvard-professor-says-surveillance-capitalism-is-undermining-democracy/; Kalev Leetaru, *Twitter Versus Facebook: Why Selling Access Is Better Than Selling Data*, FORBES, Apr. 13, 2019, https://www.forbes.com/sites/kalevleetaru/2019/04/13/twitter-versus-facebook-why-selling-access-is-better-than-selling-data/?sh=39dfc459660e.

[15] *See* PARLER, VALUES, https://company.parler.com/values ("it's your data, not ours: any personal data shared with Parler is encrypted for your protection, and never sold to outside entities").

[16] *See* Dave Lee, *Facebook 'made China censorship tool'*, BBC NEWS, Nov. 23, 2016, https://www.bbc.com/news/technology-38073949 (reporting that Facebook helped develop a censorship tool to accommodate the censorship needs of the Chinese communist government).

[17] *See, e.g.*, Eva Dou & Lily Kuo, *China scrubs evidence of Xinjiang clampdown amid 'genocide' debate*, WASHINGTON POST, Mar. 17, 2021, https://www.washingtonpost.com/world/asia_pacific/china-genocide-olympics-uyghurs-xinjiang/2021/03/17/d892816c-75b7-11eb-9489-8f7dacd51e75_story.html (reporting that Facebook is currently working with the Chinese communist government to throttle information coming from China's Xinjiang region while governments investigate whether China is committing genocide against Uyghur ethnic minorities); Amanda Taub & Max Fisher, *Where Countries Are Tinderboxes and Facebook Is a Match*, NEW YORK TIMES, Apr. 21, 2018, https://www.nytimes.com/2018/04/21/world/asia/facebook-sri-lanka-riots.html (blaming Facebook for violence in Sri Lanka, and claiming that "Facebook's newsfeed played a central role in nearly every step from rumor to killing."); Paul Mozur, *A Genocide Incited on Facebook, With Posts From Myanmar's Military*, N.Y. TIMES, Oct. 15, 2018, https://www.nytimes.com/2018/10/15/technology/myanmar-facebook-genocide.html (reporting that the Myanmar military used Facebook to incite genocide against the primarily Muslim Rohingya ethnic group).



## II.   Parler Worked With Law Enforcement and Warned
##       the FBI About January 6th *Before* the Riots Began

Parler has always recognized that there are legal limits to free speech, and Parler's policies have always prohibited threats of violence and incitement on its platform.[18]  As Parler's popularity and userbase grew significantly in 2020, the Company understood the difficulties of scaling its procedures to curb violent content, and Parler began to enhance its technical capabilities to identify and remove such content more efficiently.  At the same time, the Company also developed a strong working relationship with the FBI to facilitate cooperation and proactive reporting of unlawful incitement and violent threats.  Parler formalized the relationship with the FBI in November 2020 shortly after a FBI agent sent the following message to a senior Parler representative:[19]



After formalizing the lines of communication with the FBI, Parler regularly forwarded screenshots of unlawful posts that called for violence or which merited additional investigation to protect public safety.  For example, on December 22, 2020, Parler sent the FBI three screenshots of particularly violent rhetoric from a user who threatened to kill politicians and who specifically threatened former Attorney General Bill Barr.[20]

---

[18] *See* PARLER, COMMUNITY GUIDELINES 1-2 (Feb. 14, 2021), https://legal.parler.com/documents/guidelines.pdf; PARLER, COMMUNITY GUIDELINES 1-2 (Dec. 4, 2020), https://tinyurl.com/fdjh3sbf; PARLER, ELABORATION ON GUIDELINES 3 (Feb. 13, 2021), https://legal.parler.com/documents/Elaboration-on-Guidelines.pdf; PARLER, ELABORATION ON GUIDELINES 3 (Dec. 3, 2020), https://tinyurl.com/2mtf6zxa.
[19] *See* Ex. A  at PARLER_00000001.
[20] *See* Ex. A at PARLER_00000002 – PARLER_00000005.



In December 2020, Parler also began to alert the FBI about alarming content that included specific threats of organized violence at the U.S. Capitol on January 6, 2021.  For example, on December 24, Parler forwarded a post to the FBI from a user who called for the congregation of an armed force of 150,000 on the Virginia side of the Potomac River to "react to the congressional events of January 6th."[21]  Later that same day, Parler forwarded another unlawful post to the FBI in which a user stated that he was trying to "find some guys that are planning on lighting up Antifa in Wa[shington, D.C.] on the 6th" because he wanted to "start eliminating people."[22]

A few days later on January 2, 2021, Parler forwarded the FBI a series of posts by a user claiming that he would be wearing body armor and stating that the planned event in Washington, D.C. on January 6th "is not a rally and it's no longer a protest. This is the final stand where we are drawing the red line at Capitol Hill. I trust the American people will take back the USA with force and many are ready to die to take back #USA so remember this is not a party until they announce #Trump2020 a winner. . . . And don't be surprised if we take the #capital [sic] building . . . ."[23]  Parler included another post in this referral to the FBI in which the user made clear that armed people would be at the Capitol on January 6, 2021 and noted that an insurrection would be necessary because "Trump needs us to cause chaos to enact the #insurrectionact."[24]

Later that same day, a Parler employee expressed specific concerns "about Wednesday[, January 6th]," to the FBI while forwarding a post that included a picture of Hillary Clinton behind a noose.[25]

| From: | ████████████████████ |
|---|---|
| Sent: | 1/2/2021 4:25:02 PM |
| To: | [████████████ @fbi.gov] |
| Subject: | Screenshot 2021-01-02 at 10.24.15 AM |
| Attachments: | Screenshot 2021-01-02 at 10.24.15 AM.png; ATT00001.txt |

One more from same account. More where this came from. <mark>Concerned about Wednesday...</mark>

These referrals represent only a fraction of the dozens of posts with violent rhetoric that Parler collected and forwarded to the FBI for investigation in the days leading up to January 6th.  Even after the violent attacks stopped, Parler continued to dutifully and proactively report posts to the FBI where users threatened additional violence, including one poster who threatened after a lengthy tirade that "[i]n the next 24 hours, you will hear the shot heard around the world!!!"[26]  Moreover, even as its Big Tech rivals moved to unlawfully de-platform Parler, the Company still committed valuable resources to working with

---

[21] *See* Ex. A at PARLER_00000006.
[22] *See* Ex. A at PARLER_00000007 – PARLER_00000008.
[23] *See* Ex. A at PARLER_00000011 – PARLER_00000013.
[24] *Id.*
[25] *See* Ex. A at PARLER_00000009 – PARLER_00000010.
[26] *See* Ex. A at PARLER_00000014 – PARLER_00000015.



law enforcement in order to service and expeditiously respond to Emergency Disclosure Requests, subpoenas, and warrants.  The FBI understood the strain that the Company was under and thanked Parler for its efforts to help law enforcement especially under such difficult circumstances for the Company:[27]

| | |
|---|---|
| **From:** | ███████████ (FBI) [██████@fbi.gov] |
| **Sent:** | 1/10/2021 3:04:08 AM |
| **To:** | |
| **Subject:** | PLEASE DISREGARD EDR FOR ██████ |

██,

I apologize for the Emergency Disclosure Request for Parler user ██████. It appears that you have already sent the FBI subscriber results for this user. I sincerely apologize to bombard you with unnecessary emails, as you are already so busy!!

We appreciate all that you are doing and I'm greatly sorry.

Today, Parler continues to work closely with law enforcement and the Company has also implemented enhanced processes and procedures with the assistance of artificial intelligence, computerized filters, and manual reviews to better screen and remove incitement from the platform.[28]

## III. There Was Far More Incitement on Facebook and Twitter, Yet Only Parler Was De-Platformed

It is now well-documented and understood by honest observers that incitement occurred far more frequently on Big Tech platforms like Facebook and Twitter than Parler.[29]  An independent analysis by *Forbes* found that in over 200 charging documents filed by the Department of Justice in connection with the Capitol riot, Facebook was far and away the most utilized social media platform by rioters on January 6th.[30]  Of the charging documents analyzed, 73 included references to posts on Facebook, 24 referenced YouTube, and 20 referenced Instagram.[31]  In contrast, there were only eight referencing Parler.[32]  Our updated review and analysis of 270 charging documents collected by the George Washington University's

---

[27] *See* Ex. A at PARLER_00000016.

[28] *See* PARLER, GUIDELINES ENFORCEMENT PROCESS (Feb. 23, 2021), https://legal.parler.com/documents/Guidelines-Enforcement-Process.pdf.

[29] Emily DeCiccio, *Capitol Riot a 'Rocket Ship' for Twitter and Facebook, Ad Media Expert Says,* CNBC, Jan. 7, 2021, https://www.cnbc.com/2021/01/07/capitol-riot-a-rocket-ship-for-twitter-and-facebook-ad-media-expert-says.html.

[30] Thomas Brewster, *Sheryl Sandberg Downplayed Facebook's Role In The Capitol Hill Siege—Justice Department Files Tell A Very Different Story*, FORBES, Feb. 7, 2021, https://www.forbes.com/sites/thomasbrewster/2021/02/07/sheryl-sandberg-downplayed-facebooks-role-in-the-capitol-hill-siege-justice-department-files-tell-a-very-different-story/?sh=7b50268c10b3.

[31] *Id.*

[32] *Id.*



Program on Extremism reveals that over 54% of the charging documents reference Facebook, 13% reference Twitter, and nearly 13% reference Instagram, yet only about 5% reference Parler.[33]

According to one criminal indictment, an alleged militia known as the "Oath Keepers" used Facebook to plan its assault and post operational details about the strike on the Capitol.[34]   Another independent assessment found that militia members used Facebook to coordinate their strike on the Capitol and to communicate during the incursion.[35]   Notably, the Committee's Letter to Parler referenced a criminal complaint and arrest warrant against William McCall Calhoun, Jr. because of certain posts that he allegedly made on Parler.  However, in the very same affidavit that the Committee cites, there are far more incriminating and incendiary posts by that same user on Facebook, including a photo from outside the Capitol that the defendant allegedly posted on Facebook with the caption, "[w]e're going to get inside the Capitol before this ends," and another that read "[n]ow we're all going back armed for war and the Deep State is about to get run out of DC."[36]   Even in the aftermath of the Capitol riots, Facebook continued

---

[33] *See* CAPITOL HILL SIEGE, THE GEORGE WASHINGTON UNIVERSITY PROGRAM ON EXTREMISM, https://extremism.gwu.edu/ Capitol-Hill-Cases. Note that some charging documents apply to multiple individuals and new charging documents are added near-daily.

[34] *United States v. Caldwell*, First Superseding Indictment, No. 21-cr-28-APM (Feb. 19, 2021), https://www.justice.gov/usao-dc/case-multi-defendant/file/1369071/download.  For example, on December 25, 2020, one militia member allegedly posted: "We are all staying in DC near the Capitol we are at the Hilton garden inn but I think it's full. Dc [sic] is no guns. So mace and gas masks, some batons. If you have armor that's good." *Id.* ¶ 37.  In another Facebook message thread from December 31, 2020, another user posted, "we have a heavy QRF [quick reaction force] 10 Min out." *Id.* ¶ 46.

[35] *"This is Our House!" A Preliminary Assessment of the Capitol Hill Siege Participants*, THE GEORGE WASHINGTON UNIVERSITY PROGRAM ON EXTREMISM 24 (Mar. 2, 2021), https://extremism.gwu.edu/sites/g/files/zaxdzs2191/f/This-Is-Our-House.pdf.  The assessment cites to a criminal complaint alleging that the following posts were made on Facebook from inside the Capitol:

- "All members are in the tunnels under capital [sic] seal them in. Turn on gas";

- "Tom take that bitch over";

- "Tom all legislators are down in the Tunnels 3floors [sic] down";

- "Do like we had to do when I was in the core start tearing oit florrs [sic] go from top to bottom"; and

- "Go through back house chamber doors facing N left down hallway down steps."

*See United States v. Caldwell*, Affidavit in Support of Amended Criminal Complaint, No. 1:21-mj-00119 (Jan. 19, 2021), https://www.justice.gov/opa/page/file/1360991/download.

[36] *United States v. Calhoun*, Affidavit in Support of Criminal Complaint and Arrest Warrant, No. 1:21-mj-00151-CCB (Jan. 12, 2021), www.justice.gov/opa/page/file/1356036/download.  The Committee's Letter also singled out Parler for alleged posts referring to a "civil war" on the platform, but discussion of "a looming civil war" spread wildly on Facebook the day before rioters attacked the Capitol.  One private group on Facebook called the "2020 Civil War" included 1,400 members and allegedly "advised members who traveled to Washington, D.C., on where to meet up with like-minded Trump supporters and suggested that they bring concealed weapons with them."  *See* Georgia Wells, Ian Talley & Jeff Horwitz, *'Trump or War': How the Capitol Mob Mobilized on Social Media*, WALL STREET J., Jan. 7, 2021, https://www.wsj.com/articles/trump-or-war-how-the-capitol-mob-mobilized-on-social-media-11610069778 (internal quotes omitted).  One reporter posting on Twitter identified another Facebook group called "Red State Secession" that had 8,000 followers and was allegedly calling for a "Second American Revolution," and the reporter noted that Facebook's algorithm actually directed the reporter to join additional militias after visiting the group's Facebook page.  *See* Ryan Mac (@RMac18), TWITTER (Jan. 5, 2021, 1:16 PM), https://tinyurl.com/82ruyr7u.



to be flooded with posts calling for violent insurrection, including posts calling for the inauguration to be a "Tiananmen Square moment!!!" and other Facebook posts calling for "war."[37]

Twitter had similar problems.  One news report found that there were more than 20,800 Twitter accounts that included references to January 6th in the weeks leading up to the Capitol riots.[38]  Another found that the phrase "Hang Mike Pence" was among the top trending hashtags on Twitter for days after the riot,[39] and it had been tweeted more than 14,000 times on Friday, January 8, 2021 alone.[40]  In addition, users on YouTube livestreamed their rioting at the Capitol,[41] and one YouTube user reportedly ran ads through the YouTube platform and raised over $1,300 in donations from viewers that day.[42]

We note these problems not to suggest that Big Tech social media platforms are responsible for the violent acts perpetrated by criminals who used their platforms.  Rather, the Committee should recognize that curbing violent rhetoric and incitement is hard, and it is evident that even the largest and most well-resourced Big Tech companies have had significant difficulties doing it.  Moreover, any honest and good faith assessment of incitement on social media platforms in the days and weeks before January 6, 2021 should include all relevant platforms, especially those Big Tech platforms like Facebook and Twitter that the rioters used in far greater volume and frequency than Parler.[43]

## IV.    Parler Never Colluded With "the Russians"

Turning to the Committee's requests, the Committee's Letter references a misleading news story suggesting that Parler is either Russian-owned or colludes with Russian business interests to promote Russian disinformation, and the Committee has requested documents in connection with this strange conspiracy theory.[44]  As we have explained to Committee staff, the allegations are unfounded.[45]  We have

---

[37] Cat Zakrzewski, *The Technology 202: Posts calling for political violence continue to slip through Facebook's defenses*, WASHINGTON POST, Jan. 19, 2021, https://www.washingtonpost.com/politics/2021/01/19/technology-202-posts-calling-political-violence-continue-slip-through-facebook-defenses/. (quoting one post: "We need to organize our militia... Wars are won with guns… and when they silence your commander in chief you are in a war.").

[38] Jane Lytvynenko & Molly Hensley-Clancy, *The Rioters Who Took Over the Capitol Have Been Planning Online in the Open For Weeks*, BUZZFEED NEWS, Jan. 6, 2021, https://www.buzzfeednews.com/article/janelytvynenko/trump-rioters-planned-online.

[39] Jon Levine, *Twitter allows 'Hang Mike Pence' to trend hours after Trump ban*, NEW YORK POST, Jan. 9, 2021, https://nypost.com/2021/01/09/twitter-allows-hang-mike-pence-to-trend-hours-after-trump-ban/.

[40] *'Hang Mike Pence' trends on Twitter after platform suspends Trump for risk of 'incitement of violence'*, FOX5 WASHINGTON DC, Jan. 9, 2021, https://www.fox5dc.com/news/hang-mike-pence-trends-on-twitter-after-platform-suspends-trump-for-risk-of-incitement-of-violence.

[41] Julia Alexander, Jacob Kastrenakes, & Bijan Stephen, *How Facebook, Twitch, and YouTube are handling live streams of the Capitol mob attack*, THE VERGE, Jan. 6, 2021, https://www.theverge.com/2021/1/6/22217421/capitol-building-trump-mob-protest-live-stream-youtube-twitch-facebook.

[42] Kaitlyn Tiffany, *Trump's Tweets Were Never Just Tweets*, THE ATLANTIC, Jan. 6, 2021, https://www.theatlantic.com/technology/archive/2021/01/trump-coup-qanon-twitter/.

[43] The refusal to investigate Facebook and Twitter begs the question why this Committee singled out Parler alone.  *See* Ex. D (Letter from Ranking Member James Comer to Chairwoman Maloney, dated Jan. 25, 2021).

[44] For reference, see the Committee's Letter at 2 (Request Nos. 4 and 5).

[45] Notably, the allegation is contrary to a fundamental principal of the Company's to remove bots from the platform because they are "nuisances and are not conductive to productive and polite discourse."  *See* PARLER, COMMUNITY GUIDELINES (Feb. 14, 2021) (Principal #2), https://legal.parler.com/documents/guidelines.pdf.



investigated these claims and explained to Committee staff that there is no evident or relevant Russian connection to the Company, and we repeatedly requested that the Committee staff provide us with additional details that could facilitate a more targeted review to avoid a costly and unduly burdensome fishing expedition into the Company's files.  To date, however, Committee staff has declined to provide us with any additional information.[46]  As explained to Committee staff, Parler has no Russian owners, and the only business agreement with any Russian individual or entity that we have identified is an independent contractor agreement with a relative of the former CEO's wife who happens to be Russian.  The work itself involved low-level quality assurance testing of Parler's Android app and would not have involved access to user data.[47]

The Committee's Letter also refers to a misleading news article about a "Russian hosting service, DDoS-Guard," and suggests that Parler had an improper business relationship with that company.  This is false.  After Amazon unlawfully de-platformed Parler, the Company worked tirelessly to return online to service the platform's over 15 million users who were left without a viable alternative to Facebook or Twitter.  Unfortunately, due to the concerted disinformation campaign to scapegoat Parler for the January 6th riots, the Company struggled to find vendors willing to work with it.  Ultimately, Parler identified a Swiss cloud services vendor to host a static page—not the Parler platform or any user data—which Parler used only to provide information and status updates to users while the Company worked to restore service.[48]  A Scottish company, Cognitive Cloud LLP, which goes by the trade name "DDoS-Guard," was engaged as a vendor to the Swiss company to provide DDoS protection services to the static page.  Parler did not learn until later that the DDoS-Guard also operated in Russia.  The Swiss company's use of DDoS-Guard to provide DDoS protection services for the static page provided no security risk to Parler or its users.  Contrary to inaccurate media reports, DDoS-Guard never provided any hosting services to Parler and ***no user data ever passed through DDoS-Guard's servers***.  Moreover, once Parler identified and engaged a U.S.-based vendor to host the Company's current platform, it discontinued the temporary use of DDoS-Guard's services for its static page.

## V.   <u>Parler Never Offered President Trump an Ownership Interest in the Company</u>

Finally, the Committee's Letter references a news article that suggests Parler negotiated with individuals representing then-President Donald Trump and offered to provide the former president with an ownership interest in the Company.  This is also false.  Based on our review of documents and interviews of relevant individuals, we have identified no evidence that Parler ever negotiated with anyone

---

[46] We attempted to engage in good faith discussions with Committee staff on this matter multiple times, including on two telephone conferences that were held on February 26, 2021 and March 5, 2021.  At both of those telephone conferences, we asked the majority staff, in the spirit of cooperation and to expedite the identification of material of interest to the Committee, to share *any* specific information they had about the Committee's allegations of Russian ownership or influence at Parler.  The majority staff refused to provide any factual basis to justify this request or further inquiry into this topic.

[47] *See* Ex. E (redacted contractor agreement). This individual is hardly relevant to your inquiry and Parler has redacted the name and other identifying information to protect this individual from the consequences of such a disclosure, including intimidation, threats, and doxing that would very likely occur if personal information were released to the public.  We also understand that Parler had an account for translation services with Yandex, a Nasdaq-traded company headquartered in Russia and registered in the Netherlands, but we have not identified any contract with Yandex.

[48] *See* Ex. F (example of one of Parler's static webpages at www.parler.com that was hosted by the Swiss cloud service vendor).



to provide former President Donald Trump with a personal ownership interest in the Company.  We understand that the Trump Campaign purchased advertisements on Parler, as it did on numerous other platforms.  We also understand that there were early-stage conceptual discussions between Parler and the Trump Organization, which involved participation and oversight by legal counsel, concerning the possibility that the Trump Organization would acquire an ownership interest in Parler, but these discussions were terminated early-on before an agreement was reached.[49]  We note that the *Buzzfeed* article you cited actually quoted individuals on both sides of such discussions who claimed on the record that "[t]he president was never part of the discussions" and "[t]he discussions were never that substantive." To further put this matter to rest, the Trump Organization made clear to Parler that President Trump had no knowledge of, or involvement in, the discussions, and Parler engaged in the discussions with that understanding.[50]

\*   \*   \*

Parler thanks the Committee for the opportunity to respond to the Committee's Letter and thereby set the record straight about Big Tech's damaging disinformation campaign and anticompetitive efforts to de-platform the Company.  As explained above, Parler was poised to challenge Twitter's and Facebook's dominance of social media when the Big Tech giants colluded to scapegoat Parler for the tragic events at the Capitol on January 6th.[51]  However, as the only social media platform that stands, unbiased, for free and lawful speech; which refuses to commoditize users or their data for profit; and which rejects the use of dangerous algorithms to increase profits by driving "engagement through enragement," Parler should not be singled out for investigation, especially given the Company's significant and proactive partnership with the FBI before and after January 6th. We trust that the new information presented in this letter will prompt the Committee to reconsider its focus on Parler and instead investigate the unlawful and anticompetitive actions by Big Tech.  Only by holding Big Tech accountable for its anticompetitive conduct will it be possible to level the playing field for small start-up companies like Parler.  Parler looks forward to continuing its work towards what we assume is a shared goal:  providing Americans the option

---

[49] The media reported that there was a nondisclosure agreement in place between the Trump Organization and Parler covering these discussions.  In the interest of transparency, the Trump Organization has agreed not to enforce the NDA at this time so that Parler could provide the information in this response to the Committee.

[50] Despite the extraordinary circumstances created by the unjust and unlawful de-platforming of Parler, coupled with the logistical difficulties associated with collecting documents and information during a pandemic, the Company has worked expeditiously to respond to the Committee staff's aggressive timeline and requests.  We reviewed numerous documents within the Company's custody and control and attempted to speak with current and former employees, contractors, consultants and associates to respond as fulsomely as possible to the Committee's request.  We also attempted in good faith to interview Parler's former Chief Executive Officer John Matze, but Mr. Matze refused to cooperate with our request for an interview.  Parler reserves the right to supplement this response should new information come to light based on information that may have been in the sole custody or control of Mr. Matze or otherwise. *See also* Ex. C at ¶ 8 (". . . I engaged in discussions with representatives from the Trump Organization concerning the Trump Organization potentially obtaining a ownership interest in Parler, but those discussions never materialized beyond the concept stage. I never communicated directly with President Donald J. Trump, nor was I ever aware of any discussions concerning President Donald J. Trump obtaining an ownership interest in Parler.  The Trump Organization made it clear that President Donald J. Trump was not involved and had no knowledge of the discussions about the Trump Organization potentially obtaining an ownership interest in Parler.").

[51] Unfortunately, Big Tech's disinformation campaign against Parler has been working.  Apple removed Parler from its App Store on January 9, 2021, when Parler's app was the most downloaded app in the App Store, and as of the date of this response, Apple still has not allowed Parler back into the App Store.



of a virtual town square where the freedoms of speech, expression, and association are respected, and where the free marketplace of ideas can truly flourish.

Respectfully,

Michael S. Dry
Ephraim (Fry) Wernick

Enclosures

cc:     The Honorable James R. Comer, Ranking Member
        Committee on Oversight and Reform
        U.S. House of Representatives

# EXHIBIT E

Electronically Filed
3/22/2021 6:53 PM
Steven D. Grierson
CLERK OF THE COURT

1   James J. Pisanelli, Esq., Bar No. 4027
    JJP@pisanellibice.com
2   Todd L.  Bice, Esq., Bar No. 4534
    TLB@pisanellibice.com
3   Debra L. Spinelli, Esq., Bar No. 9695
    DLS@pisanellibice.com
4   Jordan T. Smith, Esq., Bar No. 12097
    JTS@pisanellibice.com
5   PISANELLI BICE PLLC
    400 South 7th Street, Suite 300
6   Las Vegas, Nevada  89101
    Telephone:   702.214.2100
7   Facsimile:   702.214.2101

8   *Attorneys for Plaintiff John Matze*

CASE NO: A-21-831556-B
Department 13

9                    **EIGHTH JUDICIAL DISTRICT COURT**

10                        **CLARK COUNTY, NEVADA**

| | |
|---|---|
| JOHN MATZE, an individual, | Case No.: |
| Plaintiff, | Dept. No.: |
| v. | **COMPLAINT** |
| PARLER LLC; NDMASCENDANT, LLC; JEFFREY WERNICK; MARK MECKLER; DAN BONGINO; REBEKAH MERCER; DOES I-X, and ROE CORPORATIONS XI-XX, | **(Request for Business Court Assignment Pursuant to EDCR 1.61(a)(2)(ii) and (iii))** |
| Defendants. | **(Exempt from Arbitration – Declaratory/Equitable Relief Requested)** |

18          For his complaint, Plaintiff John Matze hereby states and alleges as follows:

19                        **NATURE OF THE CASE**

20          1.        Plaintiff John Matze ("Matze") is the founder and former Chief Executive Officer

21   ("CEO") of the microblog and social network entity commonly known as Parler, which in French

22   means "to speak." Matze served as CEO from Parler's creation and until January 2021, when he

23   was abruptly ousted in violation of the law and public policy for endeavoring to preserve Parler's

24   commitment to free expression while combatting any misuse by violent extremists and domestic

25   terrorists in the wake of the January 6, 2021 attack at the U.S. Capitol.  Rather than protect Parler,

26   its other owner, Rebekah Mercer, sought to co-opt it as a symbol or as the "tip of the spear" for

27   her brand of conservatism, and plotted to force Matze out as CEO, Manager, and Member, and

28   steal his forty percent (40%) ownership interest.  Indeed, while Mercer readily acknowledged and

PISANELLI BICE
400 SOUTH 7TH STREET, SUITE 300
LAS VEGAS, NEVADA 89101

1

PISANELLI BICE
400 SOUTH 7TH STREET, SUITE 300
LAS VEGAS, NEVADA 89101

broadly boasted (including to business and political acquaintances) that Parler was an enterprise worth hundreds of millions of dollars, if not a billion dollars, she and others orchestrated a theft of Matze's 40% ownership, claiming that it could be taken from him for a mere $3.00.  This outlandish and arrogant theft, which occurred in Nevada, is the product of a conspiratorial agreement and actions taken both inside and outside of Nevada, that include intimidating threats and defamatory accusations of misconduct all designed to bully and deprive Matze of his valuable personal property and legal rights.  This scheme is epitomized by oppression, fraud, and malice, for which Matze is entitled to punitive damages trebling (at a minimum) the millions that he is owed in compensatory damages.

## THE PARTIES

## PARTIES AND RELATED PERSONS/ENTITIES

2.     Plaintiff John Matze is and was at all relevant times a resident of the State of Nevada.

3.     Defendant Parler LLC ("Parler") is and was at all relevant times a Nevada limited liability company, with its present headquarters and principal place of business at 209 South Stephanie Street, Suite B135, Henderson, Nevada.

4.     Defendant NDMascendant, LLC ("NDM"), upon information and belief, is and was at all relevant times a Delaware limited liability company with its present headquarters and principal place of business at 209 South Stephanie Street, Suite B135, Henderson, Nevada.  NDM is one of the two owners of Parler.

5.     Defendant Jeffrey Wernick ("Wernick"), upon information and belief, is and was at all relevant times a resident of California and in control (at least in part) over convertible debt in Parler.  As further set forth, Wernick was a party to, and an active participant in, the conspiracy to oust Matze from Parler, defame him, and steal his property.

6.     Defendant Mark Meckler ("Meckler"), upon information and belief, is and was at all relevant times a resident of Texas and now operates as the CEO of Parler from Parler's headquarters in Henderson, Nevada.  As further set forth, Meckler was a party to and an active participant in the conspiracy to oust Matze from Parler, defame him, and steal his property.

2

PISANELLI BICE
400 SOUTH 7TH STREET, SUITE 300
LAS VEGAS, NEVADA 89101

7.     Defendant Dan Bongino ("Bongino"), upon information and belief, is and was at all relevant times a resident of Florida, and holds himself out as an owner in Parler.  As set forth, Bongino was a party to, and an active participant in, the conspiracy to oust Matze from Parler, to defame him, and to steal his property.

8.     Defendant Rebekah Mercer ("Mercer"), upon information a belief, is and was at all relevant times a resident of New York, controls both NDM and Parler, and is responsible for arranging and directing the conspiracy and acts designed to oust Matze from Parler, defame him, and steal his property.

9.     The true names and capacities, whether individual, corporate, associate or otherwise, of Defendants DOES I through X, inclusive, and ROE CORPORATIONS XI through XX, inclusive, and each of them, are unknown to Matze at the present time, and Matze therefore sues said Defendants by such fictitious names.  Matze is informed and believes and thereon alleges that each of the Defendants designated herein as DOES I through X and ROE CORPORATIONS XI through XX, are responsible for the claims and damages alleged herein.  Once discovery has disclosed the true identities of such parties, Matze will ask leave of this Court to amend his Complaint to insert the true names and capacities of said Defendants DOES I though X, inclusive, and ROE CORPORATIONS XI through XX, inclusive, and to join such Defendants in this action.

## JURISDICTION AND VENUE

10.     Defendants have caused the acts and events herein within the State of Nevada, and are subject to the jurisdiction of this Court.  Venue is also proper in this Court.

11.     This matter is properly designated as a business court matter and assigned to the Business Docket under EDCR 1.61(a), as the claims alleged herein arise from business torts.

12.     Jurisdiction and venue are proper in this Court pursuant to NRS 14.065 and NRS 13.010.

**COMMON ALLEGATIONS**

**I.      THE FOUNDING OF PARLER**

13.      What ultimately would become the social media platform known as Parler was the brainchild of Matze, with the assistance of his college roommate.

14.      In 2017, Matze was introduced to Rebekah Mercer, and thereafter had discussions with her concerning politics and concepts surrounding free expression.

15.      Matze learned that Mercer had some affiliation with Breitbart News and, considering his knowledge and experience in coding, the two of them discussed the possibility of creating a community commenting platform that could be leased to Breitbart.  Mercer indicated she would provide financing, and supply Matze with business contacts and everything else he needed to build the commenting platform.

16.      While Matze worked on building the commenting platform, the business contacts and potential Breitbart relationship did not materialize.  But Matze had an additional idea:  Create a social media platform, one devoted to real principles of free expression and not owing to mainstream media.  Mercer indicated that she liked Matze's idea, and agreed to finance it.  The name "Parler" was later agreed upon.  In French, the word "parler" means "to speak."  The name "Parler" was available for a reasonable price, and would be consistent with the planned platform's objectives of promoting a free and open platform.  Matze promptly purchased the name "Parler."

17.      As an experienced coder, Matze personally created the iOS app for Parler, devoting thousands of hours to creating it.  The Parler app first became available via Apple's App Store in August, 2018.

18.      In May of 2018, Matze and Mercer formed Parler LLC, a Nevada limited liability company, with the assistance of legal counsel, Greenberg Traurig, in Las Vegas.

19.      At her direction, Mercer's ownership in Parler was initially intended to be secret, and thus held in the name of Defendant NDM.

20.      However, Matze alleges and believes that NDM simply served as Mercer's alter ego to mask her role in Parler.  Mercer herself believed that her involvement would serve as a distraction and would be potentially toxic to Parler's business objectives.

PISANELLI BICE
400 SOUTH 7TH STREET, SUITE 300
LAS VEGAS, NEVADA 89101

4

21. On May 19, 2020, the parties signed the "Operating Agreement" for Parler LLC.

22. The Operating Agreement provided that the purported Mercer entity, NDM, would be the 60% owner of all voting shares, and would have the power to appoint two managers. Under the Operating Agreement, Matze is the 40% owner with the power to appoint one manager, with the agreement specifying that Matze would be the original designated manager. On July, 23, 2020, Mercer designated Matthew Richardson as one of her designated managers. Later, Matze would be informed that Mercer had appointed J.D. Vance as her second manager, although Matze was never provided with confirming documentation. Vance did attend at least one manager's meeting purporting to hold himself out as a manager of Parler.

## II.   JEFFREY WERNICK'S INVOLVEMENT

23. In Matze's view, starting in the fall of 2019, Mercer seemed to lose interest in Parler and in providing additional funding for its operations. But as an early startup, Parler was certainly in need of financing and capital to continue to grow its business.

24. Accordingly, Matze began to explore alternatives. He was introduced to Defendant Wernick who held himself out as a person of some financial means and one interested in what Matze was doing with Parler. Wernick also held himself out as having experience in the social media realm. Wernick lead Matze to believe that he could provide valuable advice and guidance to Matze in growing Parler.

25. Wernick was never an officer nor an owner of Parler, although he was allowed to portray himself as Chief Operating Officer. In actuality, he was not. Instead, Wernick was a third-party consultant who ultimately was affiliated with entities that entered into convertible debt agreements with Parler. The first such entity was Kryptos Alpha, Limited ("Kryptos"), which Matze understood to be a California entity. Wernick informed Matze that he (Wernick) controlled Kryptos, but that several high-profile conservative media personalities had provided funding for Kryptos' convertible debt investment. Subsequently, another entity affiliated with Wernick, Dream Seekers Limited from Shanghai, China, provided convertible debt funding. Mercer ultimately approved the convertible debt arrangement.

PISANELLI BICE
400 SOUTH 7TH STREET, SUITE 300
LAS VEGAS, NEVADA 89101

PISANELLI BICE
400 SOUTH 7TH STREET, SUITE 300
LAS VEGAS, NEVADA 89101

26.     Wernick had no authority or power to act on behalf of Parler.  But in his role as an outside consultant, Wernick urged Matze, and later Mercer, to bring political commentator Dan Bongino into the company in a more substantive capacity.  Wernick insisted that Bongino could use his media presence and various media platforms and appearances in order to promote Parler, and that it was worth providing Bongino a stake in Parler for all of the promotion that Bongino would be able to accomplish.

27.     At present, Matze is unclear about the interests, if any, Bongino purports to have, as Matze was aware of documents and discussions about granting Bongino an ownership stake. Matze believes that Mercer avoided executing any of the ownership documents to allow her to later dispute that Bongino has any such interest.

28.     In the summer and fall of 2020, with Parler's popularity increasing, Mercer's interest in Parler and its operations returned and she once again began to regularly engage with Matze.

29.     One of the issues Matze and others, including Mercer, discussed was how to position Parler for its future.  Matze laid out three options.  The first focused on growing the accounts base and expansion.  This first strategy would require Parler's continued reliance upon "big tech" providers, like Amazon, because that was the only means by which to scale up sufficient operations to handle additional accounts and functions.  The second alternative was to maintain its current scale, but provide some additional features to the platform.  The third option centered on disassociation from "big tech" like Amazon, and diversify, a prospect that was not possible if growth was desired.

30.     Everyone agreed that the growth option was preferable, despite the required continued reliance upon companies like Amazon as the hosting platform.  Absent a large scale cloud provider, such as Amazon, with sufficient scale and reach, quick exponential further growth was not a viable option.  Indeed, Wernick and Bongino were pushing their insistence that the soon-to-be former President Donald Trump would be joining the Parler platform after the inauguration. To accommodate the expected expanded number of accounts, immediate enhanced scale capacity would be a necessity.

PISANELLI BICE
400 SOUTH 7TH STREET, SUITE 300
LAS VEGAS, NEVADA 89101

31.     As Mercer would repeatedly represent to Matze, she believed that Parler had become, and would continue to be, quite successful and valuable.  Confirming that view, Mercer proposed allowing a friend to invest in Parler at a $200 million valuation, a level that she conceded was heavily discounted as an accommodation to her friend and to better protect her interest from future dilution.  But, outside of this self-interested suggestion, Mercer stated that she was not interested in any transaction with a valuation of less than $500 million.  She and Matze continually discussed that the enterprise should have a valuation of at least one billion dollars.  In fact, Parler recently reiterated the one-billion-dollar valuation in ongoing litigation.

32.     In November, 2020, with Mercer's interest renewed in both Parler and its value, her involvement in Parler also became public.  A friend of Mercer's revealed her involvement to the Wall Street Journal.  In response, Mercer issued her own statement on Parler, confirming what she and Matze had created with Parler:



33.     With Parler's increasing popularity and growth, Matze was focused on additional expansion.  Toward that end, Matze and Mercer discussed the need to reorganize the company into a C Corporation, which would provide a more sustainable platform for financing and a path toward a Series A Preferred Stock financing. Matze and Mercer began to have disagreements concerning the dilutive effect of new funds inserted into Parler.  Matze began to realize that Mercer was claiming the exact same investment funds as simultaneously being both her equity

and debt owed to her.  While Mercer's NDM entity was listed as owning 60% of Parler, there is no evidence that NDM actually put anything into Parler.  Rather, the funds that Mercer and/or her family provided were later characterized as personal loans that must be repaid by Parler.  In short, the very same dollars that were the supposed 60% equity stake were also being claimed as debt.

34.     By December 2020, Mercer's relationship with Matze became more antagonistic, with Matze questioning efforts by Mercer to claim that Matze's 40% should be subject to dilution for any additional financing that came in to Parler but that her 60% should be preserved.

35.     Despite these discussions, both Matze and Mercer were optimistic and enthusiastic about Parler and its future.  Its growth had skyrocketed, and by the fall of 2020, it was earning substantial advertising revenues.  Indeed, by the beginning of 2021, the Parler app was one of the most downloaded apps in the Apple Store, even reaching the status of the number one downloaded app at times.

### III.     THE SCHEME TO CHEAT MATZE

36.     But Mercer's now-public involvement in Parler also threatened to add fuel to the already toxic political environment.  In the face of the January 6, 2021 events at the U.S. Capitol, multiple media sources began blaming Parler and, not coincidentally, citing Mercer's role in the company.  In fact, it was Matze's understanding and belief – and media sources also referenced – that Mercer was playing a substantial role in funding legal challenges to contest the outcome of the presidential election.

37.     On January 9, 2021, Apple suspended Parler's app from the App Store, claiming Parler had not done enough to preclude extreme or violent rhetoric on the platform. On January 11, 2021, Amazon web services suspended service to Parler citing similar concerns. Parler maintains that the actions of Apple, Amazon, and others in refusing to do business with Parler was the result of their desire to appease and avoid media inquiries, monopolistic practices, or were politically motivated rather than the reasons proffered.

38.     In the face of threats from Apple and Amazon to suspend services to Parler, Matze proposed to implement industry-wide satisfactory moderation policies and procedures that would preserve the right of free expression for all points of view, but would preclude content that is

PISANELLI BICE
400 SOUTH 7TH STREET, SUITE 300
LAS VEGAS, NEVADA 89101

1   inciting violence and acts of domestic terrorism.  To address what Matze viewed as improper

2   threats from Apple and Amazon, Matze proposed to Mercer and her representative, Matthew

3   Richardson ("Richardson"), that Parler bar any identifiable extremist groups like QAnon and neo

4   Nazis from Parler's platform, i.e., inciting violence and acts of domestic terrorism.   Matze's

5   proposal was met with dead silence, which he took to be a rejection of his proposal.

6       39.    Mercer's refusal to heed Matze's suggestion about reasonable moderation policies –

7   without impacting the substance and viewpoint of expression – became more alarming for Matze

8   during a marketing meeting where an individual named Mark Meckler suddenly made an

9   appearance for the first time, ostensibly acting on behalf of Mercer.  It became apparent to Matze

10  that Meckler's efforts were not to grow Parler as a free expression platform, but instead to redirect

11  it into what Meckler called as the "tip of the conservative spear" for a brand of conservatism in

12  keeping with Mercer's preferences.  Simply put, Parler was now being hijacked to advance the

13  personal political interests and personal advantages of Defendants rather than serve as the free

14  expression platform as originally conceived.

15      40.    Mercer's and the other Defendants' personal desires to drive the company in the

16  direction of their own personal political branding and enrichment were in conflict with, and

17  detrimental to, the company's interests. Pushing Parler in the direction of their personal political

18  brands – as opposed to an open free expression platform – would only create further alienation

19  and loss of business.   Defendants' actions and inactions conferred personal benefits upon

20  themselves that were not shared by the company.

21      41.    Matze became concerned Mercer and her allies would begin to strong-arm him out

22  of the company because of Matze's competing vision of the company's direction including, in

23  part, due to his objections to allowing violent extremists to abuse Parler's platform. Subsequent

24  events confirmed Matze's fears about Mercer's scheme to kick him out of the company that he

25  founded.  On January 28, 2020, Wernick, at the clear and apparent direction by Mercer, contacted

26  Matze and threatened him with financial ruin if he did not immediately sign a release of claims

27  and resign.  Wernick threatened Matze that he would be buried under an avalanche of legal claims

28  and expenses if he dared defy Mercer.  Wernick further warned Matze to not consult Matze's own

PISANELLI BICE
400 SOUTH 7TH STREET, SUITE 300
LAS VEGAS, NEVADA 89101

PISANELLI BICE
400 SOUTH 7TH STREET, SUITE 300
LAS VEGAS, NEVADA 89101

legal counsel, and threatened that he would be ruined if he did so.  When Matze refused to relinquish his rights, and in fact consulted his legal counsel, he was abruptly and unceremoniously fired the next day through Meckler without reason, who also asserted that he (Meckler) had been installed as a manager of Parler by Mercer.  Meckler further declared that he was now acting CEO of Parler.

42.    Through Matze's firing, Defendants financially benefitted in their personal capacities, including dividing up the spoils of their theft of Matze's 40% ownership.

43.    After Matze refused to go away quietly or genuflect to the demands of the billionaires (as insinuated by Wernick), the Defendants set in motion a plan to defame Matze's business reputation, claiming that he had been fired for misconduct and that he had breached his obligations as a manager.  This was all false, and the Defendants knew it was false, but they knew it would advance their scheme and agreement to try and bully Matze into giving up what they, themselves, acknowledged to be multi-million dollar rights.

44.    Defendants enlisted what they considered to be their public relations "bulldog," Bongino, to lead the attack on Matze's personal and professional reputation. Indeed, as part of the scheme, on February 3, 2020, Bongino published an unhinged rant claiming that he was "pissed" and accused Matze of lying and further insinuating that Matze's ouster was warranted, referring to himself and two others as the purported owners.  Bongino did not specify just who these other owners purported to be.   The gist of Bongino's sting accused Matze of impropriety and misconduct in his business. Matze believes and alleges that this statement was in furtherance of a scheme to deprive him of his valuable property, and was at the direction and involvement of the other Defendants.

45.    Now, having fabricated false claims of "misconduct," the conspirators then claimed that the Parler Operating Agreement allowed the forced sale and purchase of Matze's 40% ownership stake.  Demonstrating the depravity of their arrogance and tactics, Mercer, through Meckler and Richardson, claimed that they had determined that the "fair market value" of Matze's 40% interest to be a mere $3.00.  Thus, Defendants took Matze's property and smeared

1   his name and asserted that his sole entitlement is to $3.00. That is the true nature of these

2   Defendants.

3        46.  Further underscoring that they knew their attacks on Matze were false and

4   malicious, Parler has now largely endeavored to follow Matze's technological AI and server plans

5   to get back online and to screen for extreme content. For example, before his wrongful ouster,

6   Matze had secured a hosting platform for Parler to return to service. As of today, that is the exact

7   platform Parler is using. Similarly, Matze had set up an industry-compliant moderating process

8   which Parler has, in fact, employed with its relaunch but without the careful attention to detail of

9   Matze. However, as Meckler lacked the technical know-how to actually run such a social media

10  platform – and his real role was to simply push a political agenda – the implementation was

11  beyond lacking. In other words, the very technological pathway for Parler's future operations as

12  conceived by Matze is, in fact, what Parler is presently doing, albeit with poor implementation,

13  despite the lies having been told about Matze and scapegoating him in order to steal his

14  40% ownership.

### **FIRST CAUSE OF ACTION**

### **(Breach of Contract – the Operating Agreement)**

### **(Parler and NDM)**

18       47.  Matze repeats, realleges, and incorporates all of the allegations contained in the

19  preceding and subsequent paragraphs as though fully set forth herein.

20       48.  The Operating Agreement constitutes a valid, binding, and enforceable contract.

21       49.  At all times relevant hereto, Matze fulfilled his contractual obligations, or was

22  excused from performance under the same.

23       50.  As set forth herein, Parler and NDM materially breached their obligations without

24  justification or excuse.

25       51.  As a direct and proximate result, Matze has suffered and will continue to suffer

26  damages in an amount to be proven at trial, but in any event in excess of $15,000, plus

27  prejudgment interest.

28

PISANELLI BICE
400 SOUTH 7TH STREET, SUITE 300
LAS VEGAS, NEVADA 89101

PISANELLI BICE
400 SOUTH 7TH STREET, SUITE 300
LAS VEGAS, NEVADA 89101

52.     Matze has been forced to retain counsel to address the conduct complained of herein and is therefore entitled to all of his attorneys' fees and costs associated with bringing this action.

## SECOND CAUSE OF ACTION

### (Breach of Implied Covenant of Good Faith and Fair Dealing – the Operating Agreement)

### (Parler and NDM)

53.     Matze repeats, realleges, and incorporates all of the allegations contained in the preceding and subsequent paragraphs as though fully set forth herein.

54.     In all contractual agreements in Nevada, there is an implied covenant of good faith and fair dealing.

55.     As set forth herein, Parler and NDM breached the implied covenant of good faith and fair dealing.

56.     Matze's reasonable and specific expectations under the Operating Agreement were thus denied.

57.     As a direct and proximate result, Matze has suffered and will continue to suffer damages in an amount to be proven at trial, but in any event in excess of $15,000, plus prejudgment interest.

58.     Matze has been forced to retain counsel to address the conduct complained of herein and is therefore entitled to all of his attorneys' fees and costs associated with bringing this action.

## THIRD CAUSE OF ACTION

### (Conspiracy to Induce Breach of Contract)

### (All Defendants)

59.     Matze hereby repeats, realleges, and incorporates all of the allegations contained in the preceding and subsequent paragraphs as though fully set forth herein.

60.     The Operating Agreement constitutes a valid, binding, and enforceable contract.

61.     Defendants were individually and collectively aware of the Operating Agreement.

62.     These Defendants are each capable of making agreements.

63.     Defendants agreed, acted in concert, conspired, and intended to accomplish the unlawful objective of inducing a breach of the Operating Agreement.

64.     Defendants intended to harm Matze.

65.     Defendants individually and collectively have taken overt acts in furtherance of their conspiratorial and unlawful objectives without any justifiable excuse or privilege.

66.     As a direct and proximate result of their civil conspiracy, Matze has suffered damages in an amount to be proven at trial but in excess of $15,000.

67.     These Defendants' conduct was done with malice, fraud and oppression, thereby entitling Matze to an award of punitive damages from Defendants for the purpose of deterring them and others similarly situated from engaging in like conduct in the future.

68.     Matze has been forced to retain counsel to address the conduct complained of herein and is therefore entitled to all of his attorneys' fees and costs associated with bringing this action.

## **FOURTH CAUSE OF ACTION**

### **(Conversion)**

### **(Wernick, Meckler, Bongino and Mercer)**

69.     Matze repeats, realleges, and incorporates all of the allegations contained in the preceding and subsequent paragraphs as though fully set forth herein.

70.     Wernick, Meckler, Bongino and Mercer committed a distinct act of dominion wrongly exerted over Matze's personal property.

71.     The act was in denial of, or inconsistent with, Matze's title or rights therein.

72.     The act was in derogation, exclusion, or defiance of Matze's title or rights in the personal property.

73.     As a direct and proximate result, Matze has suffered and will continue to suffer damages in an amount to be proven at trial, but in any event in excess of $15,000, plus prejudgment interest.

74.     In committing the acts herein above alleged, these Defendants are guilty of oppression, fraud, and malice toward Matze.  Therefore, in addition to general damages, Matze is

PISANELLI BICE
400 SOUTH 7TH STREET, SUITE 300
LAS VEGAS, NEVADA 89101

1  entitled to recover punitive damages from Defendants for the purpose of deterring them and

2  others similarly situated from engaging in like conduct in the future

3      75.    Matze has been forced to retain counsel to address the conduct complained of

4  herein and is therefore entitled to all of his attorneys' fees and costs associated with bringing this

5  action.

6  **FIFTH CAUSE OF ACTION**

7  **(Civil Conspiracy to Commit Conversion)**

8  **(Wernick, Meckler, Bongino and Mercer)**

9      76.    Matze hereby repeats, realleges, and incorporates all of the allegations contained in

10  the preceding and subsequent paragraphs as though fully set forth herein.

11      77.    Wernick, Meckler, Bongino and Mercer are each capable of making agreements.

12      78.    They agreed, acted in concert, conspired, and intended to accomplish the unlawful

13  objective of converting Matze's personal property.

14      79.    They intended to harm Matze.

15      80.    As a direct and proximate result of their civil conspiracy, Matze has suffered

16  damages in an amount to be proven at trial but in excess of $15,000.

17      81.    In committing the acts herein above alleged, these Defendants are guilty of

18  oppression, fraud, and malice toward Matze. Therefore, in addition to general damages, Matze is

19  entitled to recover punitive damages from Defendants for the purpose of deterring them and

20  others similarly situated from engaging in like conduct in the future.

21      82.    Matze has been forced to retain counsel to address the conduct complained of

22  herein and is therefore entitled to all of his attorneys' fees and costs associated with bringing this

23  action.

24  **SIXTH CAUSE OF ACTION**

25  **(Tortious Discharge in Violation of Public Policy)**

26  **(Parler)**

27      83.    Matze repeats, realleges, and incorporates all of the allegations contained in the

28  preceding and subsequent paragraphs as though fully set forth herein.

PISANELLI BICE
400 SOUTH 7TH STREET, SUITE 300
LAS VEGAS, NEVADA 89101

84.     As set forth, Parler retaliated and terminated Matze for reasons that violate the law and Nevada's strong public policy, including objecting to policies and refusing to engage in conduct that violates public policy as well as for engaging in conduct which Nevada's law and public policy favors.

85.     As a direct and proximate result of Parler's tortious discharge, Matze has suffered damages in an amount to be proven at trial but in excess of $15,000.

86.     Parler's conduct, which was carried out and/or ratified by managerial level agents and employees, was done with malice, fraud and oppression, thereby entitling Matze to an award of punitive damages for the purpose of deterring them and others similarly situated from engaging in like conduct in the future.

87.     In committing the acts herein above alleged, these Defendants are guilty of oppression, fraud, and malice toward Matze. Therefore, in addition to general damages, Matze is entitled to recover punitive damages from Defendants for the purpose of deterring them and others similarly situated from engaging in like conduct in the future.

88.     Matze has been forced to retain counsel to address the conduct complained of herein and is therefore entitled to all of his attorneys' fees and costs associated with bringing this action.

### SEVENTH CAUSE OF ACTION

### (Civil Conspiracy to Commit Tortious Discharge in Violation of Public Policy)

### (All Defendants)

89.     Matze hereby repeats, realleges, and incorporates all of the allegations contained in the preceding and subsequent paragraphs as though fully set forth herein.

90.     Defendants are each capable of making agreements.

91.     Defendants agreed, acted in concert, conspired, and intended to accomplish the unlawful objective of effectuating Matze's tortious discharge in violation of public policy.

92.     Defendants intended to harm Matze.

93.     As a direct and proximate result of their civil conspiracy, Matze has suffered damages in an amount to be proven at trial but in excess of $15,000.

PISANELLI BICE
400 SOUTH 7TH STREET, SUITE 300
LAS VEGAS, NEVADA 89101

94.    In committing the acts herein above alleged, these Defendants are guilty of oppression, fraud, and malice toward Matze. Therefore, in addition to general damages, Matze is entitled to recover punitive damages from Defendants for the purpose of deterring them and others similarly situated from engaging in like conduct in the future.

95.    Matze has been forced to retain counsel to address the conduct complained of herein and is therefore entitled to all of his attorneys' fees and costs associated with bringing this action.

## EIGHTH CAUSE OF ACTION

### (Defamation/Slander Per Se)

### (All Defendants)

96.    Matze hereby repeats, realleges, and incorporates all of the allegations contained in the preceding and subsequent paragraphs as though fully set forth herein.

97.    In an attempt to cover their tracks and distract from their improper activities, Defendants undertook and waged a public relations campaign to smear and spread lies about Matze, including making false assertions that Matze was guilty of misconduct and lying about the reason for his termination.

98.    Defendants' claims of misconduct and dishonesty as to Matze were (1) false and defamatory; (2) published to a third person or party for the express intent of republication to a worldwide audience; (3) maliciously published knowing their falsity and/or in reckless disregard of the truth thereof; (4) intended to and did in fact harm Matze's reputation and good name in his trade, business, profession, and customary corporate office; and (5) were of such a nature that the law presumes significant economic damages.

99.    Defendants' actions were unprivileged.

100.    As a direct and proximate result of Defendants' defamation, Matze has suffered damages in an amount to be proven at trial but in excess of $15,000. Moreover, Matze is entitled to the imposition of punitive damages against Defendants and such punitive damages are not subject to any statutory limitations under NRS 42.005.

PISANELLI BICE
400 SOUTH 7TH STREET, SUITE 300
LAS VEGAS, NEVADA 89101

101.   Matze has been forced to retain counsel to address the conduct complained of herein and is therefore entitled to all of his attorneys' fees and costs associated with bringing this action.

## NINTH CAUSE OF ACTION

### (Civil Conspiracy to Commit Defamation/Slander Per Se)

### (All Defendants)

102.   Matze hereby repeats, realleges, and incorporates all of the allegations contained in the preceding and subsequent paragraphs as though fully set forth herein.

103.   Defendants are each capable of making agreements.

104.   Defendants agreed, acted in concert, conspired, and intended to accomplish the unlawful objective of defaming Matze.

105.   Defendants intended to harm Matze.

106.   As a direct and proximate result of this civil conspiracy, Matze has suffered damages in an amount to be proven at trial but in excess of $15,000.  Moreover, Matze is entitled to the imposition of punitive damages against each Defendant, as such punitive damages are not subject to any statutory limitation under NRS 42.005.

107.   Matze has been forced to retain counsel to address the conduct complained of herein and is therefore entitled to all of his attorneys' fees and costs associated with bringing this action.

## TENTH CAUSE OF ACTION

### (Declaratory Relief)

### (Parler)

108.   Matze hereby repeats, realleges and incorporates all the allegations contained in the preceding and subsequent paragraphs as though fully set forth herein.

109.   NRS Chapter 30 provides that this Court shall have the power to declare the "rights, power, status and other legal relations" to any person interested in a written contract whose rights or status are in dispute.  NRS 30.030-040.

110.    Pursuant to the terms of the Operating Agreement, Matze is entitled to indemnity as well as advancement of legal fees for Matze's legal representation for actions growing out of his role as CEO, Manager or Member of Parler.

111.    Matze has retained legal counsel in ongoing reviews and requests for information from governmental bodies.

112.    The current management of Parler has thus far asserted that it disputes Matze's entitlement to advancement.

113.    Accordingly, a justiciable controversy has arisen between the parties whose interests are adverse, and the dispute is ripe for adjudication.

114.    Declaratory relief pursuant to NRS 30.040 is necessary and appropriate to declare and establish Matze's rights to advancement under the Operating Agreement as well as under the law.

115.    Matze has been forced to retain counsel to address the conduct complained of herein, and is therefore entitled to all of his attorneys' fees and costs associated with bringing this action, including any motion to compel advancement.

## **PRAYER FOR RELIEF**

WHEREFORE, Matze prays for judgment as follows:

1.    For temporary and permanent injunctive relief;

2.    For compensatory and special damages, including attorneys' fees, in an amount in excess of Fifteen Thousand Dollars ($15,000.00) to be determined at trial;

3.    For punitive damages in an amount to be determined at trial;

4.    For prejudgment and post-judgment interest at the highest rate permitted by law;

PISANELLI BICE
400 SOUTH 7TH STREET, SUITE 300
LAS VEGAS, NEVADA 89101

5.      For attorneys' fees and costs of suit herein, as allowed by law, in an amount to be determined; and

6.      Any additional relief this Court deems just and proper.

DATED this 22nd day of March, 2021.

PISANELLI BICE PLLC

By:   */s/ Todd L. Bice*
          James J. Pisanelli, Esq., Bar No. 4027
          Todd L.  Bice, Esq., Bar No. 4534
          Debra L. Spinelli, Esq., Bar No. 9695
          Jordan T. Smith, Esq., Bar No. 12097
          400 South 7th Street, Suite 300
          Las Vegas, Nevada 89101

*Attorneys for Plaintiff John Matze*

# EXHIBIT F



**Angelo J. Calfo**
angeloc@calfoeakes.com
(206) 407-2210

April 7, 2021

***Via Email***

Ambika Kumar Doran
Davis Wright Tremaine LLP
920 Fifth Avenue
Seattle, WA 98104-1610
ambikadoran@dwt.com

> Re:   *Parler v. Amazon Web Services, Inc. and Amazon.com, Inc. ("Amazon")*: Case No.
>       21-cv-00270-BJR—Amazon's Request for Jurisdictional Discovery

Dear Ambika:

This letter responds to Amazon's letter dated March 30, 2021, "requesting information necessary for Amazon to evaluate [Parler's] request that we stipulate to remand of this case[.]" Amazon's request for discovery to determine whether there is diversity jurisdiction is nothing short of an admission that Amazon currently has no basis for the allegations it made in its removal notice in which Amazon claimed that jurisdiction existed at the time the action was filed. *Grupo Dataflux v. Atlas Global Group, L.P.*, 541 U.S. 567, 570 (2004). Even though you have acknowledged to us that the allegations supporting diversity jurisdiction set forth in your removal notice are inaccurate, you have done nothing to correct the false allegation about Parler's citizenship to the Court. Instead, you have left intact your false assertion in your pleading, which is the only basis on which the parties are currently in federal court. Furthermore, you are now trying to manufacture some other speculative theory for diversity jurisdiction that you have no reasonable basis to believe exists. Regrettably, you are doing all this in order to *retroactively* justify a removal notice that Amazon knowingly based on a false premise.

Pursuant to LCR 101(f), Amazon was required to "identify the citizenship of the owners/partners/members of those entities to establish the court's jurisdiction" in its removal notice. Yet Amazon failed to identify the citizenship of a single member of Parler. As addressed in more detail in my contemporaneous letter regarding the Rule 11 violations inherent in your removal notice, Amazon's statement that Parler was a "citizen of Nevada" was not supported by either law or fact. Amazon failed to conduct a reasonable inquiry into the basis of that allegation

Ambika Kumar Doran
April 7, 2021
Page 2

and, indeed, had to have known that the allegation was false.  Amazon cannot leverage its false filing in the removal notice to obtain jurisdictional discovery.

In addition, even if Amazon had not made false allegations in its removal notice, it would still be improper for Amazon to obtain jurisdictional discovery.  There is a strong presumption against removal jurisdiction and the defendant always bears the burden of establishing that removal is proper.  *See, e.g.*, *Kanter v. Warner-Lambert Co.*, 265 F.3d 853, 857 (9th Cir. 2001) (granting motion to remand after finding that defendants failed to meet their burden of showing complete diversity when they merely alleged the residence, and not the citizenship, of the parties in their notice of removal).  Indeed, in *LaPointe v. 3M Co.*, No. C18-5437 RBL, 2018 WL 5242859, at *1 (W.D. Wash. Oct. 22, 2018), the Court stated: "Federal jurisdiction must be rejected if there is *any doubt* as to the right of removal in the first instance."  *Id.* (emphasis added).  In *LaPointe*, Judge Leighton denied defendant's request for jurisdictional discovery, and instead remanded the case to Pierce County Superior Court, noting:

> [W]hen there is such uncertainty, a Federal District Court does not have diversity jurisdiction.  If and to the extent Local Rule 101 holds that "doing the best you can" to determine citizenship is sufficient, it is simply not correct.  The Supreme Court, Congress and countless other courts have for years clearly spelled out what to do when it is not clear that there is diversity jurisdiction: remand the case for lack of diversity jurisdiction.

*Id.*  Judge Leighton's approach is apt here as well.  This is because Amazon has alleged that Parler is a citizen of Nevada, and that there is complete diversity of the parties, without any basis in law or fact, and because Amazon is not presently able to carry its burden to show that diversity jurisdiction exists.

To that end, the Ninth Circuit has held that jurisdictional discovery may be denied when it is "based on little more than a hunch that it might yield jurisdictionally relevant facts." *Boschetto v. Hansing*, 539 F.3d 1011, 1020 (9th Cir. 2008); *see also Butcher's Union Local No. 498 v. SDC Inv., Inc.*, 788 F.2d 535, 540 (9th Cir. 1986) (holding that district court did not abuse its discretion by refusing jurisdictional discovery where the plaintiffs "state only that they 'believe' discovery will enable them to demonstrate sufficient California business contacts to establish the court's personal jurisdiction").  Other courts have followed suit in denying jurisdictional discovery when defendants have failed to make a colorable showing that jurisdiction exists.  *See, e.g.*, *Pool v. F. Hoffman-La Roche, Ltd.*, 386 F. Supp. 3d 1202, 1221 (N.D. Cal. 2019) (denying jurisdictional discovery noting that defendants failed to meet their burden and that they should have had jurisdictional facts in their possession, custody, or control); *Houston v. Bank of Am., N.A.*, No. CV 14-02786 MMM AJWX, 2014 WL 2958216, at *5 (C.D. Cal. June 25, 2014); *Upper Deck International B.V. v. Upper Deck Co.*, No. 11cv1741–LAB (CAB), 2012 WL 1713453, *9 n. 6 (S.D.

Ambika Kumar Doran
April 7, 2021
Page 3


Cal. May 15, 2012) (denying a request for jurisdictional discovery because "[the defendant UDC] has nothing other than blind hope that additional, helpful jurisdictional facts will turn up, and that's an inadequate basis for allowing jurisdictional discovery").

Some other courts have permitted a remand to allow the defendant to develop a *prima facie* showing of subject-matter jurisdiction-related facts that would allow a future removal. *Harris Rutsky & Co. Ins. Servs. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1135 (9th Cir. 2003); *see also Abrego v. Dow Chem. Co.*, 443 F.3d 676, 691 (9th Cir. 2006) (noting that "later-discovered facts may prompt a second attempt at removal."); *Harris v. Bankers Life & Cas. Co.*, 425 F.3d 689, 698 (9th Cir. 2005) ("By assuring that removal occurs once the jurisdictional facts supporting removal are evident, we also ensure respect for the jurisdiction of state courts.").  Thus, if Amazon wants discovery, it should stipulate to remand the case to state court and conduct any discovery it wishes in that forum.  Of course, Amazon might well be refusing to stipulate to a remand—even though it presently has *no* basis to assert diversity jurisdiction—in order to stay in federal court pursuant to the questionable snap removal procedure it deployed earlier in this litigation.

Undergirding Amazon's folly in this dispute is its misapprehension of who bears the burden of proving diversity.  Amazon's March 30, 2021, letter ignores that it is *Amazon's*, and not Parler's, burden to demonstrate by a preponderance of evidence that diversity jurisdiction exists.  Amazon's burden in this regard existed at the time its removal notice was filed, and it still exists presently.  Right now, all Amazon has is "a blind hope that additional, helpful jurisdictional facts will turn up." *Upper Deck International*, 2012 WL 1713453, *9 n. 6.  Subjecting the jurisdiction of the federal and state courts to such an aspirational fishing expedition is injudicious and inappropriate—and impermissible.  *See, e.g., Harris*, 425 F.3d at 698.  Your refusal to acknowledge Amazon's burden is never more apparent than in your criticism of Parler's motion for remand because it lacks "the information necessary to determine the nature of the trust, the role of the trustees and the residence [sic] of the beneficiaries," and where you claim that Amazon has "no way to evaluate the 'business reality' of the trust you claim destroys diversity jurisdiction."  These assertions turn the burden of proof on its head.  We will not reward Amazon for making false statements in its removal notice by providing improper discovery now.  Amazon is of course free to seek such information once the case returns to King County Superior Court.

The case you cite in your letter, *Daisy Tr. v. JP Morgan Chase Bank*, No. 213CV00966RCJVCF, 2016 WL 7107762, (D. Nev. Dec. 6, 2016), is inapposite and does not support your request for jurisdictional discovery.  In *Daisy Tr.*, neither party contested that diversity jurisdiction existed (once the Court ruled on the motion for reconsideration that was the central issue in the decision).  Defendant alleged jurisdiction based on "information and belief" as to the plaintiff-trust's citizenship, and the plaintiff did not contest that allegation.  As a result, it was assumed by the parties that the Court had jurisdiction.  However, the Court, on its own motion,

Ambika Kumar Doran
April 7, 2021
Page 4

ordered jurisdictional discovery to ensure that jurisdiction in fact existed as plaintiff conceded. Here, in contrast, the issue is not whether the case should continue in federal court based on the parties' agreement that jurisdiction exists.  Rather, it is acknowledged by both parties that the jurisdictional allegations in the removal notice are false both as a legal and factual matter.  The Court's response should not be to grant leave to Amazon to search for another basis for jurisdiction not alleged in its removal notice.  Rather, the Court should remand the case to state court as it is apparent that Amazon cannot carry its burden of proof.  *See Daisy Tr.* at *3 (citing *Gaus v. Mils*, Inc. 980 F.2d 564, 566 (9th Cir. 1992) ("[T]he defendant always has the burden of establishing that removal is proper.")).  After ordering remand, if Amazon identifies another basis for removal, it is free to file a second removal notice at that time.  *See Harris,* 425 F.3d at 698.  On that score, however, we refer you to Parler's corporate disclosure statement, which demonstrates that Parler is a Delaware citizen for diversity purposes as detailed in our amended motion for remand.

As there is no basis for Amazon's request for jurisdictional discovery, and Amazon has not met its initial burden for establishing its entitlement to removal, we again request that Amazon stipulate to an order remanding the case to King County Superior Court.

Sincerely,

CALFO EAKES LLP

Angelo J. Calfo

cc:    Alonzo B. Wickers IV

# EXHIBIT G



**Angelo J. Calfo**
angeloc@calfoeakes.com
(206) 407-2210

April 7, 2021

***Via Email***

Ambika Kumar Doran
Davis Wright Tremaine LLP
920 Fifth Avenue
Seattle, WA 98104-1610
ambikadoran@dwt.com

      Re:    *Parler v. Amazon Web Services, Inc. et al.*: Case No. 21-cv-00270-BJR—
               Rule 11 Letter

Dear Ambika:

    We have exchanged several emails regarding the improper filing of a notice of removal by Amazon.com, Inc. and Amazon Web Services, Inc. (collectively, "Amazon"), which resulted in Parler's state court complaint—which only contains state law claims against forum defendants—being removed to federal court without a good faith basis.

    In those prior emails, we asked Amazon to describe the investigation it conducted into the following legal and factual assertions in its March 3, 2021 notice of removal: "Parler is a Nevada limited liability corporation with its principal place of business in Henderson, Nevada. . . Parler therefore is a citizen of Nevada." Dkt. 1, p. 3, ¶ 9.  The removal notice also alleges, based on this assertion, that "[t]his case satisfies the complete diversity requirement" and, "[b]ecause Defendants are not citizens of the same state as Parler, the parties are completely diverse." *Id.* at ¶¶ 8 and 11.  Your most recent communications with us are an acknowledgment that these assertions in the removal notice are false and do not support your diversity jurisdiction allegations.  However, you have declined our repeated requests that Amazon stipulate to a remand order.

    At the time it filed its removal notice, Amazon knew or should have known that its allegation regarding Parler's citizenship was false.  When Amazon asserted that the citizenship of Parler LLC for diversity purposes depended on the state of its formation or its principal place of business, on what authority did it rely to make that assertion?  The fact is there is *no* authority to support this assertion.  Moreover, the local rules explicitly state that a removing defendant must

Ambika Kumar Doran
April 7, 2021
Page 2

allege the citizenship *of an LLC's members*. *See* LCR 101.  Clearly, Amazon's inaccurate allegation was made deliberately or with reckless disregard for its accuracy.

In the short time after Parler provided Amazon a courtesy copy of the state court complaint, but before Amazon was served, Amazon *did* take the time to uncover an esoteric pathway to removal, called "snap removal."  Pursuing snap removal, Amazon filed the notice of removal claiming diversity jurisdiction *even though* it was a forum defendant.  As we have explained in our motion, the snap-removal procedure has been described as "questionable" and as "gamesmanship" by a majority of courts.  But, more to the point, is it Amazon's contention that, prior to filing its removal notice, it conducted legal research that allowed it to identify this esoteric snap-removal procedure, but it did *not* conduct research into the proper method of determining citizenship of an LLC for purposes of removal?  It seems implausible, to say the least, that Amazon would explore the avenue of an esoteric legal technique (snap removal) but not also observe the local rules on alleging diversity citizenship or address a core issue purporting to support subject-matter jurisdiction.

We note that Amazon chose not to cite a single court decision or any other authority in its removal notice to support its claim that Parler's citizenship for diversity purposes was to be determined by the state of its formation or its principal place of business, even though its removal notice contains citations for its other assertions.  Is it Amazon's contention that its lawyers, prior to filing its removal notice, utterly failed to determine the proper legal test for citizenship of an LLC to determine diversity?  We do not believe that to be the case.

The reason Amazon chose to proceed with its false legal assertion in the removal notice—deliberately or otherwise—seems clear: To take advantage of the snap removal procedure, Amazon had to file its removal notice *immediately*.  If it had waited even another hour to conduct appropriate legal and factual due diligence, it would have been served with Parler's state court complaint before filing its removal notice, and its ability to employ the questionable snap removal procedure would have been lost.  In short, Amazon deliberately or recklessly alleged that Parler was a Nevada citizen for diversity purposes and it knew that in order to quickly file its notice of removal, it had to make that inaccurate allegation.  This conduct is highly improper and, in our view, sanctionable.

Despite this sanctionable conduct, which landed Parler in federal court without a legal or factual basis, Amazon now seeks jurisdictional discovery from Parler.  We address that request by separate correspondence.  Suffice to say that Amazon's effort to leverage its false statements regarding Parler's citizenship in its removal notice to gain jurisdictional discovery is as improper as its original false filing.  Amazon should not be rewarded with discovery after making false statements in its removal notice.

Ambika Kumar Doran
April 7, 2021
Page 3

Amazon's assertion in its removal notice that Parler is a citizen of Nevada, and that therefore, there is complete diversity of citizenship, runs afoul of Rule 11(b).  That rule provides:

> [B]y presenting to the court a pleading . . . an attorney . . . certifies that to the best of the person's knowledge, information and belief, *formed after an inquiry reasonable under the circumstances*:  . . . (2) the . . . *legal contentions are warranted by existing law* . . . [and] (3) the *factual contentions have evidentiary support*[.]

(emphasis added).   Amazon did not conduct a reasonable inquiry into Parler's members' citizenship, as is required by LCR 101.  Indeed, the removal notice is devoid of those required allegations concerning members' citizenship, which, as you know, determines citizenship of Parler. Instead, it rushed to file its removal notice to create the appearance of diversity jurisdiction, when there is in fact none.

The Ninth Circuit has held that a party may be sanctioned for filing a complaint in federal court that the plaintiff must have known lacked a factual foundation for federal court subject matter jurisdiction. *See Orange Production Credit Ass'n v. Frontline Ventures, Ltd.*, 792 F.2d 797, 801 (9th Cir.1986).  Moreover, the duty to assess the validity of a claim is a continuing one. *See Gambello v. Time Warner Communications, Inc.*, 186 F. Supp. 2d 209 (S.D.N.Y. 2002) (sanctions appropriate where a defendant persisted in argument flatly contradicted by plaintiff's deposition testimony); *Perry v. S.Z. Rest. Corp.*, 45 F. Supp. 2d 272, 274-75 (S.D.N.Y.) (sanctions appropriate for pursuing claim after information plaintiffs received from defendants would have prompted an objectively reasonable attorney to make a more thorough investigation of his client), appeal dismissed, 201 F.3d 432 (2d Cir. 1999).  Defendants have repeatedly been put on notice that their notice of removal contained an inaccurate assertion of Parler's citizenship, and yet Defendants have failed to take action to correct the inaccurate allegations.

We again request that Amazon agree to stipulate to a remand immediately.  Should Amazon fail to do so, Parler intends to seek all sanctions available under Rule 11(c), in addition to the penalties afforded for an unsuccessful removal under 28 U.S.C. § 1447.

Sincerely,

CALFO EAKES LLP

Angelo J. Calfo

cc:    Alonzo B. Wickers, IV

# EXHIBIT H



## AMERICAN THOUGHT LEADERS

JAN JEKIELEK

# *Video: Parler Interim CEO Mark Meckler Talks Relaunch, Data Privacy, and Building A New Independent Tech Stack*

*50d* AMERICAN THOUGHT LEADERS  273 145

The social media platform Parler is back online, a month after it was removed from the Apple and Google Play store and disconnected from Amazon's web hosting service following the breach of the Capitol on Jan. 6.

Parler's new interim CEO, Mark Meckler, discusses Parler's relaunch and his vision for creating a new tech ecosystem of companies and services that believe in free speech.

**Jan Jekielek:** Mark Meckler, such a pleasure to have you back on American Thought Leaders.

**Mark Meckler:** I'm glad to be here.

**Mr. Jekielek:** Mark, the last time we talked, it was in a very different role. Actually, now you're the interim CEO of Parler, the free speech social media that was taken down just over a month ago. And as of Monday you're back. We've actually been using you. I've been using you on the desktop version, mainly. It's been working, but not entirely perfectly. I wanted to give you an opportunity to give us an update of where things are right now.

**Mr. Meckler:** Yes, for a little background—when you get taken off the web, I think most people underestimate what that means. If we use a website and it works flawlessly, we never think about the technology. And having had to dig in to see the technology stack that's required to run something like this, it's incredibly complex. There are a lot of layers to it from the ground and the cloud.

All of that stuff had to be rebuilt in order to be back on the web. So to be back up, I'm just proud of the staff. There's an incredible group of people behind the scenes working 20 hour days to make this happen. We knew when we launched that it wouldn't be perfect.

It's impossible to do something this complex to be perfect when you launch. We knew there would be some limitations. There have been some bounces and glitches along the way. I agree with you, I think the web version is working better. We had some problems

with the iOS version for those who are using Apple devices. The problem there is something to do with the App Store.

I think we've fixed most of that now, but we're not up on the App Store yet, which means you can't upgrade your app. We can't remove the bugs from the app, so we have to wire around those. There is a little bit more glitchiness there. Part of it is load-glitchiness as we get surges in traffic as we do media. We're doing our best to manage those surges.

Today is much better than we were on Monday, but I would expect to see—you're still going to see bumps and hiccups along the way, but over the next week or so you should see that really even out and things should be a lot better.

**Mr. Jekielek:** This has happened to me a few times, and I've heard from other users as well that sometimes you just try to load the site—this is desktop again, I've been pretty much using that exclusively—you just get "site not found." You try to refresh, it doesn't happen. What should people be thinking when they see that?

**Mr. Meckler:** Well, don't think that that we've been taken off the web, because we haven't been. Just understand that this is complex, and there are a lot of things going on in the background. I'll give you a specific example, and this is kind of the nature of the complexity.

We did have a problem with iOS, that is the operating system that's on your phone if you've got an Apple phone, or that's on your iPad. It was bouncing back a bunch of errors, and those errors were actually overloading the system. So it wasn't exactly traffic, and we had to figure out how to wire around that.

Once in a while I expect this is going to happen. As I said, day by day, it should get better and better. We've been seeing uninterrupted time up, and the flow is improving every day, and I expect by the time we hit early next week, things should be pretty clear and smooth sailing.

**Mr. Jekielek:** Well, great. So tell me a little bit about the response. Obviously, there's a lot of people that were very, very interested to see you back up. What are you hearing from the field, so to speak?

**Mr. Meckler:** I've been doing a bunch of interviews. Everybody's really excited to be back on. I'm talking to my grassroots folks out there. As you know, from Convention of States I've got millions of folks that I know. They're very excited to see it back up. Even with the glitches and the hiccups people keep trying, because they're so excited to know that there's a platform where they're not going to be censored—people who [have] become so sensitive about what they can write on Facebook, what they can tweet about. It's an incredible relief, just to know that there's a platform dedicated to free speech where they're not going to be censored for the things that they say.

**Mr. Jekielek:** I do want to talk a little bit about your philosophy of free speech here, because there were some questions about that recently. Before I go there, a lot of people have been reaching out, basically saying, "How do I get on Parler right now? It seems like you can't, or is it only for existing users?" What's the situation at the moment?

**Mr. Meckler:** Yes, we made a choice that for the first week we were going to cater to the existing Parler family and we wanted to make sure, and you're seeing some of the hiccups, we wanted to make sure that we did the best we possibly could to take care of the existing user base—they can all log on, they can see their accounts exactly as they were before, they're going to be following all the same people they were following. We wanted to make

sure that worked and was stable before we open it up. Sometime next week, we'll open it up for folks who want to add accounts to Parler. So be ready for that. I think we should expect another flood.

**Mr. Jekielek:** Let's talk about the free speech element here. Basically, Parler has been portrayed from the beginning, and I know from the previous CEO who I've interviewed on this show, that the goal was to offer maximal viewpoint diversity, or at least the opportunity for that. I wanted to find out what your philosophy behind this is, and what people can expect to find, because typically, it's portrayed as a very conservative platform.

**Mr. Meckler:** Yes, I want to push back on that first, and I know that is how it's portrayed. It's amazing all the articles that have been written just in the last couple of days: we're far-right, we're alt-right, whatever label they want to put on us. It's something that I've been used to since my time in politics. I get portrayed that way. I've always been portrayed that way.

This is the left attempting to push us into a particular category, because they don't value free speech, and they don't want people listening to the things that people on our platform would say. The actual philosophy of the platform is that it welcomes everybody. We don't have either President Trump on the platform or President Biden. We would welcome both of them on the platform.

We welcome viewpoint diversity, and not just political viewpoint diversity. I think this is really important. We hope that people will come on that have no interest, necessarily, in politics. I'm interested in the arts and music. We have gaming on here. People are big gamers and have gaming followings. We have people, again, musicians and artists, I think those things add to the fullness of life and the fullness of discourse online. We want all of it, regardless of viewpoint.

**Mr. Jekielek:** Another big question that I have, and we may actually go back to the free speech piece as well, more philosophically in general, a little later. But you describe Parler now as a truly independent platform, right? Given this whole technology stack that you just identified, and all these multiple dependencies, how can you guarantee this independence that you're describing? What does that actually mean?

**Mr. Meckler:** What it means is independence from the big tech oligarchy. So obviously, we have vendors and providers that are not owned by Parler. So we're not entirely independent of any outside dependence on technology, but all of our partners are people who are committed to free speech. For the most part, I've spoken to the CEOs of all the companies, they're not going to be cowed by the woke mob.

We've been very careful about choosing partners that are not necessarily aligned with us politically, we're not doing a political litmus test, we just want to make sure that they're committed to free speech. We have those kinds of assurances from all of our partners up and down the technology stack.

I would add that's not enough to be secure. We also need redundancy, meaning just in case we lose part of this deck, in case somebody does end up falling to the mob or maybe somebody comes under technology attack and we lose a particular service, we build redundancy into our services, so that we don't have a single point of failure. One of the problems that we had in the past is that we had single points of failure, and when those got pulled, we were done. We're very careful about that now, and we've built around and for that eventuality.

**Mr. Jekielek:** What's the response of other social media companies out there to all this?

**Mr. Meckler:** They don't seem to like it very much. The comments are generally negative from other social media providers. Mostly, we just ignore them, because, look, our position in the market is different than anybody else's. We are the free speech platform. We believe in free speech, we believe in data sovereignty and privacy, and we believe in civil discourse. That's what we're here for. We were the dominant platform for that before we were taken down, and we're going to be the dominant platform for that on a go-forward basis in the future. So mostly, we just ignore the other social media platforms.

**Mr. Jekielek:** I understand you're actually in the process of launching or have launched a lawsuit against Amazon for taking down your hosting.

**Mr. Meckler:** Yes, that's correct. First of all, just plain and simple: their breach of contract. The contract required a certain notice period before they shut down our hosting. They didn't provide that notice period. There are also all kinds of antitrust violations that have taken place and possibly some free speech violations. There's a state actor theory around free speech. We'll be filing our first amended complaint here probably in the next week to 10 days. There'll be a lot more news on that coming soon.

**Mr. Jekielek:** So what was the ostensible reason for being taken down?

**Mr. Meckler:** As best I can tell, and honestly it's not really clear, the ostensible reason was allegations that we were not moderating content, that the events on January 6 at the Capitol were somehow the responsibility of Parler. What's astounding about that is even Forbes has done an independent analysis that shows that while Sheryl Sandberg, Facebook's head, said it's all our fault, if you look at the actual numbers, probably numbers 10 times greater than anything found on Parler, barely a blip on Parler—it was Facebook, it was YouTube, it was Twitter—that's where the bad activity was taking place for the most part, not much on Parler at all.

So I think this was a political hit, and I actually think it was a business hit. There are two things. They are trying to stifle free speech. They don't like the idea that people can go online and say whatever they want to say, as long as it's legal. They're opposed to that philosophy.

The second is a business thread. Our model is entirely different than the other social media platforms. We're not monetizing the data of our users. We don't use algorithms, that big "A" word that everybody's afraid of, and I think they should be—where they're forcing content into your feed. If you go on Parler, the content you're going to get is the content you want. You're only going to get content from the people that you sign up to follow. This allows users to curate their own content. That's a real threat to people like Facebook and Twitter and Google.

**Mr. Jekielek:** You are moderating however, clearly. I saw a release from, I forget right now the name of the provider, but is it Silk? It's your cloud provider. Basically, the release said that they're happy with the moderation initiatives that you're putting in. Apparently, you're using AI. So how does that work? Is it really free speech?

**Mr. Meckler:** Look, I want to be really clear: we don't moderate. That's an important distinction. We have community guidelines. Those guidelines are intended to prevent any kind of illegal activity. In other words, if you can do it in the town square, if you can say it in the town square, then you can do it on Parler. If you can't, if you're actually inciting violence according to the legal definition, if you're making actual threats, that would be considered legally actionable threats, that's not going to be allowed on Parler.

What we use is we have two layers of intervention in that regard. We use artificial intelligence to screen for those comments. And then backing that up, we have a human intervention to make sure—this is very important—to make sure that we're not over-censoring. In other words, if anything is being screened out by artificial intelligence, and it's done in a way that we don't believe is correct and it's still legal speech, then we have humans that intervene and make sure that that stuff is released.

**Mr. Jekielek:** You mentioned a little earlier that you're not monetizing the data, which is kind of the standard business model these days. So what are you doing for money? What's the idea here?

**Mr. Meckler:** Yes, it's just a standard advertising model. If you think about how it works on the radio, if you listen to the radio, inserted in the programming that you would normally get on the radio, you're going to get the occasional ad, or series of ads. So advertisers can buy advertising in the stream, and they can just decide where they want to put their ads in.

As you see content flow across your screen, occasionally, you're going to see an ad, and those are advertisers just buying straight advertising time. By the way, it's not because you fit a particular profile, or in any way the advertisers know what your data is, or who their advertisements will be in front of. They're just choosing the streams that they want to put it in, and that's where it shows up if you're following those people.

**Mr. Jekielek:** Are you concerned that there will be attempts to cancel those advertisers because they're working with you?

**Mr. Meckler:** Yes, absolutely. I would be stunned if that doesn't happen. In fact, that's what we're seeing in media generally. We're seeing a separate ecosystem of media providers that are getting a certain kind of advertiser that doesn't care about the woke mob, but understands what their market is, and they're willing to play directly into that market. Those are the kinds of advertisers that we expect to see on Parler. They could stand up against the woke mob.

We would invite everybody and we would encourage every advertiser to stand against the woke mob. It's not a good business model, actually, to cater to the woke mob. Whether it's a Fortune 500 company looking for advertising in this market, or a small mom and pop company that wants advertising, we're going to be accepting all advertisers, just as we accept all points of view.

**Mr. Jekielek:** You're describing this other ecosystem which is not constrained by, as you describe it, the woke mob. Explain to me this woke mob, in your mind. Who are these people?

Look, I think it's a very small minority of people in America, some of them organized and paid for probably centrally. I don't want to be a conspiracy theorist, but what you see is anytime somebody steps out of line with what I would describe as the radical leftist orthodoxy, the woke mob descends.

**Mr. Meckler:** Some people call them the "twitterati," and what they try to do is they try to get companies canceled. They try to get employees fired. They try to get people censored. So this is a mob mentality that now exists on the internet. It's a very important, vitally important as a society, that we push back against this sort of censorious behavior, because censorship is more than just censoring speech. They're trying to get people fired from their jobs, excluded from polite society, etc. This is a real danger, in my opinion in living in a civilized society.

**Mr. Jekielek:** You're describing this situation where there's this, as you said, alternate or different ecosystem developing which isn't interested in what the people you just described would think. It's almost like there are these parallel systems that are developing in many areas.

**Mr. Meckler:** I actually think this is correct. This is something that I have described previously as the great decoupling taking place in the United States, where we have two different ecosystems, so to speak. We're starting to watch different things, listen to different things, read different things. I know a lot of people are concerned about this. I'm actually not concerned about it.

This country in its history has always been divided, in a way. The original colonies were very divided, until they had to face off together against the King of England. We've had divisions in our country for very long. Our system is actually designed to take this. The system of federalism is designed to take states that believe very differently, populations that believe very differently, and allow them to get along.

This idea of a monoculture where everybody listens to the same thing, reads the same thing, that's really an anathema to a federalist system. This is actually a healthy development, where there are separate ecosystems for people who believe different ways. If you're interested in getting different forms of information, you can crossover. Hopefully, Parler itself will be part of that crossover ecosystem where everybody is welcome.

**Mr. Jekielek:** So in line with these alternate ecosystems that you're describing, you've also advocated for the development of a full alternative stack for building technology and financing, buying and selling, everything. Tell me about this.

**Mr. Meckler:** Yes, this is something that's necessary in today's world. What we're seeing is, because of the cancel culture, there are vulnerabilities all through the system. We live in a digital world, we all exist in some form or another online, and it's actually required that we do so. What that means is we're vulnerable at each of these levels.

For example, for a company to exist online, you need hosting in the cloud, and so you've got servers in the cloud. As we experienced here at Parler, if you are on a hostile service provider, they can erase you from the cloud.

There are other layers of the stack that are required for people doing business in the cloud. For example, today email service providers, ESPs, are censoring their users. MailChimp is censoring their users, not allowing the use of certain terms like election integrity or election fraud. The same is going on with Constant Contact, another big email service provider.

So ultimately, there needs to be, and we have in development, an email service provider that won't censor their users. It will be a lot like Parler. It will allow you to say anything you want to say, as long as it's legal. We need those services. We need banking services. We're seeing banks today that refuse to do business with, for example, gun manufacturers, or gun shops and that is expanding into people who just have conservative values.

We're going to need our own banks, and so we're out there seeking banks. I've found a couple of partners that are banks that are owned by people who believe in free speech and are not going to censor their customers or decide not to do business with people because they have the wrong political perspectives. These kinds of services are going to be necessary all the way through the stack.

Another example is what's called merchant account providers, those who facilitate credit card processing. A lot of the credit card processors have been cutting off a variety of people. For example, Stripe, which is a major processor, cut off President Trump's organization. So we need credit card processors that will agree that they're going to process as long as it's legal.

So the stack is large. There are a lot of components to it. Some need to be rebuilt from scratch. Some we just need to find the right providers. I'm in the process of helping to put all of that together.

Mr. Jekielek: That's super interesting. From what you're saying, this isn't left and right. This is more like free speech and non-free speech? How do you describe the distinction here?

Mr. Meckler: That's a great way to put it. One of the things that I think a lot of consumers and a lot of business consumers, a lot of B2B business to business consumers, is we just want these companies out of politics. But I'm not necessarily looking for companies that are conservative or libertarian or have a particular value set. I'm looking for companies that just want to do business and will remove politics and then those sorts of value judgments from business. So I agree, I think it's free speech versus people who are censorious that are willing to use their businesses to shut down free speech,

Mr. Jekielek: But you would work with companies that support cancel culture, potentially?

Mr. Meckler: No, because the companies that support cancel culture, we can't trust them not to cancel. So unless they're committed to not supporting cancel culture, our position, my position, with these companies is just to get out of politics. Make a great product, provide a great service, let consumers help make your shareholders rich, we're good with all of that. Just stay out of politics and stay in your lane, which is business.

Mr. Jekielek: Mark, from what you said earlier, this idea of viewpoint diversity is very important to you. You're welcoming all sorts of people onto the platform. However, it has been somewhat typecast as a conservative platform at the moment. Are you doing some kind of outreach, or when do you intend to do this to try to explain the values and what Parler is all about?

Mr. Meckler: We're constantly doing outreach. I'll give you a very specific example, and people might be kind of shocked by this. Obviously, I'm a pretty conservative guy, so you might not expect this, but we're reserving usernames for organizations that you might be surprised would be welcome here on Parler, if you think we're a right wing organization. For example, we would reserve the username New York Times for the New York Times. We're not going to let anybody else take that username and use and abuse it.

We would do that for any organization on the left or the center or the right. They're thinking about coming onto Parler, and they're worried about maybe somebody else absconding with their username. We're gonna reserve that name for them, because we absolutely want them here. We want their point of view represented here on Parler.

Mr. Jekielek: Mark, any final thoughts before we finish up?

Mr. Meckler: Yes, in closing, what I want people to understand is that this is, in my opinion, right now the most important fight in America. Free speech is at the root of our American system. We believe that more speech is better speech. If there's bad speech, and

there's plenty of bad speech out there, that should be countered with more speech and better speech.

Today, we live in a universe where the online speech is getting more and more limited. If we allow that to happen, if we allow viewpoint diversity to be shut down, I believe we're going to lose the Republic. This is the home of free speech in the world. If we lose it here in the United States, we're likely to lose it worldwide. So I would encourage everybody who's interested in free speech and viewpoint diversity, to get involved by coming to Parler.com. If you don't already have an account, wait until next week, and sign up for an account. If you have a Parler account and you haven't come back, come back to Parler.com and get involved today.

**Mr. Jekielek:** Mark Meckler, it's such a pleasure to have you on.

**Mr. Meckler:** Thanks for having me.

*This interview has been edited for clarity and brevity.*

*American Thought Leaders* *is an Epoch Times show available on* YouTube, Rumble, Youmaker, *and* The Epoch Times website. *It also airs on cable on NTD America.* Find out where you can watch us on TV.
*Follow Jan on Twitter:* @JanJekielek