The Honorable Barbara J. Rothstein

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

PARLER LLC,

                        Plaintiff,

            v.

AMAZON WEB SERVICES, INC., and
AMAZON.COM, INC.,

                        Defendants.

No. 2:21-cv-00270-BJR

DECLARATION OF AMBIKA
KUMAR IN SUPPORT OF
DEFENDANTS' OPPOSITION
TO PLAINTIFF'S MOTION FOR
RULE 11 SANCTIONS

16     I, Ambika Kumar, declare:

17     1.     I am a partner in the law firm Davis Wright Tremaine LLP, counsel for Defendants

18  Amazon Web Services, Inc. and Amazon.com, Inc.   I make this declaration from personal

19  knowledge.

20     2.     On April 30, 2021, Parler served on Defendants a Motion for Rule 11 Sanctions, a

21  true and correct copy of which is attached as **Exhibit A**.

22     3.     On May 28, 2021, Parler filed the pending Motion for Rule 11 Sanctions, Dkt. 35,

23  which is not the motion it had served on Defendants.   Parler did not serve Defendants with the

24  filed motion or offer to meet and confer with Defendants' counsel before filing it.

25     4.     Attached as **Exhibit B** is a true and correct copy of a motion to dismiss filed by

26  NDM Ascendant LLC in litigation brought by Parler's former CEO, John Matze, which includes

27  as copy of Parler LLC's operating agreement as Exhibit A to the motion.

DECL. OF AMBIKA KUMAR IN SUPPORT OF DEFS.'
OPP'N TO MOT. FOR RULE 11 SANCTIONS - 1
(2:21-cv-00270-BJR)

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

1

5.      Attached as **<u>Exhibit C</u>** is a true and correct copy of ███████████

2 ██████████████████████████████████████

3      I declare under penalty of perjury that the foregoing is true and correct.

4      Executed this 18th day of June, 2021, at Mercer Island, Washington

5

6                          */s/ Ambika Kumar*
                          Ambika Kumar

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

DECL. OF AMBIKA KUMAR IN SUPPORT OF DEFS.'
OPP'N TO MOT. FOR RULE 11 SANCTIONS - 2
(2:21-cv-00270-BJR)

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

1

**CERTIFICATE OF SERVICE**

2      I hereby certify that counsel of record have been served a true and correct copy of the

3  foregoing *Declaration of Ambika Kumar* by electronic mail through the Court's ECF Notifications

4  to the following:

5          Angelo J. Calfo, WSBA# 27079
           CALFO EAKES LLP
6          1301 Second Avenue, Suite 2800
           Seattle, WA 98101
7          Email: angeloc@calfoeakes.com

8          David J. Groesbeck, WSBA No. 24749
           DAVID J. GROESBECK, P.S.
9          1333 E. Johns Prairie Rd.
           Shelton, WA 98584
10         Email: david@groesbecklaw.com

11

12  DATED this 18th day of June, 2021.

13

14                              Davis Wright Tremaine LLP
                                Attorney for Defendants

15
                                By *s/Ambika Kumar*
16                                 Ambika Kumar, WSBA #38237

17

18

19

20

21

22

23

24

25

26

27

DECL. OF AMBIKA KUMAR IN SUPPORT OF DEFS.'
OPP'N TO MOT. FOR RULE 11 SANCTIONS - 3
(2:21-cv-00270-BJR)

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

# EXHIBIT A

THE HONORABLE BARBARA J. ROTHSTEIN

1
2
3
4
5
6
7
8
9

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10   PARLER, LLC,

11        Plaintiff,

12        vs.

13   AMAZON WEB SERVICES, INC., and
     AMAZON.COM, INC.,
14

15        Defendants.

16

Case No. 21-cv-00270

PLAINTIFF'S MOTION FOR RULE 11
SANCTIONS

17
18
19
20
21
22
23
24
25

PLAINTIFF'S MOTION FOR RULE 11 SANCTIONS
(Case No. 2:21-cv-00270)

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101-3808
TEL (206) 407-2200  FAX (206) 407-2224

1

## I.   <u>INTRODUCTION</u>

2      Defendants Amazon Web Services, Inc. and Amazon.com, Inc. (collectively, "Amazon")

3   removed this case under false pretenses.  Specifically, Amazon premised its Notice of Removal

4   solely on the following purported basis for diversity jurisdiction:

5

6       9.      Parler is a Nevada limited liability corporation with its principal place of business
   in Henderson, Nevada.  *See* Federal Complaint ¶ 10.  Parler therefore is a citizen of Nevada.

7       10.     Defendants are incorporated in Delaware with their principal places of business in

8   Seattle, Washington.  *See* State Complaint ¶¶ 13, 14; Federal Complaint ¶ 11.

9       11.     Because Defendants are not citizens of the same state as Parler, the parties are

10   completely diverse.

11

12   Amazon's Notice of Removal, Dkt. 1, at 3.  On March 11, 2021, Parler informed Amazon that the

13   critical premise of this argument—the allegation that Parler is solely a citizen of Nevada because

14   that is its principal place of business—was legally and factually false.  Declaration of Angelo J.

15   Calfo ("Calfo Decl."), ¶ 13, Ex. 1 (3/11/21 Email from Angelo J. Calfo to Ambika Kumar Doran).

16   Amazon has never disputed the falsity of this allegation—nor has Amazon identified *any* good

17   faith basis for having made the allegation—but Amazon nonetheless refused to stipulate to remand.

18   Calfo Decl., ¶ 20.   Likewise, after Parler moved for remand, Amazon did not even try to defend

19   the accuracy of this allegation in its opposition.  *See generally* Dkt. No. 28.  Instead, Amazon

20   simply asked the Court to overlook its defective Notice of Removal and to permit jurisdictional

21   discovery so Amazon could try to fish for a *new* basis for removal.  *Id.*  That is a serious abuse of

22   the judicial process.

23      While Parler recognizes that sanctions under Rule 11 are an extraordinary remedy, they are

24   necessary and justified in this case in light of Amazon's unsupported and bad-faith factual

25

PLAINTIFF'S MOTION FOR RULE 11 SANCTIONS
(Case No. 2:21-cv-00270) - 1

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101-3808
TEL (206) 407-2200  FAX (206) 407-2224

assertions and legal contentions concerning Parler's citizenship, and its dogged resistance to rectifying its error.

It is clear that Amazon did not conduct a reasonable inquiry into the facts and the test used to determine Parler's citizenship when it removed *less than 24 hours* after Parler filed its complaint in state court. It is equally obvious that, had Amazon conducted a reasonable inquiry, it would have understood that the allegations in its Notice of Removal were false. Amazon skipped a reasonable inquiry in its quest to obtain an accelerated "snap removal"—less than 24 hours after it became aware of Parler's state court complaint—which is a questionable basis for defeating state court jurisdiction when the forum defendant rule would normally prevent a forum-based defendant from removing the case to federal court. In Amazon's Response to Parler's Amended Motion to Remand, it essentially admits that it did not conduct a reasonable inquiry into Parler's citizenship when it alleges that "Parler controls the information that the Court needs to ascertain citizenship," (Dkt. 28, at 4), which implies that Amazon did not possess such information when it filed its erroneous and frivolous Notice of Removal.

Worse, Amazon has refused to correct its error. Parler has offered Amazon several safe harbor opportunities to withdraw its flawed Notice of Removal and stipulate to a remand of this action to state court. Amazon has repeatedly refused. The parties have met and conferred on several occasions concerning these issues, but Amazon insists on standing on its bad faith Notice of Removal. Sanctions are necessary to correct Amazon's behavior, to compensate Parler for the resulting legal costs, and to deter Amazon from taking such speculative, unsupported, and unwarranted positions concerning the Court's jurisdiction in the future.

## II.     FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Parler LLC originally brought both federal and state-based claims against AWS in this Court in a complaint filed on January 11, 2021. Case No. 2:21-cv-31-BJR, Dkt. 1 (the

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101-3808
TEL (206) 407-2200  FAX (206) 407-2224

"Federal Action").  On the same day, Parler filed a corporate disclosure statement indicating that one of its members was from Delaware.  *See id.*, Dkt. 3 at 2.

On March 2, 2021, at 4:27 p.m., Parler filed a complaint in the Superior Court of the State of Washington for King County (the "State Complaint") bringing solely Washington state-based claims against AWS and Amazon.com, Inc. (the "State Action").  On the same day, Parler dismissed the Federal Action.  Calfo Decl. ¶ 5.

On March 3, 2021, Amazon filed a Notice of Removal of the State Action, 24 minutes prior to being served by Parler with the complaint in the State Action.  Dkt 1.  In its Notice of Removal, Amazon alleged that "Parler is a Nevada limited liability corporation with its principal place of business in Henderson, Nevada," that "Parler therefore is a citizen of Nevada," and that "this case [therefore] satisfies the complete diversity requirement because Defendants are not citizens of the same state as Parler. . . ."  Dkt. 1, Notice of Removal, at 3.  Both defendants acknowledge in the Notice of Removal that they are residents of both Washington and Delaware.  *Id.* at 3.

Parler is a limited liability company.  Calfo Decl. ¶ 8.  Parler's corporate disclosure statement in the Federal Action—filed almost two months before Amazon's Notice of Removal— put Amazon on notice that Parler had members, one of which was a Delaware entity.  Federal Action, Dkt. 3.  Parler listed its members as "John Matze and NDM Ascendant LLC."  *Id.* at 2.  It further listed NDM Ascendant LLC's members as Rebekah Mercer and the Rebekah Mercer 2020 Irrevocable Trust.  *Id.* at 2.

Amazon's Notice of Removal failed to identify the citizenship of all of Parler's members, as required by LCR 101(f).  Instead, Amazon applied a citizenship test for ordinary corporations in its Notice of Removal, rather than for limited liability companies.  Notice of Removal, Dkt. 1 at 3.  Amazon compounded its error in assuming Parler's status as an ordinary corporation when it cited several standards for determining the citizenship of such a corporation, rather than an LLC. It cited 28 U.S.C. §1332 for the proposition that "a *corporation* shall be deemed to be a citizen of

LAW OFFICES
CALFO EAKES LLP
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101-3808
TEL (206) 407-2200  FAX (206) 407-2224

every State . . . by which it has been incorporated and of the State . . . where it has its principal place of business." Dkt. 1 at 3 (emphasis supplied). Amazon also cited *Hertz Corp. v. Friend*, 599 U.S. 77 (2010), for the purpose of supporting its position that Parler's citizenship is determined in part by its principal place of business in Nevada. *Id.* But Amazon was obviously fully aware that Parler, LLC is in fact an LLC, not an ordinary corporation.

Following Amazon's Notice of Removal, counsel for Parler conferred with counsel for Amazon to address Amazon's erroneous assertion of complete diversity, during which counsel for Amazon acknowledged that its Notice of Removal applied the wrong standard for determining Parler's citizenship. Calfo Decl., ¶ 14, 15, and 16 & Ex.'s 2 and 3. Since then, Parler has demanded on at least 3 separate occasions via emails on March 11, 13 and 18, 2021, respectively, that Amazon stipulate to remand. *Id.* at ¶ 17. On April 7, 2021, counsel for Parler also wrote a letter to counsel for Amazon concerning potential Rule 11 sanctions requesting again that Amazon stipulate to a remand or provide an explanation for its claimed basis of diversity jurisdiction. Calfo Decl. Ex. 4.

To date, Amazon has refused to stipulate to remand, and on April 12, 2021, Amazon opposed Parler's amended motion for remand. *See* Dkt. 28, Resp. to Am. Mot. to Remand (the "Response"). Amazon's Response does not provide any facts substantiating its erroneous claim that Parler is solely a citizen of Nevada and that complete diversity of jurisdiction exists. Indeed, Amazon does not even try to argue that its Notice of Removal was accurate. Instead, Amazon sought leave to issue discovery in order to try to fish for information on which it might try to base a *new* theory for diversity jurisdiction. Dkt. 28, 5-8, 15. To date, Amazon has never articulated a good faith basis for asserting diversity jurisdiction in its original Notice of Removal.

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101-3808
TEL (206) 407-2200  FAX (206) 407-2224

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

### III.   **LEGAL STANDARD**

Fed. R. Civ. Proc. Rule 11 provides:

> "**(b) Representations to the Court.**  By presenting to the court a pleading, written motion, or other paper . . .  an attorney . . . certifies that to the best of the person's knowledge, information and belief, formed *after an inquiry reasonable under the circumstances*: . . . (2) the . . . legal contentions are warranted by existing law . . . [and] (3) the factual contentions have evidentiary support[.]"

If Rule 11(b) is violated, the district court may impose an appropriate sanction.  *See* Fed. R. Civ. P. 11(c); *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 (1990).  Rule 11 is intended to be applied vigorously to curb the filing of documents that are frivolous, legally unreasonable, or without factual foundation. *United Ass'n of Journeymen & Apprentices of Plumbing & Pipefitting Indus., Loc. No. 32 v. Lockheed Shipbuilding Co.*, 1986 WL 15664, at \*3 (W.D. Wash. Oct. 17, 1986).  If the court finds that a document was signed in violation of Rule 11, the court must impose an appropriate sanction.  *Id.*

As another district court in this Circuit has observed, "Rule 11 is governed by an objective standard of reasonableness."  *William Villa v. Heller*, 885 F. Supp. 2d 1042, 1055 (S.D. Cal. 2012) (citing *Zaldivar v. City of Los Angeles*, 780 F.2d 823, 830 (9th Cir. 1986), *abrogated on other grounds by Cooter & Gell v. Hartmarx, Corp.*, 496 U.S. 384 (1990)).  Moreover, "Rule 11 sanctions *must* be assessed if the paper[ ] filed with the court is 'frivolous, legally unreasonable, or without factual foundation, even though the paper was not filed in subjective bad faith.'"  *Id.* (quoting *Zaldivar*, 780 F.2d at 831) (emphasis added).

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101-3808
TEL (206) 407-2200  FAX (206) 407-2224

IV.   **ARGUMENT**

**A.    Amazon's Allegations of Parler's Citizenship Are Frivolous Because Amazon Has Knowingly Applied the Wrong Test for Parler's Citizenship**

In seeking removal, Amazon—not Parler—bears the burden of establishing that diversity jurisdiction exists.  *See Gaus v. Miles, Inc.*, 980 F.2d 564, 566 (9th Cir. 1992).  In Amazon's response to the Amended Motion for Remand, it put the cart before the horse when it argued that "Parler's remand motion lacks the information necessary for the Court to make [a determination that there is no diversity jurisdiction]."  Dkt. 28, 5.  In reality, if Amazon lacked such information (as it did), then it did not have a good-faith basis for removal in the first place.

Precedent is unambiguous on that point.  As the Supreme Court has held, "Defendants may remove an action on the basis of diversity of citizenship [only] if there is complete diversity between *all* named plaintiffs and *all* named defendants, and no defendant is a citizen of the forum State."  *Lincoln Prop. Co. v. Roche*, 546 U.S. 81, 84 (2005) (emphases added).  Further, "the plaintiff is the master of his complaint."  *Hunter v. Philip Morris USA*, 582 F.3d 1039, 1042 (9th Cir. 2009) (citation and quotation marks omitted).  Accordingly, federal courts should apply a "strong presumption against removal jurisdiction," which "means that *the defendant always has the burden of establishing that removal is proper*, and that the court resolves all ambiguity in favor of remand to state court."  *Id.* (emphasis added).  This is because federal courts are courts of limited jurisdiction that do not lightly assume the authority to resolve disputes.  By admitting that it lacks the information "necessary for the Court to make [a determination that there is diversity jurisdiction,]" Amazon has effectively conceded that it did not have the information to allege that diversity jurisdiction existed in the first instance.

Amazon not only has failed to meet its burden of establishing diversity jurisdiction but, just as importantly, its allegation that Parler is solely a Nevada citizen, based on the legal standard applicable to ordinary *corporations*, is frivolous and devoid of a good-faith basis.  The Ninth

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101-3808
TEL (206) 407-2200  FAX (206) 407-2224

Circuit has held that a party may be sanctioned for filing in federal court absent a factual foundation for subject matter jurisdiction. *See Orange Production Credit Ass'n v. Frontline Ventures, Ltd.*, 792 F.2d 797, 801 (9th Cir. 1986). Ninth Circuit precedent is clear that the current incarnation of Rule 11 no longer requires "subjective bad faith" to warrant sanctions. *Id.* at 800 (cleaned up). On the contrary, "[s]anctions under Rule 11 are appropriate when a pleading which has been filed is frivolous, legally unreasonable, or without factual foundation." *Id.* (cleaned up). And, of course, "[t]he fact that the district court lacked jurisdiction to consider the merits of the case did not preclude it from imposing sanctions." *Id.* at 801 (cleaned up).

As Amazon knows well, the test for determining citizenship of an LLC is to determine the citizenship of its owners/members. *Tylt, Inc. v. Wireless Advocs., LLC*, 2020 WL 1286174, at *1 (W.D. Wash. Mar. 18, 2020) (Robart, J.). Amazon, a company which routinely litigates in the Western District of Washington, should have been particularly aware of this basic test for citizenship for LLCs, which is enshrined in *this* very District's local rules. If a repeat player in this District such as Amazon is not expected to know such an elementary axiom, then who is? For example, LCR 101(f) requires a removing party to allege the citizenship of all of the members of an LLC:

> If the removal is based on diversity, the notice of removal must also, to the extent possible, identify the citizenship of the parties, and, if any of the parties is a limited liability corporation (LLC), a limited liability partnership (LLP), or a partnership, identify the citizenship of the owners/partners/members of those entities to establish the court's jurisdiction.

Amazon did not comply with LCR 101(f) in its Notice of Removal. Had it done so, it would have been obvious on its face that removal was improper.

Further, at the time when Amazon failed to allege the citizenship of <u>all</u> of Parler LLC's members in its Notice of Removal, it had already been put on notice that Parler had several members through the Corporate Disclosure statement that was filed in the original Federal Action. Pl.'s Corporate Disclosure Statement, Federal Action, Dkt. 3, at 2. Remand would have been

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101-3808
TEL (206) 407-2200  FAX (206) 407-2224

appropriate on this basis *alone*.  *See, e.g.*, *Naxos, LLC v. Am. Fam. Ins. Co.*, 2018 WL 11152150, at *1 (W.D. Wash. Sept. 19, 2018) (Robart, J.) (where notice of removal did not allege the citizenship of all the LLC's members, ordering the <u>defendant</u> to produce such information within 14 days or the case would be remanded).  Everything else merely fortifies the conclusion that Amazon acted in bad faith.

Indeed, Amazon has conceded to counsel that it used the wrong test to determine Parler's citizenship.  During a March 11, 2021, meet and confer with Amazon's counsel, in which counsel for Parler asked counsel for Amazon to explain the inquiry it conducted prior to filing its Notice of Removal, Amazon's counsel conceded it had not applied the right test for determining Parler's citizenship.  Calfo Decl., ¶ 14, 16.  Amazon's counsel also wrote to counsel for Parler acknowledging that an LLC's citizenship is determined by the citizenship of its members.  *Id.*, Ex. 3.  Yet, Amazon has not produced any facts that establish there is complete diversity of citizenship, despite numerous requests and a 21-day safe-harbor period.  *Id.*, ¶ 21.  Nor has Amazon tried to amend its Notice of Removal to eliminate its knowingly inaccurate statements of law and fact on which it claimed jurisdiction.

Notably, although it had no burden to do so, Parler has produced facts through its Corporate Disclosure Statement that establish that Amazon and Parler share common citizenship in Delaware—and thus, there is not complete diversity.  One of Parler's members is NDM Ascendant LLC, a Delaware limited liability company.  Dkt. No. 15, ¶ 3.  In turn, NDM Ascendant LLC's citizenship is determined by the citizenship of its members, which include the Rebekah Mercer 2020 Irrevocable Trust (the "Trust"), which was formed under the laws of Delaware.  *See id.* ¶ 4. And, for diversity purposes, the citizenship of a trust is similarly determined by the citizenship of its trustees.  *See Johnson*, 437 F.3d at 899 (holding that a "trust has the citizenship of its trustee or trustees").  As Parler's Corporate Disclosure Statement makes clear, one of the trustees of the Trust is the J.P. Morgan Trust Company of Delaware, a company headquartered and incorporated in

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101-3808
TEL (206) 407-2200  FAX (206) 407-2224

Delaware, making it a citizen of Delaware. *See id.* ¶ 4. At the time this action was commenced (and now), the Trust was a Delaware citizen, which made NDM Ascendant LLC a Delaware citizen, which in turn made Parler a Delaware citizen. *See, e.g.*, *Grupo Dataflux v. Atlas Global Group, L.P.*, 541 U.S. 567, 570 (2004) ("the jurisdiction of the Court depends upon the state of things at the time of the action brought") (quotation marks and citation omitted). Since Delaware is a common state of citizenship between Parler and the Defendants, complete diversity is absent, and the Court lacks jurisdiction. *See Wescott v. Upshaw*, 2020 WL 3469362, at *2 (W.D. Wash. June 25, 2020) ("As Plaintiff and one Defendant are citizens of the same state, there is not complete diversity and this Court lacks jurisdiction to hear this case.").

In sum, Amazon never had any factual or legal basis for alleging in its removal papers that there is complete diversity. Rule 11 sanctions have been found to be appropriate where a claim "has no basis in the law and ignores relevant United States Supreme Court authority contrary to the position asserted." *Aquarian Found. v. State of Wash.*, 1991 WL 313900, at *2 (W.D. Wash. Aug. 29, 1991) (Rothstein, J.) (citing *Golden Eagle Distributing Corp. v. Burroughs Corp.*, 801 F.2d. 1531, 1537 (9th Cir. 1986)). Sanctions are necessary and appropriate here, in light of Amazon's flagrant decision to remove based on incomplete and false allegations, as well as its subsequent and recalcitrant refusal to stipulate to remand when the falsity of those allegations was pointed out.

**B.     Amazon Did Not Conduct a Reasonable Inquiry Before Filing Its Notice of Removal**

The need for sanctions is particularly clear in the context of Amazon's "snap removal" tactics. Amazon rushed to file its Notice of Removal before it was served by Parler, less than 24 hours after Parler filed its complaint in the State Action. Amazon obviously knew that, if it waited and found a basis for diversity jurisdiction through discovery in state court, it would no longer be able to remove in light of the forum-defendant rule. As a result, Amazon knowingly chose to file

1    its Notice of Removal *without a reasonable inquiry* in the rush to get into federal court before it

2    was served with the state court complaint.

3        The Ninth Circuit, moreover, has held that a failure to conduct a reasonable investigation

4    of a party's domicile can result in Rule 11 sanctions. *See*, *e.g.*, *Hendrix v. Naphtal*, 971 F.2d 398,

5    399 (9th Cir. 1992) (where plaintiff's counsel failed to investigate client's domicile and plaintiff

6    had moved his domicile to a state that destroyed complete diversity).   As explained above,

7    reasonable inquiry would have revealed that Parler is a limited liability company, not a

8    corporation.   In fact, a reasonable inquiry was not even needed—Amazon was already fully on

9    notice of that fact.   Complaint, Federal Action, Dkt. 1, at 3-4; Pl.'s Corporate Disclosure Statement,

10   Federal Action, Dkt. 3, at 2.   Moreover, even if Amazon did not trust Parler's original pleadings

11   identifying it as an LLC, Amazon could have confirmed those facts by spending two minutes

12   reviewing Nevada's Secretary of State's business portal, SilverFlume, which indicates that Parler

13   LLC is indeed a domestic limited liability company.   *See* Nevada's Business Portal:

14   https://esos.nv.gov/EntitySearch/BusinessInformation (which allows searches by entity name and

15   contains information concerning Parler LLC, Entity No. E0241342018-5).

16       A reasonable inquiry also should have revealed the proper test for determining the

17   citizenship of a limited liability company.   It is long-standing, black-letter law that the citizenship

18   of an LLC is determined by the citizenship of its members.   *See*, *e.g.*, *Johnson v. Columbia Props.*

19   *Anchorage, LP*, 437 F.3d 894, 899 (9th Cir. 2006).   Moreover, this principle is embedded in this

20   District's local rules, including LCR 101(f)'s requirement that a removing defendant allege the

21   citizenship of each member of a limited liability company—with which Amazon did not comply.

22   *See infra*, at 7.   It is therefore unsurprising that, when Parler confronted Amazon about the lack of

23   a good faith basis for its allegations regarding citizenship, Amazon did not try to defend them.

24   Calfo Decl., ¶¶ 17,19, and 20.   What is surprising, however, is Amazon's subsequent refusal to

25   stipulate to remand.   Amazon's brazen decision to stand on its *admittedly* false Notice of

PLAINTIFF'S MOTION FOR RULE 11 SANCTIONS
(Case No. 2:21-cv-00270) - 10

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101-3808
TEL (206) 407-2200  FAX (206) 407-2224

Removal—in which it included knowingly or recklessly false information for the sole purpose of beating Parler to the punch with its "snap removal"—makes sanctions particularly necessary and appropriate here.

**D.   Amazon Should Be Sanctioned by a Penalty Sufficient to Deter Repetition**

Fed. R. Civ. P. 11(c)(4) allows a court wide latitude to fashion an appropriate sanction for Amazon's conduct, but the sanction imposed should be sufficient "to deter repetition of the conduct or comparable conduct by others similarly situated."  The Rule defines different types of sanctions that can be applied to achieve the deterrent effect: nonmonetary directives, an order to pay a penalty to the court, or an order directing payment to the movant of all the reasonable attorney's fees and other expenses incurred directly resulting from the violation.  Fed. R. Civ. P. 11(c)(4).

Here, it would be appropriate for the court to sanction Amazon by awarding Parler all the reasonable attorney's fees and other expenses incurred as a result of Amazon's frivolous Notice of Removal—*i.e.*, all of the fees and costs that Parler has incurred in litigating this case in federal court, since Amazon removed.  *See Breckenridge Prop. Fund 2016, LLC v. Eriks*, 2018 WL 4772085, at *4 (W.D. Wash. Oct. 3, 2018) (court awarded fees and costs due to improper removal and set briefing schedule for plaintiff's fee petition).

**V.    CERTIFICATION OF COMPLIANCE WITH  FRCP 11(c)(2) AND CONFERRAL**

Parler has complied with the "safe harbor" provision under Fed. R. Civ. Proc. 11(c)(2) by serving Amazon's counsel with a copy of this motion 21 days prior to filing, on April 29, 2021. Calfo Decl., ¶ 21.  In addition, Parler's counsel previously demanded that Amazon withdraw its Notice of Removal and agree to remand on two other occasions.  *Id.* at ¶ 17.  As of the date of filing this motion, Amazon has refused to withdraw or amend its Notice of Removal.

Pursuant to the Court's Standing Order on all Civil Cases, Section II(C), the parties met and conferred concerning this motion on March 12, 2021 to discuss the substance of this motion.

PLAINTIFF'S MOTION FOR RULE 11 SANCTIONS
(Case No. 2:21-cv-00270) - 11

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101-3808
TEL (206) 407-2200  FAX (206) 407-2224

Calfo Decl., ¶22. Angelo Calfo, Andrew DeCarlow, and Henry Phillips from Calfo Eakes LLP and Ambika Kumar and Alonzo Wickers from Davis Wright Tremaine LLP attended the conference via Zoom video. *Id.* Following the meeting, the parties exchanged emails and correspondence on this same subject matter. On April 30, 2021, the parties agreed that their meet and confer obligations had been met.

## VI.   **CONCLUSION**

For these reasons, Parler requests that this Court award an appropriate sanction against Amazon pursuant to Fed. R. Civ. P. 11(c) sufficient to deter Amazon and other parties from filing (or standing on) noe3tices of removal containing knowingly or recklessly false information. These sanctions should include, at a minimum, all fees and costs incurred by Parler in connection with Amazon's removal to federal court and in bringing this instant motion.

DATED this 30th day of April, 2021.

**CALFO EAKES LLP**

By_____*/s/Angelo J. Calfo*_____
Angelo J. Calfo, WSBA# 27079
1301 Second Avenue, Suite 2800
Seattle, WA 98101
Phone: (206) 407-2200
Fax: (206) 407-2224
Email: angeloc@calfoeakes.com

**DAVID J. GROESBECK, P.S.**

David J. Groesbeck, WSBA # 24749
1333 E. Johns Prairie Rd.
Shelton, WA 98584
Phone: (509) 747-2800
Email: david@groesbecklaw.com

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101-3808
TEL (206) 407-2200  FAX (206) 407-2224

**SCHAERR |JAFFE LLP**

Gene C. Schaerr (*pro hac vice to be submitted*)
H. Christopher Bartolomucci (*pro hac*
1717 K Street NW, Suite 900
Washington, DC 20006

*Counsel for Plaintiff Parler LLC*

LAW OFFICES
**CALFO EAKES LLP**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101-3808
TEL (206) 407-2200  FAX (206) 407-2224

# EXHIBIT B

Electronically Filed
5/7/2021 3:52 PM
Steven D. Grierson
CLERK OF THE COURT

1   MICHAEL D. RAWLINS, ESQ.
    Nevada Bar No. 5467
2   **SMITH & SHAPIRO, PLLC**
3   3333 E. Serene, Ste. 130
    Henderson, Nevada 89074
4   Telephone: (702) 318-5033
    Facsimile: (702) 318-5034
5   mrawlins@smithshapiro.com
    *Attorneys for Defendant NDMAscendant, LLC*
6

7                       **DISTRICT COURT**

8                   **CLARK COUNTY, NEVADA**

9   JOHN MATZE, an individual,                CASE NO.: A-21-831556-B
                                              DEPT. NO.:   XIII
10

11                              Plaintiff,    **DEFENDANT NDMASCENDANT,
              vs.                             LLC'S MOTION TO DISMISS**
12
    PARLER LLC; NDMASCENDANT, LLC;            *Hearing Requested*
13  JEFFREY WERNICK; MARK MECKLER; DAN
    BONGINO; REBEKAH MERCER; DOES 1-X,
14  and ROE CORPORATIONS XI-XX,

15                              Defendants.

16

17          Defendant NDMAscendant, LLC, by and through its undersigned attorneys of record,

18  hereby moves this Court to dismiss Plaintiff John Matze's Complaint pursuant to Rule 12(b)(5)

19  of the Nevada Rules of Civil Procedure.   This motion is based on the attached points and

20  authorities, all prior pleadings and proceedings had herein, and matters of judicial notice.

21          DATED this 7th day of May, 2021.

22                                            **SMITH & SHAPIRO, PLLC**

23

24                                    By:  /s/ Michael Rawlins
                                          MICHAEL D. RAWLINS, ESQ.
25                                        Nevada Bar No. 5467
                                          **SMITH & SHAPIRO, PLLC**
26                                        3333 E. Serene, Ste. 130
                                          Henderson, Nevada 89074
27                                        *Attorneys for Defendant NDMAscendant, LLC*

28

                                             1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## MEMORANDUM OF POINTS AND AUTHORITIES

## PRELIMINARY STATEMENT

Plaintiff John Matze has sued Defendant NDMAscendant, LLC ("NDMA"), alleging that he was fired without cause, defamed, and cheated out of his ownership stake in social networking platform Parler.  Each of Plaintiff's claims is deficient.  He alleges against NDMA three causes of action sounding in contract, but the Complaint contains no allegations which, if any, contractual provisions were breached or how.  The Complaint alleges that Plaintiff was tortiously discharged in violation of public policy and that NDMA and others conspired to effect that discharge, but contains no allegations of a public policy violation cognizable under the law.  And Plaintiff alleges that NDMA defamed and slandered him and conspired with others to do so, but makes only one flaccid allegation of a publication made by Defendant Dan Bongino.  Even with the benefit of Nevada's liberal notice pleading standard, Plaintiff's Complaint utterly fails to establish the legal elements necessary to entitle Plaintiff to relief.  For this reason, the Complaint should be dismissed pursuant to NRCP 12(b)(5).

## FACTS ALLEGED

The facts set forth in Plaintiffs' Complaint are treated as true for purposes of this Motion. *See Vacation Vill., Inc. v. Hitachi Am., Ltd.*, 110 Nev. 481, 484, 874 P.2d 744, 746 (1994) (citing *Capital Mortgage Holding v. Hahn,* 101 Nev. 314, 315, 705 P.2d 126 (1985)).  For purposes of this Motion to Dismiss, only a few of the alleged facts matter:

- Plaintiff John Matze is the former CEO of Parler LLC ("Parler"), a Nevada LLC that operates a social networking platform.  (Compl. ¶¶ 1, 3.)

- Plaintiff alleges that he was fired from his position at Parler without reason (*id.* ¶ 41), allegedly defamed by Defendant Dan Bongino (*id.* ¶ 44) and bought out of his stake in Parler at an unfair price (*see id.* ¶ 45).

- The buyout of his stake in Parler was undertaken pursuant to the Parler Operating Agreement.  (*Id.*)

/ / /

/ / /

**ARGUMENT**

**THE COMPLAINT SHOULD BE DISMISSED BECAUSE IT FAILS TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED**

The Complaint should be dismissed because it fails to state a claim upon which relief can be granted. Plaintiff alleges seven theories for relief against NDMA: Count I (Breach of Contract), Count II (Breach of Implied Covenant of Good Faith and Fair Dealing), Count III (Conspiracy to Induce Breach of Contract), Count VI (Tortious Discharge), Count VII (Conspiracy to Commit Tortious Discharge), Count VIII (Defamation/Slander Per Se), and Count IX (Conspiracy to Commit Defamation/Slander Per Se). Not one of these claims satisfies its requisite legal elements, and the Complaint should be dismissed in its entirety.

**I.    Plaintiff's Complaint Fails to Allege Facts Sufficient to Support a Breach of Contract Claim, Even Under Nevada's Liberal Notice Pleading Standard.**

It is incumbent upon plaintiffs "to set forth the facts which support a legal theory." *Liston v. Las Vegas Metro. Police Dep't*, 111 Nev. 1575, 1578, 908 P.2d 720, 723 (1995). This is true even though Nevada is a notice pleading state, and its courts liberally construe pleadings to "place into issue matters which are fairly noticed to the adverse party." *W. States Const., Inc. v. Michoff*, 108 Nev. 931, 936, 840 P.2d 1220, 1223 (1992). In the contract context, this requires explaining *how* a contract was breached, *what* specific provisions were breached, *who* acted to breach it, *what* those acts were, and *how* they caused damage.

The Nevada Supreme Court has affirmed the dismissal of breach of contract claims which fail to plead facts sufficient to identify the breach. In *Davenport v. GMAC Mortg.*, 129 Nev. 1109 (2013),[1] for instance, an alleged victim of identity theft sued a mortgage company for breach of contract. The mortgage company moved to dismiss, arguing that the complaint did not state its breach of contract claim with the required degree of particularity. The district court agreed, and

/ / /

/ / /

/ / /

---

[1] *Davenport* is an unpublished disposition.

3

the Nevada Supreme Court affirmed:

> In his second amended complaint, Davenport … stated that he "had one or more contracts with ... Lender, orally and/or in writing." Davenport did not identify what provisions of these alleged contracts were breached, much less what breaches were attributable to GMAC. He simply asserted that GMAC and the other defendants "breached the contract terms causing damages to [him]."  Although a plaintiff's pleadings are liberally construed when considering an NRCP 12(b)(5) motion to dismiss for failure to state a claim, pleadings nonetheless must give fair notice of the nature and basis of a legally sufficient claim and the relief requested.  As pleaded, Davenport's breach of contract claim wholly failed to give GMAC fair notice as to the nature of his claim.

(internal citations omitted).  The Supreme Court similarly affirmed NRCP 12(b)(5) dismissal of a breach of contract claim in *Loo v. Deets*, 132 Nev. 1001 (2016)[2] because the complaint's "bare assertions that … unidentified terms of th[e] contract were breached due to various violations of the Nevada Physical Therapy Code of Ethics were insufficient to satisfy Nevada's notice-pleading standard."  A breach of contract claim was likewise dismissed in *Echevarria v. Echevarria*, 131 Nev. 1274 (Nev. App. 2015),[3] where the plaintiff did not "explain how the trust agreement created a contract between himself and [defendant] or how [defendant] breached any provision of the trust agreement creating a contractual duty to [plaintiff]."  The common theme: complaints that fail to explain how a contract was breached do not state a claim for breach of contract.

Cases decided in Nevada under NRCP 12(b)(5)'s "federal counterpart" are also illustrative.[4]  The breach of contract claim in *CASS, Inc. v. Prod. Pattern & Foundry Co.*, No.

---

[2] *Loo* is an unpublished disposition.

[3] *Echevarria v. Echevarria* is an unpublished decision.

[4] *Breliant v. Preferred Equities Corp.*, 109 Nev. 842, 847, 858 P.2d 1258, 1261 (1993) (describing FRCP 12(b)(6) as NRCP 12(b)(5)'s "federal counterpart").  Note that Nevada has not adopted the "plausibility" requirement of the federal notice pleading standard.  *McGowen , Tr. of McGowen & Fowler, PLLC v. Second Jud. Dist. Ct. in & for Cty. of Washoe*, 134 Nev. 733, 740, 432 P.3d 220, 225 (2018) (distinguishing *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) and *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)); *Garcia v. Prudential Ins. Co. of Am.*, 129 Nev. 15, 18, 293 P.3d 869, 871 n.2 (2013) (same).  Defendant NDMA contends that Plaintiff's complaint is deficient because it fails to include sufficient facts, not because the facts it includes are implausible.  For this reason, the federal cases cited (which also have nothing to do with plausibility) are persuasive.

3:13-CV-00701-LRH, 2014 WL 3870247 (D. Nev. Aug. 7, 2014) "failed to satisfy [the] notice pleading standard" because it did "not adequately allege the nature or terms of the agreement such that [defendant], or the Court, would have notice of the roles that either party played in the transaction." *Id.* at *4.   The court characterized plaintiff's pleading as "nothing more than a formulaic recitation of the [elements] of a breach of contract claim," and further stated that:

> [T]he Court is unable to decipher how [defendant's] failure to fulfill the sales orders, failure to pay to unwind a portion of the alleged agreement with CASS, and failure to pay for the rollover charges, fees, and costs that CASS incurred to Alcoa was a breach of the alleged agreement, as there is no indication of what [defendant's] obligations were thereunder.  For this reason as well, the Court finds that CASS' [] causes of action for breach of contract fail to give [defendant] fair notice of the grounds on which the claims rest. Accordingly, CASS' [] causes of action for breach of contract shall be dismissed for failure to state a claim.

*Id.* at 5.

Cited by CASS was *Gowen v. Tiltware LLC*, No. 208-CV-01581-RCJ-RJJ, 2009 WL 1441653 (D. Nev. May 19, 2009), *aff'd*, 437 F. App'x 528 (9th Cir. 2011).  The defendants there moved to dismiss a breach of contract action for failure to state a claim, arguing that "Gowen [the plaintiff] has failed to allege the specific terms of the Agreement, namely the obligations that she was required to perform under the Agreement in return for her 1% ownership interest in the Companies." *Id.* at *3.  The court granted the motion, explaining, "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.*

Like the complaints in *Davenport*, *Loo*, *Echevarria*, and the cited District of Nevada cases, Plaintiff's complaint contains little more than labels, conclusions, and a formulaic recitation of the elements of a breach of contract claim.  Not a single provision of the Operating Agreement can be found in the Complaint, which makes no attempt to "decipher" which of the dozens of accusations levied against Defendants constitutes a breach of the contract, or how.  In short, Defendants have not been given fair notice of the grounds upon which Count I rests, and it should therefore be dismissed.

## II.   Count II (Breach of Implied Covenant of Good Faith and Fair Dealing) is Deficiently Pleaded and Should Be Dismissed.

### A.   By failing to allege facts sufficient to support a breach of contract claim, Plaintiff's complaint also fails to allege facts sufficient to support a claim for breach of the implied covenant of good faith and fair dealing.

To prevail on a cause of action for breach of the implied covenant of good faith and fair dealing ("implied covenant") under Nevada law, a plaintiff must show:  (i) the existence of a valid, enforceable contract; (ii) the defendant's performance in a manner that is unfaithful to the purpose of the contract and the justified expectations of the plaintiff; and (iii) resulting damages sustained by the plaintiff.  *Parker v. Greenpoint Mortg. Funding Inc.*, No. 3:11-CV-00039-ECR, 2011 WL 2923949, at *7 (D. Nev. July 15, 2011) (citing *Perry v. Jordan*, 111 Nev. 943, 948, 900 P.2d 335 (1995)); *Camacho-Villa v. Great W. Home Loans*, No. 3:10-CV-210-ECR-VPC, 2011 WL 1103681, at *6 (D. Nev. Mar. 23, 2011) (same).

Because the first element of an implied covenant claim is the existence of a valid, enforceable contract, dismissal is proper where the defendant's contractual obligations cannot be construed from the complaint.  For example, 12(b)(5) dismissal was warranted in *Whitney v. CTX Mortg. Co., LLC*, No. 3:11-CV-0037-LRH-RAM, 2011 WL 1808093 (D. Nev. May 12, 2011), as "the Whitneys fail[ed] to allege how CTX breached its duty under the contract or how CTX was unfaithful to its obligations to provide the loan … Therefore, based on the unsupported conclusory allegations in the complaint, the court finds that the Whitneys have failed to state a claim for breach of the implied covenants of good faith and fair dealing." *Id*. at *2.

Count I fails to state a claim upon which relief can be granted because it lacks any "specific terms" from which to determine Defendants' obligations under the Operating Agreement.  Count II fails for the same reason.  By omitting specific contractual terms and corresponding factual assertions, Plaintiff's claim fails to allege that Defendants performed in a manner unfaithful to the purpose of the Operating Agreement or Plaintiff's justified expectations.  What was the precise duty of good faith and fair dealing, if not found withing the Operating Agreement's express terms? Which actions (and whose actions) violated that duty by being unfaithful to the purpose of the

contract or the plaintiff's justified expectations? How did this damage Plaintiff?  The Complaint

provides no answers.  Plaintiff's main complaints—his termination and an alleged defamatory

statement—do not implicate Plaintiff's rights as a Member under the Operating Agreement.

Plaintiff complains about Parler's purchase of his shares, but does not describe the Agreement's

terms governing the prerequisites or procedures for the purchase.  He fails to state how Parler's

purchase diverged from the purpose of those provisions or to describe his own "justified"

expectations regarding those provisions.  These are essential elements for a claim for breach of

the implied covenant.  Their absence means that Count II must be dismissed.[5]

**B.**   **NDMA is not liable for breach of the implied covenant of good faith and fair dealing.**

A claim for breach of the implied covenant of good faith and fair dealing "does not arise

simply from a particularly egregious or willful breach of a contract, as litigants often imply by

reflexively pleading bad faith along with nearly every breach of contract claim."  *Kennedy v.*

*Carriage Cemetery Servs., Inc.*, 727 F. Supp. 2d 925, 930 (D. Nev. 2010).  Instead, "[a] bad faith

claim is predicated on the abuse of a fiduciary relationship existing between parties to certain

kinds of contracts." *Id.*

> Although every contract contains an implied covenant of good faith
> and fair dealing, an action in tort for breach of the covenant arises
> only "in rare and exceptional cases" when there is a special
> relationship between the victim and tortfeasor. A special
> relationship is "characterized by elements of public interest,
> adhesion, and fiduciary responsibility." Examples of special
> relationships include those between insurers and insureds, partners
> of partnerships, and franchisees and franchisers. Each of these
> relationships shares "a special element of reliance" common to
> partnership, insurance, and franchise agreements. We have
> recognized that in these situations involving an element of reliance,
> there is a need to "protect the weak from the insults of the stronger"

---

[5] See *Stebbins v. Geico Ins. Agency*, No. 218CV00590APGGWF, 2019 WL 281281, at *3 (D. Nev. Jan. 22, 2019) ("While plaintiffs may plead both breach of contract and breach of the implied covenants as alternative theories of liability, all elements of each cause of action must be properly pleaded.  That is not the case with Stebbins's complaint, which uses the same allegation for both breach of contract and breach of the implied covenant of good faith and fair dealing. Accordingly, the complaint fails to state a claim for contractual breach of the implied covenant of good faith and fair dealing, and I dismiss this claim without prejudice.").

> that is not adequately met by ordinary contract damages. In addition, we have extended the tort remedy to certain situations in which one party holds "vastly superior bargaining power."

*Id.* Accordingly, the "threshold inquiry" for a breach of the implied covenant claim is whether the breaching party owed a fiduciary duty to the non-breaching party. *Id.*

Nevada law does not impose on an LLC any fiduciary duties toward its members, managers, or officers. And while the Operating Agreement could have bound the company and its members in a special relationship, the parties chose instead to disclaim fiduciary duties altogether. *See* Exhibit A, § 12.02 ("This Agreement is not intended to, and does not, create or impose any fiduciary duty on any Covered Person.  Furthermore, each of the Members and the Company hereby waives any and all fiduciary duties that, absent such waiver, may be imposed by Applicable Law[.]").  This is not the "rare and exceptional case" when there is a special relationship between the alleged victim and alleged tortfeasor.  Breach of the implied covenant claims being predicated as they are on the abuse of a fiduciary relationship, Plaintiff's cause of action against NDMA must be dismissed.

## III.   Count III (Conspiracy to Induce Breach of Contract) is Deficiently Pleaded and Should Be Dismissed.

### A.   By failing to allege facts sufficient to support a breach of contract claim, Plaintiff's complaint also fails to allege facts sufficient to support a claim for conspiracy to induce breach of contract.

Civil conspiracy has only two elements. Plaintiff's Conspiracy to Induce Breach of Contract claim fails both.

First, civil conspiracy requires the *commission* of an underlying tort.  *Boorman v. Nevada Mem'l Cremation Soc'y, Inc.*, 772 F. Supp. 2d 1309, 1315 (D. Nev. 2011) (emphasis added). "Conspiracy is not an independent cause of action in and of itself, but it must be premised on an intentional tort."  *Fung Ying Leung v. Mortg. Elec. Registration Sys., Inc.*, No. 2:12-CV-1393 JCM VCF, 2013 WL 237225, at *4 (D. Nev. Jan. 22, 2013) (citing *Eikelberger v. Tolotti,* 611 P.l2d 1086, 1188 (Nev.1980).  A conspiracy is "activated by the commission of the actual tort," and "dismissal of the substantive tort claim defeats the related claim for a civil conspiracy." James

L. Buchwalter & Lonnie E. Griffith, Jr, § 8 Underlying tort claim, 15A C.J.S. (citing *Applied Equipment Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal. 4th 503, 28 Cal. Rptr. 2d 475, 869 P.2d 454 (1994)).  *See also Flynn v. Liner Grode Stein Yankelevitz Sunshine Regenstreif & Taylor LLP,*, No. 3:09-CV-00422-PMP, 2010 WL 4339368, at *11 (D. Nev. Oct. 15, 2010) ("[A] civil conspiracy does not give rise to a cause of action unless a civil wrong has been committed resulting in damage.").

The tort underlying a claim for "conspiracy to induce breach of contract" is intentional interference with contractual relations,[6] and a claim for tortious interference cannot stand without a breach of contract.  *Lake at Las Vegas Invs. Grp., Inc. v. Pac. Malibu Dev. Corp.*, 867 F. Supp. 920, 924 (D. Nev. 1994), aff'd, 78 F.3d 593 (9th Cir. 1996) ("[T]he tortious interference claims cannot survive because Joint Venture caused no breach[.]").  *See also Cunningham Implement Co. v. Deere & Co.*, No. C7-95-1148, 1995 WL 697555, at *3 (Minn. Ct. App. Nov. 28, 1995); *McArdle v. Peoria Sch. Dist. No. 150*, 705 F.3d 751, 755 (7th Cir. 2013) (concluding that there was no breach of contract, and without a breach, there was no tortious interference with the contract); *Volvo Trademark Holding Aktiebolaget v. CLM Equip. Co.*, 236 F. Supp. 2d 536, 557 (W.D.N.C. 2002) ("Since the Court has found that the contracts were not breached, this [tortious interference] claim falls as well.").

Plaintiff's complaint fails to state a claim for breach of contract.  *See* I, *supra*.  Without a breach, Plaintiff cannot allege tortious interference.  And without tortious interference, Plaintiff cannot allege a conspiracy to commit tortious interference.

/ / /

/ / /

/ / /

/ / /

---

[6] *Hilton Hotels Corp. v. Butch Lewis Prods., Inc.*, 109 Nev. 1043, 1048, 862 P.2d 1207, 1210 (1993) (claim for conspiracy to induce breach of a boxing contract relied on plaintiff's ability to establish the elements of intentional interference with contractual relations).  *See also Tousa Homes Inc. v. Phillips*, 363 F. Supp. 2d 1274, 1283 (D. Nev. 2005) (claim for conspiracy to induce breach of asset purchase agreement relied on plaintiff's ability to establish the elements of intentional interference with contractual relations).

**B.   Plaintiff has failed to plead any facts alleging an agreement among the parties to breach the contract, or that each Defendant acted tortiously as part of an agreement.**

The second element of civil conspiracy is "an agreement between the defendants to commit [the accomplished] tort." *Boorman v. Nevada Mem'l Cremation Soc'y, Inc.*, 772 F. Supp. 2d at 1315. "[A] plaintiff must provide evidence of an explicit or tacit agreement between the alleged conspirators." *Guilfoyle v. Olde Monmouth Stock Transfer Co.*, 130 Nev. 801, 813, 335 P.3d 190, 198 (2014). While direct evidence of a meeting of the minds is not required, bare allegations are insufficient to sustain a claim for conspiracy. *Id.* (dismissing conspiracy claim where plaintiff "presented no circumstantial evidence from which to infer an agreement between [defendants] to harm [him]"). And while proof of an agreement is a necessary condition to civil conspiracy, it is not a sufficient condition. "Proof of an agreement alone is not sufficient, however, because it is essential that the conduct of each tortfeasor be in itself tortious." *Dow Chem. Co. v. Mahlum*, 114 Nev. 1468, 1489, 970 P.2d 98, 112 (1998) (emphasizing that proving the existence of an agreement requires more than evidence of concerted action).

The Complaint fails to provide even circumstantial evidence of an agreement among the Defendants to injure Plaintiff by interfering with the Operating Agreement. The paragraphs in the complaint insinuating a tortious interference conspiracy are, at best, bare allegations as to concerted action. Such allegations do not suffice under Nevada law. Count III should thus be dismissed.

**IV.   Count VII (Conspiracy to Commit Tortious Discharge) is Deficiently Pleaded and Should Be Dismissed.**

**A.   By failing to allege the commission of an underlying tortious discharge, Plaintiff fails to state a claim for conspiracy to commit tortious discharge.**

A claim for civil conspiracy cannot stand without a viable underlying tort claim. *See* III.A, *supra*. The Complaint fails to state a claim for tortious discharge. Plaintiff's claim for conspiracy to commit tortious discharge must therefore be dismissed under Rule 12(b)(5) as well.

Successful claims for tortious discharge fall into two categories. The first category involves "whistleblowers"—employees terminated for reporting an employer's illegal conduct.

1   The second category is for employees fired for "doing something or refusing to do something that

2   public policy entitles or empowers the employee[s] to do or not to do." *Buchanan v. Watkins &*

3   *Letofsky, LLC*, 2019 WL 3848785, at *6 (D. Nev. Aug. 15, 2019) (citing *Bigelow v. Bullard*, 901

4   P.2d 630, 634 (Nev. 1995)).  Employees in the second category must establish that the reasons

5   for their termination "violated strong and compelling public policy." *Id.* at *6 (citing *Ozawa v.*

6   *Vision Airlines, Inc.*, 216 P.3d 788, 791 (Nev. 2009)).  The concept of "strong and compelling

7   public policy" is "severely limited"[7] and has traditionally been reserved for cases involving

8   illegality, inherently unsafe working conditions, or jury duty.[8]  Nevada courts have consistently

9   declined to extend the doctrine of tortious discharge beyond these two narrow, recognized

10  exceptions.[9]  Otherwise, "the theory of third-party retaliatory discharge would have no logical

11  stopping point." *Brown v. Eddie World, Inc.*, 131 Nev. 150, 154, 348 P.3d 1002, 1004 (2015).  It

12  is not enough for a plaintiff to show that he was discharged for "no reason," or even for "wrong

13  reasons." *Bigelow*, 111 Nev. at 1183.  Accordingly, tortious discharge claims have been dismissed

14  even where, for example, employees were fired because of age discrimination[10] or for refusing to

15  prosecute a charge not supported by probable cause.[11]

16      Like each of Plaintiff's other causes of action, Count VI is exceedingly nebulous, failing

17  to identify the public policy on which his claim for tortious discharge is premised.  For this reason

18  alone, the claim should be dismissed under Rule 12(b)(5), which requires plaintiffs to provide

19  notice of their legal theories.  If Defendants were to guess, Plaintiff must believe that his

20  termination was tortious because he was "entitled" by public policy to implement his allegedly

21  more restrictive ideas on content moderation.

22  / / /

23

---

24  [7] *Sands Regent v. Valgardson,* 105 Nev. 436, 440, 777 P.2d 898, 900 (1989).

25  [8] *Wayment v. Holmes*, 112 Nev. 232, 237, 912 P.2d 816, 819 (1996).

26  [9] *Buchanan*, 2019 WL 3848785, at *6 (citing *Brown v. Eddie World, Inc.*, 348 P.3d 1002, 1004 (Nev. 2015); *Chavez v. Sievers*, 43 P.3d 1022, 1028 (Nev. 2002); *Sands Regent*, 105 Nev. at 440, 777 P.2d at 900; *Ainsworth v. Newmont Min. Corp.*, 128 Nev. 878, 381 P.3d 588 (2012)).

27  [10] *Sands Regent*, 105 Nev. at 440, 777 P.2d at 900.

28  [11] *Wayment*, 112 Nev. at 236, 912 P.2d at 818.

11

Even taking the Complaint's facts as true, differences of opinion about content moderation do not rise to the level of "strong and compelling public policy."  Plaintiff is not a whistleblower, and unlike successful plaintiffs in the second category of tortious discharge, Plaintiff has not asserted that his termination was motivated by a refusal to engage in illegal activity or work under inherently unsafe conditions.  Rather, Plaintiff's claim appears to be supported by little else than his purported objection to what he claims were Parler's policies on content moderation, and "[m]erely objecting to company policies . . . is not the kind of conduct that can provide a basis for a tortious discharge action."  *Bigelow*, 111 Nev. at 1186.[12]  From the face of his complaint, then, Plaintiff's claim does not fall into either of Nevada's two narrow categories of tortious discharge.

In the absence of an adequately pleaded underlying tort, Plaintiff's claim for conspiracy to commit tortious discharge fails.

**B.  The conspiracy to commit tortious discharge claim likewise fails because Plaintiff has no evidence of an agreement between the Defendants.**

A complaint alleging civil conspiracy must also provide evidence from which to infer an explicit or tacit or agreement between the defendants.  *See* III.B, *supra*.  Bare allegations are not enough, and neither is evidence of concerted action.  The Complaint fails to provide even circumstantial evidence of a conspiratorial agreement between any two defendants (let alone all six).  Count VII should thus be dismissed.

**V.  Count VIII (Defamation/Slander Per Se) is Deficiently Pleaded and Should Be Dismissed.**

**A.  The Complaint fails to allege facts sufficient to support a defamation claim, even under Nevada's liberal notice pleading standard.**

The Complaint alleges defamation without identifying so much as a single allegedly defamatory statement.  In fact, Plaintiff's pleading fails even to adequately describe the publication containing the allegedly defamatory statements, the only identifying information being "February 3, 2020"—a date predating Plaintiff's termination by nearly a year.  (*See* Compl.

---

[12] *See also Wayment*, 112 Nev. at 237, 912 P.2d at 819 ("[T]erminating an at-will employee for insubordination is not contrary to public policy.").

¶ 44.)  In an adversarial legal system, it is the job of plaintiff, not the defendant, to identify statements potentially giving rise to defamation liability.  Counts VIII and IX fail to give adequate notice to the Defendants and this Court and should be dismissed.

### B.   The Complaint does not allege that defamatory statements were published by anyone but Mr. Bongino.

The first element of a defamation claim is "a false and defamatory statement of fact *by the defendant* concerning the plaintiff."  *Pope v. Motel 6*, 121 Nev. 307, 315, 114 P.3d 277, 282 (2005) (emphasis added).  Because the statements challenged by Plaintiff were made and published by Mr. Bongino alone, the Complaint fails to identify any statement of fact *by NDMA* concerning Plaintiff. The unfounded assertions that "Defendants enlisted what they considered to be their public relations 'bulldog,' Bongino, to lead the attack on Matze's personal and professional reputation" and that "Matze believes and alleges that [Bongino's] statement was ... at the direction and involvement of the other Defendants" may accuse the other individual defendants of civil conspiracy, but they are insufficient to plead a claim for defamation against anyone but Mr. Bongino.

## VI.   Count IX (Conspiracy to Commit Defamation/Slander Per Se) is Deficiently Pleaded and Should Be Dismissed.

### A.   By failing to allege the commission of an underlying defamation tort, Plaintiff's claim for conspiracy to commit defamation also fails.

The commission of an underlying tort is a prerequisite for a civil conspiracy claim.  *See* III.A, *supra*.  For reasons outlined above, Plaintiff has not pleaded the elements of defamation against Mr. Bongino or any other defendant. Without the commission of the underlying tort, Plaintiff's conspiracy claim necessarily fails.

### B.   The conspiracy to commit defamation claim likewise fails because Plaintiff has no evidence of an agreement between Mr. Bongino and the other defendants.

A complaint alleging civil conspiracy must also provide evidence from which to infer an explicit or tacit or agreement between the defendants.  *See* III.B, *supra*.  The facts alleged in the Complaint do not evince an explicit or tacit agreement to defame Plaintiff.  The statement that

"Defendants enlisted ... their public relations 'bulldog,' Bongino, to lead the attack on Matze's personal and professional reputation" and that "Matze believes and alleges that [Bongino's] statement ... was at the direction and involvement of the other Defendants" is a bald conclusion, not a good-faith factual allegation.   Without factual allegations supporting a conspiratorial agreement between the defendants, Plaintiff cannot state a claim for conspiracy to commit defamation.

<div align="center">

**CONCLUSION**

</div>

For the reasons set forth above, Counts I, II, III, VII, VIII, and IX should be dismissed pursuant to NRCP 12(b)(5) because Plaintiff has failed to state a claim upon which relief can be granted.

DATED this 7th day of May, 2021.

**SMITH & SHAPIRO, PLLC**

By:  /s/ Michael Rawlins

MICHAEL D. RAWLINS, ESQ.
Nevada Bar No. 5467
**SMITH & SHAPIRO, PLLC**
3333 E. Serene, Ste. 130
Henderson, Nevada 89074
*Attorneys for Rebekah Mercer*

1

## <u>CERTIFICATE OF SERVICE</u>

2

I HEREBY CERTIFY that I am an employee of Smith & Shapiro, PLLC and that, on this

3

7th day of May 2021, I served a true and correct copy of the foregoing **DEFENDANT**

4

**NDMASCENDANT, LLC'S MOTION TO DISMISS** by e-serving a copy on all parties listed

5

as Service Recipients in Odyssey File & Serve, the Court's on-line, electronic filing website,

6

pursuant to Administrative Order 14-2, entered on May 9, 2014.

7

8

 /s/ *Jennifer A. Bidwell*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

# EXHIBIT A

THIS AGREEMENT RESTRICTS THE TRANSFERABILITY OF THE MEMBERSHIP INTERESTS EVIDENCED HEREBY. FURTHER, THE MEMBERSHIP INTERESTS EVIDENCED BY THIS AGREEMENT HAVE NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION, NOR WITH THE COMMISSIONER OF SECURITIES OF ANY STATE, BUT HAVE BEEN ISSUED PURSUANT TO VARIOUS EXEMPTIONS UNDER THE FEDERAL SECURITIES ACT OF 1933, AS AMENDED, AND APPLICABLE STATE SECURITIES ACT EXEMPTIONS. ACCORDINGLY, THE SALE, TRANSFER, PLEDGE, HYPOTHECATION OR OTHER DISPOSITION OF ANY OF THE MEMBERSHIP INTERESTS IS RESTRICTED AND MAY NOT BE ACCOMPLISHED EXCEPT IN ACCORDANCE WITH THIS AGREEMENT AND AN APPLICABLE REGISTRATION STATEMENT OR AN OPINION OF COUNSEL SATISFACTORY TO THE COMPANY THAT A REGISTRATION STATEMENT IS NOT REQUIRED.

## PARLER LLC

## OPERATING AGREEMENT

**THIS OPERATING AGREEMENT** (this "Agreement") of Parler LLC (the "Company") is made and entered into as of the 19th day of March, 2019, by and among the Members whose signatures appear on the signature page hereof or on counterpart signature pages hereof.

## W I T N E S S E T H:

**WHEREAS**, Articles of Organization for the Company were filed with the Nevada Secretary of State on May 17, 2018.

**NOW, THEREFORE**, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

## ARTICLE I
## DEFINITIONS

The following terms used in this Agreement shall have the following meanings:

(a)     "Achievement Date" shall mean the first date on which the NDM Member has received distributions, in the aggregate, in an amount that is equal to all of its Capital Contributions and loans.

(b)     "Act" shall mean Chapter 86 of the Nevada Revised Statutes, as amended from time to time.

(c)     "Affiliate" shall mean, with respect to any Person (i) any Person directly or indirectly controlling, controlled by or under common control with such Person, (ii) any officer, director, general partner, member or trustee of such Person or (iii) any Person who is an officer, director, general partner, member or trustee of any Person described in clauses (i) or (ii) of this sentence. For purposes of this definition, the terms "controlling," "controlled by" or "under common control with" mean the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise, or the power to elect at least fifty percent (50%) of the directors, managers, general members, or persons exercising similar authority with respect to such Person or Entities.

ACTIVE 30313098v9

(d)    "Agreement" shall mean this Operating Agreement of the Company, as originally executed and as amended from time to time.

(e)    "Applicable Taxes" shall have the meaning set forth in Section 9.05.

(f)    "Articles of Organization" shall mean the Articles of Organization of the Company, as filed with the Secretary of State of Nevada, as amended from time to time.

(g)    "Assumed Tax Rates" shall mean the tax rates that the Managers reasonably determine to be the maximum net aggregate tax rates applicable to an individual Member resident in Las Vegas, Nevada in respect of Applicable Taxes, taking into account the character of the income (i.e. ordinary income, qualified dividend income, short-term capital gains or long-term capital gains) and the deductibility of state and local income taxes, if any.

(h)    "Bankruptcy Event" shall mean, with respect to a specified Person, (i) the filing of a voluntary petition in bankruptcy, (ii) the adjudication that such Person is bankrupt or insolvent, or the entry against such person of an order for relief in any bankruptcy or insolvency proceeding, (iii) the filing of a petition or answer seeking for such Person any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute law or regulation, (iv) the filing of an answer or other pleading admitting or failing to contest the material allegations of a petition filed against such Person in any proceeding of this nature, or (v) the seeking of, consent to or acquiescence in the appointment of a trustee, receiver or liquidator of all or any substantial part of such Person's assets or the failure to vacate the appointment of a trustee, receiver or liquidator for all or any substantial part of such Person's assets within ninety (90) days from the date of such appointment; provided, however, that in the event of an involuntary action or proceeding brought against, and not initiated by such Person, such Person shall have a period of ninety (90) days in which to cure its default by having the involuntary action or proceeding dismissed.

(i)    "Business Day" shall mean any day other than a Saturday, Sunday or legal holiday under federal law or in the State of Nevada.

(j)    "Capital Account" means, with respect to any Member, the Capital Account maintained for such Member in accordance with Section 1.704-1(b)(2)(iv) of the Treasury Regulations and, in pursuance thereof, the following provisions shall apply:

(i)    To each Member's Capital Account there shall be credited (A) such Member's Capital Contributions, (B) such Member's distributive share of Net Profits and any items in the nature of income or gain that are specially allocated to such Member pursuant to Sections 9.03(a) through 9.03(g), and (C) the amount of any Company liabilities assumed by such Member or that are secured by any property distributed to such Member. The principal amount of a promissory note that is not readily traded on an established securities market and that is contributed to the Company by the maker of the note (or a Member related to the maker of the note within the meaning of Section 1.704-1(b)(2)(ii)(c)) of the Treasury Regulations shall not be included in the Capital Account of any Member until the Company makes a taxable disposition of the note or until (and to the extent) principal payments are made on the note, all in accordance with Section 1.704-1(b)(2)(iv)(d)(2) of the Treasury Regulations;

(ii)    To each Member's Capital Account there shall be debited (A) the amount of money and the Gross Asset Value of any property distributed to such Member pursuant to any provision of this Agreement, (B) such Member's distributive share of Net Losses and any items in the nature of expenses or losses that are specially allocated to such Member pursuant to Sections 9.03(a) through 9.03(g),

ACTIVE 30313096v9

and (C) the amount of any liabilities of such Member assumed by the Company or that are secured by any property contributed by such Member to the Company;

(iii)    In the event a Membership Interest is Transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the Transferred Membership Interest; and

(iv)    In determining the amount of any liability for purposes of subparagraphs (i) and (ii) above there shall be taken into account Code Section 752(c) and any other applicable provisions of the Code and Treasury Regulations.

(v)    If the Capital Accounts are adjusted pursuant to Section 1.704-1(b)(2)(iv)(f) of the Treasury Regulations, the Capital Accounts will be adjusted in accordance with Sections 1.704-1(b)(2)(iv)(g) and 1.704-1(b)(4)(i) of the Treasury regulations.

The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Section 1.704-1(b)(2)(iv) of the Treasury Regulations, and shall be interpreted and applied in a manner consistent with such Treasury Regulations.

(k)    "Capital Contributions" shall mean, with respect to any Member, the amount of money and the initial Gross Asset Value of any property (other than money) contributed to the Company with respect to such Member's Membership Interest.

(l)    "Class A Members" shall mean those Members holding Class A Units, and their successors or assigns who are duly admitted as Class A Members in accordance with the terms hereof. The Class A Members shall have no voting or management rights with regard to the Company.

(m)    "Class A Membership Interest" shall mean, for any Class A Member, the Class A Units in the Company held by the Class A Member divided by the total of all of the Class A Units (expressed as a percentage), as may be adjusted from time to time pursuant to this Agreement, entitling the holder thereof to the rights and subjecting the holder thereof to the obligations of a Class A Member. The Membership Interests of the Class A Members shall be as set forth on Schedule I attached hereto, and as Schedule I may be amended from time to time; provided, however, that the failure to set forth the Class A Membership Interests from time to time on said Schedule I shall not affect the Class A Membership Interests that exist at such time, which shall be based on the aforementioned percentages.

(n)    "Class A Unit" shall mean a unit of the Company representing the ownership of a Class A Membership Interest.

(o)    "Class B Members" shall mean the Members holding Class B Units, and their successors or assigns who are duly admitted as Class B Members in accordance with the terms hereof. The Class B Members shall retain all voting and management rights over the Company.

(p)    "Class B Membership Interest" shall mean, for any Class B Member, the Class B Units in the Company held by the Class B Member divided by the total of all of the Class B Units (expressed as a percentage), as may be adjusted from time to time pursuant to this Agreement, entitling the holder thereof to the rights and subjecting the holder thereof to the obligations of a Class B Member. The Membership Interests of the Class B Members shall be as set forth on Schedule I attached hereto, and as Schedule I may be amended from time to time; provided, however, that the failure to set forth the Class B Membership Interests from time to time on said Schedule I shall not affect the Class B Membership Interests that exist at such time, which shall be based on the aforementioned percentages.

3

(q)     "Class B Unit" shall mean a unit of the Company representing the ownership of a Class B Membership Interest.

(r)     "Code" shall mean the Internal Revenue Code of 1986, as amended, or corresponding provisions of subsequent superseding federal revenue laws.

(s)     "Company" shall mean Parler LLC, a Nevada limited-liability company.

(t)     "Company Minimum Gain" means "partnership minimum gain" determined pursuant to Section 1.704-2(d) of the Treasury Regulations.

(u)     "Confidential Information" means the terms of each Member's investment in the Units, the existence or status of negotiations with respect thereto (including the name of the Company or the names of other investors in the Company in any manner, context or format) or any material non-public information regarding the Company provided to such Member in its capacity as a Member (including information concerning business plans, financial statements, and other information provided pursuant to this Agreement, operating practices and methods, expansion plans, strategic plans, marketing plans, contracts, customer lists, trade secrets, copyrights, inventions, unpublished patents, intellectual property, software code, method, techniques, products or other business documents or processes). Confidential Information also includes other information that is marked or otherwise identified as confidential or proprietary, or that would otherwise appear to a reasonable person to be confidential or proprietary in the context and circumstances in which this information is known or used.

(v)     "Deficit Capital Account" shall mean the deficit balance, if any, in the Capital Account of a Member as of the end of the relevant Fiscal Year, after giving effect to the following adjustments:

(i) credit to such Capital Account any amount which such Member is obligated to restore under Section 1.704-1(b)(2)(ii)(c) of the Treasury Regulations, as well as any addition thereto pursuant to the next to last sentence of Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Treasury Regulations; and

(ii) debit to such Capital Account the items described in Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6) of the Treasury Regulations.

This definition of Deficit Capital Account is intended to comply with the provisions of Treasury Regulation Sections 1.704-1(b)(2)(ii)(d), and shall be interpreted consistently therewith.

(w)     "Depreciation" shall mean for each Fiscal Year or other period an amount equal to the depreciation, amortization or other cost recovery deductions allowable with respect to an asset for such period, except that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such period, Depreciation shall be an amount which bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization or other cost recovery deduction for such year or other period bears to such beginning adjusted tax basis; provided, however, that if the adjusted basis for federal income tax purposes of an asset at the beginning of such period is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Managers, and that to the extent the remedial method described in Section 1.704-3 of the Treasury Regulations is elected pursuant to the terms of this Agreement, depreciation shall be determined pursuant to Section 1.704-3(d)(2) of the Treasury Regulations.

(x)     "Election Period" shall have the meaning set forth in Section 6.06.

4

(y)      "Entity" shall mean any general partnership, limited partnership, limited-liability company, corporation, joint venture, trust, business trust, cooperative, association, foreign trust or foreign business organization.

(z)      "Exercise Notice" shall have the meaning set forth in Section 6.06.

(aa)     "Fair Market Value" of any asset as of any date shall mean the price at which a willing seller would sell, and a willing buyer would buy, the asset in question, both having full knowledge of the relevant facts and being under no compulsion to buy or sell, in an arm's-length transaction without time constraints, as determined in good faith by the Managers based on such factors as the Managers, in the exercise of their reasonable business judgment, consider relevant.

(bb)     "Fiscal Year" shall mean the calendar year.

(cc)     "Foreign Political Figure" shall have the meaning set forth in Section 14.02.

(dd)     "Gross Asset Value" means, with respect to any Company property, the Company's adjusted basis for federal income tax purposes, except as follows:

(i)      The initial Gross Asset Value of any asset contributed by a Member to the Company shall be the gross fair market value of such asset, as determined by the Managers;

(ii)     The Gross Asset Values of all Company assets shall be adjusted to equal their respective gross fair market values (taking Code Section 7701(g) into account), as reasonably determined by the Managers, as of the following times: (A) the acquisition of an additional interest in the Company by any new or existing Member in exchange for more than a de minimis Capital Contribution; (B) the distribution by the Company to a Member of more than a de minimis amount of Company property as consideration for an interest in the Company; (C) the liquidation of the Company within the meaning of Section 1.704-1(b)(2)(ii)(g) of the Treasury Regulations; and (D) in connection with the grant of an interest in the Company (other than a de minimis interest) as consideration for the provision of services to or for the benefit of the Company by an existing Member acting in a member capacity, or by a new Member acting in a member capacity in anticipation of being a Member; provided that an adjustment described in clauses (A), (B), and (D) of this paragraph shall be made only if the Managers reasonably determine that such adjustment is necessary to reflect the relative economic interests of the Members in the Company;

(iii)    The Gross Asset Value of any item of Company assets distributed to any Member shall be adjusted to equal the gross fair market value (taking Code Section 7701(g) into account) of such asset on the date of distribution as reasonably determined by the Managers; and

(iv)     The Gross Asset Values of Company assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code Section 734(b) or Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to (A) Regulations Section 1.704-1(b)(2)(iv)(m) and (B) subparagraph (vi) of the definition of "Net Profits" and "Net Losses" or Section 9.03(g); provided, however, that Gross Asset Values shall not be adjusted pursuant to this subparagraph (iv) to the extent that an adjustment pursuant to subparagraph (ii) is required in connection with a transaction that would otherwise result in an adjustment pursuant to this subparagraph (iv).

If the Gross Asset Value of an asset has been determined or adjusted pursuant to subparagraph (i), (ii), or (iv), such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset, for purposes of computing Net Profits and Net Losses.

(ee)    "Initial Capital Contributions" shall mean the initial capital contributions made by the Members as set forth in the signature section hereof or as set forth on the Members' counterpart signature pages hereto.

(ff)    "Majority Interest" shall mean Class B Member(s) holding greater than fifty percent (50%) of all of the outstanding Class B Units.

(gg)    "Managers" shall mean NDMascendant, LLC and John Matze, and such other Person(s) who become a Manager pursuant to the terms of Article V hereof.

(hh)    "Member" shall mean each of the parties who executes a counterpart of this Agreement as a Member and each of the parties who may hereafter become Members pursuant to the terms hereof. Members shall be divided into Class A Members and Class B Members as set forth in the signature section hereof, and as will be set forth in the listing of Members attached hereto after the signature page.

(ii)    "Membership Interest" shall mean, for any Member, the vested Units held by the Member divided by the total of all outstanding vested Units (expressed as a percentage), as may be adjusted from time to time pursuant to this Agreement, entitling the holder thereof to the rights and subjecting the holder thereof to the obligations of the class of Units held by such Member. The Membership Interests of the Class A and Class B Members shall be as set forth on Schedule I attached hereto, and as Schedule I may be amended from time to time; provided, however, that the failure to set forth the Members' Membership Interests from time to time on said Schedule I shall not affect the Membership Interests of the Members that exist at such time.

(jj)    "Member Nonrecourse Debt" shall have the same meaning as the term "partner nonrecourse debt" in Section 1.704-2(b)(4) of the Treasury Regulations.

(kk)    "Member Nonrecourse Debt Minimum Gain" means an amount, with respect to each Member Nonrecourse Debt, equal to the Company Minimum Gain that would result if such Member Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Section 1.704-2(i)(3) of the Treasury Regulations.

(ll)    "Member Nonrecourse Deductions" shall have the same meaning as the term "partner nonrecourse deductions" in Sections 1.704-2(i)(1) and 1.704-2(i)(2) of the Treasury Regulations.

(mm)    "Misconduct" shall have the meaning set forth in Section 6.06.

(nn)    "Misconduct Notice" shall have the meaning set forth in Section 6.06.

(oo)    "NDM Member" shall mean NDMascendant, LLC, a Delaware limited-liability company.

(pp)    "Net Cash Flow" shall mean, for any period, total cash revenue (excluding Net Cash Proceeds) of the Company reduced by the payment or accrual for payment of all business operating expenses and capital costs relating to the business of the Company and its assets including, without limitation, any and all principal payments, capital expenditures, management and other fees, rent payable under real property leases, interest and other charges or provisions, including reasonable reserves for current and future working capital requirements, contingencies, anticipated obligations, and other charges or provisions as reasonably determined by the Managers of the Company and excluding any deposits held by Company under agreements with third parties.

6

(qq)    "Net Cash Proceeds" shall mean net cash proceeds from the sale or refinancing of assets of the Company after the payment of any related expenses as determined by the Managers. Net Cash Proceeds shall be distributed in the manner set forth in Section 9.04 hereof.

(rr)    "Net Profits" and "Net Losses" shall mean, for each Fiscal Year, an amount equal to the Company's taxable income or loss for such Fiscal Year, determined in accordance with Code Section 703(a) (but including in taxable income or loss, for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code Section 703(a)(1)) with the following adjustments (without duplication):

(i)    any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Net Profits or Net Losses pursuant to this definition of "Net Profits" and "Net Losses" shall be added to taxable income or loss;

(ii)    any expenditures of the Company described in Code Section 705(a)(2)(B) (or treated as expenditures described in Code Section 705(a)(2)(B) pursuant to Regulations Section 1.704-1(b)(2)(iv)(i)) and not otherwise taken into account in computing Net Profits or Net Losses pursuant to this definition of "Net Profits" and "Net Losses" shall be subtracted from such taxable income or loss;

(iii)    in the event the Gross Asset Value of any Company asset is adjusted pursuant to subparagraphs (ii) or (iii) of the definition of "Gross Asset Value," the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the Gross Asset Value of the asset) or an item of Loss (if the adjustment decreases the Gross Asset Value of the asset) from the disposition of such asset and shall be taken into account for purposes of computing Net Profits or Net Losses;

(iv)    gain or loss resulting from any disposition of any asset of the Company with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the asset disposed of, notwithstanding that the adjusted tax basis of such asset differs from its Gross Asset Value;

(v)    in lieu of the depreciation, amortization and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such Fiscal Year or other period, computed in accordance with the definition of Depreciation;

(vi)    to the extent an adjustment to the adjusted tax basis of any assets pursuant to Code Section 734(b) is required, pursuant to Regulations Section 1.704-1(b)(2)(iv)(m)(4), to be taken into account in determining Capital Accounts as a result of a distribution other than in liquidation of a Member's interest in the Company, the amount of such adjustment shall be treated either as an item of gain (if the adjustment increases the basis of the asset) or an item of loss (if the adjustment decreases the basis of the asset) from the disposition of the asset and shall be taken into account for purposes of computing Net Profits or Net Losses; and

(vii)    notwithstanding any other provision of this definition of Net Profits and Net Losses, any items which are specially allocated pursuant to Sections 9.03(a) through 9.03(g) shall not be taken into account in computing Net Profits or Net Losses. The amounts of the items of Company income, gain, loss, or deduction available to be specially allocated pursuant to Sections 9.03(a) through 9.03(g) shall be determined by applying rules analogous to those set forth in subparagraphs (i) through (vi) above.

7

(ss)   "Nonrecourse Deductions" shall have the meaning set forth in Section 1.704-2(b)(1) of the Treasury Regulations.

(tt)   "Nonrecourse Liability" has the meaning set forth in Section 1.704-2(b)(3) of the Treasury Regulations.

(uu)   "Person" shall mean any individual or Entity, and the heirs, executors, administrators, legal representatives, successors and assigns of such "Person," where the context so permits.

(vv)   "Prohibited Member" shall have the meaning set forth in Section 14.02.

(ww)   "Reserves" shall mean funds set aside or amounts allocated to reserves, which shall be maintained in amounts reasonably deemed sufficient by the Managers for working capital and to pay taxes, insurance, debt service or other costs or expenses incident to the ownership or operation of the Company's business.

(xx)   "Resigning Member" shall have the meaning set forth in Section 6.08.

(yy)   "Service" shall have the meaning set forth in Section 9.02.

(zz)   "TMP" shall have the meaning set forth in Section 9.02.

(aaa)   "Transfer" shall have the meaning set forth in Section 10.01.

(bbb)   "Treasury Regulations" shall include proposed, temporary and final regulations promulgated under the Code.

(ccc)   "Unit" shall mean a unit of the Company representing the ownership of a Membership Interest.

## ARTICLE II
## FORMATION OF COMPANY

2.01   **Formation**. The Company has been organized as a Nevada limited-liability company by the execution and delivery of the Articles of Organization to the Nevada Secretary of State in accordance with and pursuant to the Act, and the Members hereby acknowledge and ratify the formation of the Company. Except as otherwise provided herein, the rights and obligations of the Members shall be as provided in the Act. To the extent that the rights or obligations of any Member are different by reason of any provision of this Agreement than they would be in the absence of such provision, this Agreement shall, to the extent permitted by the Act, control.

2.02   **Name**. The name of the Company is "Parler LLC". The business and affairs of the Company may be conducted under that name or any other name the Managers may deem appropriate or advisable.

2.03   **Principal Business Office**. The principal business office of the Company shall be located at 6100 S. Mountain Vista Street, Henderson, Nevada 89014. The Company may locate its places of business at any other place or places as the Managers may deem advisable.

2.04   **Registered Office and Registered Agent**. The Company's initial registered office shall be at the office of its registered agent at 701 S. Carson Street, Suite 200, Carson City, Nevada 89701, and

8

ACTIVE 30313096v9

the name of its initial registered agent is The Corporation Trust Company of Nevada. The registered office and registered agent may be changed by filing the address of the new registered office and/or the name of the new registered agent with the Nevada Secretary of State pursuant to the Act.

   2.05    **Term**. The term of the Company shall be perpetual unless the Company is earlier dissolved in accordance with either the provisions of this Agreement or the Act.

   2.06    **Units**. The Company shall be authorized to issue One Hundred Thousand (100,000) Units, which shall be comprised of Class A Units and Class B Units as determined by the Managers. Each Member's ownership of Units shall be personal property for all purposes. The number of authorized Units may be increased by the Managers in their sole discretion. The Company may issue additional authorized Units, if any, for such consideration and upon such terms and conditions as determined by the Managers, in their sole discretion. The Managers may request and accept contributions on behalf of the Company (which may be in the form of cash or other property or assets) and shall be authorized to cause the Company to issue additional Units in exchange therefore. The Managers shall be authorized on behalf of each Member to amend **Schedule I** hereto to reflect the issuance of additional Units and/or the admission of any person as a Member, and may deliver a certificate representing the issuance of the additional Units to the person(s) entitled thereto.

   2.07    **Award of Units**. The Company shall establish a restricted award pool of Twenty Thousand (20,000) Class A Units to award from time to time employees or consultants of the Company (the "Award Units"). Any award of Units shall vest over four years and be subject to the terms of a Restricted Unit Award Agreement. Distributions of Net Cash Flow and Net Cash Proceeds shall only be made to Members holding vested Units. The 20,000 Award Units are to be granted from John Matze's equity interest in the Company. Accordingly, as the 20,000 Award Units vest, the number of Class B Units owned by John Matze will simultaneously and automatically decrease on a unit-for-unit basis (without any further action by the Company), and his Class B Membership Interest and his Membership Interest will decrease proportionately; provided, that, John Matze shall retain the voting power (but not the economic rights) with respect to a 40% Class B Membership Interest until the closing of a Series A financing round or other equity investment in the Company, including, without limitation, upon conversion of a convertible note. For illustration purposes only, assuming the issuance and vesting of all 20,000 Award Units, the 40,000 Class B Units held by John Matze will automatically decrease to 20,000 Class B Units and, as a result, John Matze will have (i) a 25% Class B Membership Interest and the NDM Member will have a 75% Class B Membership Interest; provided, that John Matze will retain the voting power (but not the economic rights) with respect to a 40% Class B Membership Interest until the closing of a Series A financing round or other equity investment in the Company, including, without limitation, upon conversion of a convertible note; and (ii) John Matze will have a 20% Membership Interest and the NDM Member will have a 60% Membership Interest. For the avoidance of doubt, in no event shall any grant or issuance of Award Units dilute the voting rights or management control of the NDM Member or its Class B Membership Interest; *provided, however*, in the event that the Company subsequently issues additional Units (other than the Award Units) in connection with a Series A financing round or other equity investment in the Company, including, without limitation, upon conversion of a convertible note, it is contemplated John Matze's disproportionate voting rights, if any, shall terminate and that the Membership Interests (including both economic and voting rights) held by the NDM Member and John Matze, respectively, will be diluted proportionately.

## ARTICLE III
## BUSINESS OF COMPANY

   3.01    **Business and Purpose of the Company**. The business and purpose of the Company shall be to engage in any lawful business and to do any lawful act for which a limited-liability company may be organized under the laws of the State of Nevada and to perform all acts in furtherance thereof. The

9

Company has the power to do any and all acts that are necessary, appropriate, proper, advisable, incidental or convenient to carry out the purposes of the Company.

## ARTICLE IV
## MEMBERS

**4.01** **Names and Addresses of Members.** The names and addresses of the Members are set forth on the signature page hereto.

**4.02** **Additional Members.** From and after the date of this Agreement, any Person acceptable to the Managers may become a Member in the Company by the issuance by the Company of a Membership Interest for such consideration as the Managers shall determine, or any Person may become a Member as a transferee of a Member's Membership Interest or any portion thereof, subject to the terms and conditions of this Agreement. No new Members shall be entitled to any retroactive allocation of losses, income or expense deductions incurred by the Company. The Managers may, at their option, at the time a Member is admitted, close the Company books (as though the Fiscal Year has ended) or make pro rata allocations of loss, income and expense deductions to a new Member for that portion of the Fiscal Year in which a Member was admitted in accordance with the provisions of Code Section 706(d) and the Treasury Regulations promulgated thereunder.

**4.03** **Rights or Powers.** The Class A Members shall not have any right or power to take part in the management or control of the Company or to act for or to bind the Company in any way.

**4.04** **Voting Rights.** Any voting rights shall be exclusively vested in the Class B Members. No Class A Member shall be entitled to any voting rights. In connection with the voting rights granted to the Class B Members herein, the Class B Members may approve of a matter or take any action by the vote of the Class B Members at a meeting, in person or by proxy, or by the written consent of the Class B Member(s) holding a Majority Interest.

## ARTICLE V
## MANAGEMENT

**5.01** **Exclusive Management by Managers.** Management of the Company shall be exclusively vested in the Managers. The Managers shall direct, manage and control the business of the Company. Except for the situations in which the approval of the Class B Members is expressly required under this Agreement, the Managers shall have full and complete authority, power and discretion to manage and control the business, affairs and properties of the Company, including, without limitation, the right to sell the assets of the Company, to make all decisions regarding those matters and to perform any and all other acts or activities customary or incident to the management of the Company's business.

**5.02** **Number, Tenure and Qualifications.** The Company and the Class B Members shall take such actions as may be required to ensure that the number of Managers is at all times three (3). The Managers shall be comprised as follows: (a) NDM Member shall designate two (2) managers, one of whom shall be NDM Member, (b) John Matze ("Matze") shall designate one (1) Manager, the initial designation shall be John Matze. At all times, the composition of managers of any wholly-owned subsidiary of the Company shall be the same of that of the Managers of the Company. A Manager shall continue to act as a Manager unless and until such Manager's resignation or removal pursuant to Sections 5.08 or 5.09. Upon any such resignation or removal, a New Manager shall be elected pursuant to Section 5.10.

10

### 5.03    Meetings of the Managers.

(a)    Meetings. Meetings of the Managers may be called by the Managers. Meetings of the Managers shall be held at the principal offices of the Company or at such place as may be approved by the Managers for a particular meeting. Except in special cases where other express provisions are made by the Act, notice for meetings of the Managers shall be given to the Managers entitled to vote at the meeting and addressed to each Manager's address appearing on the books of the Company. All such notices shall be sent to each Manager entitled thereto by personal delivery, telephone, facsimile, electronic mail or other electronic transmission (in which case, notice shall be given at least twenty-four (24) hours before the time of the meeting) or by first-class mail (in which case, notice shall be deposited in the mail, postage prepaid, at least three (3) days before the meeting). Each such notice shall state: (1) the time, date, place (which shall be at the principal office of the Company unless otherwise determined by the Managers) or other means of conducting such meeting; and (2) the purpose(s) of the meeting. If a Manager gives no address, notice shall be deemed to have been given to such Manager if sent by mail or other means of written communication addressed to such Manager at the principal offices of the Company.

(b)    Action by the Managers. Each Manager shall have one vote on all matters submitted to the Managers. The Managers shall only act by the vote of a majority of the Managers constituting a quorum.

(c)    Quorum. If there are more than two Managers, then a majority of the Managers, either in person or represented by proxy, shall constitute a quorum for the transaction of business by the Managers. If there are two Managers, then both Managers, either in person or represented by proxy, shall constitute a quorum for the transaction of business by the Managers.

(d)    Waiver of Notice. The transactions carried out at any meeting of the Managers, however called and noticed or wherever held, shall be as valid as though had at a meeting regularly called and noticed, if: (1) the Managers are present at the meeting; or (2) the Managers waive notice or consent to holding such meeting or an approval of the minutes thereof, which waiver, consent or approval shall be filed with the other records of the Company or made a part of the minutes of such meeting.

(e)    Manner of Meeting. Each meeting of the Managers may be held telephonically, electronically or physically at the Company's principal place of business or other location set by the Managers. The participation of a Manager at a meeting telephonically or electronically shall constitute presence in person at such meeting and waiver of notice for such meeting. At such meetings, the Managers shall transact such business as may properly be brought before the meeting.

(f)    Written Consent. Notwithstanding anything in this Section 5.03, the Managers may take any action that may be taken by the Managers without a meeting if such action is approved by the written consent of a majority of the Managers. The written consent may be executed in one or more counterparts and by facsimile or other electronic method and each such consent so executed shall be deemed an original. Whenever action is taken by written consent, a meeting of the Managers need not be called or noticed.

5.04    Certain Powers of the Managers. Without limiting the generality of Section 5.01, the Managers shall have power and authority on behalf of the Company:

(a)    To borrow money for the Company from banks, other lending institutions, the Managers, Members, or Affiliates of the Managers or Members, on such terms as the Managers deem appropriate in connection with the business of the Company, and in connection therewith, to hypothecate, encumber and grant security interests in the assets of the Company to secure repayment of the borrowed

sums. No debt shall be contracted or liability incurred by or on behalf of the Company except by the Managers, or to the extent permitted under the Act, by agents or employees of the Company expressly authorized to contract such debt or incur such liability by the Managers;

        (b)    To incur expenses necessary for the operation of Company business;

        (c)    To enter into concession agreements and license agreements;

        (d)    To arrange for and purchase liability and other insurance to protect the assets, business and properties of the Company;

        (e)    To hold and own or lease real and personal properties in the name of the Company;

        (f)    To invest Company funds in time deposits, short-term governmental obligations, commercial paper, or other investments;

        (g)    To sell, lease, sublease, assign or otherwise grant the rights to use all or any portion of the assets of the Company as part of a single transaction or plan, or as part of multiple transactions, or as part of any transaction deemed appropriate by the Managers;

        (h)    To execute on behalf of the Company all instruments and documents, including, without limitation, checks; drafts; notes and other negotiable instruments; mortgages or deeds of trusts; security agreements; financing statements; documents providing for the acquisition, mortgage or disposition of the Company's property; assignments, bills of sale; leases; consents to foreclosure, deeds-in-lieu of foreclosure and any other instruments or documents necessary to the business of the Company;

        (i)    To employ and dismiss from employment any and all employees of the Company and to engage any and all independent contractors of the Company;

        (j)    To engage accountants, legal counsel, managing agents or other experts to perform services for the Company;

        (k)    To enter into any and all other agreements with respect to the operation of the Company, including agreements with a Manager and Affiliates of a Manager, which agreements may include, without limitation, loan agreements, management agreements, leasing agreements, construction agreements and brokerage agreements;

        (l)    To refinance the debts of the Company;

        (m)    To act on behalf of the Company, in all respects in connection with any lease, including, but not limited to, executing any lease and any amendments to or restatements of any lease, consenting (or refusing to consent) to any matter to which the Company has the right to consent (or to withhold consent) under any lease, and to exercise any rights or options which the Company may have under any lease;

        (n)    To act on behalf of the Company in all respects in connection with any management agreement including, but not limited to, executing any management agreement and any amendments to any management agreement, consenting (or refusing to consent) on behalf of the Company to any matter to which the Company has the right to consent (or to withhold consent) under any management agreement, and to exercise any rights which the Company may have under any management agreement;

(o)  To take such actions on behalf of the Company, in the event of Member Misconduct as set forth in Section 6.06; including, without limitation, exercising the Company's option to purchase any such Member's Membership Interest pursuant to said Section 6.06;

(p)  To take such actions deemed necessary to the Managers for the continuing financial well-being of the Company, including, without limitation, issuing additional Units to contributing Members and adjusting Schedule I to reflect the updated Membership Interests of the Members after any capital call as set forth in Section 8.02;

(q)  To create any new class of Membership Interest, including any new class with underlying Units having rights senior to those of any then outstanding Units;

(r)  To sell any new Membership Interest at any time and from time to time;

(s)  To borrow money on behalf of the Company and pledge assets of the Company in any debt financing;

(t)  To prosecute, defend, settle, contest or compromise legal proceedings as the same may be necessary or desirable; to pay, adjust, compromise, settle or otherwise satisfy or discharge any liability, judgment, decree, decision, settlement or demand by or against the Company;

(u)  To invest any Company funds temporarily (by way of example but not limitation) in time deposits, short-term governmental obligations, commercial paper, or other investments;

(v)  To do and perform all other acts as may be necessary or appropriate to the conduct of the Company's business.

5.05  **Managers Have No Exclusive Duty to Company; Business Opportunities**.  The Managers shall not be required to manage the Company as their sole and exclusive function, and the Managers own, operate and manage other business interests and engage in activities in addition to those relating to the Company, including business interests and activities which compete with the Company. The Managers shall devote as much time to the business of the Company as, in their sole discretion, the conduct of the business of the Company shall reasonably require. Nothing in this Agreement shall preclude the employment, at the expense of the Company, of any agent or third party including a Manager or an Affiliate of a Manager to manage or provide other services in respect of the Company's property, subject to the limitations contained herein. Neither the Company nor any Member shall have any right, by virtue of this Agreement, to share or participate in such other businesses, investments or activities of any Manager, or to the income or proceeds derived therefrom. The Managers shall not be obligated to present any particular investment or business opportunity to the Company or to the Members, even if such opportunity is of a character which, if presented to the Company, could be taken by the Company or the Members or is similar to the business conducted by the Company, and the Managers shall have the right to take such opportunity for their own account (individually or as a trustee) and to recommend to others any such particular investment opportunity.

5.06  **Fiduciary Duties**.  None of the Managers, any Member nor other person related to the Company shall owe any fiduciary duty (including, without limitation, the duty of care and duty of loyalty) to any other Manager, Member or other person, other than the implied contractual covenant of good faith and fair dealing.

13

5.07     **Bank Accounts**. The Managers may from time to time open bank accounts in the name of the Company, and the Managers shall be the only signatories thereon, unless the Managers shall designate other permitted signatories.

5.08     **Resignation**. A Manager may resign at any time by giving written notice to the Members of the Company. The resignation of a Manager shall take effect upon receipt of notice thereof or at such later date specified in such notice; and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective. The resignation of a Manager who is also a Member shall not affect such Manager's rights as a Member and shall not constitute a withdrawal of such Member.

5.09     **Removal**. The Matze Manager may be removed or replaced at any time, with or without cause, upon, and only upon, the written request of Matze. Either NDM Member Manager may be removed or replaced at any time, with or without cause. upon, and only upon, the written request of NDM Member. The removal of a Manager who is also a Class B Member shall not affect such Manager's rights as a Class B Member and shall not constitute a withdrawal of such Class B Member. The removal of a Manager who is also a Class A Member shall not affect such Manager's rights as a Class A Member and shall not constitute a withdrawal of such Class A Member.

5.10     **Vacancies**. In the event that a vacancy is created at any time due to the death, disability, retirement, resignation or removal of the Matze Manager, then Matze shall have the right to designate an individual to fill such vacancy and the Company and each Class B Member hereby agrees to take such actions as may be required to ensure the election or appointment of such designee to fill such vacancy. In the event that a vacancy is created at any time due to the death, disability, retirement, resignation or removal of either NDM Member Manager, then NDM Member shall have the right to designate a Person to fill such vacancy and the Company and each Class B Member hereby agrees to take such actions as may be required to ensure the election or appointment of such designee to fill such vacancy.

5.11     **Reimbursement**. The Company shall reimburse the Managers for any and all actual out-of-pocket costs and expenses.

5.12     **Reliance by Third Parties**. Persons dealing with the Company are entitled to rely conclusively upon the grant of any power or authority to the Managers under this Agreement.

5.13     **Title to Property**. The Managers shall cause title to all of the Company's property to be held in the name of the Company.

<div align="center">

**ARTICLE VI**
**RIGHTS AND OBLIGATIONS OF MEMBERS**

</div>

6.01     **Company Debt Liability**. A Member will not be personally liable for any debts, obligations, liabilities or losses of the Company beyond its respective Capital Contributions, except as provided in Section 6.05, or as otherwise required by law.

6.02     **List of Members**. Upon the written request of any Member, the Managers shall provide a list showing the names, addresses and Membership Interest of all Members.

6.03     **Company Books**. The Managers shall maintain and preserve, during the term of the Company, the accounts, books, and other relevant Company documents described in Section 9.10. Upon reasonable prior written request, each Member shall have the right, at a time during ordinary business hours, as reasonably determined by the Managers, to inspect and copy at the office of the Company and at the requesting Member's expense, such documents as are permitted under the Act.

6.04    **Priority and Return of Capital.** Except as may be expressly provided in Article IX or Article XI, no Member shall have priority over any other Member, either as to the return of Capital Contributions or as to distributions hereunder.

6.05    **Liability of a Member to the Company.** A Member who receives a distribution, or the return in whole or in part of its Capital Contribution, is liable to the Company only to the extent provided by the Act.

6.06    **Company Option to Purchase Membership Interest in the Event of Member Misconduct.**

(a)    Each Member hereby agrees that the Member will take no action, nor make any statement which, in the sole discretion of the Managers, is of such an improper nature that it would or could have a serious and material adverse effect or impact on the business or reputation of the Company ("Misconduct").

(b)    In the event that such Misconduct has been deemed to occur with respect to a Member, in the sole discretion of the Managers, then the Company shall so notify the Member by written notice of the nature of the Misconduct (the "Misconduct Notice") and then, for a period of ninety (90) days after the date of the Misconduct Notice (the "Election Period"), the Company shall have the option to purchase and the Member shall, upon the Company's exercise of such option, have the obligation to sell to the Company all of such Member's Membership Interest for a purchase price equal to the Fair Market Value of such Member's Membership Interest.

(c)    The Company shall exercise its aforementioned option by providing written notice (the "Exercise Notice") to such Member of the Company's election to exercise its option under this Section 6.06 at any time during the Election Period. The purchase price to be paid to such Member upon the Company's exercise of such option shall be payable in cash at the closing which shall occur within thirty (30) days of the date of the Exercise Notice. At such closing, the Member shall execute and deliver to the Company such documents, including such releases and transfer documentation, as deemed necessary and desirable by the Managers in their sole discretion. In the event that such Member fails or refuses to execute and deliver such documents, such Member's Membership Interest shall be deemed to have been terminated as of the date of such Exercise Notice and the Company shall hold the purchase price for such Member's Membership Interest in trust for such Member, subject to such Member's execution and delivery of such documentation.

(d)    The Managers shall have the right, power and authority to amend Schedule I hereto to set forth the Membership Interests of the Members in accordance with the foregoing.

6.07    **Participation in Management.** Except as expressly provided herein or required by applicable law, the Members shall not participate in the management or control of the Company's business nor shall they transact any business for the Company, nor shall they have the power to act for or bind the Company, said powers being vested solely and exclusively in the Managers.

6.08    **Resignation.** Except for Transfers permitted under Article X, it is a violation of this Agreement for a Member to resign from the Company without the prior written consent of the Managers, and the Company may recover from such Member damages against the amount otherwise distributable to the Member in addition to any remedies otherwise available under applicable law. Unless otherwise approved by all Members, a Member who resigns (a "Resigning Member") shall not be entitled to receive any distributions in excess of those distributions to which such Member would have been entitled had such Member remained a Member. Except as otherwise expressly provided herein, a Resigning Member shall

immediately become a special Member and shall not be entitled to participate in the affairs of the Company. Damages for breach of this Section 6.08 shall be monetary damages only (and not specific performance), and such damages may be offset against distributions by the Company to which the Resigning Member would otherwise be entitled.

## ARTICLE VII
## MEETINGS OF MEMBERS

7.01    **Meetings**. Meetings of the Members, for any purpose or purposes, may be called by any Manager or by any Class B Member(s) holding a Majority Interest.

7.02    **Place of Meetings**. The Managers or such applicable Class B Members properly calling the meeting of the Members may designate any place as the place of meeting for any meeting of the Members.

7.03    **Notice of Meetings**. Except as provided in Section 7.04, written notice stating the place, day and hour of the meeting and the purpose or purposes for which the meeting of the Members is called shall be delivered pursuant to Section 13.01, not less than twenty-four (24) hours nor more than thirty (30) days before the date of the meeting, by or at the direction of the Managers or Class B Members calling the meeting, to each Member entitled to vote at such meeting.

7.04    **Meeting of All Members**. If all of the Members shall meet at any time and place, and consent to the holding of a meeting at such time and place, such meeting shall be valid without call or notice, and at such meeting lawful action may be taken.

7.05    **Record Date**. For the purpose of determining Members entitled to notice of, or to vote at, any meeting of Members or any adjournment thereof, or Members entitled to receive payment of any distribution, or in order to make a determination of Members for any other purpose, the date on which notice of the meeting is mailed or the date on which the resolution declaring such distribution is adopted, as the case may be, shall be the record date for such determination of Members. When a determination of Members entitled to vote at any meeting of Members has been made as provided in this Section 7.05, such determination shall apply to any adjournment thereof.

7.06    **Quorum**. Class B Member(s) holding at least a Majority Interest, represented in person or by proxy, shall constitute a quorum at any meeting of Members. In the absence of a quorum at any such meeting, a majority of the Membership Interests so represented may adjourn the meeting from time to time for a period not to exceed sixty (60) days without further notice. At such adjourned meeting, at which a quorum shall be present or represented, any business may be transacted which might have been transacted at the meeting as originally noticed.

7.07    **Manner of Acting**. If a quorum is present, the affirmative vote of Class B Member(s) holding a Majority Interest shall be the act of the Members, unless the vote of a greater or lesser proportion or number is otherwise required by the Act, by the Articles of Organization, or by this Agreement. Each Class B Member shall be entitled to one vote per Class B Unit. Unless otherwise expressly provided herein or required under applicable law, only Class B Members who have a Membership Interest may vote or consent upon any matter, and their vote or consent, as the case may be, shall be counted in the determination of whether the matter was approved by the Members.

7.08    **Proxies**. At all meetings of Members, a Class B Member may vote in person or by proxy executed in writing by the Class B Member or by a duly authorized attorney-in-fact. Such proxy shall be

filed with the Managers of the Company before, or at the time of, the meeting. No proxy shall be valid after eleven (11) months from the date of its execution, unless otherwise provided in the proxy.

7.09    **Action by Class B Members Without a Meeting**. Any action required or permitted to be taken at a meeting of Members may be taken without a meeting and without notice to any Member, if the action is evidenced by one or more written consents describing the action taken, signed by Class B Member(s) holding a Majority Interest, or such other expressly required percentage of Class B Membership Interests, and delivered to the Managers for inclusion in the minutes or for filing with the Company records. Action taken under this Section 7.09 is effective when the Class B Member(s) holding a Majority Interest, or such other expressly required percentage interest of Class B Membership Interests, have signed the consent, unless the consent specified a different effective date.

7.10    **Waiver of Notice**. When any notice is required to be given to any Member, a waiver thereof in writing signed by the Person entitled to such notice, whether before, at, or after the time stated therein, shall be equivalent to the giving of such notice.

### ARTICLE VIII
### CONTRIBUTIONS TO THE COMPANY
### AND CAPITAL ACCOUNTS

8.01    **Members' Initial Capital Contributions**. Each Member hereby agrees to make contributions to the capital of the Company in amounts equal to the Member's Initial Capital Contribution upon such Member's respective separate counterpart signature page attached hereto and hereby made a part hereof.

8.02    **Additional Funding**.

(a)    Additional Capital Contributions. The Managers can consider and take action on any equity or debt financing alternatives that may be superior to and have priority to the rights of the Class A Units or the Class B Units. In addition, if the Managers determine that the Company requires additional funds from time to time for any reason, as determined in the Managers' sole discretion, then the Managers may conduct an offering of additional Units (including an offering of Units with rights superior to those of any then outstanding Units); borrow funds from a third party, a Manager, any Member or the Affiliate of a Manager or Member; or use the Company's reserves or other cash sources. In addition to the foregoing, the Managers may request that the Members make additional Capital Contributions in proportion to their relative Membership Interest. If the Managers decide to request additional Capital Contributions, the Managers shall give written notice to all Members at least thirty (30) days prior to the date the additional Capital Contribution is due. The written notice shall set forth the amount of the additional Capital Contribution, the purpose for which the additional Capital Contribution is to be used and the date by which the Members must contribute such additional Capital Contributions. Each Member may make an additional Capital Contribution in proportion to such Member's Membership Interest. No Member shall be obligated to make an additional Capital Contribution unless the Member has affirmatively elected to make such additional Capital Contribution through written notice to the Company. If less than all of the Members affirmatively elect to make an additional Capital Contribution to the Company, or do not make additional Capital Contributions to the Company in proportion to their respective Membership Interests, the Company shall issue additional Units to those Members who make additional Capital Contributions that are proportionately greater than their respective Membership Interests as the Managers deem appropriate to reflect such Member's additional investment in the Company.

(b)    Amendment of Schedule of Membership Interests. The Managers shall have the right, power and authority to amend Schedule I hereto to set forth the Membership Interests of the Members

and the aggregate Membership Interest of each class of Members as such Membership Interests may be adjusted in accordance with this Section 8.02; provided, however, that the failure to set forth the Members' Membership Interests from time to time on said Schedule I shall not affect the Membership Interests of the Members and the aggregate Membership Interests of each class of Members that exist at such time.

(c)    Loans from Managers, Members or Affiliates.  The Company may borrow funds from any Manager, any Member, or from any of their Affiliates, as determined by the Managers in their sole discretion.  Any such loan may be secured or unsecured, shall be made pursuant to fair and commercially reasonable terms and conditions, and shall bear interest at a commercially reasonable market interest rate.  It is understood and agreed that any such loans shall be repaid by the Company on a priority basis before any distributions are thereafter made to any Members.  It is further understood that any loan that is made by a Manager, the Class B Members, or their Affiliates is not an arm's length transaction and involves an inherent conflict of interest, which conflict of interest is hereby waived by each of the Members.  Notwithstanding the foregoing, nothing contained herein shall obligate any Manager, any Member, or any of their Affiliates to provide a loan to the Company.

### ARTICLE IX
### ALLOCATIONS, INCOME TAX, DISTRIBUTIONS, ELECTIONS AND REPORTS

9.01    Allocation of Net Profits and Net Losses.  After giving effect to the special allocations set forth in Sections 9.03(a) through 9.03(g), and after adjusting for all Capital Contributions and distributions made during the Fiscal Year, Net Profits and Net Losses of the Company for each Fiscal Year or, if necessary, other period shall be allocated among the Members in such a manner that, after such allocations have been made, the balance of each Member's Capital Account (which may be a positive, negative, or zero balance) shall, to the extent possible, be equal to (i) the amount that would be distributed to such Member, determined as if the Company were to sell all of its assets for their Gross Asset Values and distribute the proceeds in accordance with Section 11.02, minus (ii) the sum of (a) such Member's share of Company Minimum Gain and Member Nonrecourse Debt Minimum Gain and (b) the amount, if any, that such Member is obligated (or is deemed for tax purposes to be obligated) to contribute, in its capacity as a Member, to the capital of the Company as of the last day of such Fiscal Year.

9.02    Tax Matters Partner.  John Matze shall be the Company's Tax Matters Partner (Member) as defined in Code Section 6231(a)(7) (the "TMP").  The TMP shall have the right to resign by giving thirty (30) days written notice to the Members.  Upon the withdrawal of the TMP, a successor TMP shall be elected by Class B Members holding not less than a Majority Interest.  The TMP may employ tax counsel to represent the Company in connection with any audit or investigation of the Company by the Internal Revenue Service (the "Service") and in connection with all subsequent administrative and judicial proceedings arising out of such audit.  The Company shall not be obligated to pay any fees or other compensation to the TMP in its capacity as such; provided, however, that all reasonable expenses incurred by the TMP in serving as the TMP shall be Company expenses and the TMP shall be reimbursed by the Company therefor.  Notwithstanding the foregoing, it shall be the responsibility of the Managers and of each Member, at their own expenses, to employ tax counsel to represent their respective separate interests.  If the TMP is required by law or regulation to incur fees and expenses relating to or arising from the operation of the Company's business in connection with tax matters not affecting each of the Members, then the TMP may, in his sole discretion, seek reimbursement from or charge such fees and expenses to those Members on whose behalf such fees and expenses were incurred.  The TMP shall keep the Members informed of all administrative and judicial proceedings, as required by Code Section 6223(g), and shall furnish to each Member who so requests in writing a copy of such notice or other communication received by the TMP from the Service, except such notices or communications as are sent directly to such Member by the Service.  The relationship of the TMP to the Members is that of a fiduciary, and the TMP has a fiduciary obligation to perform its duties as TMP in such manner as will serve the best interests of the

Company. To the fullest extent permitted by law, the Company agrees to indemnify the TMP and its agents and save and hold them harmless, from and in respect of (i) all reasonable fees, costs and expenses in connection with or resulting from any claim, action or demand against the TMP, that arise out of or in any way relate to the TMP's status as TMP for the Company, and (ii) all such claims, actions and demands and any losses or damages therefrom, including amounts paid in settlement or compromise of any such claim, action or demand; provided that this indemnity shall not extend to conduct by the TMP which is adjudged (a) not to have been undertaken in good faith or (b) to have constituted gross negligence, recklessness or intentional wrongdoing by the TMP.

      9.03    **Special Allocations**. The following special allocations shall be made in the following order:

      (a)    Minimum Gain Chargeback. Except as otherwise provided in Section 1.704-2(f) of the Treasury Regulations, notwithstanding any other provision of this Article IX, if there is a net decrease in the Company Minimum Gain during any Fiscal Year, each Member shall be specially allocated items of Company income and gain for such year (and if necessary for subsequent years) in an amount equal to such Member's share of the net decrease in Company Minimum Gain, determined in accordance with Section 1.704-2(g) of the Treasury Regulations. Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Sections 1.704-2(f)(6) and 1.704-2(j)(2) of the Treasury Regulations. This Section 9.03(a) is intended to comply with the minimum gain chargeback requirement of Section 1.704-2 of the Treasury Regulations and shall be interpreted consistently therewith.

      (b)    Member Minimum Gain Chargeback. Except as otherwise provided in Section 1.704-2(i) of the Treasury Regulations, notwithstanding any other provision of this Article IX, if there is a net decrease in Member Nonrecourse Debt Minimum Gain attributable to Member Nonrecourse Debt during any Fiscal Year, each Member who has a share of the Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Section 1.704-2(i)(5) of the Treasury Regulations, shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in Member Nonrecourse Debt Minimum Gain, determined in accordance with Section 1.704-2(i)(4) of the Treasury Regulations. Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Sections 1.704-2(i)(4) and 1.704-2(j)(2) of the Treasury Regulations. This Section 9.03(b) is intended to comply with the minimum gain chargeback requirement of Section 1.704-2(i)(4) of the Treasury Regulations and shall be interpreted consistently therewith.

      (c)    Qualified Income Offset. In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Sections 1.704-l(b)(2)(ii)(d)(4), (5) and (6) of the Treasury Regulations, which create or increase a Deficit Capital Account of such Member, then items of Company income and gain shall be specially allocated to such Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Deficit Capital Account as quickly as possible, provided that an allocation pursuant to this Section 9.03(c) shall be made only if and to the extent that the Member would have a Deficit Capital Account after all other allocations provided for in this Article IX have been tentatively made as if this Section 9.03(c) were not in the Agreement.

      (d)    Gross Income Allocation. In the event any Member has a deficit Capital Account at the end of any Fiscal Year which is in excess of the sum of any amount that such Member is obligated to restore to the Company pursuant to the penultimate sentences of Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Treasury Regulations, each such Member shall be specially allocated items of Company income and gain in the amount of such excess as quickly as possible, provided that an allocation pursuant to this Section

ACTIVE 30313096v9

9.03(d) shall be made only if and to the extent that such Member would have a deficit Capital Account in excess of such amount after all other allocations provided for in this Article IX have been made as if Section 9.03(c) and this Section 9.03(d) were not in the Agreement.

(e)　Member Nonrecourse Deductions. Any Member Nonrecourse Deductions for any Fiscal Year shall be specially allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable in accordance with Section 1.704-2(i)(1) of the Treasury Regulations.

(f)　Nonrecourse Deductions. Nonrecourse Deductions for any Fiscal Year shall be specially allocated to the Members in proportion to their right to receive distributions pursuant to Section 9.04(b).

(g)　Section 754 Adjustments. To the extent an adjustment to the adjusted tax basis of any Company asset, pursuant to Code Section 734(b) or Code Section 743(b) is required, pursuant to Section 1.704-1(b)(2)(iv)(m)(2) or 1.704-1(b)(2)(iv)(m)(4) of the Treasury Regulations, to be taken into account in determining Capital Accounts as the result of a distribution to a Member in complete liquidation of such Member's interest in the Company, the amount of such adjustment to Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Members in accordance with their interests in the Company in the event Section 1.704-1(b)(2)(iv)(m)(2) of the Treasury Regulations applies, or to the Member to whom such distribution was made in the event Section 1.704-1(b)(2)(iv)(m)(4) of the Treasury Regulations applies.

(h)　Loss Limitation. Net Losses allocated pursuant to Section 9.01 shall not exceed the maximum amount of Net Losses that can be allocated without causing any Member to have a Deficit Capital Account at the end of any Fiscal Year. In the event some but not all of the Members would have Deficit Capital Accounts as a consequence of an allocation of Net Losses pursuant to Section 9.01, the limitation set forth in this Section 9.03(h) shall be applied on a Member by Member basis and Net Losses not allocable to any Member as a result of such limitation shall be allocated to the other Members in accordance with the positive balances in each Member's Capital Account so as to allocate the maximum permissible Net Losses to each Member under Section 1.704-1(b)(2)(ii)(d) of the Treasury Regulations.

(i)　Tax Allocations; Code Section 704(c). Except as otherwise provided in this Section 9.03(i), each item of income, gain, loss and deduction of the Company for federal income tax purposes shall be allocated among the Members in the same manner as such items are allocated for book purposes pursuant to Article IX of this Agreement. In accordance with Code Section 704(c) and the Treasury Regulations thereunder, income, gain, loss and deductions with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its initial Gross Asset Value (computed in accordance with the definition of Gross Asset Value) using a reasonable method selected by the Managers (pursuant to Treasury Regulations under Code Section 704(c)). In the event the Gross Asset Value of any Company asset is adjusted pursuant to subparagraph of the definition of Gross Asset Value, subsequent allocations of income, gain, loss, and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Gross Asset Value in the same manner as under Code Section 704(c) and the Treasury Regulations thereunder. Any elections or other decisions relating to such allocations shall be made by the Managers in any manner that reasonably reflects the purpose and intention of this agreement. Allocations pursuant to this Section 9.03(i) are solely for purposes of federal, state, and local taxes and shall not affect, or in any way be taken into account in computing, any Member's

20

Capital Account or share of Net Profits, Net Losses, other items, or distributions pursuant to any provision of this Agreement.

   (j) Other Allocation Rules.

     (i) For purposes of determining the Net Profits, Net Losses, or any other items allocable to any period, Net Profits, Net Losses, and any such other items shall be determined on a daily, monthly, or other basis, as determined by the Managers using any permissible method under Code Section 706 and the Treasury Regulations thereunder.

     (ii) The Members are aware of the income tax consequences of the allocations made by this Article IX and hereby agree to be bound by the provisions of this Article IX in reporting their shares of Company income and loss for income tax purposes.

     (iii) Solely for purposes of determining a Member's proportionate share of the "excess nonrecourse liabilities" of the Company within the meaning of Section 1.752-3(a)(3) of the Treasury Regulations, the Members' interests in Company profits are in proportion to their right to receive distributions pursuant to Section 9.04(b).

 **9.04** **Distributions of Net Cash Flow and Net Cash Proceeds**. Distributions of Net Cash Flow and Net Cash Proceeds shall be made to the Members from time to time, as determined by the Managers, in the following order and priority:

   (a) First, prior to the Achievement Date, to the Members as follows: (i) to the NDM Member 80% and to the remaining Members 20% on a pro rata basis in accordance with their respective vested Membership Interests;

   (b) Second, after the Achievement Date, to the Members, on a pro rata basis, in accordance with their respective vested Membership Interest; and

   (c) Notwithstanding anything herein contained to the contrary, in no event shall a distribution pursuant to this Agreement be made in violation of the restrictions provided in Section 9.06. No Member has any right to demand and receive any distribution in a form other than cash. The Company is authorized to withhold from payments and distributions, or with respect to allocations to the Members, and to pay over to any federal, state, local, or foreign government, any amounts required to be so withheld pursuant to the Code or any provisions of state, local or foreign tax law, and all such amounts withheld shall be treated as amounts paid or distributed, as the case may be, to the relevant Member or Members.

 **9.05** **Tax Distributions**. Notwithstanding anything to the contrary in the other provisions of Section 9.04, and unless the Managers determine it would adversely affect the business or prospects of the Company, the Company shall make annual cash distributions to the Members in amounts designed to enable each Member to pay income taxes and any other taxes attributable to any items of taxable income that are properly reportable by the Company to such Member on a Schedule K-1 (such taxes, the "Applicable Taxes"); provided, that any such distributions in respect of a Fiscal Year shall be made prior to April 1 of the following Fiscal Year. The amount distributable to each Member in respect of estimated Applicable Taxes for any estimated tax payment date shall be calculated by the Managers by multiplying (A) the taxable income reported by the Company to such Member for the period taken into account for purposes of making such Member's next scheduled estimated tax payment and all prior periods in respect of the same applicable Fiscal Year by (B) a blended tax rate determined by the Managers using the appropriate Assumed Tax Rates relating to each item of income or gain comprising such taxable income, then subtracting all previous distributions (if any) made to such Member pursuant to this Section 9.05 in respect of such

applicable Fiscal Year. Notwithstanding the foregoing, in determining the amount of any tax distribution distributable to a Member pursuant to this Section 9.05, the Managers may adjust the amount of such tax distribution to account for losses allocated to such Member in respect of any previous Fiscal Year. Distributions pursuant to this Section 9.05 shall be made only to the extent that all previous distributions from the Company pursuant to Section 9.04 in respect of a Fiscal Year to such Member are not sufficient to pay such Member's Applicable Taxes for such Fiscal Year (based on the appropriate blended tax rate for such Fiscal Year, as determined by the Managers pursuant to clause (B) of the second sentence of this Section 9.05). Tax distributions pursuant to this Section 9.05 are advances of distributions that otherwise would be payable to a Member pursuant to Section 9.04. All tax distributions shall be repaid by reducing the amount of the contemporaneous or next succeeding distribution or distributions which would have otherwise been made to such Member pursuant to Section 9.04, or if such distributions are not sufficient for that purpose, by so reducing the proceeds of liquidation otherwise distributable to such Member pursuant to Section 9.04. For all other purposes of this Agreement, each Member will be treated as having received all distributions unreduced by the amount of such tax distributions.

### 9.06  Limitation upon Distributions.

(a)  No distributions or return of Capital Contributions shall be made and paid if, after the distribution or return of Capital Contribution is made, either:

(i)  the Company would not be able to pay its debts as they become due in the usual course of business; or

(ii)  the total assets of the Company would be less than the sum of its total liabilities.

(b)  The Managers may base a determination that a distribution or return of Capital Contributions may be made under Section 9.06(a) in good faith reliance upon a balance sheet and profit and loss statement of the Company represented to be correct by the person having charge of its books of account or certified by an independent public or certified public accountant or firm of accountants to fairly reflect the financial condition of the Company.

### 9.07  Interest on and Return of Capital Contributions.  Except as otherwise expressly provided herein, no Member shall be entitled to interest on its Capital Contributions or to return of its Capital Contributions.

### 9.08  Loans to Company.  Nothing in this Agreement shall prevent any Member or Manager from making secured or unsecured loans to the Company by agreement with the Company.

### 9.09  Accounting Period.  The Company's accounting period shall be the Fiscal Year.

### 9.10  Records and Reports.  At the expense of the Company, the Managers shall maintain records and accounts of the operations and expenditures of the Company. At a minimum, the Company shall keep at its principal place of business the following records:

(a)  A current list of the full name and last known address of each Member, setting forth the amount of cash each Member has contributed, a description and statement of the agreed value of the other property or services each Member has contributed, and the date on which each became a Member;

(b)     A copy of the Articles of Organization of the Company and all amendments thereto, together with executed copies of any powers of attorney pursuant to which any amendment has been executed;

(c)     Copies of the Company's federal, state and local income tax returns and reports, if any, for the three (3) most recent years;

(d)     Copies of the Company's currently effective written Operating Agreement and copies of any financial statements of the Company for the three (3) most recent years; and

(e)     Any written consents obtained from Members for actions taken by Members without a meeting.

**9.11    Returns and Other Elections.** The Managers shall cause the preparation and timely filing of all tax returns required to be filed by the Company pursuant to the Code and all other tax returns deemed necessary and required in each jurisdiction in which the Company does business. Copies of such returns, or pertinent information therefrom, shall be furnished to the Members within a reasonable time after the end of the Fiscal Year upon the Members' written request. Any election permitted to be made by the Company under federal or state laws shall be made by the Managers.

**9.12    Expenses.** The Company shall reimburse the Managers for reasonable expenses incurred, including, without limitation, costs of legal, accounting, statistical or bookkeeping services, market research, computing or accounting equipment, travel, telephone and/or other costs and expenses relating to the operation of the Company business that were incurred in performing services for the Company.

### ARTICLE X
### TRANSFERS

**10.01    No Transfer.** Subject to Sections 10.02 and 10.03, no Member shall have the right, without the prior written consent of the Managers (in their sole discretion) as to all or any part of such Member's Membership Interest, to, directly or indirectly: sell, assign, pledge, encumber, hypothecate, transfer, exchange or otherwise transfer for consideration; or gift, bequeath or otherwise transfer for no consideration (whether or not by operation of law, except in the case of bankruptcy) ("Transfer"). This restriction on Transfer shall include a restriction against any change of control of a Member that is an Entity where "change of control" shall mean (i) any Person, alone or together with its Affiliates, shall become the beneficial owner, including by merger or otherwise, of more than 25% of the total voting or investment power of such Member; or (ii) any merger or consolidation in which the holders of the voting or investment power of such Member immediately prior thereto own less than 25% of the voting or investment power, as applicable, of the surviving Entity immediately after such merger or consolidation.

**10.02    Permitted Transfers Upon Reasonable Consent.** The following Transfers by a Member are permissible with, and only with, the prior written consent of the Managers, which such consent shall not be unreasonably withheld, conditioned or delayed, and any transferee or donee thereof shall have the right to vote and to participate as a Member in the management of the business and affairs of the Company in accordance with this Agreement and shall be a Member to the extent of the Membership Interest so transferred:

(a)     A Member may Transfer all or any part of his Membership Interest to one or more Members.

ACTIVE 30313096v9

(b)    A Member may Transfer all or any part of his Membership Interest to a partnership or corporation or limited-liability company owned entirely by himself or a trust for the benefit of himself and/or one or more of the entities named in this Section 10.02(b).

**10.03   Permitted Transfers Without Consent**. Subject to Section 10.04, the Transfer of all of a Member's Membership Interest upon such Member's death by will, trust or intestacy to or for the benefit of his heirs shall be permissible without the prior written consent of the Managers, and subject to Section 10.04, any transferee thereof shall have the rights associated with the type or class of such Membership Interest in accordance with this Agreement and shall be a Member to the extent of the Membership Interest so transferred.

**10.04   Conditions to Transfer**.

(a)    As a condition to the Company recognizing the effectiveness of a Transfer, the Managers may require the selling Member, gifting Member or the proposed purchaser, donee or successor-in-interest, as the case may be, to execute, acknowledge and deliver to the Company or to the remaining Members such instruments of transfer, assignment and assumption and such other certificates, representations, guarantees and documents, and to perform all such other acts which the Managers may deem necessary or desirable to:

(i)    verify the Transfer;

(ii)    confirm that the person desiring to acquire an interest in the Company, or to be admitted as a Member, has accepted, assumed and agreed to be subject and bound by all of the terms, obligations and conditions of the Agreement (whether or not such Person is to be admitted as a new Member);

(iii)    maintain the status of the Company as a partnership for federal and state tax purposes;

(iv)    assure compliance with any applicable state and federal laws, including securities laws and regulations; and

(v)    assure that the transferee or donee shall have the financial ability to comply with the terms and conditions of this Agreement, including, but not limited to, the provisions contained in Section 8.02.

(b)    Any Transfer of a Membership Interest or admission of a Member in compliance with this Article X shall be deemed effective as of the last day of the calendar month in which the Managers' consent thereto was given, or if no such consent was required, then on such date that the donee or successor interest holder complies with the conditions set forth in Sections 10.04(a) and (b). The transferring Member agrees, upon request of the remaining Members, to execute such certificates or other documents and to perform such other acts as may be reasonably requested by the remaining Members from time to time in connection with such Transfer. The transferring Member hereby indemnifies the Company and the remaining Members against any and all loss, damage, or expense (including, without limitation, tax liabilities or loss of tax benefits) arising directly or indirectly as a result of any Transfer or purported Transfer in violation of this Article X.

**10.05   Prohibited Transfers**.

(a)     Any purported Transfer of Membership Interests that is not permitted in accordance with this Article X shall be null and void and of no force or effect whatever; provided, that if the Company is required by law to recognize a Transfer that is not permitted in accordance with this Article X, the Membership Interests transferred shall be strictly limited to the transferor's rights to allocations and distributions as provided by this Agreement with respect to the transferred Membership Interests, which allocations and distributions may be applied (without limiting any other legal or equitable rights of the Company) to satisfy any debts, obligations, or liabilities for damages that the transferor or transferee of such Membership Interests may have to the Company.

(b)     In the case of a Transfer or attempted Transfer of Membership Interests that is not permitted in accordance with this Article X, the parties engaging or attempting to engage in such Transfer shall be liable to indemnify and hold harmless the Company and the other Members from all cost, liability, and damage that any of such indemnified Members may incur (including, without limitation, incremental tax liabilities, attorneys' fees and expenses) as a result of such Transfer or attempted Transfer and efforts to enforce the indemnity granted hereby.

10.06    **Rights Of Unadmitted Assignees**. A Person who acquires Membership Interests, but who is not admitted as a substituted Member pursuant to Section 10.07 shall be entitled only to allocations and distributions with respect to such Membership Interests in accordance with this Agreement, and shall have no right to any information or accounting of the affairs of the Company, shall not be entitled to inspect the books or records of the Company, and shall not have any of the rights of a Member under the Act or this Agreement.

10.07    **Admission Of Substituted Members**. Subject to the other provisions of this Article X (including, without limitation, the conditions of Section 10.04), a transferee of Membership Interests in a Transfer permitted in accordance with this Article X shall be admitted to the Company as a substituted Member, and shall have all of the rights of the transferring Member under the Act and under this Agreement.

10.08    **Distributions And Allocations In Respect Of Transferred Membership Interests**. If any Membership Interests are transferred during any Fiscal Year in compliance with the provisions of this Article X, Net Profits and Net Losses, each item thereof, and all other items attributable to the Membership Interests transferred for such Fiscal Year shall be divided and allocated between the transferring or gifting Member and the transferee or donee by taking into account their varying Membership Interests during the Fiscal Year in accordance with Code Section 706(d), using any conventions permitted by law and selected by the TMP. All distributions on or before the date of such Transfer shall be made to the transferring or gifting Member, and all distributions thereafter shall be made to the transferee or donee.

## ARTICLE XI
## DISSOLUTION AND TERMINATION

11.01    **Dissolution**.

(a)     The Company shall be dissolved upon the earlier to occur of either written agreement of the Managers and Class B Member(s) holding a Majority Interest, (ii) the entry of a decree of judicial dissolution of the Company pursuant to the Act, or (iii) the sale or other disposition of all of the Company's property.

(b)     If a Member who is an individual dies or a court of competent jurisdiction adjudges him to be incompetent to manage his person or his property, the Member's executor, administrator, guardian, conservator, or other legal representative may exercise all of the Member's rights for the purpose of settling his estate or administering his property.

**11.02    Winding Up, Liquidation and Distribution of Assets**.

(a)    Upon dissolution, an accounting shall be made by the Company's independent accountants of the accounts of the Company and of the Company's assets, liabilities and operations, from the date of the last previous accounting until the date of dissolution.

(b)    If the Company is dissolved and its affairs are to be wound up, the Managers shall, in the following order and priority:

(i)    sell or otherwise liquidate all of the Company's assets as promptly as practicable (except to the extent the Managers may determine to distribute any assets to the Members in kind);

(ii)    allocate any profit or loss resulting from such sales to the Member's Capital Accounts in accordance with Article IX;

(iii)    discharge all liabilities of the Company, to the extent otherwise permitted by law, other than liabilities to Members for distributions, and establish such Reserves as may be reasonably necessary to provide for contingent liabilities of the Company (for purposes of determining the Capital Accounts of the Members, the amounts of such Reserves shall be deemed to be an expense of the Company);

(iv)    distribute any remaining assets to the Members as provided in Section 9.04.

(c)    Notwithstanding anything to the contrary in this Agreement, upon a liquidation within the meaning of Section 1.704-l(b)(2)(ii)(g) of the Treasury Regulations, if any Member has a Deficit Capital Account (after giving effect to all contributions, distributions, allocations and other Capital Account adjustments for all Fiscal Years, including the year during which such liquidation occurs), such Member shall have no obligation to make any Capital Contribution, and the negative balance of such Member's Capital Account shall not be considered a debt owed by such Member to the Company or to any other Person for any purpose whatsoever.

(d)    Upon completion of the winding up, liquidation and distribution of the assets, the Company shall be deemed terminated.

(e)    The Managers shall comply with all requirements of applicable law pertaining to the winding up of the affairs of the Company and the final distribution of its assets.

**11.03    Articles of Dissolution**.   When all debts, liabilities and obligations of the Company have been paid and discharged or adequate provisions have been made therefor and all of the remaining property and assets of the Company have been distributed, articles of dissolution, as required by the Act, shall be executed and filed with the Nevada Secretary of State.

**11.04    Effect of Filing of Articles of Dissolution**.   Upon the filing of articles of dissolution with the Nevada Secretary of State, the existence of the Company shall cease, except for the purpose of suits, other proceedings and appropriate action as provided in the Act.  The Managers shall have authority to distribute any Company property discovered after dissolution, convey real estate and take such other action as may be necessary on behalf of and in the name of the Company.

**11.05    Return of Contribution Nonrecourse to Other Members**.   Except as provided by law or as expressly provided in this Agreement, upon dissolution, each Member shall look solely to the assets of

26

the Company for the return of its Capital Contribution.  If the Company property remaining after the payment or discharge of the debts and liabilities of the Company is insufficient to return the cash contribution of one or more Members, such Member or Members shall have no recourse against any other Member, except as otherwise provided by law.

## ARTICLE XII
## EXCULPATION AND INDEMNIFICATION

### 12.01   Exculpation of Covered Persons.

(a)     Covered Person.  As used herein, the term "Covered Person" shall mean (i) each Manager; (ii) each officer, manager, director, stockholder, partner, member, Affiliate, employee, agent or representative of the Manager; (iii) each Member; (iv) each officer, manager, director, stockholder, partner, member, Affiliate, employee, agent or representative of the Member; and (v) each officer, employee, agent or representative of the Company.

(b)     Standard of Care.  No Covered Person shall be liable to the Company or any other Covered Person for any loss, damage or claim incurred by reason of any action taken or omitted to be taken by such Covered Person in good faith reliance on the provisions of this Agreement, so long as such action or omission does not constitute fraud, gross negligence, willful misconduct or a material breach of this Agreement by such Covered Person or is not made in knowing violation of the provisions of this Agreement.

(c)     Good Faith Reliance.  A Covered Person shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements (including financial statements and information, opinions, reports or statements as to the value or amount of the assets, liabilities, Net Profits or Net Losses of the Company or any facts pertinent to the existence and amount of assets from which distributions might properly be paid) of the following Persons or groups: (i) another Manager; (ii) another Member; (iii) one or more officers or employees of the Company; (iv) any attorney, independent accountant, appraiser or other expert or professional employed or engaged by or on behalf of the Company; or (v) any other Person selected in good faith by or on behalf of the Company, in each case as to matters that such relying Person reasonably believes to be within such other Person's professional or expert competence.  The preceding sentence shall in no way limit any Person's right to rely on information to the extent provided in the Act.

### 12.02   Liabilities and Duties of Covered Persons.

(a)     Limitation of Liability.  This Agreement is not intended to, and does not, create or impose any fiduciary duty on any Covered Person.  Furthermore, each of the Members and the Company hereby waives any and all fiduciary duties that, absent such waiver, may be implied by Applicable Law, and in doing so, acknowledges and agrees that the duties and obligation of each Covered Person to each other and to the Company are only as expressly set forth in this Agreement.  The provisions of this Agreement, to the extent that they restrict the duties and liabilities of a Covered Person otherwise existing at law or in equity, are agreed by the Members to replace such other duties and liabilities of such Covered Person.

(b)     Duties.  Whenever in this Agreement a Covered Person is permitted or required to make a decision (including a decision that is in such Covered Person's "discretion" or under a grant of similar authority or latitude), the Covered Person shall be entitled to consider only such interests and factors as such Covered Person desires, including its own interests, and shall have no duty or obligation to give any consideration to any interest of or factors affecting the Company or any other Person.  Whenever in this Agreement a Covered Person is permitted or required to make a decision in such Covered Person's

"good faith," the Covered Person shall act under such express standard and shall not be subject to any other or different standard imposed by this Agreement or any other Applicable Law.

### 12.03   Indemnification.

(a)   Indemnification.  To the fullest extent permitted by the Act, as the same now exists or may hereafter be amended, substituted or replaced (but, in the case of any such amendment, substitution or replacement, only to the extent that such amendment, substitution or replacement permits the Company to provide broader indemnification rights than the Act permitted the Company to provide prior to such amendment, substitution or replacement), the Company shall indemnify, hold harmless, defend, pay and reimburse any Covered Person against any and all losses, claims, damages, judgments, fines or liabilities, including reasonable legal fees or other expenses incurred in investigating or defending against such losses, claims, damages, judgments, fines or liabilities, and any amounts expended in settlement of any claims (collectively, "Losses") to which such Covered Person may become subject by reason of: (i) any act or omission or alleged act or omission performed or omitted to be performed on behalf of the Company, any Member or any direct or indirect subsidiary of the foregoing in connection with the business of the Company; or (ii) such Covered Person being or acting in connection with the business of the Company as a member, stockholder, Affiliate, manager, director, officer, employee or agent of the Company, any Member, or any of their respective Affiliates, or that such Covered Person is or was serving at the request of the Company as a member, manager, director, officer, employee or agent of any Person including the Company.

(b)   Reimbursement.  The Company shall promptly reimburse (and/or advance to the extent reasonably required) each Covered Person for reasonable legal or other expenses (as incurred) of such Covered Person in connection with investigating, preparing to defend or defending any claim, lawsuit or other proceeding relating to any Losses for which such Covered Person may be indemnified pursuant to this Section 12.03; provided, that if it is finally judicially determined that such Covered Person is not entitled to the indemnification provided by this Section 12.03, then such Covered Person shall promptly reimburse the Company for any reimbursed or advanced expenses.

(c)   Entitlement to Indemnity.  The indemnification provided by this Section 12.03 shall not be deemed exclusive of any other rights to indemnification to which those seeking indemnification may be entitled under any agreement or otherwise.  The provisions of this Section 12.03 shall continue to afford protection to each Covered Person regardless of whether such Covered Person remains in the position or capacity pursuant to which such Covered Person became entitled to indemnification under this Section 12.03 and shall inure to the benefit of the executors, administrators, legatees and distributees of such Covered Person.

(d)   Insurance.  To the extent available on commercially reasonable terms, the Company may purchase, at its expense, insurance to cover Losses covered by the foregoing indemnification provisions and to otherwise cover Losses for any breach or alleged breach by any Covered Person of such Covered Person's duties in such amount and with such deductibles as the Managers may reasonably determine; provided, that the failure to obtain such insurance shall not affect the right to indemnification of any Covered Person under the indemnification provisions contained herein, including the right to be reimbursed or advanced expenses or otherwise indemnified for Losses hereunder.  If any Covered Person recovers any amounts in respect of any Losses from any insurance coverage, then such Covered Person shall, to the extent that such recovery is duplicative, reimburse the Company for any amounts previously paid to such Covered Person by the Company in respect of such Losses.

(e)   Funding of Indemnification Obligation.  Notwithstanding anything contained herein to the contrary, any indemnity by the Company relating to the matters covered in this Section 12.03

shall be provided out of and to the extent of Company assets only, and no Member (unless such Member otherwise agrees in writing) shall have personal liability on account thereof or shall be required to make additional Capital Contributions to help satisfy such indemnity by the Company.

(f)    Savings Clause. If this Section 12.03 or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, then the Company shall nevertheless indemnify and hold harmless each Covered Person pursuant to this Section 12.03 to the fullest extent permitted by any applicable portion of this Section 12.03 that shall not have been invalidated and to the fullest extent permitted by Applicable Law.

(g)    Amendment. The provisions of this Section 12.03 shall be a contract between the Company, on the one hand, and each Covered Person who served in such capacity at any time while this Section 12.03 is in effect and the Company and each such Covered Person intend to be legally bound. No amendment, modification or repeal of this Section 12.03 that adversely affects the rights of a Covered Person to indemnification for Losses incurred or relating to a state of facts existing prior to such amendment, modification or repeal shall apply in such a way as to eliminate or reduce such Covered Person's entitlement to indemnification for such Losses without the Covered Person's prior written consent.

12.04    **Survival.** The provisions of this Article XII shall survive the dissolution, liquidation, winding up and termination of the Company.

## ARTICLE XIII
## MISCELLANEOUS PROVISIONS

13.01    **Notices.** Any notice, demand, or communication required or permitted to be given by any provision of this Agreement shall be deemed to have been sufficiently given or served for all purposes if delivered personally to the party, or to an officer or partner of a party that is an Entity, or if sent by nationally recognized overnight courier service or if sent by registered or certified mail, postage and charges prepaid, addressed to the Member's and Company's address, as appropriate, which is set forth in this Agreement. Any such notice shall be deemed to be given upon delivery thereof or, if delivery is refused, upon such refusal.

13.02    **Books of Account and Records.** Proper and complete records and books of account shall be kept or shall be caused to be kept by the Managers in which shall be entered fully and accurately all transactions relating to the Company's business in such detail and completeness as is customary and usual for businesses of the type engaged in by the Company. Such books and records shall be maintained as provided in Section 9.10. The books and records shall at all times be maintained at the principal place of business of the Company or such other location as may be determined by the Managers.

13.03    **Application of Nevada Law.** Except as otherwise required by federal law or the laws of the state in which the Company conducts its business, this Agreement, and its interpretation, shall be governed exclusively by its terms and by the laws of the State of Nevada and specifically the Act.

13.04    **Waiver of Action for Partition.** Each Member irrevocably waives during the term of the Company any right that it may have to maintain any action for the partition with respect to the property of the Company.

13.05    **Amendments.** Except as otherwise set forth herein, this Agreement may be amended only with the agreement of a Majority Interest. Any such amendment may, with the approval of a Majority Interest, modify any provision hereof, including, without limitation, the Distribution provisions of Section 9.04.

29

**13.06  Execution of Additional Instruments.** Each Member hereby agrees to execute such other and further statements of interest and holdings, designations and other instruments necessary to comply with any laws, rules or regulations.

**13.07  Confidentiality.** Each Member recognizes and acknowledges that it has and may in the future receive certain Confidential Information of the Company. Except as otherwise consented to by the Managers in writing, each Member (on behalf of itself and, to the extent that such Member would be responsible for the acts of the following Persons under principles of agency law, its managers, directors, officers, shareholders, partners, employees, agents and members) agrees that it will not, during or after the term of this Agreement, whether directly or indirectly through an Affiliate or otherwise, take commercial or proprietary advantage of or profit from any Confidential Information or disclose Confidential Information to any Person for any reason or purpose whatsoever, except (i) to authorized Managers, Members, officers, representatives, agents and employees of the Company and as otherwise may be proper in the course of performing such Member's obligations, or enforcing such Member's rights, under this Agreement and the agreements expressly contemplated hereby; (ii) to any bona fide prospective purchaser of the equity or assets of such Member or its Affiliates or the Units held by such Member, or prospective merger partner of such Member or its Affiliates, provided, that such purchaser or merger partner, prior to the disclosure of Confidential Information, agrees to be bound by the provisions of this Section 13.07 or other confidentiality agreement approved by the Managers; or (iii) as is required to be disclosed by order of a court of competent jurisdiction, administrative body or governmental body, or by subpoena, summons or legal process, or by law, rule or regulation, provided, that the Member, as the case may be, required to make such disclosure pursuant to clause (iii) above shall provide to the Company prompt notice of such disclosure to enable the Company to seek an appropriate protective order or confidential treatment. For purposes of this Section 13.07, the term "Confidential Information" shall not include any information which (A) such Person learns from a source other than the Company, or any of its respective representatives, employees, agents or other service providers, and in each case who is not known by such Person to be bound by a confidentiality obligation, (B) is disclosed in a document publicly disseminated by the Company, or (C) is required by law to be disclosed by a Member, provided, that prior to such disclosure, such Member provides written notice to the Company of his, her or its intent to disclose such matter and further provides the Company a reasonable opportunity to contest such disclosure with the appropriate governmental authority. Nothing in this Section 13.07 shall in any way limit or otherwise modify any confidentiality obligations owed by any Member to the Company pursuant to any other agreement entered into by such Member and the Company.

**13.08  Non-Competition.**

(a)  Because of the Company's legitimate business interest as described herein and during the term of a Member's ownership in the Company and for a period of two (2) years thereafter, other than through the Company, no Member shall, without the written consent of the Managers, directly or indirectly own, manage, operate, control or participate in any manner in the ownership, management, operation or control of or serve as a partner, employee, principal, agent, consultant or otherwise contract with, or have any financial interest in, or aid or assist any other Person that operates or provides services of the type provided by the Company within the United States of America, the target market of the Company's business ("Territory").

(b)  Each Member understands and acknowledges that the provisions of this Section 13.08. are designed to preserve the goodwill of the Company. Accordingly, each Member hereby acknowledges and agrees that any breach or threatened breach of the provisions of this Section 13.08 will result in irreparable harm and injury to the Company and that monetary damages will not provide an adequate remedy to a part. Each Member hereby agrees that in the event of a breach or threatened breach of the provisions of this Section 13.08, the Company shall be entitled to: (i) a temporary restraining order,

preliminary injunction and permanent injunction to enjoin such breach or threatened breach and the Company shall not be required to post a bond in such action; (ii) an accounting for any and all monies, earnings, profits and other benefits that the breaching Member has derived or received, directly or indirectly, as a result of such breach or threatened breach; and (iii) recover from the breaching Member the reasonable attorneys' fees and costs incurred by the Company in enforcing the provisions of this Section 13.08. The breaching Member further agrees that in the event of a breach or threatened breach of the provisions of this Section 13.08, the restrictions set forth in this Section 13.08 shall be extended during the period of any breach or threatened breach by the breaching Member. The rights and remedies set forth herein are cumulative and shall be in addition to any other rights or remedies to which a party may be entitled.

(c)    If a court of competent jurisdiction should declare this Section 13.08, or any provision hereof, unenforceable because of any unreasonable restriction of duration, activity and/or geographical area, then the Members hereby acknowledge and agree that such court shall have the express authority to reform this Agreement to provide for reasonable restrictions and/or grant the Company such other relief at law or in equity, reasonably necessary to protect the interests of the Company.

13.09    **Construction**. Whenever the singular number is used in this Agreement and when required by the context, the same shall include the plural and vice versa, and the masculine gender shall include the feminine and neuter genders and vice versa.

13.10    **Headings**. The headings in this Agreement are inserted for convenience only and are in no way intended to describe, interpret, define, or limit the scope, extent or intent of this Agreement or any provision hereof.

13.11    **Waivers**. The failure of any party to seek redress for default of or to insist upon the strict performance of any covenant or condition of this Agreement shall not prevent a subsequent act, which would have originally constituted a default, from having the effect of an original default.

13.12    **Rights and Remedies Cumulative**. The rights and remedies provided by this Agreement are cumulative, and the use of any one right or remedy by any party shall not preclude or waive the right to use any other remedy. Said rights and remedies are given in addition to any other legal rights the parties may have.

13.13    **Severability**. If any provision of this Agreement or the application thereof to any person or circumstance shall be invalid, illegal or unenforceable to any extent, the remainder of this Agreement and the application thereof shall not be affected and shall be enforceable to the fullest extent permitted by law.

13.14    **Entire Understanding**. This Agreement constitutes the entire understanding among the Members and supersedes any prior understanding and/or written or oral agreements among them with respect to the Company.

13.15    **Further Assurances**. Each of the Members shall hereafter execute and deliver such further instruments and do such further acts and things as may be required or useful to carry out the intent and purpose of this Agreement and as are not inconsistent with the terms hereof.

13.16    **Heirs, Successors and Assigns**. Each and all of the covenants, terms, provisions and agreements herein contained shall be binding upon and inure to the benefit of the parties hereto and, to the extent permitted by this Agreement, their respective heirs, legal representatives, successors and assigns.

13.17 **Creditors**. None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditors of the Company or of any the Member.

13.18 **Counterparts**. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

13.19 **Interpretations**. The Managers, without the consent of the Members, shall have the power to interpret and clarify any ambiguities, matters or questions arising under this Agreement.

## ARTICLE XIV
## SECURITIES REGISTRATION AND
## INVESTMENT REPRESENTATIONS

14.01 **No Securities Registration**. No registration statement relating to the Membership Interests in the Company or otherwise, has been or shall be filed with the United States Securities and Exchange Commission under the federal Securities Act of 1933, as amended, or the securities laws of any state.

14.02 **Representations**. Each Member hereby represents and warrants to, and agrees with, the other Members, the Managers and the Company as follows:

(a) Due Incorporation or Formation; Authorization of Agreement. With respect to any Member that is not a natural person, such Member is a corporation duly organized or a partnership or limited-liability company duly formed, validly existing, and in good standing under the laws of the jurisdiction of its incorporation or formation and has the corporate, partnership, or company power and authority to own its property and carry on its business as owned and carried on at the date hereof and as contemplated hereby. Such Member has the power and authority to execute and deliver this Agreement and to perform its obligations hereunder and the execution, delivery, and performance of this Agreement has been duly authorized by all necessary actions. This Agreement constitutes the legal, valid, and binding obligation of such Member.

(b) No Conflict with Restrictions; No Default. Neither the execution, delivery, and performance of this Agreement, nor the consummation by such Member of the transactions contemplated hereby and thereby (i) will conflict with, violate, or result in a breach of any of the terms, conditions, or provisions of any law, regulation, order, writ, injunction, decree, determination, or award of any court, any governmental department, board, agency, or instrumentality, domestic or foreign, or any arbitrator, applicable to such Member, (ii) will conflict with, violate, result in a breach of, or constitute a default under any of the terms, conditions, or provisions of the articles of incorporation, bylaws, partnership agreement or operating agreement of such Member (if and to the extent applicable), or of any material agreement or instrument to which such Member is a party or by which such Member is or may be bound or to which any of its material properties or assets is subject, (iii) will conflict with, violate, result in a breach of, constitute a default under (whether with notice or lapse of time or both), accelerate or permit the acceleration of the performance required by, give to others any material interests or rights, or require any consent, authorization, or approval under any indenture, mortgage, lease agreement, or instrument to which such Member is a party or by which such Member is or may be bound, or (iv) will result in the creation or imposition of any Encumbrance upon any of the material properties or assets of such Member.

(c) Governmental Authorizations. Any registration, declaration, or filing with, or consent, approval, license, permit, or other authorization or order by, any governmental or regulatory authority, domestic or foreign, that is required in connection with the valid execution, delivery, acceptance and performance by such Member under this Agreement, or the consummation by such Member of any

transaction contemplated hereby or thereby, has been completed, made, or obtained on or before the date hereof.

(d)   Litigation.  There are no actions, suits, proceedings, or investigations pending or, to the knowledge of such Member, threatened against or affecting such Member or any of its properties, assets, or businesses in any court or before or by any governmental department, board, agency, or instrumentality, domestic or foreign, or any arbitrator which could, if adversely determined (or, in the case of an investigation could lead to any action, suit, or proceeding, which if adversely determined could) reasonably be expected to materially impair such Member's ability to perform its obligations under this Agreement; and such Member has not received any currently effective notice of any default, and such Member is not in default, under any applicable order, writ, injunction, decree, permit, determination, or award of any court, any governmental department, board, agency, or instrumentality, domestic or foreign, or any arbitrator which could reasonably be expected to materially impair such Member's ability to perform its obligations under this Agreement. Without limiting the foregoing, such Member has not been and is not currently subject to any criminal or civil enforcement action by any governmental department, board, agency, or instrumentality or any other criminal investigation, indictment or conviction by any governmental department, board, agency, or instrumentality.

(e)   Complete Information.  All of the information and materials that have been provided by or on behalf of such Member in connection with such Member's purchase of the Membership Interests and all evidence of such Member's identity is true, complete and correct in all material respects and not misleading in any material respect. All of the information and materials that will be provided by or on behalf of such Member in connection with such Member's purchase of the Membership Interests will be, at the time such information is provided, true, complete and correct in all material respects and not misleading in any material respect.

(f)   Investment Representations. Each Member hereby represents and warrants to, and agrees with, the other Members, the Managers and the Company as follows:

(i)   Preexisting Relationship or Experience.  By reason of such Member's business or financial experience, or by reason of the business or financial experience of such Member's financial advisor who is unaffiliated with and who is not compensated, directly or indirectly, by the Company or any Affiliate or selling agent of the Company, such Member is capable of evaluating the risks and merits of an investment in the Membership Interests and of protecting such Member's own interests in connection with this investment.

(ii)   No Advertising.  Such Member has not seen, received, been presented with, or been solicited by any leaflet, public promotional meeting, newspaper or magazine article or advertisement, radio or television advertisement, or any other form of advertising or general solicitation with respect to the sale of the Membership Interests.

(iii)   Investment Intent. Such Member is acquiring the Membership Interests for investment purposes for such Member's own account only and not with a view to or for sale in connection with any distribution of all or any part of the Membership Interests. No other Person will have any direct or indirect beneficial interest in or right to the Membership Interests. Such Member has no contract, undertaking, agreement or arrangement with any Person to sell, transfer or pledge to such Person or anyone else such Member's Membership Interests (or any part thereof), and such Member has no present plans or intentions to enter into any such contract, undertaking or arrangement.

(iv)   Accredited Investor. Such Member is an "accredited investor" within the meaning of the Rule 501 of Regulation D of the Securities Act.

33

ACTIVE 30313096v9


(v)     Economic Risk.  Such Member is financially able to bear the economic risk of an investment in the Membership Interests, including the total loss thereof.

(vi)     No Registration of Membership Interests.  It acknowledges that the Membership Interests have not been registered under the Securities Act of 1933, as amended (the "Securities Act") or any other applicable blue sky laws in reliance, in part, on its representations, warranties, and agreements herein.  Such Member understands that neither the Company nor its Managers have any obligation or intention to register such Member's Membership Interests under any federal or state securities act or law.

(vii)     Membership Interests Are Restricted Securities.  Such Member understands that the Membership Interests are "restricted securities" under the Securities Act in that the Membership Interests will be acquired from the Company in a transaction not involving a public offering, and that the Membership Interests may be resold without registration under the Securities Act only in certain limited circumstances and that otherwise the Membership Interests must be held indefinitely.

(viii)     No Disposition in Violation of Law.  Without limiting the representations set forth above, such Member will not make any disposition of all or any part of the Membership Interests which will result in the violation by such Member or by the Company of the Securities Act or any other applicable securities laws.

(ix)     Legends.  Such Member understands that the certificates (if any) evidencing the Membership Interests may bear one or all of the following legends:

"THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 NOR REGISTERED NOR QUALIFIED UNDER ANY STATE SECURITIES LAWS.  SUCH SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, DELIVERED AFTER SALE, TRANSFERRED, PLEDGED, OR HYPOTHECATED UNLESS QUALIFIED AND REGISTERED UNDER APPLICABLE STATE AND FEDERAL SECURITIES LAWS OR UNLESS, IN THE OPINION OF COUNSEL SATISFACTORY TO THE COMPANY, SUCH QUALIFICATION AND REGISTRATION IS NOT REQUIRED.  ANY TRANSFER OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE IS FURTHER SUBJECT TO OTHER RESTRICTIONS, TERMS, AND CONDITIONS WHICH ARE SET FORTH IN THE OPERATING AGREEMENT EFFECTIVE AS OF MARCH 19, 2019, AS IT MAY BE AMENDED."

Any legend required by applicable state securities laws.

(x)     Information Reviewed.  Such Member has received and reviewed all information it considers necessary or appropriate for deciding whether to purchase the Membership Interests.  Such Member has had an opportunity to ask questions and receive answers from the Company and its officers, representatives and employees regarding the terms and conditions of purchase of the Membership Interests and regarding the business, financial affairs, and other aspects of the Company and has further had the opportunity to obtain all information (to the extent the Company possesses or can acquire such information without unreasonable effort or expense) that such Member deems necessary to evaluate the investment and to verify the accuracy of information otherwise provided to such Member.  Such Member, of his or her own knowledge, understands that risks involved in investments in the software/information technology industry in general and in an investment in the Membership Interests in particular.  Such Member further recognizes that an investment in the Membership Interests involves a risk of loss of his or her entire investment.

    (xi) <u>Legality of Funds</u>. Such Member has conducted a reasonable level of due diligence on the identity of each of its beneficial owners and the source of funds provided by each such beneficial owner or any other Person to such Member in connection with such Member's purchase of the Membership Interests. Such Member does not know or have any reason to suspect that (a) the monies used to fund such Member's purchase of the Membership Interests or to make any capital contributions to the Company have been or will be directly or indirectly derived from or related to (i) any illegal activities, or (ii) any person or entity with whom the Company is prohibited by applicable law from conducting business, or (b) the proceeds from such Member's purchase in the Membership Interests or any portion of any commission, investment, placement, contingency, finder's or other fees in connection with such purchase will be directly or indirectly (i) used to finance any illegal activities or (ii) distributed, paid or transferred to any person or entity with whom the Company is prohibited by applicable law from conducting business. Such Member is not engaging in money laundering or any other undocumented or "off-the-books" transactions. Without limiting any other provision herein, neither such Member's purchase of the Membership Interests nor the use of the proceeds from such Member's purchase of the Membership Interests has or will violate any applicable law relating to anti-money laundering or anti-terrorism financing, including (1) the U.S. Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, as may be amended from time to time, and any other related or successor legislation, including all applicable anti-money-laundering regulations promulgated in connection therewith, (2) the Bank Secrecy Act of 1970, as amended, (3) the Money Laundering Control Act of 1986, and (4) the International Money Laundering Abatement and Anti-Terrorist Financing Act of 2001, as each such legislation may be amended, modified or supplemented from time to time. Neither such Member, nor any Person having a direct or indirect beneficial interest in the Company, nor any Person loaning or otherwise providing funds to such Member, nor any Person in control of, controlled by, or under common control with such Member, is (w) a Person listed in the Annex to Executive Order No. 13224 (2001) issued by the President of the United States of America (Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism), (x) named on the List of Specially Designated Nationals and Blocked Persons maintained by the U.S. Office of Foreign Assets Control or any similar or comparable list promulgated by any governmental authority, (y) a non-U.S. bank without a physical presence in any country or providing banking services indirectly to such a bank, or (z) otherwise prohibited by applicable law from having a direct or indirect beneficial interest in the Membership Interests (each Person described in the foregoing clauses (w) through (z), a "<u>Prohibited Member</u>").

    (xii) <u>Political Figure</u>. Neither such Member, nor any source of funds in connection with such Member's purchase of the Membership Interests, nor any beneficial owner of such Member is (a) an official in the executive, legislative, administrative, military or judicial branches of a foreign government (whether elected or not), (b) an official of a major political party or an executive of a corporation controlled by a foreign government (such official described in this clause (b) or any official described in the foregoing clause (a) being a "<u>Foreign Political Figure</u>"), (c) a member of the immediate family of a Foreign Political Figure, (d) a close associate of a Foreign Political Figure (e.g., a person who is widely and publicly known to maintain an unusually close relationship with a Foreign Political Figure, including a person who is in a position to conduct substantial financial transactions on behalf of a Foreign Political Figure), (e) a former Foreign Political Figure, or (f) a foreign government.

    (xiii) <u>Misc. Representations</u>. Such Member expressly acknowledges that: no federal or state agency has reviewed or passed upon the adequacy or accuracy of the information set forth in the documents submitted to such Member or made any finding or determination as to the fairness for investment, or any recommendation or endorsement of an investment in the Company; (b) there are restrictions on the transferability of the Membership Interests; (c) any anticipated federal or state income tax benefits applicable to such Member's Membership Interest may be lost through changes in, or adverse interpretations of, existing laws and regulations; (d) such Member has either secured independent tax advice

with respect to the investment in the Company, upon which such Member is solely relying, or such Member is sufficiently familiar with the income taxation of limited-liability companies that such Member has deemed such independent advice unnecessary; (e) such Member's financial condition is such that such Member has no need for liquidity with respect to such Member's investment in the Company in order to satisfy any existing or contemplated undertaking or indebtedness; and (f) such Member is able to bear the economic risk of such Member's investment in the Company for an indefinite period of time, including the risk of losing all of such investment, and the loss of such investment would not materially adversely affect such Member.

(xiv) Dilution; Repurchase. Such Member is aware of the provisions of this Agreement providing for (a) the possible substantial dilution of such Member's Membership Interest if the Company is required to raise additional funds, either through a new offering of Units or other similar transaction or otherwise, which would occur to such Member if that Member fails to participate in any new offering or fails to contribute its pro-rata share in the event of an offering to the Members; and (b) the Company to have a right to redeem the Members' Membership Interests in the event of Misconduct as set forth in Section 6.06, and is further aware that the price which would be paid by the Company in the event of such redemption would likely be substantially less than the amount paid for such Membership Interests, and substantially less than the amount which the Member would be entitled to in the event of the liquidation of the Company.

(xv) No Broker or Finder. Such Member has not employed any broker or finder in connection with the transactions contemplated by this Agreement.

(g) Foreign Investors. If such Member is not a United States person (as defined by Section 7701(a)(30) of the Code), such Member hereby represents that it has satisfied itself as to the full observance of the laws of its jurisdiction in connection with any invitation to purchase such Member's Membership Interest or any use of this Agreement, including (i) the legal requirements within its jurisdiction for the purchase of the Membership Interests, (ii) any foreign exchange restrictions applicable to such purchase, (iii) any governmental or other consents that may need to be obtained, and (iv) the income tax and other tax consequences, if any, that may be relevant to the purchase, holding, redemption, sale, or Transfer of the Membership Interests. Such Member's payment for and continued beneficial ownership of the Membership Interests will not violate any applicable securities or other laws of such Member's jurisdiction.

14.03 **Indemnity**. Each Member shall indemnify and hold harmless the Company, the Managers, each and every other Member, and their Affiliates who was or is a party or is threatened to be made a party to any threatened, pending, or completed action, suit, or proceeding, whether civil, criminal, administrative, or investigative, by reason of or arising from any misrepresentation or misstatement of facts or omission to represent or state facts made by such Member, including, without limitation, the information in this Agreement, against losses, liabilities, and expenses of the Company, each and every Manager, each and every other Member, and their Affiliates (including, without limitation, attorneys' fees, judgments, fines, and amounts paid in settlement, payable as incurred) incurred by such Person in connection with such action, suit, proceeding, or the like.

14.04 **Further Assurances**. Each Member shall promptly provide any information, and execute and deliver any documents that the Company or any Manager reasonably requests to verify the accuracy of such Member's representations and warranties in this Agreement or to comply with any applicable law. Without limiting the foregoing, each Member (a) understands and acknowledges that the Company may be subject to certain legal requirements that require verification of its source of funds and the identities of its Members and of the Persons associated with each such Member and (b) agrees to provide promptly such information and materials as may from time to time be reasonably requested by the Company or any

36

Manager for such purposes and to otherwise enable them to comply with their respective responsibilities under applicable anti-money-laundering, anti-terrorism and asset control laws, regulations, rules and orders.

14.05    **Consent to Disclosure**.  The Company, with the approval of the Managers, may release confidential or personal information about each Member and, if applicable, any direct or indirect beneficial owners of such Member, to appropriate governmental authorities if the Managers determine that such release is necessary, appropriate, advisable or convenient to the Company in light of applicable law, including, without limitation, in connection with any investigation, inquiry or request for information by such governmental authorities regarding such Member.  Without limiting the foregoing, each Member consents to the disclosure by the Company to U.S. and foreign regulators and law enforcement authorities of such information about such Member as the Managers reasonably determine to be necessary, appropriate, advisable or convenient in order to comply with applicable anti-money-laundering, anti-terrorism and asset control laws, regulations, rules and orders.

14.06    **Blocking of Investment**.  If the Managers reasonably believe that a Member is a Prohibited Member, is otherwise in breach of Sections 14.02(f)(xi) or 14.02(f)(xii) above, is otherwise engaged in suspicious activity or refuses to provide promptly any information that is requested hereunder, then the Managers may (a) prohibit such Member's further participation in the Company, (b) freeze, block, segregate or otherwise restrict such Member's access to its investment, including by blocking any distribution that would otherwise have been made to such Member, until such time as the Managers are reasonably satisfied that such access by such Member would not violate applicable law, or (c) require such Member to withdraw from the Company.  Without limiting the foregoing, such conduct shall be deemed "Misconduct" for purposes of this Agreement.  In addition, without limiting the foregoing, and notwithstanding anything in this Agreement to the contrary, no Manager, Member, officer, employee or other representative of the Company shall be required to take any action that such Person reasonably believes would violate applicable law.  For the avoidance of doubt, no such Person shall have any liability to such Member as a result of any act or omission taken or failed to be taken in accordance with this Section 14.06.

*[Remainder of page intentionally left blank.]*

IN WITNESS WHEREOF, the parties hereto have caused their signatures, or the signatures of their duly authorized representatives, to be set forth below on the day and year first above written.

**Class A Members:**

_____
Jared Thompson

_____
Robertson Williams

_____
Mathew Matze

[Signature Pages to Operating Agreement]

**Class B Members**

NDMascendant, LLC

By: _____

Name: MATTHEW RICHARDSON

Its: Authorized Person

_____

John Matze

[Signature Pages to Operating Agreement]

SCHEDULE I

PARLER LLC
MEMBERS

CLASS A MEMBERSHIP
(as of March 19, 2019)

| Class A Member | Unvested Class A Units (1) | Vested Class A Units | Class A Membership Interest (2) | Membership Interest (3) | Initial Capital Contribution |
|---|---|---|---|---|---|
| Jared Thompson | 5,000 | 0 | 0% | 0% | Services |
| Robertson Williams | 500 | 0 | 0% | 0% | Services |
| Mathew Matze | 3,500 | 0 | 0% | 0% | Services |
| Subtotal (Class A Only) | 9,000 | 0 | 0% | 0% | |

(1) The Class A Units vest in equal installments on the first, second, third and fourth anniversary of July 1, 2018, and are subject to the terms of the respective Restricted Unit Award Agreement for each Class A Member.

(2) The Class A Membership Interest of each Class A Member shall be expressed as a percentage interest equal to the proportion of the vested Class A Units held by such Class A Member divided by the total of all outstanding vested Class A Units, as may be adjusted from time to time pursuant to the Operating Agreement.

(3) The Membership Interest of each Class A Member shall be expressed as a percentage interest equal to the proportion of the vested Class A Units held by such Class A Member divided by the total of all outstanding vested Class A Units and Class B Units, as may be adjusted from time to time pursuant to the Operating Agreement.

[Class B Membership Table Follows]

## CLASS B MEMBERSHIP
(as of March 19, 2019)

| Class B Member | Class B Units | Class B Membership Interest(1) | Membership Interest(2) | Initial Capital Contribution |
|---|---|---|---|---|
| NDMascendant, LLC | 60,000 | 60.000%(3) | 60.000%(3) | On record with accountant. |
| John Matze | 40,000(3) | 40.000%(3) | 40.000%(3) | On record with accountant. |
| | | | | |
| Subtotal (Class B Only) | 100,000* | 100.000% | 100.000%* | |
| Total (Vested Class A and Class B) | 100,000 | | 100.000% | |

(1) The Class B Membership Interest of each Class B Member shall be expressed as a percentage interest equal to the proportion of the Class B Units held by such Class B Member divided by the total of all outstanding Class B Units, as may be adjusted from time to time pursuant to the Operating Agreement.

(2) The Membership Interest of each Class B Member shall be expressed as a percentage interest equal to the proportion of the Class B Units held by such Class B Member divided by the total of all outstanding vested Class A Units and Class B Units, as may be adjusted from time to time pursuant to the Operating Agreement.

(3) The 20,000 Award Units are to be granted from John Matze's equity interest in the Company. Accordingly, as the 20,000 Award Units vest, the number of Class B Units owned by John Matze will simultaneously and automatically decrease on a unit-for-unit basis (without any further action by the Company), and his Class B Membership Interest and his Membership Interest will decrease proportionately; provided, that, John Matze shall retain the voting power (but not the economic rights) with respect to a 40% Class B Membership Interest until the closing of a Series A financing round or other equity investment in the Company, including, without limitation, upon conversion of a convertible note. For illustration purposes only, assuming the issuance and vesting of all 20,000 Award Units, the 40,000 Class B Units held by John Matze will automatically decrease to 20,000 Class B Units and, as a result, John Matze will have (i) a 25% Class B Membership Interest and the NDM Member will have a 75% Class B Membership Interest; provided, that John Matze will retain the voting power (but not the economic rights) with respect to a 40% Class B Membership Interest until the closing of a Series A financing round or other equity investment in the Company, including, without limitation, upon conversion of a convertible note; and (ii) John Matze will have a 20% Membership Interest and the NDM Member will have a 60% Membership Interest. For the avoidance of doubt, in no event shall any grant or issuance of Award Units dilute the voting rights or management control of the NDM Member or its Class B Membership Interest; provided, however, in the event that the Company subsequently issues additional Units (other than the Award Units) in connection with a Series A financing round or other equity investment in the Company, including, without limitation, upon conversion of a convertible note, it is contemplated John Matze's disproportionate voting rights, if any, shall terminate and that the Membership Interests (including both economic and voting rights) held by the NDM Member and John Matze, respectively, will be diluted proportionately.

# EXHIBIT  C
## Filed Under Seal